**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:                                    Case No.: 19-26521-LMI

ROBERTO ROMAGNOLI,                        Chapter 7

     Debtor.

_____/

**DEBTOR'S NOTICE OF FILING EXHIBITS**
**TO MOTION FOR SUMMARY JUDGMENT**

     Debtor, Roberto Romagnoli, by and through undersigned counsel, hereby gives notice of

filing the attached Exhibits "A" through "J" to his Motion for Summary Judgment [ECF 84].

                            Respectfully submitted,
                            **Aaronson Schantz Beiley P.A.**

                            /s/ *Tamara D. McKeown*
                            Tamara D. McKeown, Esq.
                            Florida Bar No. 773247
                            tmckeown@aspalaw.com
                            Geoffrey S. Aaronson, Esq.
                            Florida Bar No. 349623
                            gaaronson@aspalaw.com
                            One Biscayne Tower, 34th Floor
                            2 S. Biscayne Boulevard
                            Miami, Florida 33131
                            Ph: 786.594.3000
                            Fax: 305.424.9336
                            *Attorneys for Debtor*

**CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that a true and correct copy of the foregoing will be furnished by email
on November 3, 2020 through the Court's CM/ECF system to all CM/ECF electronic notice parties
registered to receive electronic service in this case.

                            /s/ *Tamara D. McKeown*
                            Tamara D. McKeown, Esq.

EXHIBIT "A"

# THE VAROMA JOINT REVOCABLE LIVING TRUST AGREEMENT

TRUST AGREEMENT, made this 14th day of October, 2015 between grantors **ROBERTO ROMAGNOLI** and **MARIA ANTONIETA LAVIOSA**, husband and wife, herein referred to as "Grantors", and **ROBERTO ROMAGNOLI** and **MARIA ANTONIETA LAVIOSA**, husband and wife, herein referred to as "Trustees".

## DEFINITIONS

**1.01 Grantors And Initial Co−Trustees.** Roberto Romagnoli and Maria Antonieta Laviosa, both currently residing at 9401 Collins Ave., Apt. 1103, Surf Side, FL 33154, shall be referred to herein as the "Grantors". Grantors shall also serve as the initial trustees of this trust. They shall also be referred to herein as "Co−Trustees" or "initial Co−Trustees".

**1.02 Successor Co-Trustees.** If either of the Initial Co−Trustees is unable to serve as trustee for any reason or resigns, the remaining Initial Co−Trustee shall individually serve as trustee without the appointment of a Successor Co−Trustee. When both Initial Co−Trustee are unable to serve as trustee for any reason or resign **Veronica Laviosa,** Maria Antonieta Laviosa' s sister, shall serve as Successor Trustee. If **Veronica Laviosa** is unable to serve as trustee for any reason or resigns, **Yazmine Livinalli** shall serve as Successor Trustee. Any then−acting trustee (or, if co−trustees are named, both trustees acting jointly) shall have the power to add to this list of successor trustees through a written declaration. The term "Successor Trustee" or "Co−Trustee" should be substituted hereinafter, where applicable, for the term "Trustee." The pronoun "he" may be used generically herein to refer to the Trustee regardless of the true gender of the Trustee or Successor Trustee actually referred to. An incapacitated individual is "unable to serve" as trustee under this trust agreement and shall be removed from office. Any successor trustee shall serve with all the powers, discretions, and immunities granted in this document to my trustees, shall have no duty to investigate or inquire into the acts of a former trustee, and shall have no liability for the acts or omissions of a former trustee.

**1.03 Children.** Grantors are the parents of the following children **Maria Valentina Romagnoli, date of birth 04/03/2007**.

**1.04 Incapacitation.** The term "incapacitated" or "incapacitation" shall mean the inability, whether due to physical or mental infirmity, to handle the business affairs of another as a fiduciary which is attested to in a written instrument executed by at least two medical doctors, one of whom is the individual in question's treating physician or having been adjudicated incapacitated or incapable of managing financial affairs by a judge of a circuit court of the State of Florida or by a court of competent jurisdiction.

## ARTICLE I
## Name of Trust

I hereby transfer to the trustees the property described in the schedule attached as "Exhibit A," on the terms and conditions set forth in this agreement. With the consent of the trustees, additional property may be transferred from time to time to this trust estate by me or by any other person, and that property shall be held and disposed of on the same terms and conditions as the property originally transferred. This trust agreement shall hereafter be known as **THE VAROMA JOINT REVOCABLE LIVING TRUST AGREEMENT.**

## ARTICLE II
## Dispositive Provisions During Grantor's Life

During the Grantors lifetime, the Trustees shall pay to Grantors or for Grantors benefit as much of the net income or principal of the trust estate as Grantors may request. In addition, Grantors shall be entitled to full use and possession of any non-income-producing real estate owned by the trust. Grantors further reserve the right to reside upon any property placed in this trust as Grantors permanent residence, referred to hereafter as Grantors homestead, during Grantors life, it being the intent of this provision to preserve Grantors requisite beneficial interest and possessory right in and to such real property, to comply with Sections 196.031 and 196.041 of the Florida Statutes, such that Grantors possessory right constitutes in all respects, "equitable title to real estate," as the term is used in Section 6, Article 7 of the Constitution of the State of Florida. An incapacitated Grantor shall, during the length of the incapacitation, no longer have the power to direct the actions of the Trustee under this trust agreement. In the event of Grantors incapacity or incompetence, my Trustees shall distribute for my benefit as much of the net income or principal of the trust estate as may be necessary to ensure Grantors health and support.

## ARTICLE III
## Payment of Taxes and Expenses After Death

**Upon the Death of the First Grantor:** Upon the death of the first Grantor, the Trustee may pay any portion or all of the expenses of the first deceased Grantor's last illness, burial, and funeral. The Trustee is further authorized to pay honorarium to any clergymen in conjunction with the first deceased Grantor's funeral and the travel costs of any family members who wish to travel from their

residence to attend Grantor's funeral. The Trustee may also pay any debt or claim—such as, but not limited to, state or federal taxes—against the first deceased Grantor's estate regardless of whether or not a probate estate has been formally established.

*So long as one of the Grantors shall survive, the provisions of Article II shall remain in full force and effect.*

**Upon the Death of the Second Grantor:** Upon the death of the last surviving Grantor, the trustee shall windup the affairs of the trust and pay all outstanding trust debts and expenses of any kind including those related to trust administration. Thereafter trustee shall pay any outstanding debts related to the last surviving Grantor's last illness, burial, and funeral expenses (if any). The trustee is further authorized to pay honorarium to any clergymen in conjunction with the last surviving Grantor's funeral and the travel costs of any family members who wish to travel from their residence to attend Grantor's funeral. The trustee shall also pay any debt or claim—such as, but not limited to, state or federal taxes, credit card debts, or bank loans—against the last surviving Grantor's estate regardless of whether or not a probate estate has formally been established.

### ARTICLE IV
### Dispositive Provisions After Death

As soon as is reasonably practicable after the death of both Grantors, but after payment of or provision for debts and expenses as provided in Article III of this Trust Agreement, the remaining trust estate shall be divided and distributed outright and free from further trust as follows: **100% to Maria Valentina Romagnoli. Upon the death of Maria Valentina Romagnoli, then 50% to EDITA RUIZ (Grantor, Maria Antonieta Laviosa's mother) and 25% to MARCO ROMAGNOLI (Grantor, Roberto Romagnoli's nephew) and 25% to ROBERTO ROMAGNOLI Grantor, (Roberto Romagnoli's nephew)**

If any beneficiary entitled to a final distribution has not attained age 18, his or her share shall vest but shall be held for his or her benefit until he or she attains age 18 or dies sooner, at which time final distribution shall be made to him or her or to his or her estate; and, in the meantime, the trustees shall pay those sums to that person or those persons at those times as considered necessary or advisable for his, her, or their health, education, or support. Any net income accumulated shall be added to the principal.

**ARTICLE V**
**Powers of Trustees**

In the administration of any trust established hereunder, trustees shall have the following powers:

a.     To retain any property contributed to this trust, either during life or at death of the Grantors, or to sell, convey, exchange, or otherwise dispose of the property, at public or private sale, without application to court, on any terms, including the extension of credit, which they consider advisable.

b.     To acquire, by purchase or otherwise, any property, real or personal, without being limited by any provision of law that restricts investments by fiduciaries and without regard to any principles of diversification, including, but not limited to, common and preferred stocks, bonds, mutual funds, common trust funds, general or limited partnership interests, secured and unsecured obligations and mortgages; or to sell, convey, exchange, or otherwise dispose of the property, at public or private sale, without application to court, on any terms, including the extension of credit, which they consider advisable.

c.     To acquire and pay for, exercise, or sell any options or subscription rights in connection with securities or any other property.

d.     To hold securities in the names of nominees or in bearer form.

e.     To operate, repair, alter, improve, insure, grant options on, mortgage, partition, or lease for any period of time any real property or interest in real property held by them.

f.     To retain and pay, as an expense of administration, appraisers, accountants, attorneys, investment advisors, and other assistants, and to delegate discretionary and nondiscretionary investment management authority.

g.     To borrow money from any source and for any purpose, including, but not limited to, the payment of taxes, and to pledge or mortgage any assets held by them as security for money borrowed.

h.     To make distributions from any trust created hereunder in cash, in kind, or partly in each, and to allocate property other than ratably.

i.     To hold property of separate trusts in common investments for the convenience of investment or administration.

j.     To enter into contracts or agreements or to compromise or settle any debts, claims, or controversies as they consider necessary or advisable.

k.     To vote personally or by proxy any share of stock held by them.

If there is more than one trustee serving, then the vote of the trustees for any action hereunder must be an unanimous vote of all then–serving trustees. Trustees may act freely under all of the powers given to them after forming their judgment concerning the wisest and best course to pursue based on all of the circumstances, without the necessity of obtaining the consent or approval of any interested person or any court, and notwithstanding that they may be interested in connection with the same matters in other capacities.

The powers granted to the trustees shall be considered to be supplementary to, and not exclusive of, the general powers of trustees according to law and shall include all powers necessary to carry the same into effect.

## ARTICLE VI
### Spendthrift Clause

The interests of the beneficiaries are held subject to a spendthrift trust. Grantors direct that none of the assets or income of the trusts established in this agreement shall be subject to or liable for any of the debts, contracts, engagements, or taxes of any of the beneficiaries under this trust, nor shall the same be liable to execution, attachment, or any other legal process whatsoever at the suit of any creditor or otherwise, nor shall the same be subject to assignment, transfer, or anticipation; but all payments of principal and income as provided in this agreement shall be made by my trustees to the beneficiaries designated in accordance with the provisions of this agreement. Provided, however, that nothing in this article shall prevent a beneficiary at any time from disclaiming or renouncing his or her interest in any trust created hereunder and, in the event of a renunciation or disclaimer, the beneficiary shall be treated as if he or she died on the effective date of the renunciation or disclaimer.

## ARTICLE VII
### Simultaneous Death Clause

Notwithstanding anything in this agreement or in any statute to the contrary, if Grantors die under any circumstances in which there is insufficient evidence to prove which one died first or insufficient evidence to prove that they died otherwise than simultaneously, for the purposes of this trust, it shall be presumed that the husband died first.

## ARTICLE VIII
### Principal and Income Determinations

On the death of any income beneficiary of a trust created under this agreement, including Grantors, any accrued but unpaid income shall be distributed as income to the next succeeding beneficiary. Otherwise, in determining whether receipts and disbursements are allocated to principal or income, the trustees shall be governed by the principal and income law of Florida, as it may have been amended at the time of determination.

## ARTICLE IX
### Revocability

Grantors retain the following rights and powers:

a.    The right to revoke this agreement and the trusts created in it by a writing delivered to the trustees.

b.    The right to revoke this agreement and the trusts created in it with respect to any funds, securities, or other property held by the trustees and to require the same to be paid over, assigned, and delivered to me, free from trust, by writing delivered to the trustees.

c.    The right and power to amend, change, and supplement this agreement by written agreement between me and the trustees, executed in like manner as this Trust Agreement.

d.    The right and power to remove any trustee serving under this agreement, without cause, by a writing delivered to the trustees, and to appoint a successor trustee.

## ARTICLE X
### Arbitration of Disputes

All disputes arising under this trust, other than disputes of the validity of all or a part of the trust, between or among the beneficiaries and a fiduciary under the trust, or any combination of such persons or entities, shall be submitted to binding arbitration.

## ARTICLE XII
### Miscellaneous

This Trust Agreement is a Florida contract, and it shall be construed according to and be governed by the laws of the State of Florida.

The headings used herein are intended solely for use as reference and are not intended to be a

part of this agreement.

Florida law may impose duties and responsibilities on a trustee in addition to those described in this Trust Agreement.

When necessary or appropriate to the meaning in this agreement, the singular and plural are interchangeable, and words of any gender include all genders.

It is the express intent of the Grantors that property held under the Trust Agreement be held as Tenants by the Entirety.

IN WITNESS WHEREOF, the trustee and I have duly executed this Trust Agreement the day and year first written on the first paragraph of this document.

Grantor
**ROBERTO ROMAGNOLI**

Grantor
**MARIA ANTONIETA LAVIOSA**

Trustee
**ROBERTO ROMAGNOLI**

Trustee
**MARIA ANTONIETA LAVIOSA**

## EXHIBIT A

**(1)  Condominium Unit No. PH-1103, in AZURE, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 23738, Page 743 of the Public Records of Miami-Dade County, Florida.**

   **AKA:** 9401 Collins Ave., Apt. 1103, Surfside, FL 33154
   **FOLIO NUMBER:** 14-2235-046-0310

**(2)  Unit 2504, THE METROPOLITAN, a Condominium according to the Declaration of Condominium thereof, filed April 16, 2001 and recorded under Clerk's File No. 01R-186030 and recorded in Official Records Book 19604, page 1579 , of the Public Records of Miami-Dade County, Florida.**

   **AKA:** 2475 Brickell Ave., Unit 2504, Miami , FL 33131
   **FOLIO NUMBER:** 01-4140-032-0780

**(3)  Lot 64, ROYAL LEGACY ESTATES,  according to the plat thereof, as recorded in Plat Book 81, Page(s)125 through 129, Public Records of Orange County, Florida**

   **AKA:** 11843 Prince George Way, Orlando, FL 32836
   **PARCEL NUMBER:** 01-24-27-7140-00-640

We certify that the above instrument was signed willingly, published, and declared by Roberto Romagnoli and Maria Antonieta Laviosa, as **THE VAROMA JOINT REVOCABLE LIVING TRUST AGREEMENT,** in our joint presence, and at the request of Roberto Romagnoli and Maria Antonieta Laviosa, we have signed our names as attesting witnesses in the presence of each other on October 14, 2015.

Witness 1):    **Sandra C. Sweat**
2800 Weston Rd., #103, Weston, FL 33331

Witness 2):    Helen Tamburi
2800 Weston Rd., #103, Weston, FL 33331

STATE OF FLORIDA          )
County of Broward          )

Acknowledged and subscribed before me by Roberto Romagnoli and Maria Antonieta Laviosa, who have both produced Florida Drivers Licenses as identification, and sworn to and subscribed before me by the witnesses, **Sandra C. Sweat** _____ and _____ Helen Tamburi _____, who are personally known to me and subscribed by me in the presence of the each other, all on October 14, 2015.

LUISA F. RENGIFO
MY COMMISSION # FF 016732
EXPIRES: May 9, 2017
Bonded Thru Notary Public Underwriters

Notary Public

**Luisa F. Rengifo**

Print Name

# EXHIBIT "B"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:                                              Case No.: 19-26521-LMI

ROBERTO ROMAGNOLI                    Chapter 7

    Debtor
_____/

**<u>AFFIDAVIT OF MARIA LAVIOSA</u>**

**STATE OF FLORIDA**      )
                       )
**COUNTY OF MIAMI-DADE**  )

       Before me, the undersigned authority personally appeared, Maria Laviosa who being first duly

sworn deposes and states as follows:

       1.     My name is Maria Laviosa and I am over the age of 18 and *sui juris*.

       2.     My husband, Roberto Romagnoli, is the debtor in this case. We have been married

since December 28, 2006.

       3.     I am a licensed real estate broker in good standing in the State of Florida.  I obtained

my real estate license in October 2000 and obtained my real estate broker's license in March 2007.

       4.     I operate as a real estate broker through Concept International Realty, Inc.

("Concept"), a Florida corporation which is 100% owned by the Varoma Joint Revocable Living

Trust ("Varoma Trust"), which is an estate planning trust that was created by my husband and I in

October 2015 to provide estate planning for the protection and care of our daughter, an only child.

       5.     Concept is full-service realty office that handles purchases and sales primarily of

residential real properties in Miami-Dade County, and provides property management services for

the owners of rental properties in Miami-Dade County.

6.      Since we have been married, my husband and I have purchased certain real property, all of which we acquired as husband and wife with the intention to own it as tenants by the entireties. At no time have we acquired property with the intent to hold it as anything other than as husband and wife, as tenants by the entireties.

7.      My husband and I purchased a unit at the Brickell Heights condominium development in Miami, located at 55 S.W. 9th Street, Unit 1607, Miami, Florida 33130 (the "Brickell Heights Property") which closed on July 7, 2017. We purchased the condominium as husband and wife and the deed reflects that we own it as husband and wife.  A copy of the Special Warranty Deed is attached to my affidavit as Exhibit 1.

8.      My husband and I are currently using the Brickell Heights Property as a rental property, and because Concept and I provide property management services for rental properties as part of our normal business activities, I often handle ordinary day-to-day rental and tenant issues that arise in connection with the Brickell Heights Property.  However, I discuss all significant issues with my husband, my husband and I make all major decisions regarding the Brickell Heights Property together, and we share control of the Brickell Heights Property equally regarding all substantive matters.

9.      Recently I have seen a copy of a Uniform Residential Loan Application for the Brickell Heights Property that was an exhibit to my husband's deposition taken by the Trustee. I recall that I gave the information for that loan application to the mortgage broker by telephone, and the mortgage broker filled out the application form before sending it to me. When I received the application, I did not notice before signing it that the application said that my husband and I would hold the property as "joint tenants" rather than as tenants by the entireties. In fact, the loan application is only a preliminary document and is not an assurance of getting the mortgage loan, nor is it a final document determining how title to the property is to be held.  The final documents for closing were reviewed

2

Aaronson Schantz Beiley P.A. | One Biscayne Tower, Suite3450 | 2 S. Biscayne Blvd. | Miami, FL 33131 | 786.594.3000 | Fax 305.424.9336

by an attorney to ensure their accuracy, and the final closing documents here, the Settlement Statement and the Deed, do not include any reference to "joint tenant" ownership of the property, but rather reflect ownership as husband and wife.

10.    At no time did I tell the mortgage broker that my husband and I wanted to hold title to the property as joint tenants rather than as tenants by the entireties, nor did I tell the mortgage broker that my husband and I wanted to acquire the property as anything other than husband and wife. I do not know why "joint tenants" appears on the application form and I do not know whether this is the final version of the application, since my husband did not sign it. However, the "joint tenant" language does not appear in the final documents later when the transaction was closed, either in the Special Warranty Deed (Exhibit 1) or in the final Settlement Statement (HUD-1) that was executed at the closing, a copy of which is attached as Exhibit 2.

11.    My husband and I also purchased a single family home in Orlando, Florida on May 22, 2015, located at 11843 Prince George Way, Orlando, Florida 32836 (the "Orlando Property"). We also acquired this property as husband and wife, with the intent to own it as tenants by the entireties. A copy of the Special Warranty Deed for the Orlando property is attached as Exhibit 3.

12.    We purchased the Orlando Property when we were considering relocating to Orlando and opening a Concept office in Orlando. We did form a corporation for the Orlando office but ultimately decided not to relocate to Orlando or continue with an Orlando office of Concept.

13.    Like the Brickell Heights property, my husband and I make all major decisions regarding the Orlando Property together. When we originally purchased the house, we used it for our own purposes when we traveled to Orlando. However, after we decided not to relocate to Orlando on a permanent basis, we rented the property to a tenant to generate income to offset the mortgage payments and other expenses on the house. As with the Brickell Heights Property, although I sometimes handle ordinary day-to-day rental and tenant issues that arise in connection with the

3

Orlando Property now that it is rented, I discuss all significant issues with my husband, my husband and I make all major decisions regarding the Orlando Property together, and we share control of the Orlando Property equally regarding all substantive matters.

14.    . Recently I also have since seen the Uniform Mortgage Loan Application for the Orlando Property, which reflects that my husband and I were going to hold title to the property as "joint tenants." Again, the mortgage application was taken by the mortgage broker over the telephone and it was the mortgage broker who completed the form which he later sent to my husband and me to sign.  I did not notice at that time that the application said title to the property would be held as "joint tenants," and neither I nor my husband told the mortgage broker that we wanted to hold title to the property as joint tenants.

15.    At no time did my husband or I tell the mortgage broker, or anyone else, that we wanted to purchase the Orlando Property as anything other than husband and wife, as tenants by the entireties.  I do not know why "joint tenants" appears on the application form but again, this is a preliminary application and that language does not appear in the final documents when the transaction was closed, either in the Special Warranty Deed (Exhibit 3) or in the final Settlement Statement (HUD-1) that was executed at the closing, a copy of which is attached as Exhibit 4

16.    In or around 2015, my husband and I began estate planning for our daughter, who was eight years old at the time. We wanted to put our affairs in order so that our daughter would be protected if anything were to happen to both of us, and to ensure that she would be cared for by people we trusted. On or about October 14, 2015, my husband and I executed the Varoma Joint Revocable Living Trust Agreement ("Trust Agreement"), which was prepared for us by Luisa F. Rengifo, a trusts and estates attorney.  The Trust Agreement, a copy of which is attached as Exhibit 5, provides that my husband and I retain joint control over all trust property and states our express intent that all

4

Aaronson Schantz Beiley P.A. | One Biscayne Tower, Suite3450 | 2 S. Biscayne Blvd. | Miami, FL 33131 | 786.594.3000 | Fax 305.424.9336

property held under the Trust Agreement be held as tenants by the entireties. *See* Trust Agreement at page 7 of 9.

17.     Our creation of the Varoma Trust had nothing to do with my husband's dispute with his former partners or with any creditors that my husband may have had at that time.  In fact, at the time the Varoma Trust was created, the only property owned solely by my husband was our homestead property at 9401 Collins Avenue, Unit 1103, Surfside, Florida 33154 (the "Homestead Property"), which my husband purchased in December 2005, the year before we were married.  My husband and I have lived continuously at our Homestead Property since before our marriage in 2006, and our daughter has lived there with us since her birth in April 2007.

18.     When we formed the Varoma Trust for estate planning purposes, we transferred three pieces of real property to the Trust: (i) the Homestead Property, which was transferred to the Trust by my husband; (ii) a condominium at the Metropolitan, located at 2475 Brickell Avenue, Unit 2504, Miami, Florida 33129 (the "Metropolitan Property") which I purchased prior to our marriage and which was owned solely by me and transferred to the Trust by me; and (iii) the Orlando Property, which we had purchased as husband and wife, tenants by the entireties, and which we transferred together as tenants by the entireties to the Trust.

19.     The Orlando Property later was transferred out of the Varoma Trust by my husband and myself as Co-Trustees, and back to my husband and I as tenants by the entireties when we needed to refinance the Orlando Property for financial reasons and the bank required the property to be held in our individual names rather than by the Trust.

20.     My husband and I also own 100% of the equity interests in a company called Marova, LLC, which we have owned as husband and wife, tenants by the entireties, since the company was formed in March 2011.  A copy of the executed Marova, LLC Operating Agreement is attached as

5

Exhibit 6 (see page 3 of 13).  My husband and I have owned 100% of the equity interests in this company in this same manner since it was formed in March 2011.

21.     We are both Managing Members of Marova, LLC as well, and have both been Managing Members since the company's formation in March, 2011.  At no time have either my husband or I been the sole Managing Member of Marova, LLC, even if only one of us was listed as a Managing Member on the company's filings with the Florida Division of Corporations, all of which have been filed by an attorney or an accountant on behalf of the company.

22.     Marova, LLC owns an office condominium located at 55 S.E. 6th Street, Unit 206, Miami, Florida 33131 (the "Office Property"), which is the location of Concept's office. The Office Property originally was purchased by Concept, but later was transferred to Marova, LLC to hold title to the property in a separate entity from the operating realty company.

23.     Marova, LLC is not engaged in any business and only holds title to the real estate, therefore no "control" of Marova is necessary.  Any issues regarding Marova, LLC would necessarily involve the ownership of the Office Property and my husband and I would make all decisions regarding the Office Property together. I do not control or make decisions regarding Marova, LLC independently, and there is nothing to control on a day to day basis.

24.     However, Concept's office is located at the Office Property owned by Marova, LLC and because I am the licensed real estate broker of Concept, I do make most decisions regarding Concept's operations.

25.     I have never been involved with Dinuro Investments, LLC, the company my husband owned with his brother, not have I ever been involved with any of my husband's business dealings with SR Acquisitions or its principals.

6

FURTHER AFFIANT SAYETH NAUGHT.

_____
Maria Laviosa

     BEFORE ME the foregoing instrument was acknowledged before me by means of [✓] physical presence or [ ] online notarization, on <u>Aug 12</u> 2020, by MARIA LAVIOSA, who is <u>personally known to me</u> or who has produced _____ as identification.



Notary Public, State of Florida
Print Name: <u>Sonia Correa</u>
My Commission Expires: 12-15-2020

Aaronson Schantz Beiley P.A. | One Biscayne Tower, Suite3450 | 2 S. Biscayne Blvd. | Miami, FL 33131 | 786.594.3000 | Fax 305.424.9336

Exhibit 1

CFN: 20170393475 BOOK 30607 PAGE 4050
DATE:07/11/2017 02:13:29 PM
DEED DOC 1,853.40
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

This instrument prepared by, or under the supervision of (and after recording, return to):

Gary A. Saul, Esq.
Greenberg Traurig, P.A.
333 Avenue of the Americas (333 SE 2⁻ Avenue)
Miami, FL 33131

Parcel ID No.: 01-4138-163-2020

(Reserved for Clerk of Court)

SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED is made and entered into as of the 7 day of July, 20 17 by 9SMA West, L.L.C., a Delaware limited liability company, Grantor, whose office address is at 315 S. Biscayne Boulevard, 3rd Floor, Miami, Florida 33131, to Maria Antonieta Laviosa and Roberto Romagnoli, wife and husband, Grantee, whose mailing address is 55 SW 9 Street, Unit 1607, Miami, Florida 33130. Wherever used herein, the terms "Grantor" and "Grantee" shall include all of the parties to this instrument and their heirs, legal representatives and assigns.

W I T N E S S E T H:

GRANTOR, for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained and sold, and by these presents does hereby grant, bargain and sell to Grantee, the following described land situate and being in Miami-Dade County, Florida (the "Property"):

Condominium Parcel No. 1607 of BRICKELL HEIGHTS WEST CONDOMINIUM, according to the Declaration of Condominium thereof, recorded November 17, 2014 in Official Records Book 29392, at Page 4849, as amended in Official Records Book 29470, Page 4525, as amended in Official Records Book 30423, Page 1004, as further amended in Official Records Book 30562, Page 2634, of the Public Records of Miami-Dade County, Florida, as amended and/or supplemented from time to time, together with an undivided interest in the common elements appurtenant thereto.

TOGETHER WITH all the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining.

THIS CONVEYANCE is subject to: taxes and assessments for 2017 and all subsequent years; zoning ordinances, restrictions, prohibitions and other requirements imposed by governmental authority; conditions, restrictions, reservations, limitations and easements of record, if any, but this reference shall not operate to reimpose same; and restrictions, conditions, covenants, liens, terms and limitations set forth in (i) the Declaration of Condominium referenced above and all exhibits thereto, all as amended or modified from time to time (the "Declaration of Condominium"), and (ii) the Declaration of Covenants, Restrictions and Easements for Brickell Heights recorded February 3, 2014 in Official Records Book 29015, Page 1788, as amended in Official Records Book 29161, Page 0632, as amended in Official Records Book 29381, Page 1023, as further amended in Official Records Book 30562, Page 2475, and as affected by Collateral Assignment of

*MIA 185949460v1*

CFN: 20170393475 BOOK 30607 PAGE 4051

(Reserved for Clerk of Court)

Declarants Rights recorded in Official Records Book 29565, Page 3400, of the Public Records of Miami-Dade County, Florida, all as amended and/or supplemented from time to time (the "Master Covenants").

GRANTOR hereby warrants the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor.

IN WITNESS WHEREOF, Grantor has hereunto set its hand and seal as of the day and year first above written.

Witnessed by:

_____
Name: Sheila Lorenzo

_____
Name:  Priscilla Rivas

9SMA West, L.L.C., a Delaware limited liability company

By: _____
Jon Paul Perez, Project Manager

STATE OF FLORIDA          )
                          ) SS
COUNTY OF MIAMI-DADE      )

The foregoing instrument was acknowledged before me this _20_ day of June, 2017 by Jon Paul Perez, as Project Manager of 9SMA West, L.L.C., a Delaware limited liability company, on behalf of said entity. He is personally known to me or produced _____ as identification.

Name: Victoria Delgado
Notary Public, State of Florida
Commission No. ___FF094501___

VICTORIA DELGADO
MY COMMISSION #FF094501
EXPIRES February 20, 2018
(407) 398-0153  FloridaNotaryService.com
My commission expires:

MIA 185828888v1

# Exhibit 2

OMB Approval No. 2502-0265



A. **Settlement Statement (HUD-1)**

| B. Type of Loan | | | | |
|---|---|---|---|---|
| 1. ☐ FHA   2. ☐ RHS   3. ☐ Conv. Unins. | | 6. File Number<br>030303.061607 | 7. Loan Number<br>1417052601 | 8. Mortgage Insurance Case Number |
| 4. ☐ VA   5. ☒ Conv. Ins. | | | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. NAME OF BORROWER:** Maria Antonieta Laviosa and Roberto Romagnoli

    **ADDRESS OF BORROWER:** 9401 Collins Ave, Apt 1103, Surfside, FL 33154

**E. NAME OF SELLER:** 9SMA West, L.L.C., a Delaware limited liability company

    **ADDRESS OF SELLER:** 315 S. Biscayne Boulevard, 3rd Floor, Miami, FL 33131

**F. NAME OF LENDER:** A & D Mortgage, LLC

    **ADDRESS OF LENDER:** 1040 S Federal Hwy, Hollywood, FL 33020

**G. PROPERTY LOCATION:** 55 SW 9 Street, Unit 1607, Miami, FL 33130
    ID#

**H. SETTLEMENT AGENT:** Greenberg Traurig, P.A.
    PH# (305) 579-0500     333 Avenue of the Americas, Miami, FL 33131
    **PLACE OF SETTLEMENT:** 333 Avenue of the Americas, Miami, FL 33131

                                                      Settlement Agent Tax ID#:   59-1270754

**I. SETTLEMENT DATE:** 7/7/2017     **Disbursement Date:**

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100.   Gross Amount Due from Borrower** | | **400.   Gross Amount Due to Seller** | |
| 101.   Contract sales price | 308,900.00 | 401.   Contract sales price | 308,900.00 |
| 102.   Personal property | | 402.   Personal property | |
| 103.   Settlement charges to borrower (line 1400) | 10,232.36 | 403. | |
| 104.   Development Fee  1.70% | 5,251.30 | 404.   Development Fee  1.70% | 5,251.30 |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106.   City/town taxes          to | | 406.   City/town taxes          to | |
| 107.   County taxes             to | | 407.   County taxes             to | |
| 108.   Assessments              to | | 408.   Assessments              to | |
| 109.                            to | | 409.                            to | |
| 110.                            to | | 410.                            to | |
| 111.                            to | | 411.                            to | |
| 112.                            to | | 412.                            to | |
| **120.   Gross Amount Due from Borrower** | **324,383.66** | **420.   Gross Amount Due To Seller** | **314,151.30** |
| **200.   Amounts Paid by or in Behalf of Borrower** | | **500.   Reductions In Amount Due to Seller** | |
| 201.   Deposit or earnest money | 143,560.00 | 501.   Excess deposit (see instructions) | |
| 202.   Principal amount of new loan(s) | 185,340.00 | 502.   Settlement charges to seller (line 1400) | 15,315.80 |
| 203.   Existing loan(s) taken subject to | | 503.   Existing loan(s) taken subject to | |
| 204. | | 504.   Payoff of first mortgage loan | |
| | |       Wells Fargo Bank, N.A. | |
| 205. | | 505.   Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| 209a. | | 509a. | |
| 209b. | | 509b.   Deposit Directly to Seller | 112,670.00 |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210.   City/town taxes          to | | 510.   City/town taxes          to | |
| 211.   County taxes     1/1/2017   to   7/7/2017 | 227.94 | 511.   County taxes     1/1/2017   to   7/7/2017 | 227.94 |
| 212.   Assessments              to | | 512.   Assessments              to | |
| 213. | | 513.                            to | |
| 214.   Master Maint   7/1/2017   to   7/7/2017 | 16.37 | 514.   Master Maint   7/1/2017   to   7/7/2017 | 16.37 |
| 215.   Condo Maint    7/1/2017   to   7/7/2017 | 61.99 | 515.   Condo Maint    7/1/2017   to   7/7/2017 | 61.99 |
| 216. | | 516.                            to | |
| 217. | | 517.                            to | |
| 218. | | 518.                            to | |
| 219. | | 519.                            to | |
| **220.   Total Amounts Paid by or in Behalf of Borrower** | **329,206.30** | **520.   Total Reductions in Amount Due Seller** | **128,292.10** |
| **300.   Cash at Settlement from/to Borrower** | | **600.   Cash at Settlement to/from Seller** | |
| 301.   Gross amount due from borrower (line 120) | 324,383.66 | 601.   Gross amount due to seller (line 420) | 314,151.30 |
| 302.   Less amounts paid by/for borrower (line 220) | 329,206.30 | 602.   Less reductions in amount due seller (line 520) | 128,292.10 |
| **303.   Cash  ☐ From  ☒ To   Borrower** | **4,822.64** | **603.   Cash  ☒ To   ☐ From   Seller** | **185,859.20** |

SETTLEMENT STATEMENT    PAGE 2

| L. Settlement Charges | | | | | |
|---|---|---|---|---|---|
| **700.** | **Total Real Estate Broker Fees** | 10,569.89 | | **Paid From Borrower's Funds At Settlement** | **Paid From Seller's Funds At Settlement** |
| | Division of Commission (line 700) as follows: | | | | |
| 701. | 1,467.27  Balance on Commission | to Fortune Developement Sales | | | |
| 702. | 2,924.62  Balance on Commission | to Related Realty LLC | | | |
| 702a. | 6,178.00  Balance on Commission | to Concept International | | | |
| 703. | Commission paid at Settlement | | | | 10,569.89 |
| 704. | | to | | | |
| 705. | | to | | | |
| **800.** | **Items Payable in Connection With Loan** | | | | |
| 801. | Our origination charge    Global Lending Corporation | $ 1,853.40   (from GFE #1) | | | |
| 802. | Your credit or charge (points) for the specific interest rate chosen | $            (from GFE #2) | | | |
| 803. | Your adjusted origination charges  to  Global Lending Corporation | (from GFE #A) | | 1,853.40 | |
| 804. | Appraisal Fee           to  A A/AMC ($595 poc) | (from GFE #3) | | | |
| 805. | Credit Report          to UniversalCredit fbo A&D Mortgage | (from GFE #3) | | 51.28 | |
| 806. | Tax Related Service Fee  to  A & D Mortgage | (from GFE #3) | | 85.00 | |
| 807. | Flood certification       to | (from GFE #3) | | | |
| 808. | Processing Fee        to Global Lending Corporation | (from GFE #3) | | 750.00 | |
| 809. | Underwriting Fee     to  A & D Mortgage | (from GFE #3) | | 1,495.00 | |
| 810. | Appraisal CDA Valuation   to  Clear Capital fbo A& D Mortgage | (from GFE #3) | | 150.00 | |
| **900.** | **Items Required By Lender To Be Paid In Advance** | | | | |
| 901. | Daily interest charges from   7/7/2017   to  8/1/2017  @    38.61 /day | (from GFE #10) | | 965.25 | |
| 902. | Mortgage Insurance Premium for    months to | (from GFE #3) | | | |
| 903. | Homeowner's Insurance for($1211 POC)   1 years   to Florida Peninsula Ins.Co. | (from GFE #11) | | POC | |
| 904. | | to | | | |
| **1000.** | **Reserves Deposited With Lender**    Payee: | | | | |
| 1001. | Initial deposit for your escrow account | (from GFE #9) | | 558.12 | |
| 1002. | HO6 Insurance          4 months@     100.92 per month | $         403.68 | | | |
| 1003. | Mortgage insurance        months@       per month | $ | | | |
| 1004. | Property taxes          11 months@     38.62 per month | $         424.82 | | | |
| 1005. | Annual assessments       months@       per month | $ | | | |
| 1009. | Aggregate Adjustment | -$          270.38 | | | |
| **1100.** | **Title Charges** | | | | |
| 1101. | Title services and lender's title insurance | (from GFE #4) | | 1,217.25 | |
| 1102. | Settlement or closing fee    Greenberg Traurig, P.A. | $ 770.00 | | | |
| 1103. | Owner's title insurance    Chicago Title Insurance Company | (from GFE #5) | | | 1,447.51 |
| 1104. | Lender's title insurance    Chicago Title Insurance Company | $ 247.25 | | | |
| 1105. | Lender's title policy limit    $ 185,340.00      9 - 147.25;4.1 - 25.00;6 - 25.00;8.1 - 25.00; | | | | |
| 1106. | Owner's title policy limit    $ 308,900.00 | | | | |
| 1107. | Agent's portion of the total title insurance premium | $ 1,186.33 | | | |
| 1108. | Underwriter's portion of the total title insurance premium | $ 508.43 | | | |
| 1109. | | to | | | |
| 1110. | | to | | | |
| 1112. | Copies, courier, miscellaneous costs    to Greenberg Traurig, P.A. | 200.00 | | | |
| 1113. | Attorney Fee          to Greenberg Traurig, P.A. | | | | 1,400.00 |
| **1200.** | **Government Recording and Transfer Charges** | | | | |
| 1201. | Government recording charges | (from GFE #7) | | 218.00 | |
| 1202. | Recording Fees: Deed $18.50; L-Mortgage(s) $214.00; Releases $18.50; | | | | 37.00 |
| 1203. | Transfer taxes | (from GFE #8) | | 1,019.58 | |
| 1204. | City/county tax/stamps: L-Mortgage $370.68; | | | | |
| 1205. | State tax/stamps: Deed $1,853.40; L-Mortgage $648.90; | | | | 1,853.40 |
| 1208. | | to | | | |
| 1209. | | to | | | |
| 1210. | e-Recording         to Simplifile | | | 4.00 | |
| 1211. | e-Recording         to Simplifile | | | | 8.00 |
| **1300.** | **Additional Settlement Charges** | | | | |
| 1301. | Required services that you can shop for | (from GFE #6) | | | |
| 1302. | | $ | | | |
| 1303. | | $ | | | |
| 1304. | WorkCapMasterMaint - 2@$84.59   to Brickell Heights Master Association,  Inc. | | | 169.18 | |
| 1305. | Master Maint 7/01/17 - 7/31/17    to Brickell Heights Master Association, Inc. | | | 84.59 | |
| 1306. | Master Maint 8/01/17 - 8/31/17    to Brickell Heights Master Association, Inc. | | | 84.59 | |
| 1307. | WorkCapCondoMaint - 2@$320.28   to Brickell Heights West Condominium Association, Inc. | | | 640.56 | |
| 1308. | Condo Maint 7/01/17 - 7/31/17    to Brickell Heights West Condominium Association, Inc. | | | 320.28 | |
| 1309. | Condo Maint 8/01/17 - 8/31/17    to Brickell Heights West Condominium Association, Inc. | | | 320.28 | |
| 1311. | FPL Deposit          to Florida Power & Light | | | 250.00 | |
| **1400.** | **Total Settlement Charges** | (enter on lines 103, Section J and 502, Section K) | | 10,232.36 | 15,315.80 |

**CERTIFICATION**    DATE: 7/7/2017

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

9SMA West, L.L.C., a Delaware limited liability company

_____ Borrower    By: _____ Seller
Maria Antonietta Laviosa                  Attorney-in-fact

_____ Borrower    _____ Seller
Roberto Romagnoli

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.
                                              Greenberg Traurig, P.A.

                                                          7/7/2017      DATE

**Warning:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

030303.061607

| Comparison of Good Faith Estimate (GFE) and HUD-1 Charges | | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| **Charges That Cannot Increase** | **Hud-1 Line Number** | | |
| Our origination charge | #801 | | 1,853.40 |
| Your credit or charge (points) for the specific interest rate | #802 | | |
| Your adjusted origination charges | #803 | | 1,853.40 |
| Transfer taxes | #1203 | | 1,019.58 |

| Charges That in Total Cannot Increase More Than 10% | | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Government recording charges | #1201 | | 218.00 |
| **Total** | | | 218.00 |
| **Increase between GFE and HUD-1 Charges** | | 218.00   or | |

| Charges That Can Change | | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Initial deposit for your escrow account | #1001 | | 558.12 |
| Daily interest charges from | #901 | | 965.25 |
| Homeowner's Insurance for($1211 POC) | #903 | | POC |

## Loan Terms

| | |
|---|---|
| Your Initial loan amount is | $ 185,340.00 |
| Your Loan term is | 30   years |
| Your initial interest rate is | 7.5   % |
| Your initial monthly amount owed for principal, interest, and any mortgage insurance is | $ 1,295.92   includes<br>[X] Principal<br>[X] Interest<br>[ ] Mortgage Insurance |
| Can your interest rate rise? | [ ] No. [X] Yes, it can rise to a maximum of 13.5   %. The first change will be on  08/01/2020  and can change again every  12 mo.  after  08/01/2020 . Every change date, your interest rate can increase or decrease by 2   %. Over the life of the loan, your interest rate is guaranteed to never be lower than 6   % or higher than 13.5   %. |
| Even if you make payments on time, can your loan balance rise? | [X] No. [ ] Yes, it can rise to a maximum of   . |
| Even if you make payments on time, can your monthly amount owed for principal, interest, and mortgage insurance rise? | [ ] No. [X] Yes, the first increase can be on   and the monthly amount owed can rise to $   The maximum it can ever rise to is $ |
| Does your loan have a prepayment penalty? | [ ] No. [ ] Yes, your maximum prepayment penalty is $   . |
| Does your loan have a balloon payment? | [X] No. [ ] Yes, you have a balloon payment of $   due in   years on |
| Total monthly amount owed including escrow account payments | [ ] You do not have a monthly escrow payment for items, such as property taxes and homeowner's insurance. You must pay these items directly yourself.<br>[X] You have an additional monthly escrow payment of $ 139.54 that results in a total initial monthly amount owed of $ 1,435.46  . This includes principal, interest, any mortgage insurance and any items checked below:<br>[X] Property taxes              [X] Homeowner's insurance<br>[ ] Flood insurance              [ ]<br>[ ]                              [ ] |

Exhibit 3

DOC# 20150266674  B: 10924 P: 3966
05/27/2015 10:56 AM  Page 1 of 2
Rec Fee: $18.50
Deed Doc Tax: $2,902.90
Mortgage Doc Tax: $0.00
Intangible Tax: $0.00
Martha O. Haynie, Comptroller
Orange County, FL
Ret To: SIMPLIFILE LC

**Prepared By:**
PGP Title of Florida, Inc. dba PGP Title
Attn:  Tracy Minerley
4901 Vineland Road, Suite 500
Orlando, FL 32811

**Return To:**
PGP Branch Support Center

2728 N. Harwood, 3rd Floor
Dallas, TX 75201

File No.: FL-070509

Property Appraiser's Parcel I.D. (folio) No.:
01-24-27-7140-00640

## SPECIAL WARRANTY DEED



THIS SPECIAL WARRANTY DEED made this May 22, 2015 by Pulte Home Corporation, a Michigan corporation existing under the laws of Michigan, and having its principal place of business at 4901 Vineland Road, Suite 500, Orlando, FL 32811 (the "Grantor"), and Roberto Romagnoli and Maria Antonieta Laviosa, husband and wife having a mailing address  of 9401 Collins Ave Apt 1103, Surfside, FL 33154, (the "Grantee"):

(Which terms "Grantor" and "Grantee" shall include singular and plural, corporation or individual, and either sex, and shall include heirs, legal representatives, successors and assigns of the same)

WITNESSETH:  That the Grantor, for and in consideration of the sum of TEN and No Dollars ($10.00) and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold, remised, released, conveyed and confirmed unto the Grantee, its successors and assigns forever, following described land situated in County of Orange, State of Florida, to-wit:

Lot 64, ROYAL LEGACY ESTATES, according to the plat thereof, as recorded in Plat Book 81, Page(s) 125 through 129, Public Records of Orange County, Florida.

SUBJECT, however, to all reservations, covenants, conditions, restrictions and easements of record and to all applicable zoning ordinances and/or restrictions or requirements imposed by governmental authorities, if any.

TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in any wise appertaining.

TO HAVE AND TO HOLD the same in Fee Simple forever.

AND the Grantor hereby covenants with said Grantee that the Grantor is lawfully seized of said land in fee simple; that the Grantor has good right and lawful authority to sell and convey said land; and that said land is free of all encumbrances except taxes accruing subsequent to 12/31/2014, and any other matters referenced herein; and hereby warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through or under the said grantor, but against none other.

IN WITNESS WHEREOF, the said grantor has caused these presents to be executed in its name, and its corporate seal to be hereunto affixed, by its proper officers duly authorized, the day and year first above written.

(CORPORATE SEAL)

Signed, and sealed and delivered in presence of:

Pulte Home Corporation, a Michigan corporation

_____
Witness Signature

BY: _____
    Jose Rosario
    Closing Coordinator

Tracy Minerley
_____
Printed Name of First Witness

_____
Witness Signature

**Grantee Address:**
9401 Collins Ave Apt 1103
Surfside, FL 33154

Michelle Jones
_____
Printed Name of Second Witness

STATE OF Florida  )
COUNTY OF Orange )

The foregoing instrument was acknowledged before me this May 22, 2015 by Jose  Rosario, Closing Coordinator of Pulte Home Corporation, a Michigan corporation, on behalf of the corporation.  He/she is personally known to me or produced _____ as identification.

_____
Notary Public

_____
Printed Name
My Commission Expires:
(SEAL)

TRACY A. MINERLEY
Commission # FF 4797
My Commission Expires
May 25, 2017

Exhibit 4



OMB Approval No. 2502-026

A. **Settlement Statement (HUD-1)**

**B. Type of Loan**

| 1. ☐ FHA | 2. ☐ RHS | 3. ☒ Conv. Unins. | 6. File Number: FL-070509 | 7. Loan Number: | 8. Mortgage Insurance Case Number: |
|---|---|---|---|---|---|
| 4. ☐ VA | 5. ☐ Conv. Ins. | | | | |

C. Note: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown.
Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.* ( FL-070509/ 76)

| D. Name and Address of Buyer: | E. Name and Address of Seller: | F. Name and Address of Lender: |
|---|---|---|
| Roberto Romagnoli and Maria Antonieta Laviosa 9401 Collins Ave Apt 1103 Surfside, FL 33154 | Pulte Home Corporation, a Michigan corporation 4901 Vineland Road, Suite 500 Orlando, FL 32811 | |

| G. Property Location: | H. Settlement Agent: PGP Title of Florida, Inc. dba PGP T (407)661-2130 | I. Settlement Date: |
|---|---|---|
| 11843 Prince George Way Orlando, FL 32836 Orange County, Florida LOT: 64, Subdivision: Royal Legacy Estates, Builder Ref. No.: 1045535606401 | 4901 Vineland Road, Suite 500 Orlando, FL 32811 Place of Settlement: 4901 Vineland Road Suite 500 Orlando, FL 32811    (407)661-2130 | May 22, 2015 Disbursement Date: May 22, 2015 |

| J. Summary of Buyer's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Buyer** | | **400. Gross Amount Due to Seller** | |
| 101. Contract sales price | 414,665.00 | 401. Contract sales price | 414,665.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to buyer (line 1400) | 6,163.95 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/Town taxes | | 406. City/Town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. REIMBURSE Termite | 75.00 | 409. REIMBURSE Termite | 75.00 |
| 110. REIMBURSE Survey | 125.00 | 410. REIMBURSE Survey | 125.00 |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross amount due from Buyer** | 421,028.95 | **420. Gross amount due to Seller** | 414,865.00 |
| **200. Amounts Paid by or in Behalf of Buyer** | | **500. Reductions in Amount Due to Seller** | |
| 201. Deposit or earnest money | 40,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 12,439.95 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Credit from Realty company | 12,439.95 | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Dep. retained by sellers | 40,000.00 |
| 207. Credit from seller | 1,000.00 | 507. Credit from seller | 1,000.00 |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/Town taxes | | 510. City/Town taxes | |
| 211. County taxes   01/01/15 to 05/22/15 | 273.74 | 511. County taxes   01/01/15 to 05/22/15 | 273.74 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total paid by/for Buyer** | 53,713.69 | **520. Total reduction amount due Seller** | 53,713.69 |
| **300. Cash at Settlement from/to Buyer** | | **600. Cash at Settlement from/to Seller** | |
| 301. Gross amount due from Buyer (Line 120) | 421,028.95 | 601. Gross amount due to Seller (Line 420) | 414,865.00 |
| 302. Less amount paid by/for Buyer (Line 220) | ( 53,713.69) | 602. Less reductions due Seller (Line 520) | ( 53,713.69) |
| **303. CASH FROM BUYER** | 367,315.26 | **603. CASH TO SELLER** | 361,151.31 |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

**L. Settlement Charges**

| | | | Paid From Buyer's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| **700. Total Real Estate Broker Fees** | $12,439.95 | | | |
| *Division of commission (line 700) as follows:* | | | | |
| 701. | to | | | |
| 702. $ 12,439.95 | to Concept International Realty | | | |
| 703. Commission paid at settlement | | | | |
| 704. | | | | 12,439.95 |
| **800. Items Payable in Connection with Loan** | | | | |
| 801. Our origination charge | | (from GFE #1) | | |
| 802. Your credit or charge (points) for the specific interest rate chosen | | (from GFE #2) | | |
| 803. Your adjusted origination charges | | (from GFE #A) | | |
| 804. Appraisal fee | | (from GFE #3) | | |
| 805. Credit report | | (from GFE #3) | | |
| 806. Tax service | | (from GFE #3) | | |
| 807. Flood certification | | (from GFE #3) | | |
| 808. | | | | |
| **900. Items Required by Lender to be Paid in Advance** | | | | |
| 901. Interest from 05/22/15 to 06/01/15 to @ $ /day (10 days @ %) | | (from GFE#10) | | |
| 902. Mortgage insurance premium for month to | | (from GFE #3) | | |
| 903. Homeowner's insurance for year to | | (from GFE #11) | | |
| 904. for year to | | | | |
| **1000. Reserves Deposited with Lender** | | | | |
| 1001. Initial deposit for your escrow account | | (from GFE #9) | | |
| 1002. Homeowner's insurance months @ $ per month | | | | |
| 1003. Mortgage insurance months @ $ per month | | | | |
| 1004. Property taxes months @ $ per month | | | | |
| 1005. months @ $ per month | | | | |
| 1006. months @ $ per month | | | | |
| 1007. months @ $ per month | | | | |
| 1008. Aggregate Adjustment | | | | |
| **1100. Title Charges** | | | | |
| 1101. Title services and lender's title insurance to PGP Title of Florida, | | (from GFE #4)  See Additional 1101 items | 435.67 | |
| 1102. Settlement/Closing Fee to PGP Title of Florida, Inc. dba PGP Title $ 335.67 | | | | |
| 1103. Owner's title insurance to PGP Title of Florida, Inc. dba PGP Title | | (from GFE #5) | 2,177.40 | |
| 1104. Lender's title insurance | | | | |
| 1105. Lender's title policy limit | | | | |
| 1106. Owner's title policy limit $414,665.00 | | | | |
| 1107. Agent's portion of the total title insurance premium to PGP Title of Florida, Inc. dt $ 1,473.46 | | | | |
| 1108. Underwriter's portion of the total title insurance premium to Premier Land Title In: $ 707.22 | | | | |
| 1109. Search Fee to PGP Title of Florida, Inc. dba PGP Title | | | | |
| 1110. Florida Statutory Surcharge to Premier Land Title Insurance Com | | | 3.28 | |
| **1200. Government Recording and Transfer Charges** | | | | |
| 1201. Government recording charges to PGP Title fbo Clerk of Court | | (from GFE #7) | 18.50 | |
| 1202. Deed $ 18.50; Mortgage $ ; Releases $ | | | | |
| 1203. Transfer taxes to PGP Title fbo Clerk of Court | | (from GFE #8) | 2,902.90 | |
| 1204. City/County tax/stamps Deed $ ; Mortgage $ | | | | |
| 1205. State tax/stamps Deed $ 2,902.90; Mortgage $ | | | | |
| 1206. | | | | |
| **1300. Additional Settlement Charges** | | | | |
| 1301. Required services that you can shop for | | (from GFE #6) | | |
| 1302. Capital Contribution to Royal Estates HOA | | | 500.00 | |
| 1303. Survey to American Surveying & Mapping | | P.O.C.$125.00(S)* | | |
| 1304. Termite to Home Team Services | | P.O.C.$75.00(S)* | | |
| 1305. Prorated Monthly - Current Dues to Royal Estates HOA | | | 31.20 | |
| 1306. June HOA Dues to Royal Estates HOA | | | 95.00 | |
| **Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | 6,163.95 | 12,439.95 |

*Paid outside of closing by seller (S)

# HUD-1, Attachment

| | |
|---|---|
| **Buyer:** Roberto Romagnoli and Maria Antonieta Laviosa<br>9401 Collins Ave<br>Apt 1103<br>Surfside, FL 33154 | **Seller:** Pulte Home Corporation, a Michigan corporation<br>4901 Vineland Road, Suite 500<br>Orlando, FL 32811 |
| **Settlement Agent:** PGP Title of Florida, Inc. dba PGP Title<br>(407)661-2130 | **Place of Settlement:** 4901 Vineland Road<br><br>Suite 500<br>Orlando, FL 32811 |
| **Settlement Date:** May 22, 2015 | **Disbursement Date:** May 22, 2015 |
| **Property Location:** 11843 Prince George Way<br>Orlando, FL 32836<br>Orange County, Florida<br>LOT: 64, Subdivision: Royal Legacy Estates,<br>**Builder Ref. No.:** 1045535606401 | |

---

**Our Origination Charge**

| Description/Payee | | Disclosure | Buyer | Seller |
|---|---|---|---|---|

**Title Services and Lender's Title Insurance**

| Description/Payee | | Disclosure | Buyer | Seller |
|---|---|---|---|---|
| Title Search Fee<br>  PGP Title of Florida, Inc. dba PGP Title | (from GFE #4) | 100.00 | | |
| Settlement/Closing Fee<br>  PGP Title of Florida, Inc. dba PGP Title | | 335.67 | | |
| **Total Title Services and Lender's Title Insurance** | | **435.67** | | |

**Additional Disbursements**

| Payee/Description | Disclosure | Buyer | Seller |
|---|---|---|---|
| PGP Title of Florida, Inc. dba PGP Title<br>  Owner's Policy Premium | | 1,979.45 | |
| PGP Title of Florida, Inc. dba PGP Title<br>  Restrictions, Encroachments, Minerals<br>  Endorsement - Owner's Policy: Improved Land | | 197.95 | |
| **Total Line 1103** | | **2,177.40** | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____
Roberto Romagnoli

_____
Maria Antonieta Laviosa

Pulte Home Corporation, a Michigan corporation

BY: _____
Jose Rosario
Closing Coordinator

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____
PGP Title of Florida, Inc. dba PGP Title
Settlement Agent

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Exhibit 5

# THE VAROMA JOINT REVOCABLE LIVING TRUST AGREEMENT

TRUST AGREEMENT, made this 14th day of October, 2015 between grantors **ROBERTO ROMAGNOLI** and **MARIA ANTONIETA LAVIOSA**, husband and wife, herein referred to as "Grantors", and **ROBERTO ROMAGNOLI** and **MARIA ANTONIETA LAVIOSA**, husband and wife, herein referred to as "Trustees".

## DEFINITIONS

**1.01 Grantors And Initial Co−Trustees.** Roberto Romagnoli and Maria Antonieta Laviosa, both currently residing at 9401 Collins Ave., Apt. 1103, Surf Side, FL 33154, shall be referred to herein as the "Grantors". Grantors shall also serve as the initial trustees of this trust. They shall also be referred to herein as "Co−Trustees" or "initial Co−Trustees".

**1.02 Successor Co-Trustees.** If either of the Initial Co−Trustees is unable to serve as trustee for any reason or resigns, the remaining Initial Co−Trustee shall individually serve as trustee without the appointment of a Successor Co−Trustee. When both Initial Co−Trustee are unable to serve as trustee for any reason or resign **Veronica Laviosa,** Maria Antonieta Laviosa' s  sister, shall serve as Successor Trustee. If **Veronica Laviosa** is unable to serve as trustee for any reason or resigns, **Yazmine Livinalli** shall serve as Successor Trustee. Any then−acting trustee (or, if co−trustees are named, both trustees acting jointly) shall have the power to add to this list of successor trustees through a written declaration. The term "Successor Trustee" or "Co−Trustee" should be substituted hereinafter, where applicable, for the term "Trustee." The pronoun "he" may be used generically herein to refer to the Trustee regardless of the true gender of the Trustee or Successor Trustee actually referred to. An incapacitated individual is "unable to serve" as trustee under this trust agreement and shall be removed from office. Any successor trustee shall serve with all the powers, discretions, and immunities granted in this document to my trustees, shall have no duty to investigate or inquire into the acts of a former trustee, and shall have no liability for the acts or omissions of a former trustee.

**1.03 Children.** Grantors are the parents of the following children ███████████████ **date of birth 04/03/2007.**

**1.04 Incapacitation.** The term "incapacitated" or "incapacitation" shall mean the inability, whether due to physical or mental infirmity, to handle the business affairs of another as a fiduciary which is attested to in a written instrument executed by at least two medical doctors, one of whom is the individual in question's treating physician or having been adjudicated incapacitated or incapable of managing financial affairs by a judge of a circuit court of the State of Florida or by a court of competent jurisdiction.

## ARTICLE I
### Name of Trust

I hereby transfer to the trustees the property described in the schedule attached as "Exhibit A," on the terms and conditions set forth in this agreement. With the consent of the trustees, additional property may be transferred from time to time to this trust estate by me or by any other person, and that property shall be held and disposed of on the same terms and conditions as the property originally transferred. This trust agreement shall hereafter be known as **THE VAROMA JOINT REVOCABLE LIVING TRUST AGREEMENT.**

## ARTICLE II
### Dispositive Provisions During Grantor's Life

During the Grantors lifetime, the Trustees shall pay to Grantors or for Grantors benefit as much of the net income or principal of the trust estate as Grantors may request. In addition, Grantors shall be entitled to full use and possession of any non-income-producing real estate owned by the trust. Grantors further reserve the right to reside upon any property placed in this trust as Grantors permanent residence, referred to hereafter as Grantors homestead, during Grantors life, it being the intent of this provision to preserve Grantors requisite beneficial interest and possessory right in and to such real property, to comply with Sections 196.031 and 196.041 of the Florida Statutes, such that Grantors possessory right constitutes in all respects, "equitable title to real estate," as the term is used in Section 6, Article 7 of the Constitution of the State of Florida. An incapacitated Grantor shall, during the length of the incapacitation, no longer have the power to direct the actions of the Trustee under this trust agreement. In the event of Grantors incapacity or incompetence, my Trustees shall distribute for my benefit as much of the net income or principal of the trust estate as may be necessary to ensure Grantors health and support.

## ARTICLE III
### Payment of Taxes and Expenses After Death

**Upon the Death of the First Grantor:** Upon the death of the first Grantor, the Trustee may pay any portion or all of the expenses of the first deceased Grantor's last illness, burial, and funeral. The Trustee is further authorized to pay honorarium to any clergymen in conjunction with the first deceased Grantor's funeral and the travel costs of any family members who wish to travel from their

residence to attend Grantor's funeral. The Trustee may also pay any debt or claim—such as, but not limited to, state or federal taxes—against the first deceased Grantor's estate regardless of whether or not a probate estate has been formally established.

*So long as one of the Grantors shall survive, the provisions of Article II shall remain in full force and effect.*

**Upon the Death of the Second Grantor:** Upon the death of the last surviving Grantor, the trustee shall windup the affairs of the trust and pay all outstanding trust debts and expenses of any kind including those related to trust administration. Thereafter trustee shall pay any outstanding debts related to the last surviving Grantor's last illness, burial, and funeral expenses (if any). The trustee is further authorized to pay honorarium to any clergymen in conjunction with the last surviving Grantor's funeral and the travel costs of any family members who wish to travel from their residence to attend Grantor's funeral. The trustee shall also pay any debt or claim—such as, but not limited to, state or federal taxes, credit card debts, or bank loans—against the last surviving Grantor's estate regardless of whether or not a probate estate has formally been established.

### ARTICLE IV
### Dispositive Provisions After Death

As soon as is reasonably practicable after the death of both Grantors, but after payment of or provision for debts and expenses as provided in Article III of this Trust Agreement, the remaining trust estate shall be divided and distributed outright and free from further trust as follows: **100% to** ▮▮▮▮▮▮▮▮▮▮▮▮▮. **Upon the death of** ▮▮▮▮▮▮▮▮▮ **then 50% to EDITA RUIZ (Grantor, Maria Antonieta Laviosa's mother) and 25% to MARCO ROMAGNOLI (Grantor, Roberto Romagnoli's nephew) and 25% to ROBERTO ROMAGNOLI Grantor, (Roberto Romagnoli's nephew)**

If any beneficiary entitled to a final distribution has not attained age 18, his or her share shall vest but shall be held for his or her benefit until he or she attains age 18 or dies sooner, at which time final distribution shall be made to him or her or to his or her estate; and, in the meantime, the trustees shall pay those sums to that person or those persons at those times as considered necessary or advisable for his, her, or their health, education, or support. Any net income accumulated shall be added to the principal.

## ARTICLE V
### Powers of Trustees

In the administration of any trust established hereunder, trustees shall have the following powers:

a.      To retain any property contributed to this trust, either during life or at death of the Grantors, or to sell, convey, exchange, or otherwise dispose of the property, at public or private sale, without application to court, on any terms, including the extension of credit, which they consider advisable.

b.      To acquire, by purchase or otherwise, any property, real or personal, without being limited by any provision of law that restricts investments by fiduciaries and without regard to any principles of diversification, including, but not limited to, common and preferred stocks, bonds, mutual funds, common trust funds, general or limited partnership interests, secured and unsecured obligations and mortgages; or to sell, convey, exchange, or otherwise dispose of the property, at public or private sale, without application to court, on any terms, including the extension of credit, which they consider advisable.

c.      To acquire and pay for, exercise, or sell any options or subscription rights in connection with securities or any other property.

d.      To hold securities in the names of nominees or in bearer form.

e.      To operate, repair, alter, improve, insure, grant options on, mortgage, partition, or lease for any period of time any real property or interest in real property held by them.

f.      To retain and pay, as an expense of administration, appraisers, accountants, attorneys, investment advisors, and other assistants, and to delegate discretionary and nondiscretionary investment management authority.

g.      To borrow money from any source and for any purpose, including, but not limited to, the payment of taxes, and to pledge or mortgage any assets held by them as security for money borrowed.

h.      To make distributions from any trust created hereunder in cash, in kind, or partly in each, and to allocate property other than ratably.

i.      To hold property of separate trusts in common investments for the convenience of investment or administration.

j.      To enter into contracts or agreements or to compromise or settle any debts, claims, or controversies as they consider necessary or advisable.

k.      To vote personally or by proxy any share of stock held by them.

If there is more than one trustee serving, then the vote of the trustees for any action hereunder must be an unanimous vote of all then–serving trustees. Trustees may act freely under all of the powers given to them after forming their judgment concerning the wisest and best course to pursue based on all of the circumstances, without the necessity of obtaining the consent or approval of any interested person or any court, and notwithstanding that they may be interested in connection with the same matters in other capacities.

The powers granted to the trustees shall be considered to be supplementary to, and not exclusive of, the general powers of trustees according to law and shall include all powers necessary to carry the same into effect.

## ARTICLE VI
### Spendthrift Clause

The interests of the beneficiaries are held subject to a spendthrift trust. Grantors direct that none of the assets or income of the trusts established in this agreement shall be subject to or liable for any of the debts, contracts, engagements, or taxes of any of the beneficiaries under this trust, nor shall the same be liable to execution, attachment, or any other legal process whatsoever at the suit of any creditor or otherwise, nor shall the same be subject to assignment, transfer, or anticipation; but all payments of principal and income as provided in this agreement shall be made by my trustees to the beneficiaries designated in accordance with the provisions of this agreement. Provided, however, that nothing in this article shall prevent a beneficiary at any time from disclaiming or renouncing his or her interest in any trust created hereunder and, in the event of a renunciation or disclaimer, the beneficiary shall be treated as if he or she died on the effective date of the renunciation or disclaimer.

## ARTICLE VII
### Simultaneous Death Clause

Notwithstanding anything in this agreement or in any statute to the contrary, if Grantors die under any circumstances in which there is insufficient evidence to prove which one died first or insufficient evidence to prove that they died otherwise than simultaneously, for the purposes of this trust, it shall be presumed that the husband died first.

## ARTICLE VIII
### Principal and Income Determinations

On the death of any income beneficiary of a trust created under this agreement, including Grantors, any accrued but unpaid income shall be distributed as income to the next succeeding beneficiary. Otherwise, in determining whether receipts and disbursements are allocated to principal or income, the trustees shall be governed by the principal and income law of Florida, as it may have been amended at the time of determination.

## ARTICLE IX
### Revocability

Grantors retain the following rights and powers:

a.      The right to revoke this agreement and the trusts created in it by a writing delivered to the trustees.

b.      The right to revoke this agreement and the trusts created in it with respect to any funds, securities, or other property held by the trustees and to require the same to be paid over, assigned, and delivered to me, free from trust, by writing delivered to the trustees.

c.      The right and power to amend, change, and supplement this agreement by written agreement between me and the trustees, executed in like manner as this Trust Agreement.

d.      The right and power to remove any trustee serving under this agreement, without cause, by a writing delivered to the trustees, and to appoint a successor trustee.

## ARTICLE X
### Arbitration of Disputes

All disputes arising under this trust, other than disputes of the validity of all or a part of the trust, between or among the beneficiaries and a fiduciary under the trust, or any combination of such persons or entities, shall be submitted to binding arbitration.

## ARTICLE XII
### Miscellaneous

This Trust Agreement is a Florida contract, and it shall be construed according to and be governed by the laws of the State of Florida.

The headings used herein are intended solely for use as reference and are not intended to be a

part of this agreement.

Florida law may impose duties and responsibilities on a trustee in addition to those described in this Trust Agreement.

When necessary or appropriate to the meaning in this agreement, the singular and plural are interchangeable, and words of any gender include all genders.

It is the express intent of the Grantors that property held under the Trust Agreement be held as Tenants by the Entirety.

IN WITNESS WHEREOF, the trustee and I have duly executed this Trust Agreement the day and year first written on the first paragraph of this document.

Grantor
**ROBERTO ROMAGNOLI**

Grantor
**MARIA ANTONIETA LAVIOSA**

Trustee
**ROBERTO ROMAGNOLI**

Trustee
**MARIA ANTONIETA LAVIOSA**

## EXHIBIT A

(1) **Condominium Unit No. PH-1103, in AZURE, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 23738, Page 743 of the Public Records of Miami-Dade County, Florida.**

   **AKA:** 9401 Collins Ave., Apt. 1103, Surfside, FL 33154
   **FOLIO NUMBER:** 14-2235-046-0310

(2) **Unit 2504, THE METROPOLITAN, a Condominium according to the Declaration of Condominium thereof, filed April 16, 2001 and recorded under Clerk's File No. 01R-186030 and recorded in Official Records Book 19604, page 1579 , of the Public Records of Miami-Dade County, Florida.**

   **AKA:** 2475 Brickell Ave., Unit 2504, Miami , FL 33131
   **FOLIO NUMBER:** 01-4140-032-0780

(3) **Lot 64, ROYAL LEGACY ESTATES,  according to the plat thereof, as recorded in Plat Book 81, Page(s)125 through 129, Public Records of Orange County, Florida**

   **AKA:** 11843 Prince George Way, Orlando, FL 32836
   **PARCEL NUMBER:** 01-24-27-7140-00-640

We certify that the above instrument was signed willingly, published, and declared by Roberto Romagnoli and Maria Antonieta Laviosa, as **THE VAROMA JOINT REVOCABLE LIVING TRUST AGREEMENT,** in our joint presence, and at the request of Roberto Romagnoli and Maria Antonieta Laviosa, we have signed our names as attesting witnesses in the presence of each other on October 14, 2015.

Witness 1):    **Sandra C. Sweat**
2800 Weston Rd., #103, Weston, FL 33331

Witness 2):    Helen Tamburi
2800 Weston Rd., #103, Weston, FL 33331

STATE OF FLORIDA        )
County of Broward        )

Acknowledged and subscribed before me by Roberto Romagnoli and Maria Antonieta Laviosa, who have both produced Florida Drivers Licenses as identification, and sworn to and subscribed before me by the witnesses, **Sandra C. Sweat** _____ Helen Tamburi _____ and _____, who are personally known to me and subscribed by me in the presence of the each other, all on October 14, 2015.

LUISA F. RENGIFO
MY COMMISSION # FF 016732
EXPIRES: May 9, 2017
Bonded Thru Notary Public Underwriters

Notary Public

**Luisa F. Rengifo**

Print Name

Exhibit 6

# OPERATING AGREEMENT FOR MANAGEMENT

## MAROVA, LLC

THIS AGREEMENT, is made this __11th__ day of ___March_____, 20_11__ between Marova, LLC and the members (as hereinafter defined) of said Limited Liability Company, for the purpose set forth herein:

RECITALS:

WHEREAS, the Articles of Organization of Marova, LLC permit the election/appointment/designation of manager(s)/managing member(s) in accordance with Florida Statute 608.404(8); and

WHEREAS, Marova, LLC and manager(s)/managing member(s) desire to set forth the terms and provisions of the management of Marova, LLC in accordance with Florida Statutes 608.422.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, it is agreed as follows:

1. Marova, LLC retains the hereinafter named person(s) as manager(s)/managing member(s) for this Limited Liability Company.

2. The compensation terms for the services of the within manager(s)/managing member(s) are as follows:

_____

_____

_____

3. The manager(s)/managing member(s) are retained/appointed/designated to perform the following:

(a) Manage the day to day affairs of Marova, LLC, subject to the restrictions limitations and instructions as may be agreed upon by the members of Marova, LLC.

(b) Adopt, amended and/or repeal regulations of Marova, LLC in accordance with Florida Statute.

(c) Enter into contracts and agreements, incur debt or exercise the powers of Marova, LLC necessary for the management of Marova, LLC business, except as may be otherwise restricted or

FLMINLC

provided by agreement of the members of Marova, LLC.

(d) _____

_____

_____

**4.** The term of this agreement shall expire at the annual meeting of members unless the manager(s)/managing member(s) resign, or removed or otherwise cease serving as manager(s)/managing member(s) and successors thereto are appointed/elected by the members.

**5.** The operation of Marova, LLC will be conducted in accordance with the provisions of this agreement.

## FURTHER PROVISIONS REGARDING THE LIMITED LIABILITY COMPANY

### I. DEFINITIONS

For purposes of this operating agreement, the following terms are defined as follows:

**Section 1. Articles of Organization.** As used throughout this operating agreement, this term is defined as the document creating Marova, LLC pursuant to Florida Statute 608.407.

**Section 2. Capital Account.** As used throughout this operating agreement, this term is defined as the agreed value of the initial contributions, increased by amounts subsequently contributed to capital and reduced by distributions as set forth in Florida Statute 608.402(6).

**Section 3. Limited Liability Company.** As used throughout this operating agreement, this term is defined as the entity herein created in accordance with Florida Statutes Chapter 608 et. seq.

**Section 4. Manager(s).** As used throughout this operating agreement, this term is defined as the persons who are elected or appointed pursuant to the Articles of Organization or by this operating agreement of Marova, LLC to manage the affairs of this entity pursuant to Florida Statutes 608.422 and 608.4225. The manager(s) are designated/appointed as follows:

_____

_____

_____

_____

_____

_____

**Section 5. Managing Member(s).** As used throughout this operating agreement, this term is defined as the member(s) appointed or elected by the members of Marova, LLC to manage this entity as set forth in Florida Statue 608.402(20). The managing member(s) are designated/appointed as follows:

FLMINIC

Roberto Romagnoli & Maria Antonieta Laviosa

_____

_____

_____

_____

_____

**Section 6.  Majority Relative Capital Account Vote.**  As used throughout this operating agreement, this term is defined as the vote of members of Marova, LLC, entitled to vote, who together hold relative capital accounts (as that term is defined under Florida Statue 608.402(17)) in excess of fifty per cent (50%) of the total the capital accounts of all members.

**Section 7. Member(s).**  As used throughout this operating agreement, this term is defined as any person who has an equity interest in Marova, LLC represented by a capital account as set forth in Florida Statute 608.402(21).  The member(s) are defined as follows:

Roberto Romagnoli & Maria Antonieta Laviosa-Tenant by Entirety  100%

_____

_____

_____

_____

_____

**Section 8. Member's Promise to Contribute.**  As used throughout this operating agreement, this term is defined as a promise by a member to contribute to  Marova, LLC which is set forth in writing and signed by the said member, pursuant to Florida Statute 608.4211(2).

**Section 9.  Operating Agreement.**  As used throughout this operating agreement, this term is defined as the written provisions set forth herein which are adopted for the management and operating agreement of the affairs of Marova, LLC and which set forth the relationships of the members as set forth in Florida Statute 608.402(24).

**Section 10.  Relative Capital Account.**  As used throughout this operating agreement, this term is defined with respect to a member, the ratio, the numerator of which is the capital account of that member and the denominator of which is total of the capital account of all members as set forth in Florida Statue 608.402(6).

## II.  MEETINGS OF MEMBERS

**Section 1. Annual Meeting.**  The annual membership meeting of  Marova, LLC will be held on

FLMINLC

the _____ day of _____ _____, of each year or at such other time and place as designated by the managing members(s) (or manager(s) as applicable) of Marova, LLC provided that if said day falls on a Sunday or legal holiday, then the meeting will be held on the first business day thereafter. Business transacted at said meeting may include the election/appointment/designation of manager(s)/managing member(s) of Marova, LLC.

**Section 2. Special Meetings.** Special meetings of the member(s) will be held when directed by a member(s), manager(s) or managing member(s) provided that said person(s) sign, date and deliver to Marova, LLC's managing member(s) (or manager(s) if applicable) one or more written demands for the meeting describing the purposes(s) for which it is to be held. A meeting so requested will be called for a date not less than 10 nor more than 60 days after the request is made, unless the member (or manager(s) or managing member(s)) requesting the meeting designates a later date. The call for the meeting will be made by the member(s), manager(s) or managing member(s) initiating the request.

**Section 3. Place.** Meetings will be held at the principal place of business of Marova, LLC or at such other place as is designated by the members.

**Section 4. Record Date and List of Members.** The members of Marova, LLC shall fix the record date; however, in no event may a record date fixed by the members be a date prior to the date on which the resolution fixing the record date is adopted.

After fixing a record date for a meeting, the member(s) (manager(s) or managing member(s), if applicable) shall prepare an alphabetical list of the names of all the Marova, LLC's members who are entitled to notice of a meeting, arranged by name with the address and relative capital account of each member. Said list shall be available for inspection in accordance with Florida law.

**Section 5. Notice.** Written notice stating the place, day and hour of the meeting, and the purpose(s) for which said special meeting is called, will be delivered not less than 10 nor more than 60 days before the meeting, either personally or by first class mail, by or at the direction of managing member(s) (or manager(s) if applicable) calling the meeting to each member of record entitled to vote at such meeting. If mailed, such notice will be deemed to be effective when deposited in the United States mail and addressed to the member at the member's address as it appears on the membership Ledger of Marova, LLC, with postage thereon prepaid.

Marova, LLC shall notify each member, entitled to a vote at the meeting, of the date, time and place of each annual and special meeting no fewer than 10 or more than 60 days before the meeting date. Notice of a special meeting shall describe the purpose(s) for which the meeting is called. A member may waive any notice required hereunder either before or after the date and time stated in the notice;

FL.MINLC

however, the waiver must be in writing, signed by the member entitled to the notice and be delivered to Marova, LLC for inclusion in the minutes of Marova, LLC.

**Section 6. Notice of Adjourned Meeting.**  When a meeting is adjourned to another time or place, it will not be necessary to give any notice of the adjourned meeting provided that the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken. At such an adjourned meeting, any business may be transacted that might have been transacted on the original date of the meeting. If, however, a new record date for the adjourned meeting is made or is required, then, a notice of the adjourned meeting will be given on the new record date as provided in this Article to each member of record entitled to notice of such meeting.

**Section 7. Member Quorum and Voting.**  Members representing more that 50% of the relative capital accounts of Marova, LLC, represented in person or by proxy, will constitute a quorum at a meeting of members.

If a quorum, is present as herein defined, a Majority Relative Capital Account Vote represented at the meeting will be the act of the members unless otherwise provided by law.

**Section 8. Voting by Members.**  All members of Marova, LLC are entitled to vote on matters relating to Marova, LLC except to the extent otherwise provided in the Articles of Organization or in this Operating Agreement. Each member's vote shall be weighted in proportion to the member's relative capital account; however, if the capital account of each member is negative or zero, each member shall have one vote. Any manager who is not a member shall not be entitled to vote on matters relating to Marova, LLC, except to the extent otherwise provided in the Articles of Organization or in this operating agreement.

**Section 9. Proxies.**  A member may vote either in person or by proxy provided that any and all proxies are executed in writing by the member or his duly authorized attorney-in-fact. No proxy will be valid after the duration of 11 months from the date thereof unless otherwise provided in the proxy.

**Section 10. Action by Members Without a Meeting.**  Any action required or permitted by law, this operating agreement, or the Articles of Organization of Marova, LLC to be taken at any annual or special meeting of members may be taken without a meeting, without prior notice and without a vote, provided that the action is taken by the members constituting a Majority Relative Capital Account Vote. The foregoing actions(s) shall be evidenced by written consents describing the action taken, dated and signed by members constituting a Majority Relative Capital Account Vote and delivered to Marova, LLC in accordance with Florida law. Within 10 days after obtaining such authorization by written consent, notice shall be given to those members who have not consented in writing or who are not

5 of 13

entitled to vote. Said notice shall fairly summarize the material features of the authorized action.

## III. MANAGEMENT

**Section 1:  Management of Limited Liability Company.**  Unless otherwise provided in the Articles of Organization or in this operating agreement, the management of Marova, LLC shall be vested in the members in proportion to the members' contributions to the capital of Marova, LLC, as adjusted from time to time to properly reflect any additional contributions or withdrawals by the members.

If the Articles of Organization or this operating agreement provide for the management of Marova, LLC by a manager(s) or managing member(s), said manager(s) or managing member(s) shall be elected annually by the members in the manner prescribed by this operating agreement.  Such manager(s) or managing member(s) shall hold the offices and have responsibilities accorded to them by the members and set out in the Articles of Organization or this operating agreement of Marova, LLC. The manager(s) or managing member(s) of  Marova, LLC shall discharge said person(s)' duties , including duties as a committee member in accordance with Florida Statute 608.4225.

## Section 2:  Liability of Managers, Managing Members and Members.

Neither the members of  Marova, LLC nor the managers or managing members are liable under a judgment, decree or order of a court or in any other manner, for a debt, obligation or liability of Marova, LLC, except as provided in Florida Statutes 608 et. seq. Notwithstanding the foregoing, the manager(s) and/or managing member(s) of Marova, LLC may be found liable to the extent set forth in Florida Statute 608.4362.

## IV. MANAGING MEMBER(S) OR MEMBER(S)

**Section 1.  Function.**  All limited liability company powers, business, and affairs will be exercised, managed and directed by  Marova, LLC's _____

_____.

**Section 2. Qualification.**  Managing member(s) (or manager(s) if applicable) must be natural persons of 18 years of age or older but need not be residents of this state and need not be members of Marova, LLC.  Managing member(s) must be member(s) of  Marova, LLC; however, if manager(s) are utilized, manager(s) need not be member(s) of  Marova, LLC.

**Section 3. Compensation.**  The member(s) will have authority to fix the compensation (if any) for the manager(s) and/or managing member(s) of  Marova, LLC.

**Section 4.  Number.**  If managing member(s) are used by  Marova, LLC, the number of managing member(s) will be as set forth hereafter.  If manager(s) are used by  Marova, LLC, the number

6 of 13

of manager(s) will be as set forth hereafter.  Said number is ___2___.

**Section 5.  Election and Term.**  Each person named in the Articles of Organization as a managing member(s) or manager(s) will hold office until the first annual meeting of member, or until the earlier resignation, removal or death of said managing member(s) or manager(s).

At the first annual meeting of members and at each annual meeting thereafter, the members will elect managing member(s) (or manager(s), if applicable) to serve until the next annual member meeting, prior resignation, removal or death.

**Section 6.  Vacancies.**  Any vacancy occurring in the managing member(s) (or manager(s) if applicable) will be filled by a Majority Relative Capital Account Vote.  A managing member or manager so elected to fill a vacancy will hold office only until the next annual meeting of members.

**Section 7.  Removal and Resignation of Managers.**  At a meeting of managers called expressly for that purpose, any managing member(s) (or manager(s) if applicable) may be removed by a Majority Relative Capital Account Vote.  Managing member(s) (or manager(s) if applicable) may resign at any time by delivering written notice to the members of Marova, LLC.  Such a resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

## V.  MEMBERSHIP CERTIFICATES

**Section 1.  Issuance.**  Every member in  Marova, LLC will be entitled to have a certificate representing said member's interest in the limited liability company.  No certificate representing such membership will be issued until the respective member has fully paid the initial capital contribution applicable for said member.

**Section 2.  Form.**  Certificates representing membership in  Marova, LLC will be signed by the managing member(s) (or manager(s) if applicable) and will be sealed with the seal of  Marova, LLC.

**Section 3.  Admission and Transferability of Membership.**  Unless otherwise provided in the Articles of Organization or in this operating agreement, a member's interest in  Marova, LLC is not assignable in whole or in part, unless a majority of the non assigning members consent to this assignment.  Thus, an assignee of an interest in a limited liability company may not become a member unless all other members consent.  As assignee who has become a member has, to the extent assigned, the rights and powers, and is subject to the restrictions and liabilities, of a member under the Articles of Organization, this operating agreement and Florida law.   An assignee who becomes a member also is liable for the obligations of his assignor to make and return contributions as provided under Florida Statutes 608.421 and 608.428; however, the assignee is not obligated for liabilities which are unknown to the assignee at the time he became a member and which could not be ascertained  this operating

FLMINLC

agreement hereof. If an assignee of an interest in Marova, LLC becomes a member, the assignor is nor released from liability to the limited liability company under Florida Statutes 608.4211, 608.426 and 608.4362. As assignment of a member's interest in Marova, LLC does not dissolve the limited liability company or entitle the assignee to become or to exercise any rights or powers of a member. An assignment entitles the assignees to share in the profits and losses of Marova, LLC, to receive such distribution(s) and to receive such allocation of income, gain, loss deduction or credit or similar item to which the assignor was entitled, to the extent assigned. A member ceases to be a member and ceases to have the power(s) to exercise of a member upon assignment of his entire interest in Marova, LLC.

If an individual member dies or is adjudged incompetent to manage his person or his property by a court of competent jurisdiction, the member's legal representative may exercise all the member's rights for the purpose of settling such member's estate or administering such member's property, including any power the member had to give an assignee the right to become a member. If a non-individual member is dissolved or terminated, the powers of that member may be exercised by its legal representative or successor.

No person may be admitted as a member unless each member consents in writing to the admission of the additional member, unless otherwise provided in the Articles of Organization or in this operating agreement.

**Section 4. Lost, Stolen, or Destroyed Certificates.** If a member claims that a membership certificate issued and recorded by Marova, LLC has been lost or destroyed, a new certificate will be issued to said member, provided that said member presents an affidavit claiming the said certificate to be lost, stolen or destroyed. At the discretion of the managing member(s) (or manager(s), if applicable), said member may be required to deposit a bond or other indemnity in such amount and with such sureties, if any, as the members may require.

## VI. BOOKS AND RECORDS

**Section 1. Books and Records.** Marova, LLC shall keep as permanent records the following:

(a) Current list of the full names and last known business addresses of all members;

(b) Copy of the articles of organization and all certificates of amendments thereto, together with executed copies of any powers of attorney pursuant to which any certificate was executed;

(c) Copies of Marova, LLC's federal, state and local income tax returns and reports, if any, for the three (3) most recent years;

(d) Copies of any effective operating agreement and financial statements of Marova, LLC for the three (3) most recent years;

FLMINLC

(e) Unless contained in the articles of organization or the operating agreement, a writing setting forth:

(i) The amount of cash and a description and statement of the agreed value of the other property or services contributed by each member and which each member has agreed to contribute;

(ii) The times at which or events on the happening of which any additional contributions agreed to be made by each member are to be made;

(iii) Any events upon the happening of which the limited liability company is to be dissolved and its affairs wound up."

**Section 2. Member's Inspection Rights.** A member of Marova, LLC (including a beneficial owner whose interest are held in a trust or a nominee on behalf of a beneficial owner) may inspect and copy, during regular business hours at Marova, LLC's principal office, any of Marova, LLC records required to be kept pursuant to Section 1, of this Article of these operating agreement, if said member gives Marova, LLC written notice of such demand at least 5 business days before the date on which the member wishes to inspect and copy. The foregoing right of inspection is subject however to such other restrictions as are applicable under Florida law, including, but not limited to, the inspection of certain records being permitted only if the demand for inspection is made in good faith and for a proper purpose (as well as the member describing with reasonable particularity the purpose and records desired to be inspected and such records are directly connected with the purpose).

**Section 3. Other Reports to Members.** Marova, LLC shall report any indemnification or advanced expenses to any managing member, manager, employee, or agent (for indemnification relating to litigation or threatened litigation) in writing to the members with or before the notice of the next members' meeting, or prior to such meeting if the indemnification or advance occurs after the giving of such notice but prior to the time such meeting is held, which report shall include a statement specifying the persons paid, the amounts paid, and the nature and status, at the time of such payment, of the litigation or threatened litigation.

## VII. CONTRIBUTIONS

**Section 1.   Contributions by Members.** The contribution of a member may be in cash, property or services rendered or a promissory note or other obligation to contribute cash or property or to perform services as set forth in Florida Statute 608.4211. A member is obligated to Marova, LLC to perform any enforceable promise to contribute cash or property or services, even if he is unable to perform because of his death, disability or any other reason. If a member does not make the required contribution of property or services, he is obligated at the option of Marova, LLC to contribute cash

9 of 13

FLMINLC

equal to that portion of the value, as stated in the records of Marova, LLC of the stated contribution that have not been made. The obligation of a member to make a contribution or return money or other property paid or distributed in violation of these operating agreements or of Chapter 608, Florida Statutes, may be compromised only by consent of all the members.

**Section 2. Failure to Make Contributions.**  Any member who fails to make any contribution which said member is obligated to make shall be subject to the following penalties or consequences as may be determined by the non-defaulting members:

(i) The defaulting member's proportionate interest in Marova, LLC may be reduced;

(ii) The defaulting member's interest may be subordinated to the interest(s) of the non-defaulting members;

(iii) The defaulting member's interest may be subjected to forced sale;

(iv) The defaulting member's interest may be forfeited;

(v) The loan by the non-defaulting members to the defaulting member of the amount necessary to meet the defaulting member's commitment on such terms as may be reasonable and proper;

(vi) The fixing of the value of the defaulting member's interest in Marova, LLC by appraisal or by formula and redemption or sale of such interest at such value; and/or

(vii) Such other penalties and/or consequences as may be determined to be fair and reasonable, under the circumstances.

## VIII.  DISTRIBUTIONS

Marova, LLC may from time to time distribute its property to its members in accordance with this operating agreement, except that no distribution may be made if after the distribution Marova, LLC would not be able to pay its debts as they become due in the usual course of business, or Marova, LLC's total assets would be less than the sum of its total liabilities (except liabilities to members on account of their contributions, unless otherwise provided in the Articles of Organization). The distributions, when made, must be allocated on the basis of each member's relative capital account. The managing member(s) (or manager(s) if applicable) may base a determination that a distribution is proper either on financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances. In the case of any distribution based upon such valuation, each such distribution shall be identified as a distribution based upon a current valuation of assets, and the amount distributed shall be disclosed to the receiving members concurrent with their receipt of the distribution.

## IX.  SHARING OF PROFITS AND LOSSES

FLMINLC

The profits and losses of Marova, LLC shall be allocated among the members on the basis of each member's relative capital accounts.

## X.  WITHDRAW/REDUCTION OF CAPITAL CONTRIBUTIONS

A member may withdraw from Marova, LLC upon not less than six (6) months' prior written notice on each non withdrawing member at the records for each such non withdrawing member appearing on Marova, LLC's records.  Upon withdrawal, a withdrawing member is entitled to receive any distribution to which he is entitled under the Articles of Organization and the within operating agreement hereunder.  At the minimum, the withdrawing member is entitled to receive the balance of such member's capital account within a reasonable time after withdrawal; however, such a withdrawing member may not receive a distribution from Marova, LLC to the extent that after giving effect to the distribution, all liabilities of  Marova, LLC (other than liabilities to members on account of their ownership interests) exceed the value of Marova, LLC's assets.  Irrespective of the nature of a member's contribution, a member has only the right to demand and receive cash in return for such member's contribution to capital.  If a member receives the return of any part of such member's contribution, such member is subject to potential liability for and in the amount set forth in Florida Statute 608.428.

## XI.  LIMITED LIABILITY COMPANY SEAL

The manager(s)/managing member(s) will provide a limited liability company seal which will be in circular form embossing in nature and stating "Limited Liability Company Seal", "Florida", year of organization and name of Marova, LLC.

## XII.   ADOPTION, ALTERATION, AND REPEAL OF OPERATING AGREEMENT

The power to adopt, alter, or repeal provisions of this operating agreement of Marova, LLC shall be vested in the members of the company (unless vested in the manager(s) or in the managing member(s) by the Articles of Organization) provisions of this operating agreement adopted by the members (or manager(s)/managing member(s) if applicable) may be repealed or altered; new provisions of this operating agreement may be adopted; and the members may prescribe in any regulations that such operating agreement may not be altered, amended or repealed by the manager(s)/managing member(s).  The operating agreement may contain any provisions for the provisions of this operating agreement and management of the affairs of  Marova, LLC which are consistent with law and the Articles of Organization.

If the management of  Marova, LLC is vested in a manager(s) or managing member(s), the manager(s) (or managing member(s) if applicable) may adopt provisions of this operating agreements to be effective only in an emergency.  An emergency exists if Marova, LLC's manager(s) (or managing

FLMINLC

member(s) if applicable) cannot readily be assembled because of some catastrophic event. The emergency provisions of this operating agreement, which are subject to amendment or repeal by the members, may make all provisions necessary for managing Marova, LLC during an emergency, including procedures for calling a meeting of the manager(s) (or managing member(s) if applicable) and designation of additional or substitute manager(s) (or managing member(s) if applicable). All provisions of the regular operating agreement consistent with the emergency provisions of this operating agreement remain effective during the emergency. The emergency provisions of this operating agreement are not effective after the emergency ends. Actions taken by Marova, LLC in good faith in accordance with the emergency operating agreement have the effect of binding the company and may not be used to impose liability on a manager(s), managing member(s) (if applicable), employee, or agent(s) of the company.

FLMINLC

Year 2011

**IN WITNESS WHEREOF,** the parties have exacted this agreement on the year and date above written.

Manager(s)/Managing Member(s)/Member(s):


Marova, LLC


_____
MANAGER/MANAGING MEMBER

_____
MANAGER/MANAGING MEMBER

_____
MANAGER/MANAGING MEMBER

_____
MANAGER/MANAGING MEMBER

_____
MANAGER/MANAGING MEMBER

_____
MEMBER

_____
MEMBER

_____
MEMBER

_____
MEMBER

_____
MEMBER

FLMINLC

EXHIBIT "C"

ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
1—4

**Page 1**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  19-26521-LMI

Chapter 7

In re:

ROBERTO ROMAGNOLI

    Debtor

_____/

REMOTE DEPOSITION OF

ROBERTO ROMAGNOLI

VOLUME 1

Pages 1 through 151

Tuesday, June 9, 2020

9:25 a.m. - 2:50 p.m.

Miami, Florida 33131

Stenographically Reported By:

Alexa Goldman, FPR

**Page 2**

1  APPEARANCES:
2
    On behalf of Mr. Romagnoli:
3
      AARONSON, SCHANTZ, BEILEY, P.A.
4      One Biscayne Tower, 34th Floor
      2 South Biscayne Boulevard
5      Miami, Florida 33131
      BY:  TAMARA D. McKEOWN, ESQ.
6      tmckeown@aspalaw.com
7
    On behalf of Ms. Yip:
8
      MARK, MIGDAL & HAYDEN
9      80 SW 8th Street
      Suite 1999
10     Miami, Florida 33130
      (305)374-0440
11     BY:  MAIA ARON, ESQ.
      maia@markmigdal.com
12
13
14
    ALSO PRESENT:
15 Isaac Marcushamer, Esq.
16
17
18
19
20
21
22
23
24
25

**Page 3**

1          I N D E X
2  Examination                     Page
3  Direct    By Ms. Aron           6
4  Cross     By Ms. McKeown     132
5  Redirect  By Ms. Aron         139
6  Recross   By Ms. McKeown     145
7  Certification               148
8  Errata Sheet (forwarded upon execution)   149
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1          EXHIBITS
2                  Page
3  Exhibit 1    Voluntary Petition and    11
             Schedules
4
    Exhibit 2    Warranty Deed (Azure)    16
5
    Exhibit 3    HUD Settlement Statement  17
6               (Azure)
7  Exhibit 4    QC Deed (Azure)       19
8  Exhibit 5    Varoma Trust         21
9  Exhibit 6    QC Deed (Metropolitan)  37
10 Exhibit 7    QC Deed (Metropolitan)  38
11 Exhibit 8    QC Deed (6th Street)   48
12 Exhibit 9    Sunbiz.org for Marova   51
13 Exhibit 10   Articles of Organization  53
             (Marova)
14
    Exhibit 11   IRS Employer ID     54
15
    Exhibit 12   Marova, LLC Membership  55
16              Certificates
17 Exhibit 13   Operating Agreement for  59
             Marova, LLC
18
    Exhibit 14   Marova, LLC '14 Annual Report  60
19
    Exhibit 15   Marova, LLC '15 Annual Report  62
20
    Exhibit 16   Marova, LLC '14 Tax Return  64
21
22 Exhibit 17   Marova, LLC '15 Tax Return  67
23 Exhibit 18   Marova, LLC '18 Tax Return  69
24 Exhibit 18A  American Express Billing  88
             Statement
25



Page 5

EXHIBITS (CONT'D)                                    Page

Exhibit 18B    American Express Billing                 90
               Statement
Exhibit 18C    SR Acquisitions Homestead v.             91
               Marco and Roberto Romagnoli
               Complaint
Exhibit 18D    SR Acquisitions Florida City             92
               v. Marco and Roberto Romagnoli
               Complaint
Exhibit 19     QC Deed (Orlando)                        96
Exhibit 20     QC Deed (Orlando)                        98
Exhibit 20A    Loan Application (Orlando)              103
Exhibit 21     Special Warranty Deed                   105
               (Brickell Heights)
Exhibit 21A    Loan Application (Brickell              108
               Heights)
Exhibit 22     Final Judgment (SR                      121
               Acquisitions Florida City)
Exhibit 23     Final Judgment (SR                      122
               Acquisitions Homestead)
Exhibit 24     Concepcion Final Judgment               125
Exhibit 25     Otero Final Judgment                    126
Exhibit 26     Money Wires                             128
Exhibit 27     Order Granting Dismissal of             131
               Case
Exhibit 28     Operating Agreement for                 132
               Management
Exhibit 29     Warranty Deed (Orlando)                 138

Page 6

1  The following proceedings began at 9:25 a.m.:
2        THE COURT REPORTER:  Please raise your
3  right hand.
4        Do you swear or affirm that the testimony
5  you are about to give will be the truth, the whole
6  truth, and nothing but the truth?
7        THE WITNESS:  Yes.
8  Thereupon:
9        ROBERTO ROMAGNOLI,
10  having been first duly sworn, was examined and
11  testified as follows:
12        DIRECT EXAMINATION
13  BY MS. ARON:
14     Q.  Mr. Romagnoli, good morning.  How are you
15  today?
16     A.  Good morning.  Thank you.  Doing well.
17     Q.  My name is Maia Aron.  I am an attorney at
18  Mark, Migdal, and Hayden.  I represent the trustee
19  Maria Yip in this case.
20        Can you please state your name for the
21  record.
22     A.  Roberto Romagnoli.
23     Q.  I want to go through a couple of
24  examination rules.  Do you understand that you have
25  to tell the truth, right?

Page 7

1     A.  Yes.
2     Q.  And you understand that you're under oath?
3     A.  Yes.
4     Q.  I will ask you that you please wait for me
5  to finish my question before you begin your answers
6  so that we can have a clear record, do you
7  understand that?
8     A.  Yes.
9     Q.  Okay.  If you don't understand a question,
10  please let me know.  If you answer the question,
11  I'll assume you understood it, okay?
12     A.  Yes.
13     Q.  If for whatever reason you can't hear me
14  because we are on a Zoom connection and my voice
15  comes out garbled or the sound goes off, please let
16  me know and I will repeat the question, do you
17  understand that?
18     A.  Okay.  Yes.
19     Q.  If you would like to take any breaks
20  during the examination, please let me know and we
21  can take breaks, okay?
22     A.  Okay.
23     Q.  Are you under the influence of any
24  medication that could affect your testimony today?
25     A.  No.

Page 8

1     Q.  I want to briefly talk about your
2  educational background after high school.  Did you
3  go to college?
4     A.  Yes.
5     Q.  Where did you go?
6     A.  I went to the University of Bridgeport in
7  Connecticut.
8     Q.  Did you graduate?
9     A.  Yes 1982.
10     Q.  What degree did you graduate with?
11     A.  Marketing.
12     Q.  Did you have any other formal education
13  after college?
14     A.  No.
15     Q.  Do you have any licenses, not a driver's
16  license, but a professional license?
17     A.  No.
18     Q.  Can you briefly tell me about your work
19  history after you graduated from college?
20     A.  After I graduated from college, I went
21  back to Venezuela and basically worked with my
22  family's company, my father's, until about 2000.
23  Always been working in a family business.  So that's
24  pretty much it.  Since 1983 until 2000 we had a
25  family business in Venezuela.



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
9–12

Page 9

1    Q.   In 2000 did you start working in another
2  field?
3    A.   Well, in 2000 I moved to Miami and started
4  doing investments, like buying a property, fixing
5  it.  I did a couple real estate investments with
6  some partners.  That was pretty much my line of
7  business, real estate investing, since 2000.
8    Q.   Did you do anything else professionally
9  besides real estate investments?
10   A.   No.
11   Q.   Are you employed today?
12   A.   No.  I help my wife at her office.
13   Q.   What does your wife do?
14   A.   She's a real estate broker.
15   Q.   Do you get paid for helping your wife?
16   A.   No.
17   Q.   What's your wife's name?
18   A.   Maria Laviosa.
19   Q.   Do you plan to be employed in the future?
20   A.   I hope so.
21   Q.   Have you ever been sued?
22   A.   Yes.
23   Q.   How many times?
24   A.   Once.
25   Q.   Who sued you?

Page 10

1    A.   SR Acquisitions.
2    Q.   Is that in Miami?
3    A.   Yes.
4    Q.   Going back to your wife.  When did you
5  marry your wife?
6    A.   2006.
7    Q.   Where did you get married?
8    A.   Miami.
9    Q.   Have you ever testified under oath or been
10  deposed?
11   A.   Yes.
12   Q.   How many times?
13   A.   Once.
14   Q.   In what case?
15   A.   The SR Acquisitions versus me.
16   Q.   When did you start helping your wife with
17  her job?
18   A.   Five years ago.
19   Q.   Did you ever get paid for helping your
20  wife with her job?
21   A.   I was getting paid until a year and a half
22  or two year ago.
23   Q.   Why did you stop getting paid a year and a
24  half, two years ago?
25   A.   Because after the litigation with SR

Page 11

1  Acquisitions, I was going through a very hard time,
2  and I wasn't performing like I should.  And my wife
3  is starting to take me out of the office for a
4  little while, then after a while I went back, like,
5  just helping her without salary.  Trying to get back
6  on track.
7    Q.   How many hours a week do you help your
8  wife with her job?
9    A.   About 30 hours a week, five, six hours a
10  day.
11   Q.   What tasks do you do?
12   A.   I pick up a client, take the client to see
13  a property, you know, that kind of stuff, basically.
14   Q.   Is there a reason for all those tasks that
15  you help your wife with that you don't get paid?
16   A.   I help her.  She's the one who gets paid.
17  She's the broker.
18   Q.   Have you ever been arrested?
19   A.   No.
20   Q.   I'm going to introduce Exhibit 1 in the
21  Zoom.
22        (Thereupon, the document was marked as
23     Exhibit 1.)
24        (Discussion off the record.)
25

Page 12

1  BY MS. ARON:
2    Q.   So Mr. Romagnoli, I have uploaded Exhibit
3  1, do you see it?
4    A.   The voluntary petition?
5    Q.   Yes.
6    A.   Yes, I can see it.
7    Q.   Is this the petition and the schedules
8  that you filed?
9    A.   Yes.
10   Q.   Is this petition and schedules accurate?
11   A.   Yes, to my knowledge.
12   Q.   Are there any changes that you would like
13  to make to this petition and schedules or are they
14  accurate the way they are?
15   A.   I think they're accurate.
16       MS. McKEOWN:  Can I interject?
17       MS. ARON:  Yes.
18       MS. McKEOWN:  I think there might be a
19  couple of corrections that I can't remember the
20  question number, the one that talks about rental
21  income.  I think a couple of those are a little
22  bit off, the rental income for the previous two
23  years.  So we can amend the SOPA just to correct
24  those.
25       MS. ARON:  Okay.

ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
13–16

Page 13

1    BY MS. ARON:
2        Q.    So aside from the rental incomes that your
3    counsel mentioned, are these petition and schedules
4    accurate?
5        A.    I think so.
6        Q.    Can you please -- oh, the rental income
7    that your counsel just mentioned, are you going to
8    file corrections to those numbers?
9        A.    I suppose.
10       Q.    Can you move to page 2 of the PDF?
11       A.    Yes.
12       Q.    If you look on the top, it says page 2 of
13    56.
14       A.    Yes, I'm on page 2 of 56.
15       Q.    If you look at section 5, do you see where
16    it says where you live?
17       A.    Yes.
18       Q.    Okay.  So you live at 9401 Collins Avenue,
19    Apartment 1103 in Surfside, Florida?
20       A.    Yes.
21       Q.    And who do you live with?
22       A.    My wife and my daughter.
23       Q.    How long have you lived at 9401 Collins?
24       A.    Since 2006.
25       Q.    Has 9401 Collins been your primary

Page 14

1    residence since 2006?
2        A.    Yes.
3        Q.    Okay.  Can you please move to page 16 of
4    56.
5        A.    Okay.  I'm in page 16.
6        Q.    Okay.  So look at section 25, please.  Do
7    you see there it says:  Varoma Joint Revocable
8    Living Trust?
9        A.    Yes, I do.
10       Q.    What is the Varoma Joint Revocable Living
11    Trust?
12       A.    A trust that my wife and I set up to
13    provide, you know, some security for our daughter,
14    like estate plan.  Since we're kind of old.
15    Basically, something happen to us, she would have
16    security, our daughter.
17       Q.    Was the Varoma Trust also set up to
18    protect you and your wife?
19       A.    I don't think so.  All we had in mind was
20    our daughter when we set up the trust.
21       Q.    Who owns 9401 Collins?
22       A.    Myself.
23       Q.    If you look at page 16, which is in front
24    of you, do you see where it says:  The Varoma Joint
25    Revocable Living Trust?

Page 15

1        A.    Yes.
2        Q.    It says:  Estate planning trust that owns
3    two parcels of real property.  And it lists the
4    debtor's homestead property in 9401 Collins, do you
5    see that?
6        A.    Yes.
7        Q.    Does this refresh your recollection as to
8    who owns 9401 Collins?
9        A.    Well, originally when I bought it, I
10    bought it myself before I get married, and then it
11    was received to the trust.
12       Q.    When did you buy 9401 Collins?
13       A.    I believe I closed in 2006.
14       Q.    So, today does the Varoma Trust own 9401
15    Collins?
16       A.    Yes.
17       Q.    When did you make the 9401 Collins
18    apartment your homestead?
19       A.    As soon as I bought it, I guess a few
20    months later.  I don't remember exact date, you
21    know, when I bought it.  That's when I homestead
22    because it was going to be my primary home.
23       Q.    Who owns the Varoma Trust?
24       A.    My wife and I.
25       Q.    Do you have any plans to move out of the

Page 16

1    9401 Collins Avenue apartment?
2        A.    No.
3        Q.    Do you have any plans to sell the
4    apartment?
5        A.    No, I don't think so.  I mean, we like it
6    there.  We been there for so long.  We want to get
7    old there.
8        Q.    So you have no intention of renting that
9    apartment?
10       MS. McKEOWN:  Object to the form.
11       A.    No, I don't think so.  That's the place
12    we'd like to live.
13    BY MS. ARON:
14       Q.    I'll now introduce Exhibit 2.  I'll now
15    put it in the chat.
16       (Thereupon, the document was marked as
17    Exhibit 2.)
18    BY MS. ARON:
19       Q.    Mr. Romagnoli, do you have Exhibit 2 in
20    front of you?
21       A.    Yes.
22       Q.    Do you know what this document is?
23       A.    It's a warranty deed.
24       Q.    And is this a warranty deed for the
25    property at 9401 Collins, Apartment 1103?



ROBERTO ROMAGNOLI VOLUME 1                                    June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                           17–20

Page 17
1      A.  I don't know this.
2      Q.  What's the name of the building?
3      A.  Azure Condominium.
4      Q.  If you go down to the middle of the
5  document, do you see it says:  Condominium Unit PH
6  1103 in Azure, do you see that?
7      A.  Yeah, yeah, yeah, Unit PH 1103, Surfside,
8  yeah, Azure Condominium, that's where I live.
9      Q.  Does this warranty deed refresh your
10 recollection that you purchased Apartment 1103 in
11 Azure, 9401 Collins, in December of 2005?
12     A.  I can see now.  Yeah, December 2005.
13     Q.  And you bought this apartment as a single
14 man, right?
15     A.  Yes.
16     Q.  I will now introduce Exhibit 3.  I'm now
17 going to put it in the chat.
18         (Thereupon, the document was marked as
19         Exhibit 3.)
20 BY MS. ARON:
21     Q.  Mr. Romagnoli, do you have the exhibit in
22 front of you?
23     A.  Yes.
24     Q.  If you could please go to the --
25         MS. McKEOWN:  Can you identify it for the

Page 18
1  record because I don't have your email yet?
2         MS. ARON:  Exhibit 3 is US Department of
3  Housing and Urban Development settlement statement
4  for the property at 9401 Collins Avenue, Unit
5  PH1103.
6         MS. McKEOWN:  Thank you.
7         MS. ARON:  You're welcome.
8  BY MS. ARON:
9      Q.  So Mr. Romagnoli?
10     A.  Yes, I'm there.
11     Q.  Is this your signature at the bottom where
12 it says filer?
13     A.  Yes, that's my signature.
14     Q.  If you can please go back to the first
15 page.
16     A.  I'm here.
17     Q.  Look at section D.  It says name and
18 address of borrower, and then it says Roberto
19 Romagnoli, single man.  Do you see that?
20     A.  Yes.
21     Q.  This is for the 9401 Collins Avenue, Unit
22 1103, right?
23     A.  Yes.
24     Q.  I will now introduce Exhibit 4.
25

Page 19
1         (Thereupon, the document was marked as
2         Exhibit 4.)
3         MS. McKEOWN:  Identify it as well.
4         MS. ARON:  Yes.  Let me send it.
5  BY MS. ARON:
6      Q.  Mr. Romagnoli, if you can please open --
7      A.  Yes, I opened it.
8      Q.  Do you know what this document is?
9         MS. McKEOWN:  Can you identify it?
10        MS. ARON:  Yes.  Quitclaim Deed dated
11 October 14, 2015, which relates to Unit 1103.
12 BY MS. ARON:
13     Q.  Do you know what this document is?
14     A.  Yes.
15     Q.  What is this document?
16     A.  This is I believe when we transfer the
17 property to the trust, if I'm not mistaken.
18     Q.  Is this your signature in the document?
19     A.  Yes.
20     Q.  And you testified earlier today that you
21 transferred the property to the trust.  Can you
22 please repeat that, why did you transfer this
23 property, 9401, to the trust?
24     A.  To provide security for our daughter in
25 case something happen to me and my wife or both,

Page 20
1  basically.
2      Q.  Do you know if the property, the 9401
3  apartment, is held by the Varoma Trust as tenants by
4  the entireties with your wife?
5         MS. McKEOWN:  Object to the form.
6      A.  Yes.  It says so.
7         MS. McKEOWN:  Did you say the property or
8  the trust is held by the entireties?
9         MS. ARON:  I asked if the property held by
10 Varoma Trust, the 9401 apartment, is held as
11 tenants by the entireties with your wife.
12        MS. McKEOWN:  Thank you.
13 BY MS. ARON:
14     Q.  Mr. Romagnoli, before the property was
15 deeded to the Varoma Trust, it was owned by you
16 individually, right?
17     A.  Yes.
18     Q.  Do you know why on the deed it says on the
19 first paragraph Grantor Roberto Romagnoli, a married
20 man joined by his spouse, Maria Antonieta Laviosa,
21 if your wife did not own the property before?
22     A.  I don't understand.  I mean, that's the
23 way the attorney did it.  I don't know.
24     Q.  Who is the attorney who prepared this?
25     A.  The trust?  Luisa Rengifo did.



ROBERTO ROMAGNOLI VOLUME 1                                          June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                                      21—24

Page 21

1    Q.   I see her name here on the deed.  Did she
2  also prepare this deed?
3    A.   Probably.
4    Q.   What did you get for transferring this
5  property, this 9401 Collins apartment, to the trust?
6    A.   I don't understand the question.  Can you
7  repeat?
8    Q.   You transferred this apartment that you
9  owned by yourself to the Varoma Trust, right?
10   A.   Yes.
11   Q.   Did you get anything in exchange for
12  transferring the property to the trust?
13   A.   No.
14   Q.   I will now introduce Exhibit 5.  It's the
15  Varoma Trust.
16        (Thereupon, the document was marked as
17     Exhibit 5.)
18  BY MS. ARON:
19   Q.   So Exhibit 5 is the Varoma Joint Revocable
20  Living Trust Agreement, do you see that,
21  Mr. Romagnoli?
22   A.   Yes.
23   Q.   Do you know what this document is?
24   A.   Yeah.  That's start of the trust, I
25  suppose, yeah.

Page 22

1    Q.   And you stated that Attorney Rengifo
2  prepared this trust?
3    A.   Yes.
4    Q.   Are these your initials on the first page?
5    A.   Yes.
6    Q.   And if you go to page 7 of 9.  Let me know
7  when you're there, please.
8    A.   Okay.
9    Q.   Is this your signature?
10   A.   Above where it says on top of Grantor
11  Roberto Romagnoli, that's my signature.
12   Q.   Is that your signature where it says
13  Trustee Roberto Romagnoli?
14   A.   Yes.
15   Q.   I will ask you to go to the first page of
16  this exhibit.
17   A.   Okay.
18   Q.   If you look at section 1.01.
19   A.   Yes.
20   Q.   So the grantors of this trust are you and
21  your wife, right?
22   A.   Yes, that's what it says there.
23   Q.   Do you understand you and your wife are
24  the grantors of this trust?
25   A.   Yes.

Page 23

1    Q.   The same paragraph provides you and your
2  wife are trustees of this trust, do you see that?
3    A.   Yes.
4    Q.   Are you and your wife still trustees of
5  this trust today?
6    A.   I would say so.
7    Q.   Have you resigned as trustee?
8    A.   We haven't changed anything.
9    Q.   If you can please go to page 2 of that
10  document.
11   A.   Yes.
12   Q.   I would like to point you to Article 1 at
13  the top of the page, do you see that?
14   A.   Yes.
15   Q.   And it says:  I hereby transfer to the
16  trustees the property described in the schedule
17  attached as Exhibit A on the terms and conditions
18  set forth in this agreement.  Do you see that?
19   A.   Um-hmm.
20   Q.   If you can please go to page 8.  Let me
21  know when you get there.
22   A.   Okay, I'm there.
23   Q.   You see it lists three properties here?
24   A.   Um-hmm.
25   Q.   One of them is the 9401 Collins apartment,

Page 24

1  do you see that?
2    A.   Yes.
3    Q.   The second apartment is Unit 2504 at the
4  Metropolitan, which is at 2475 Brickell Avenue, do
5  you see that?
6    A.   Yes.
7    Q.   And the third property is 11843 Prince
8  George Way in Orlando, Florida, do you see that?
9    A.   Yes.
10   Q.   Did you get anything in exchange for
11  transferring these three properties to the trust?
12   A.   No.
13        MS. McKEOWN:  Objection to the form.
14  BY MS. ARON:
15   Q.   Besides the three properties listed here,
16  did you transfer any other properties to the trust,
17  not just at the time of the set up of the trust but
18  at a later time?
19   A.   I don't remember.  I don't think I did or
20  we did.  We haven't touched the trust since we did
21  it, so I don't think so.
22   Q.   I would like to go to page 2 of the
23  document that you have in front of you.  And please
24  let me know when you're there.
25        MS. McKEOWN:  I'm sorry, you said page 2?



ROBERTO ROMAGNOLI VOLUME 1                                          June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                                25—28

Page 25

1         MS. ARON:  Yes.
2         MS. McKEOWN:  Thank you.
3     BY MS. ARON:
4     Q.   Are you there?
5     A.   Okay, yes, I'm here.
6     Q.   Look at Article 2?
7     A.   Okay.
8     Q.   Dispositive provisions during grantors
9    life, do you see that?
10    A.   Yes.
11    Q.   "During the Grantors lifetime, the
12   Trustees shall pay to Grantor or for Grantors
13   benefit as much of the net income or principal of
14   the trust estate as Grantors may request."  Do you
15   see that?
16    A.   Yes.  I just read it.
17    Q.   So this trust allows you and your wife to
18   pay yourselves as much as you request; is that
19   correct?
20        MS. McKEOWN:  Objection to the form.
21    A.   I don't know.  I mean, that's something
22   that's there that the lawyer did.  To be honest with
23   you, I never thought about it.
24    BY MS. ARON:
25    Q.   Has the trust ever paid anything to you or

Page 26

1    your wife?
2     A.   I don't understand.  Pay, like what?
3     Q.   Has the trust ever paid money or
4    distributed properties to you and your wife?
5     A.   No.
6     Q.   Does the Varoma Trust hold any bank
7    accounts?
8     A.   Not now.
9     Q.   Did it hold bank accounts in the past?
10    A.   I think we opened an account in the
11   beginning.  I think it has no movement.  Since there
12   was no moment, I don't know if we closed it or the
13   bank for lack of use.
14    Q.   Do you remember what bank that was at?
15    A.   Citibank.
16    Q.   Do you recall when that account closed?
17    A.   My guess is two years, two and a half.
18   I'm not so sure.  Maybe two or three years.
19    Q.   Do you recall how much money was in that
20   bank account?
21    A.   When we opened it, we opened it with the
22   very minimum, like, I don't remember, maybe $1,000.
23    Q.   Did the balance grow at any time?
24    A.   No -- actually, decrease with bank charges
25   and stuff.

Page 27

1     Q.   Who controls that bank account?
2         MS. McKEOWN:  Objection to the form.
3     A.   Both my wife and I.
4     BY MS. ARON:
5     Q.   I want to go back to Article 2, if you
6    can.
7     A.   What page is that?
8     Q.   Same page we're on, page 2.
9         Starting on the second line it says, "In
10   addition, Grantors shall be entitled to full use and
11   possession of any non-income-producing real estate
12   owned by the trust."  Do you see that?
13    A.   Yes.
14    Q.   We went through the three properties that
15   were transferred to the trust.  So, which ones have
16   you used for yourself and your family out of the
17   three properties that we went through?
18    A.   Well, the 1103 where we live.  It's in
19   use.  We live there.  And the Orlando house, we used
20   it for some time.  And the Metropolitan, my wife
21   lived there before we were married.
22    Q.   When did you live in the Orlando house?
23    A.   When?  Until about two years ago, two and
24   a half years ago.
25    Q.   When did you start living in the Orlando

Page 28

1    house?
2     A.   We didn't live there, but we were planning
3    to live there.  We would go three to five times a
4    month to the house and stay two or three days.  Our
5    plan was to move there.
6     Q.   Like a second home?
7     A.   We were having plans to move to Orlando,
8    that's why we got that house.
9     Q.   Why did you end up not moving to Orlando?
10    A.   The business we were planning to do didn't
11   work quite as well as we had in mind.
12    Q.   What business was that?
13    A.   It was same real estate that my wife has
14   but in Orlando.
15    Q.   Do you recall the name of the business?
16    A.   Yes.  Concept International Realty
17   Orlando.
18    Q.   Going back to the Varoma Trust, who are
19   the beneficiaries under this trust?
20    A.   My daughter's one for sure, my wife's
21   mother, I believe, and a couple of my nephews.  But
22   that just in case something happen -- the
23   beneficiary would be my daughter, Maria Valentina
24   Romagnoli --
25    Q.   Okay.



Page 29

1     A.  -- if something would happen to us.
2     Q.  During while you are alive, the trust can
3  pay you and distribute properties to you, though,
4  right?
5          MS. McKEOWN:  Object to the form.
6     A.  I don't understand.
7   BY MS. ARON:
8     Q.  So if we go back to Article 2 on page 2,
9  the first two lines of Article 2 say that, "The
10  trustee shall pay to the Grantors or for Grantors
11  benefit as much of the net income or principal of
12  the trust estate as Grantors may request."  Do you
13  see that?
14     A.  I read that.
15     Q.  The trust can pay or give properties to
16  you and your wife, correct?
17     A.  I suppose.  I guess.  It's not that we
18  have received anything.
19     Q.  Do you know if the trust has made any
20  distributions, whether money or any assets or
21  properties, to anyone else besides -- taking aside
22  you and your wife?
23     A.  No.
24     Q.  Now, I'd like to go to page 4, please.
25  Let me know when you're there.

Page 30

1     A.  Now I'm there.
2     Q.  Okay.  Sorry, page 5.
3     A.  Yes.
4     Q.  If you look at the first line, "If there
5  is more than one Trustee serving, then the vote of
6  the Trustees for any action hereunder must be a
7  unanimous vote of all then serving Trustees."  Can
8  you read that?
9     A.  Yes.
10     Q.  You and your wife are the trustees of the
11  trust, right?
12     A.  Yes.
13     Q.  So in order to take action as trustees,
14  you and your wife need to agree?
15     A.  I guess.  I don't really understand the
16  writing, but I suppose.
17     Q.  That's what the document says, right?
18          MS. McKEOWN:  Objection to the form.
19     A.  Which line?
20   BY MS. ARON:
21     Q.  First two lines in page 5.
22     A.  Yes, I can see that.
23     Q.  Okay.  So the trust says if there's more
24  than one trustee, then the vote to take action must
25  be unanimous, that's what it says, right?

Page 31

1     A.  Yes.
2     Q.  Do you know if the trust is revocable?
3     A.  It says revocable.
4     Q.  Can you please go to page 6.  Let me know
5  when you're there.
6     A.  Okay.  I'm here.
7     Q.  If you look on Article 9, it says
8  revocability, do you see that?
9     A.  Yes.
10     Q.  And it says, "Grantors retain the
11  following rights and powers:  (a) The right to
12  revoke this agreement and the trust created in it by
13  a writing delivered to the trustees."  Do you see
14  that?
15     A.  Yes.
16     Q.  So in order to revoke the trust, you and
17  your wife have to decide to revoke it, right?
18     A.  I suppose.
19     Q.  That's what the document provides, right?
20          MS. McKEOWN:  Object to the form.
21     A.  Yeah, that's what it says.
22   BY MS. ARON:
23     Q.  Okay.  If you wanted to revoke the trust
24  and your wife said she did not want to do it, that
25  means you can't revoke the trust, right?

Page 32

1          MS. McKEOWN:  Object to the form.
2     A.  I don't know.
3   BY MS. ARON:
4     Q.  It says here, we just went through the
5  other clause saying that the trustees had to act
6  unanimously, meaning both you and your wife.  So in
7  order to revoke, you would have to act together.  Do
8  you have any understanding about that?
9     A.  Yes.
10     Q.  What's your understanding?
11     A.  We have to agree, both my wife and I.
12     Q.  Has this trust ever been revoked?
13     A.  No.
14     Q.  Has any property been taken out of the
15  Varoma Trust?
16          MS. McKEOWN:  Object to the form.
17     A.  Yes.  We took one property out of the
18  trust.
19   BY MS. ARON:
20     Q.  Which property?
21     A.  The Orlando house.
22     Q.  Why was that property taken out of the
23  trust?
24     A.  Because we were struggling with money, and
25  we needed to get a line of credit from the house.



ROBERTO ROMAGNOLI VOLUME 1                                    June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                           33–36

Page 33
1   And the condition that the bank gave us was in order
2   for them to give us the second mortgage or the
3   credit line, the house had to be out of the trust.
4       Q.   Has the Varoma Trust ever been amended or
5   supplemented?
6       A.   No.
7       Q.   Have you or your wife ever been removed as
8   trustees?
9       A.   No.
10      Q.   If you could please go to page 7.  Please
11  let me know when you are there.
12      A.   I'm here.
13      Q.   If you go three paragraphs down, do you
14  see where it says, "It is the express intent of the
15  Grantors that property held under the Trust
16  Agreement be held as Tenants by the Entirety."  Do
17  you see that?
18      A.   Yes.
19      Q.   Do you know what that means?
20      A.   Husband and wife.
21      Q.   That you're holding the property as
22  husband and wife?
23      A.   Yeah.
24      Q.   So, do you and your wife own the
25  properties or do you and your wife own the trust

Page 34
1   which owns the property, do you know which one it
2   is?
3       A.   Which properties?
4       Q.   The properties that the trust holds today.
5       A.   I don't understand the question.
6       Q.   What properties does the trust hold today?
7       A.   Metropolitan and Azure, our home.
8       Q.   Who owns the properties, is it the Varoma
9   Trust or is it you and your wife?
10      MS. McKEOWN:  Objection to the form.
11      A.   The Azure, the penthouse, I bought myself;
12  the Metropolitan, my wife bought it before we got
13  married, and now it's in the trust.  So I guess we
14  both own it.
15  BY MS. ARON:
16      Q.   I'm trying to understand.  Do you and your
17  wife own the trust or is it your testimony that you
18  and your wife own the Azure and Metropolitan
19  properties?
20      A.   I don't understand how you making the
21  questions.  It doesn't make sense to me the way you
22  asking it.
23      Q.   Okay.  I'll rephrase it.
24      Who owns the Azure property today?
25      A.   The Varoma Trust.

Page 35
1       Q.   And who owns the Metropolitan property
2   today?
3       A.   The Varoma Trust.
4       Q.   I'd like to go back to Exhibit 4, please.
5       A.   The quitclaim deed?
6       Q.   Yes.
7       A.   Okay.
8       Q.   Okay.  So it says here that you granted
9   the property, this is in the Azure condo at 9401
10  Collins, to you and your wife as trustees, or their
11  successors in interest, of the Varoma Joint
12  Revocable Living Trust, do you see that?
13      A.   Yes, I can read that.
14      Q.   Do you know when this property was
15  transferred to the -- strike that.
16      Do you know whether or not this property
17  was transferred to you and your wife as trustees of
18  the Varoma Trust as tenants by the entirety?
19      MS. McKEOWN:  Objection to the form.
20      A.   Yes, I guess so.  I don't understand.
21  BY MS. ARON:
22      Q.   Do you understand what tenants by the
23  entirety means?
24      A.   Yes.  Owned by husband and wife.
25      Q.   Did you or your wife convey or give any

Page 36
1   interest in the 9401 Collins apartment to any third
2   person?
3       A.   No.
4       Q.   Did you and your wife convey the 9401
5   apartment to each other at any point in time?
6       MS. McKEOWN:  I'm sorry, can you repeat
7   that?
8   BY MS. ARON:
9       Q.   Did you or your wife convey any interest
10  in the 9401 Collins apartment to each other at any
11  time?
12      MS. McKEOWN:  Object to the form.
13      A.   I don't understand the question.
14  BY MS. ARON:
15      Q.   So husband and wife, two people, can
16  transfer property to each other.
17      A.   Okay.
18      Q.   My question is, did this ever happen with
19  the 9401 Collins property where you give the
20  property to your wife or a piece of the property to
21  your wife?
22      MS. McKEOWN:  Object to the form.
23      A.   No.
24  BY MS. ARON:
25      Q.   The 9401 Collins, who makes decisions as



Page 37

1  to the property?  So for example, who makes the
2  decision when something needs to get fixed in the
3  house, a bill needs to get paid?
4      A.   Both my wife and I.  We live there
5  together.
6      Q.   And who has control of the 9401 property,
7  you or your wife or both of you?
8          MS. McKEOWN:  Form.
9      A.  Both of us.
10 BY MS. ARON:
11     Q.   I will introduce the next exhibit.
12         (Thereupon, the document was marked as
13     Exhibit 6.)
14 BY MS. ARON:
15     Q.   Exhibit 6 is a quitclaim deed dated
16 January 20, 2006, for the 2475 Brickell Avenue
17 property.  Do you recognize this document
18 Mr. Romagnoli?
19     A.   Quitclaim deed.
20     Q.   Have you seen it before?
21     A.   I have seen it.
22     Q.   Can you turn to the second page.  Let me
23 know when you're there.  This is your wife's
24 signature?
25     A.   Yes.

Page 38

1      Q.   Who is Myriam Peleaz?
2      A.   She was a friend of my wife when she
3  bought the property.  The reason her name is there
4  is because back then her credit score wasn't so
5  good.  In order for her to get financing, she helped
6  with her own credit of this Myriam Peleaz.
7      Q.   This deed is dated January 2006.  This is
8  before you and your wife got married, right?
9      A.   Yes.  She bought the property before we
10 got married.
11     Q.   What month of 2006 did you get married on?
12     A.   December 28 of 2006.
13     Q.   Okay.  And now I'll introduce Exhibit 7.
14         (Thereupon, the document was marked as
15     Exhibit 7.)
16 BY MS. ARON:
17     Q.   This is a quitclaim deed dated October 14,
18 2015, and which relates to Unit 2504 of the
19 Metropolitan.
20     A.   Okay.
21     Q.   Do you know what this document is,
22 Mr. Romagnoli?
23     A.   Quitclaim deed.
24     Q.   Do you know what property this is for?
25     A.   The metropolitan, 2504.

Page 39

1      Q.   So this is the apartment that was owned by
2  your wife?
3      A.   Yes.
4      Q.   You are listed here.  If you see at the
5  top it says, "Grantor Maria Antonieta Laviosa, a
6  married woman joined by her spouse, Roberto
7  Romagnoli."  Do you see that?
8      A.   Yes.
9      Q.   Do you know if your wife got anything in
10 return for putting this property in the Varoma
11 Trust?
12     A.   No, she didn't get anything.
13     Q.   Do you know if this property at the 2475
14 Brickell is rented today?
15     A.   It was rented for 12 years, but right now
16 it's not rented.  The tenant, Dr. Rester, he passed
17 away about three weeks ago, so it is empty now.
18     Q.   It was rented for 12 years?
19     A.   Pretty much, yeah.
20     Q.   Which entity did rent payments go?
21     A.   The rent payments, my wife would receive a
22 check to her name in the mailbox.
23     Q.   Did you or your wife or the trust, the
24 Varoma Trust, convey or transfer any part of this
25 property to any third person?

Page 40

1      A.   No.
2      Q.   Did you and your wife at any time transfer
3  this property or an interest in this property to
4  each other?
5      A.   No.
6      Q.   Who makes decisions as to this property?
7      A.   As to this property, pretty much my wife.
8      Q.   Is it fair to say that your wife controls
9  this property at the Metropolitan?
10         MS. McKEOWN:  Objection to the form.
11     A.   She makes the decisions.
12 BY MS. ARON:
13     Q.   Are you planning on renting this property
14 to a new tenant?
15     A.   Probably, yes.
16     Q.   Are you planning on selling this property?
17     A.   I would have to speak to my wife in that
18 regard.  I could not answer right now.
19     Q.   I'd like to go back to the Varoma Trust,
20 Exhibit 5.  Please go to page 2, please.  Let me
21 know when you're there.
22     A.   I'm here.
23     Q.   If you look at Article 2.
24     A.   Page 2.  Okay, Article 2.
25     Q.   Actually, Article 1 starting on the second



ROBERTO ROMAGNOLI VOLUME 1                          June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                  41—44

Page 41
1  line it says, "With the consent of the trustees,
2  additional property may be transferred from time to
3  time to this trust estate by me or by any other
4  person, and that property shall be held and disposed
5  of on the same terms and conditions as the property
6  originally transferred."  Do you see that?
7      A.  Yes.
8      Q.  So the trust allows you and your wife to
9  transfer additional property to this trust, right?
10     A.  I would say so.
11     Q.  Besides the three the properties that we
12 went through that are in Exhibit A, so that's 9401
13 Collins, the Metropolitan apartment, and the Orlando
14 property, have you and your wife transferred
15 additional property to the trust?
16     A.  Not that I remember.
17     Q.  Please go to page 4.  Let me know when
18 you're there.
19     A.  I'm here.
20     Q.  If you look at the article, it says
21 Article 5, Powers of Trustees.  "In the
22 administration of any trust established hereunder,
23 trustees shall have the following powers."
24     A.  Which article are you referring to?
25     Q.  Article 5.  Are you on page 4?

Page 42
1      A.  I'm on page 4.
2      Q.  Powers of Trustees.  "In the
3  administration of any trust established hereunder,
4  trustees shall have the following powers."
5      A.  Um-hmm.
6      Q.  Under this trust, you and your wife have
7  the power to -- look a subsection A -- "To retain
8  any property contributed to the trust, either during
9  the life or at death of the grantors, or to sell,
10 convey, exchange, or otherwise dispose of the
11 property."  Do you see that?
12     A.  Yes.
13     Q.  That's a power you and your wife have as
14 trustees, right?
15     A.  I guess.
16     Q.  That's what the document provides, right?
17     A.  Yeah, I can read that.
18     Q.  Same with subsection B, it gives you the
19 power, "To acquire by purchase or otherwise any
20 property, real or personal, without being limited by
21 any provision of law that restricts investments by
22 fiduciaries and without regard to any principles of
23 diversification, including, but not limited to,
24 common and preferred stocks, bonds, mutual funds,
25 common trust funds, general or limited partnership

Page 43
1  interests, secured and unsecured obligations and
2  mortgages; or to sell, convey, exchange, or
3  otherwise dispose of the property, at public or
4  private sale, without application to court, on any
5  terms, including the extension of credit, which they
6  consider advisable."
7      So this is a power that you have together
8  with your wife as trustees, right?
9      A.  I think so.
10     Q.  We can agree that's what the document
11 provides, right?
12     A.  Yes.
13     Q.  If we go to subsection G, it says, "To
14 borrow money from any source and for any purpose,
15 including, but not limited to, the payment of taxes
16 and to pledge or mortgage any assets held by them as
17 security for money borrowed."
18     A.  Yeah.
19     Q.  So you or your wife, according to this
20 document, have power to distribute properties from
21 the trust.
22     MS. McKEOWN:  Objection to the form.
23     A.  To distribute, I don't understand.
24 BY MS. ARON:
25     Q.  You have the power to borrow money for the

Page 44
1  trust, right?
2      A.  Um-hmm.
3      Q.  And I need a verbal response, please.
4      A.  That's what it says.
5      MS. McKEOWN:  You need to answer yes or
6  no, Roberto.
7      A.  Yes.
8      MS. McKEOWN:  You can't just say uh-huh.
9  BY MS. ARON:
10     Q.  You and your wife as trustees have the
11 power to pledge or mortgage any assets, do you see
12 that?
13     A.  Yes.
14     Q.  So this Article 5 are all powers you and
15 wife have as trustees, right?
16     A.  Yes.
17     MS. McKEOWN:  Form on that one.
18 BY MS. ARON:
19     Q.  Mr. Romagnoli, has the trust been amended
20 or revised in any way?
21     A.  No.
22     Q.  You and your wife as trustees have control
23 over the trust, right?
24     A.  Yes.
25



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
45–48

Page 45

1        MS. McKEOWN:  Form.
2    BY MS. ARON:
3        Q.   And we talked about the beneficiaries, and
4    you said your daughter was beneficiary of the trust,
5    right?
6        A.   Yes.
7        Q.   Do you have any understanding that you and
8    your wife are also beneficiaries of the trust?
9        A.   I don't understand.  Me and my wife are
10   owners of the trust.
11       Q.   Are you and your wife beneficiaries of the
12   trust?
13       MS. McKEOWN:  Object to the form.
14       A.   Does it say it?  I don't see that.  I
15   don't know.  I don't remember.  I cannot answer the
16   question from the tops of my head.
17   BY MS. ARON:
18       Q.   So you go on to Article 9, which is on
19   page 6, please.  Let me know when you're on page 6.
20       A.   Okay.
21       Q.   If you look at Article 9, Revocability, do
22   you see that?
23       A.   Yes.
24       Q.   So you and your wife as grantors, you have
25   the power to revoke the trust, right?

Page 46

1        A.   Yes.
2        Q.   You and your wife have the power to amend
3    the trust, right, if you look at subsection C?
4        A.   Yes.
5        Q.   And you and your wife have the power to
6    remove trustees under subsection D, do you see that?
7        A.   Yes.
8        Q.   If you can please go back to the petition
9    of schedules, which is Exhibit 1.  And I will direct
10   you to page 15 of Exhibit 1, please.
11       A.   Okay.
12       Q.   Section 19, do you see where it says
13   Marova, LLC, you see that?
14       A.   Yes.
15       Q.   And it says, "Marova, LLC, entity owns
16   office condo at 55 Southeast 6th Street, Suite 206,
17   Miami, Florida."  Do you see that?
18       A.   Yes.
19       Q.   Your schedule says that you own 100
20   percent with spouse as tenants by the entirety, do
21   you see that?
22       A.   Yes.
23       Q.   Is what you own with your wife as tenants
24   by the entireties, Marova, LLC, or the office condo?
25       A.   The office condo.

Page 47

1        Q.   So who owns office condo?
2        A.   Marova.
3        Q.   Who owns Marova?
4        A.   Me and my wife.
5        Q.   Are you and your wife the only owners of
6    Marova?
7        MS. McKEOWN:  Object to the form.
8        A.   I would say so.
9    BY MS. ARON:
10       Q.   If you go to page 21 of 56.  Let me know
11   when you're there.
12       A.   Yes, I'm in page 21.
13       Q.   If you go down four lines, do you see
14   where it says on the left:  Marova, LLC?
15       A.   Yes.
16       Q.   Okay.  Now, here it says, "The entity owns
17   the condo at 55 Southwest 6th Street."  Do you see
18   that?
19       A.   Yes.
20       Q.   Then it says, "Owned 100 percent with
21   spouse as tenants by the entirety."  Do you see
22   that?
23       A.   Yes.
24       Q.   What does Marova do as an entity?
25       A.   Right now owns the property.

Page 48

1        Q.   And that's the office condo at 55
2    Southeast 6th Street?
3        A.   Yes.
4        Q.   Are you renting that office condo or are
5    you using it?
6        A.   Right now we using it.
7        Q.   When you say, "we," is that you and your
8    wife?
9        A.   Yes.  The company, my wife's company.
10       Q.   What's the name of that company?
11       A.   Concept International Realty.
12       Q.   Are you planning on keep using the
13   property or renting it out or selling it?
14       A.   That's a good question for my wife.  For
15   now she intends to be there for some time.  We have
16   no intention of renting it or selling it.
17       Q.   I will now introduce Exhibit 8.
18       (Thereupon, the document was marked as
19   Exhibit 8.)
20   BY MS. ARON:
21       Q.   This is a quitclaim deed dated May 4,
22   2012.  This relates to the property at 55 Southeast
23   6th Street, Suite 206 in Miami, Florida.
24       Mr. Romagnoli, do you know what this is?
25       A.   Yes, quitclaim.



ROBERTO ROMAGNOLI VOLUME 1                                June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                  49–52

Page 49
1    Q.  For which property?
2    A.  55 Southeast 6th Street.
3    Q.  If you could please go to the second page.
4        Is that your signature where it says
5    Roberto Romagnoli, President?
6    A.  Yes.
7    Q.  Were you the president of Concept
8    International Realty, Inc., at this time?
9    A.  A long time ago.  I don't even remember
10   now.
11   Q.  Why did you stop being president of
12   Concept International Realty?
13   A.  When did I stop being president?
14   Q.  Yes.
15   A.  I don't know to be honest with you.  I
16   don't know.  Concept International Realty, if I'm
17   not mistaken, we're member, basically, my wife and
18   I.  President is just work.
19   Q.  You don't recall why or when you stopped
20   being president?
21   A.  No.  I mean, I'm surprised to see my name
22   as president on here, to be honest with you.
23   Q.  But that's your signature, right?
24   A.  That's my signature.
25   Q.  Here this document shows that Concept

Page 50
1    International Realty, Inc., quitclaim deeded the
2    property, the office condo, to Marova, LLC, do you
3    see that?
4    A.  Yes.
5    Q.  Do you know why Concept International
6    Realty quitclaimed the property to Marova?
7    A.  Yes.
8    Q.  Why?
9    A.  We wanted to separate one thing to the
10   other.  We wanted Concept International Realty
11   owning the property.  And at the same time we would
12   have a plan for Marova.  So, you know, we didn't
13   know if we were going to keep it or rent it, so
14   that's why we separate it.
15   Q.  You separated the property from Concept
16   International?
17   A.  Concept transfer the property to Marova.
18   Q.  So you just didn't want Concept
19   International to have the property anymore?
20   MS. McKEOWN:  Objection to the form.
21   A.  Concept International was going to be in
22   the property, but it was not going to be the owner
23   of the unit.
24   BY MS. ARON:
25   Q.  So you wanted Marova to be the owner of

Page 51
1    the property, right?
2    A.  Yes.
3    Q.  And who decided to transfer the property
4    from Concept International Realty to Marova?
5    A.  My wife and I.
6    Q.  Did you and your wife get anything in
7    return for transferring the property over from
8    Concept to Marova?
9    A.  No.
10   Q.  Does Marova own the office condo today?
11   A.  Yes.
12   Q.  Besides the office condo, does Marova own
13   any other assets, whether money or properties?
14   A.  No.
15   Q.  Do you know who the officers or directors
16   are of Marova today?
17   A.  My wife and I.
18   Q.  I'm going to introduce the next exhibit.
19       (Thereupon, the document was marked as
20       Exhibit 9.)
21   BY MS. ARON:
22   Q.  Exhibit 9 is a Sunbiz.org division of
23   corporation printout which is dated June 4th, 2020.
24   Okay.  So Mr. Romagnoli, do you see that this
25   document relates to Marova, LLC?

Page 52
1    A.  Yes.
2    Q.  If you go down, it says principal address
3    55 Southeast 6th Street, Suite 206, do you see that?
4    A.  Yes.
5    Q.  That's the office condo that we were just
6    talking about, right?
7    A.  Yes.
8    Q.  If you go down, it says authorized persons
9    details, do you see that?
10   A.  Yes.
11   Q.  It says title MGRM, and that's your wife
12   listed there, right.
13   A.  Maria Laviosa.  Laviosa, Maria, yes.
14   Q.  So as of May 4, 2020, your wife was the
15   only authorized person for Marova, LLC, right?
16   MS. McKEOWN:  Object to the form.
17   A.  My wife.
18   BY MS. ARON:
19   Q.  And who makes decisions for Marova?
20   MS. McKEOWN:  Form.
21   A.  Together.  I mean, we talk to each other
22   when there's something to be done.  There is not
23   much to be done anyways because -- basically both my
24   wife and I.
25   Q.  Why was Marova created?



Page 53
1      MS. McKEOWN:  Form.  When or why?
2    BY MS. ARON:
3      Q.  Why was Marova created?
4      A.  To transfer the property from Concept
5    International Realty and also to do some, you know,
6    rental investments.
7      Q.  Did Marova, LLC, have any other rental
8    investments?
9      A.  No.
10     Q.  I'm going to introduce the next exhibit.
11   Please give me a second.
12         (Thereupon, the document was marked as
13     Exhibit 10.)
14   BY MS. ARON:
15     Q.  Exhibit 10 is the articles of organization
16   for Marova, LLC.  Mr. Romagnoli, do you have the
17   exhibit in front of you?
18     A.  Yes, I do.
19     Q.  I will direct you to page 4.
20     A.  Okay.
21     Q.  Is that your signature?
22     A.  Yes, that's my signature.
23     Q.  It says here Roberto Romagnoli managing
24   member, do you see that?
25     A.  Yes.

Page 54
1      Q.  So when Marova was created, you were the
2    managing member, right?
3      A.  Yes.
4      Q.  Okay.  So let's take a break.  It's 10:55
5    now.  Tamara, how long would you like?
6      MS. McKEOWN:  Five minutes, ten minutes.
7      MS. ARON:  How about we come back 11:05.
8      MS. McKEOWN:  Perfect.
9      MS. ARON:  Let's go off the record.
10         (Thereupon, a break was taken from
11     10:55 a.m. to 11:09 a.m., after which the
12     following proceedings were held:)
13   BY MS. ARON:
14     Q.  So I will now introduce Exhibit 11.
15         (Thereupon, the document was marked as
16     Exhibit 11.)
17   BY MS. ARON:
18     Q.  Mr. Romagnoli, do you have Exhibit 11 in
19   front of you?
20     A.  Yes.
21     Q.  Exhibit 11 is an Employer ID number for
22   Marova from the IRS.  And do you see it says date of
23   notice March 15th, 2011, do you see that?
24     A.  Yes.
25     Q.  And it says Marova, LLC, Roberto

Page 55
1    Romagnoli, sole MBR, do you see that?
2      A.  Yes.
3      Q.  Do you know what it means?
4      A.  It might be a mistake.  I don't know why
5    it says like that.
6      Q.  What should it say?  Why is it a mistake?
7      A.  It says sole member.  I don't remember
8    being the sole member of that.
9      Q.  Who from the other members?
10     A.  My wife and I.
11     Q.  Did you ever see this document?
12     A.  This document, I don't think I have seen
13   it before.
14     Q.  Okay.  Who are the members of Marova
15   today?
16     A.  My wife and I.
17     Q.  I will now introduce Exhibit 12.  Give me
18   a moment, please.
19         (Thereupon, the document was marked as
20     Exhibit 12.)
21   BY MS. ARON:
22     Q.  Mr. Romagnoli, do you have Exhibit 12 in
23   front of you?
24     A.  Yes.
25     Q.  Do you know what this document is?

Page 56
1      MS. McKEOWN:  Can you identify it for the
2    record?
3      MS. ARON:  Marova, LLC, share
4    certificates, excuse me, membership certificates.
5    BY MS. ARON:
6      Q.  Do you know what these are?
7      A.  Membership certificates.
8      Q.  For what entity?
9      A.  Marova, LLC.
10     Q.  Have you seen these documents before?
11     A.  Yeah, I may have seen it.
12     Q.  Okay.  So page 1 of the document, it
13   certifies that you have an interest in 40 percent of
14   Marova, do you see that?
15     A.  Yes.
16     Q.  Do you know why this is not signed?
17     A.  No, I have no idea.
18     Q.  Do you have signed versions of this
19   membership certificate?
20     A.  I don't think so.
21     Q.  Do you have anything to dispute that this
22   document is valid?
23     MS. McKEOWN:  Objection to the form.
24     A.  I don't understand.  Dispute what?
25



ROBERTO ROMAGNOLI VOLUME 1                                    June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                      57–60

Page 57

1    BY MS. ARON:
2        Q.   Do you have any reason to believe that
3    this membership certificate is not accurate?
4            MS. McKEOWN:  Objection to the form.
5        A.   I don't think it's valid.
6    BY MS. ARON:
7        Q.   Why not?
8        A.   It's not signed.
9        Q.   Do you know if a signed version of this
10   document exists?
11       A.   I don't know.
12       Q.   So you don't believe this document is
13   valid because it is not signed?
14       A.   I would say so it's not valid.
15       Q.   What's that conclusion based on?
16       A.   Because I don't even remember who did this
17   document.
18       Q.   Is it accurate that you have 40 percent
19   interest in Marova, LLC?
20           MS. McKEOWN:  Objection to form.
21       A.   Right now my wife and I, we have tenant by
22   entirety 100 percent.  Actually, it would be
23   80 percent if we consider that my brother, who was
24   going to be part of it, could have had 20 percent,
25   but, you know, of the income if it operated the way

Page 58

1    it was supposed to.  But he never contributed any
2    work or any money, so we never did what we had to do
3    originally, but it stayed like that.
4    BY MS. ARON:
5        Q.   So today do you and your wife own 100
6    percent of Marova or does your brother also have an
7    interest?
8            MS. McKEOWN:  Form.
9        A.   My wife and I are 100 percent.  If it says
10   80 percent, I don't know why.  That's a different
11   story.
12   BY MS. ARON:
13       Q.   Was it always that way since the company
14   was created?
15       A.   When we bought the unit, it was bought by
16   Concept International Realty owned by my wife and I.
17   When it was transferred to Marova, it was
18   transferred as my wife and I entirely.  Then when we
19   were making a project doing management investments,
20   as my brother was going to come to the venture, but
21   eventually he never did, and he was going to get
22   20 percent of the income if there was any income
23   generated.  But he never did come, so I guess, you
24   know, it wasn't changed, basically.
25       Q.   Okay.  If you please go to the second page

Page 59

1    of this document.
2        A.   Okay.
3        Q.   That's 40 percent for your wife, right?
4        A.   That's a mistake.  This is a mistake.
5        Q.   If you go to the third page, it says Marco
6    Romagnoli 20 percent.  Is that your brother?
7        A.   Yes.  He never came on board, so
8    everything, you know, everything was stopped, so.
9        Q.   I will now introduce Exhibit 13.
10           (Thereupon, the document was marked as
11       Exhibit 13.)
12       A.   Yes, I'm here.
13   BY MS. ARON:
14       Q.   One second, I'm sending it to your
15   counsel.
16           This is the operating agreement for
17   Marova, LLC.  Have you seen this document before?
18       A.   Yes, I may have seen it.
19       Q.   And do you remember in what context you
20   saw it?
21       A.   In what context, no.
22       Q.   Okay.  If you go to page -- the second to
23   last page.
24       A.   Two of 13?
25       Q.   12 of 13.

Page 60

1        A.   12 of 13.
2        Q.   You see this document is not signed,
3    right?
4        A.   No, it's not signed.
5        Q.   Do you know whether you ever signed an
6    operating agreement for Marova?
7        A.   I don't recall.
8        Q.   Okay.  And if you go to the first page,
9    please let me know when you're there.
10       A.   Yes.
11       Q.   And then your brother Marco also shows up
12   as a party to this agreement, do you see that?
13       A.   Yes.
14       Q.   If you go to page 2 -- let me know when
15   you're there, please.
16       A.   Yes.
17       Q.   And this provides 40 percent for you,
18   40 percent for your wife, and 20 percent for your
19   brother?
20       A.   But it never happened that way.
21       Q.   This was never executed?
22       A.   No.
23           (Thereupon, the document was marked as
24       Exhibit 14.)
25



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
61-64

Page 61

1    BY MS. ARON:
2        Q.   Exhibit 14 is 2014 Florida limited
3    liability company annual report for Marova, LLC.
4        A.   Yes.
5        Q.   Who is Jackie Rodriguez who is listed
6    here?
7        A.   Accountant and registered agent.
8        Q.   You see where it says authorized person
9    detail?
10       A.   Yes.
11       Q.   It lists your name, do you see that?
12       A.   Um-hmm.
13       Q.   Title says MGRM, do you see that?
14       A.   Yes.
15       Q.   Do you know MGRM stands for managing
16   member?
17           MS. McKEOWN:  Object to the form.
18    BY MS. ARON:
19       Q.   This was filed April 10, 2014, do you see
20   that?
21       A.   Yes.
22       Q.   As of April 2014, you were managing member
23   of Marova, LLC?
24           MS. McKEOWN:  Objection to the form.
25       A.   Yeah, apparently.

Page 62

1    BY MS. ARON:
2        Q.   I will now enter Exhibit 15.
3           (Thereupon, the document was marked as
4        Exhibit 15.)
5    BY MS. ARON:
6        Q.   Do you have Exhibit 15 in front of you?
7        A.   Yes.
8        Q.   So, do you see where it says here Maria A.
9    Laviosa as MGRM, do you see that?
10       A.   Yes.
11       Q.   Do you know why your wife became managing
12   member of Marova, LLC, in February 2015?
13           MS. McKEOWN:  Objection to the form, lacks
14   foundation.
15       A.   Could you repeat the question?
16    BY MS. ARON:
17       Q.   Sure.
18           The previous exhibit we saw had you listed
19   as managing member for Marova, do you recall that?
20       A.   Yes.
21       Q.   This exhibit shows that your wife is a
22   managing member for Marova, do you see that?
23       A.   Yes.
24       Q.   This was filed on February 2015, do you
25   see that?

Page 63

1        A.   Yes.
2        Q.   So, why was there a change from you to
3    your wife being the managing member to Marova?
4           MS. McKEOWN:  Object to the form.
5        A.   I don't know.  That's a decision that was
6    made maybe when the -- usually these things, they
7    were done by the accountant and, you know, they must
8    put her as managing member, Maria.
9    BY MS. ARON:
10       Q.   Is your wife the managing member of Marova
11   today?
12           MS. McKEOWN:  Object to the form.
13       A.   Yes, I think so.  Yes.
14    BY MS. ARON:
15       Q.   So, your wife as the managing member,
16   she's the one that decides what to do in Marova?
17           MS. McKEOWN:  Objection to the form.  Can
18   we just -- I think we need to clarify something,
19   if I may.  I don't think the acronym on Sunbiz --
20   I'm looking on my phone now -- I don't think MGRM
21   is managing member, I think it's manager member.
22    BY MS. ARON:
23       Q.   Okay.  We can refer to it as manager
24   member.
25           Mr. Romagnoli, your wife is listed here as

Page 64

1    the MGRM for Marova, LLC, right?
2        A.   Yes.
3        Q.   Do you understand what MGRM means?
4        A.   Manager member.
5        Q.   Who decides what happens with Marova
6    today?
7        A.   That would be my wife.
8        Q.   Is it fair to say your wife controls
9    Marova today?
10           MS. McKEOWN:  Objection to the form.
11       A.   She controls it.
12    BY MS. ARON:
13       Q.   Now, I will introduce the next Exhibit 16.
14           (Thereupon, the document was marked as
15       Exhibit 16.)
16    BY MS. ARON:
17       Q.   This is the 2014 tax return for Marova,
18   LLC?
19       A.   Yes.
20       Q.   Can you tell me what this is?
21       A.   Tax return.
22       Q.   Can you move on to page 10?
23       A.   Yes.
24       Q.   And it says at the top, Schedule B-1, do
25   you see that?



Page 65

1    A.  Yes.
2    Q.  If you look down to part two, it says you
3  owned 50 percent and your wife owned 50 percent?
4    A.  Page 6?
5    Q.  No.  One second.
6       The schedule K-1?
7    A.  Yes.
8    Q.  So this has your name on it.  Partner's
9  name Roberto Romagnoli?
10    A.  Yes.
11    Q.  If you go down to section J, partners
12  share profit/loss and capital, do you see that?
13    A.  Yes.
14    Q.  And it shows for you profit 40 percent and
15  loss 40 percent, do you see that?
16    A.  Yes.
17    Q.  And capital 50 percent, do you see that?
18    A.  Yes.
19    Q.  This is what we were discussing before
20  that you said you thought 20 percent was given to
21  your brother, but it didn't work out that way?
22    A.  Yes.
23    Q.  So is this schedule accurate?
24    A.  It was made by my accountant, I would say
25  so.

Page 66

1    Q.  If you go to page 12.  Please let me know
2  when you're there.
3    A.  Okay.  Page 12.
4    Q.  This is a schedule for your wife, do you
5  see that?
6    A.  Yes.
7    Q.  Shows the same thing for her, do you see
8  that?
9    A.  Yes.
10    Q.  And then if you move on to page 14.
11  Please let me know when you're there.
12    A.  I'm here.
13    Q.  And Marco Romagnoli is your brother,
14  right?
15    A.  Yes.
16    Q.  It shows here partners shares of
17  profit/loss in capital 20 percent profit and loss
18  and nothing for capital, right?
19    A.  Yeah.  He never contributed any capital.
20    Q.  Do you know whether your brother got any
21  percentage, any 20 percent of any profit or loss of
22  Marova?
23    A.  No.  That 20 percent was supposed to be --
24  he would get 20 percent of anything that Marova
25  would have, but it never had any income, any profit.

Page 67

1  If Marova made money, he would be entitled to
2  20 percent of the operating income.
3    Q.  So Marova never had any income?
4    A.  No.
5    Q.  Okay.  If you look at subsection F, it
6  says:  Partner's name, city, state, zip code, and it
7  lists your brother, right?
8    A.  Yes.
9    Q.  This schedule shows Marco was partner in
10  Marova; is that right?
11    A.  Yeah.  Like I said, a partner who would
12  have got an income if the 20 percent based on income
13  if the company made any profits.
14    Q.  I would like to introduce the next exhibit
15  now.  Please give me a second.
16       (Thereupon, the document was marked as
17       Exhibit 17.)
18  BY MS. ARON:
19    Q.  This is Marova 2015 tax return.
20    A.  Okay.
21    Q.  Is this the tax return that you approved
22  to be filed with the IRS?
23    A.  Yes.
24    Q.  If you could please go to page 12 of this
25  document.  Do you see your name, partner's name, in

Page 68

1  section F as in Frank?
2    A.  I don't see F.
3    Q.  Do you see in part two, you and your wife
4  are listed as owning 100 percent of profit, loss, or
5  capital of Marova, do you see that?
6    A.  Yes.
7    Q.  If you can please move on to page 13, and
8  let me know when you're there.
9    A.  I'm there.
10    Q.  Section F as in Frank.
11    A.  Yes.
12    Q.  If you go down to J, it says partner's
13  share of profit, loss, and capital.  It says profit,
14  loss, you're at 40 percent and capital of
15  50 percent, do you see that?
16    A.  Yes.
17    Q.  That's the same thing we just saw for
18  2014, right?
19    A.  Yes.
20    Q.  And if you go to page 15.
21    A.  Okay.
22    Q.  Same thing for your wife, it shows profit
23  and loss 40 percent and capital 50 percent?
24    A.  Yes.
25    Q.  Page 17, please.



ROBERTO ROMAGNOLI VOLUME 1                                    June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                         69–72

Page 69

1     A.   Yes.
2     Q.   Here's your brother under partner's name,
3   subsection F, do you see that?
4     A.   Yes.
5     Q.   And J says profit and loss, he's up to 20
6   percent, correct?
7     A.   Yes.  But zero capital.
8     Q.   And nothing for capital, right?
9     A.   Yes.
10    Q.   I will now introduce Exhibit 18.
11         (Thereupon, the document was marked as
12   Exhibit 18.)
13         MS. McKEOWN:  Before you go on, I mean, we
14   can do this off the record.
15         (Discussion off the record.)
16   BY MS. ARON:
17    Q.   Exhibit 18 is the partnership return for
18   Marova, LLC, do you have the document in front of
19   you?
20    A.   Yes.
21    Q.   Do you know what this document is?
22    A.   Tax return.
23    Q.   Is this a document you approved before you
24   submitted it to the IRS?
25    A.   Yes.

Page 70

1     Q.   Mr. Romagnoli, can you please go to page
2   15.  Let me know when you're there.  Actually, go
3   back to 14, please, then we'll go to page 15.
4     A.   Yes.
5     Q.   You and your wife own 100 percent of
6   Marova, do you see that?
7     A.   Yes.
8     Q.   Now, please move on to page 15.
9     A.   Okay.
10    Q.   This shows your brother as a partner in
11   subsection F, as in Frank, do you see that?
12    A.   Yes.
13    Q.   And then if you go down to section J, it
14   says 20 percent profit and loss for your brother,
15   right?
16    A.   Right.  Still with zero capital.
17    Q.   As of 2018 your brother had 20 percent of
18   the profit or loss of Marova, correct?
19         MS. McKEOWN:  Object to the form.
20    A.   If there had to be loss or profit --
21   actually, he only had 20 percent of profit if there
22   was profit, but there was never profit.
23   BY MS. ARON:
24    Q.   The document shows 20 percent of any
25   profit or loss for your brother, right?

Page 71

1     A.   Yes, it says that.  Had we engaged in
2   operating business, then that would be the case, you
3   know, make 20 percent or loss 20 percent.
4     Q.   Did you or your wife ever transfer
5   interest of Marova to someone else?
6     A.   No.
7     Q.   You testified earlier Marova is owned by
8   you and your wife, right?
9     A.   Yes.
10    Q.   Is there any document stating what happens
11   to the shares of Marova if you or your wife, you
12   know, like a will or something, if you or your wife
13   pass away, what would happen to the shares of
14   Marova?
15    A.   I don't think there is such a documents.
16   I don't think so.  Not to my knowledge there's not.
17    Q.   Is it your testimony that you and your
18   wife own Marova as tenants by the entirety?
19    A.   Yes.
20    Q.   When did you and your wife begin owning
21   Marova as tenants by the entirety?
22    A.   Since we bought the unit in 2011, we
23   bought it through Concept International Realty.
24    Q.   And I believe Marova was created in 2011.
25   So is it your testimony that Marova was owned as

Page 72

1   tenants by the entirety with your wife from the
2   creation of the company?
3     A.   I would say so.
4     Q.   Do you know either way?
5     A.   What do you mean either way?
6     Q.   Do you know, yes, you owned Marova from
7   the beginning as tenants by the entirety with your
8   wife or you're not sure?
9     A.   I'm not sure.
10    Q.   So let's go back to Exhibit 1, which is
11   your petition and schedules.  Once you're there,
12   page 23, please.
13    A.   What page?
14    Q.   23.
15    A.   Okay.
16    Q.   So if you can please look at line 2.1
17   Citadel Servicing Corp, do you see that?
18    A.   Yes.
19    Q.   Okay.  And then it says it's checked where
20   it says who owes the debt on the left side, at least
21   one of the debtors and another, do you see that?
22    A.   At least one of the debtors and another
23   okay, yes.
24    Q.   Who else is the debtor on this Citadel
25   mortgage?



Page 73

1        MS. McKEOWN:  Form.
2        A.  My wife and I.
3    BY MS. ARON:
4        Q.  The amount of the claim, if you see column
5    A, 200,946.72, do you see that?
6        A.  Yes, I do.
7        Q.  And the value of the collateral that
8    supports this claim is $356,429, do you see that?
9        A.  Yes.
10       Q.  The mortgage is secured by the Orlando
11   property?
12       A.  Yes.
13       Q.  If you can please move on to the next
14   page, which is page 24 of 56.
15       A.  Yes.
16       Q.  Can you please look at line 2.2.
17       A.  Yes.
18       Q.  So Ocean Bank has a mortgage on the 9401
19   Collins apartment?
20       A.  Yes.
21       Q.  And the mortgage is under your name only?
22       A.  Yes.
23       Q.  If you can please look at same page
24   section 2.3.  It says Shellpoint Mortgage Servicing,
25   do you see that?

Page 74

1        A.  Yes.
2        Q.  And under other where it's checked, it
3    says first mortgage, do you see that?
4        A.  Yes.
5        Q.  Okay.  And so this is a mortgage that's
6    secured by the property and 55 Southwest 9th Street
7    Apartment 1607?
8        A.  Yes.
9        Q.  And it says here on the left is checked
10   where it says at least one of the debtors and
11   another.  Who is -- who else owes this debt besides
12   you?
13       A.  My wife.
14       Q.  And then if you can move on to the next
15   page, which is page 25.
16       A.  Okay.
17       Q.  Look at 2.1, it says Internal Revenue
18   Service.
19       A.  Yes.
20       Q.  Then it says total claim $8,634.40, do you
21   see that?
22       A.  Yes.
23       Q.  It says the debt was incurred in 2015, do
24   you see that?
25       A.  Yes.

Page 75

1        Q.  And under types of priority on secured
2    claim, it's checked taxes and certain other debts
3    you owe the government?
4        A.  Yes.
5        Q.  Then it says Federal Income Tax
6    Installment Agreement, right?
7        A.  Yes.
8        Q.  So why is that installment agreement
9    about?
10       A.  Well, we had an agreement with the IRS
11   that the debt that we owed them would be paid
12   monthly.  They were debiting $1,000 a month towards
13   the debt.  We didn't have the money to pay.
14   Actually, the amount was much higher when we start.
15   We didn't have the money, so the IRS gave us the
16   flexibility to have installment agreement.
17       Q.  Do you recall what the amount that you owe
18   the IRS is?
19       A.  Originally, must have been around 32 or
20   $30,000.  Every month we pay $1,000.
21       Q.  Is the installment agreement with the IRS,
22   is it just you or is it you and your wife?
23       A.  My wife and I, we file taxes together, so
24   both, I guess.
25       Q.  If you look at who incurred the debt, it's

Page 76

1    marked one of the debtors and another, do you see
2    that?
3        A.  We incurred the debts.
4        Q.  And see it's checked at least one of the
5    debtors and another?
6        A.  Yes.  My wife and I.
7        Q.  Your wife is the other person that's
8    identified here, right?
9        A.  Yes.
10       Q.  Okay.  If you can please move on to the
11   next page, page 26 of 56.
12       A.  Okay.
13       Q.  And if you look at 4.2, it says American
14   Express, do you see that?
15       A.  Yes.
16       Q.  Okay.  And the amount is $39,267.52, do
17   you see that.
18       A.  Yes.
19       Q.  Under other where it's checked, it says
20   business credit card, do you see that?
21       A.  Yes.
22       Q.  If you look to the left under American
23   Express who incurred the debt, it says at least one
24   of the debtors and another, do you see that?
25       A.  Yes.



Page 77

1    Q.   Who is the another?
2    A.   My wife.  I'm the one who used most of the
3    card, but she would use it occasionally, so she's
4    the other.
5         MS. McKEOWN:  There's a schedule that
6    lists all the codebtors.
7         MS. ARON:  Okay.
8         MS. McKEOWN:  The schedules were prepared
9    very carefully.  Are you referring to the American
10   Express business card now?
11        MS. ARON:  Yes.
12        MS. McKEOWN:  Okay.  That's a Concept
13   International Realty card.
14        MS. ARON:  Okay.
15   BY MS. ARON:
16   Q.   Mr. Romagnoli, is this American Express
17   card for Concept International Realty company as
18   well?
19   A.   Which?  The one with the $39,000 debt?
20   Q.   Yes.
21   A.   Yeah, I would say so.  It says American
22   Express, yes.  Because on top is American Express
23   Roberto.  This one would be the Concept
24   International Realty.
25   Q.   And if you please move on to the next

Page 78

1    page.
2    A.   Okay.
3    Q.   And I would like to direct your attention
4    to 4.4.
5    A.   Yes.
6    Q.   And it says Carlos F. Concepcion, Esquire.
7    The amount is $109,917.21, do you see that?
8    A.   Yes.
9    Q.   On the bottom it says other, final
10   judgment for attorney's fees and costs, do you see
11   that?
12   A.   Yes.
13   Q.   The date the debt was incurred is
14   June 15th, 2018; is that right?
15   A.   Yes.
16   Q.   On the left it says who incurred the debt,
17   and it's marked at least one of the debtors and
18   another, do you see that?
19   A.   Yes.
20   Q.   Who is the another?
21   A.   It's only me.
22   Q.   Can you tell me what this final judgment
23   was related to?
24   A.   These people are basically the reason I'm
25   sitting here right now.  The attorney that we had

Page 79

1    suggested we should sue for malpractice, but it
2    didn't work, so we lost.  So, that's basically
3    attorney's fees that they're charging.
4    Q.   So did you sue Carlos Concepcion for
5    malpractice?
6    A.   Yes.
7    Q.   And that is a lawsuit that you lost?
8    A.   Yes.  I mean he was the attorney in charge
9    of the almost eight years of litigations that I had
10   with my former partners, the ones who took the
11   property from us.  We sued for malpractice.
12   Q.   So you lost that the case that you filed
13   against Mr. Concepcion?
14   A.   Yes.
15   Q.   After you lost, there was a judgment for
16   attorney's fees and costs entered against you?
17   A.   Yes.
18   Q.   In favor of Mr. Concepcion?
19   A.   Yes.
20   Q.   If you can please go down the same page
21   4.6, Jorge Otero.
22   A.   Yes.
23   Q.   Amount $117,440.40, do you see that?
24   A.   Yes.
25   Q.   When was debt occurred, June 19, 2018; is

Page 80

1    that right?
2    A.   Yes.
3    Q.   Then it says other, final judgment for
4    attorney's fees and costs, do you see that?
5    A.   Yes.
6    Q.   Can you tell a little bit about what this
7    debt represents?
8    A.   It's -- Jorge Otero and Carlos Concepcion,
9    they work together in the litigation.  He also
10   signed when one of the attorneys involved in the
11   litigation that we lost against our former partners.
12   That's why it was a suit for malpractice.  The same
13   case as Carlos Concepcion.
14   Q.   Mr. Otero has a judgment for attorney's
15   fees and costs for the $117,000, right?
16   A.   Yes.
17   Q.   Then if you look on the left, it's checked
18   at least one of the debtors and another, do you see
19   that?
20   A.   Yes.
21   Q.   Who is the another?
22   A.   Like I said before, the Concepcion case
23   it's only me, there's not another.
24        MS. McKEOWN:  Can I direct him to the
25   schedule of codebtors?



ROBERTO ROMAGNOLI VOLUME 1                                    June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                      81–84

Page 81

1    MS. ARON: Okay. One second, please.
2  BY MS. ARON:
3    Q.  Please go to page 31, Mr. Romagnoli. Let
4  me know when you're there.
5    A.  I'm there. Page 31, Schedule H.
6    Q.  Yes. If you look at the bottom 3.2 and
7  3.3 it lists Dinuro Investments, LLC.
8    A.  Yes.
9    Q.  That's for Carlos Concepcion and Jorge
10  Otero, do you see that?
11   A.  Yes.
12   Q.  Dinuro Investments is the codebtor for the
13  debt with Mr. Concepcion and Mr. Otero, right?
14   A.  Yes.
15   Q.  If you go to the next page 32, please look
16  at 3.6 and 3.7, Marco Romagnoli is also a codebtor
17  for the debt with Mr. Concepcion and Mr. Otero,
18  right?
19   A.  Yes.
20   Q.  Have you paid any of that judgment amount
21  that Mr. Concepcion and Mr. Otero have against you?
22   A.  No.
23   Q.  Why not?
24   A.  Because I don't have money, and basically
25  they ruined me, they lost me everything I have,

Page 82

1  basically, with the case, and I couldn't pay them.
2  I didn't have any money, and even if I did, I don't
3  know if I could pay them, basically, because that
4  was too much money. I didn't have it. I still
5  don't have it.
6    Q.  You mentioned even if you had the money,
7  you wouldn't pay them. Can you elaborate a little
8  more on that?
9    A.  Meaning if I had the money, I don't know,
10  probably reach an agreement with them of payment,
11  but not the amount they were claiming.
12   Q.  Can you please go to page 28.
13   A.  Yes.
14   Q.  4.7 and 4.8, SR Acquisitions, Florida
15  City, Inc.
16   A.  Yes.
17   Q.  It lists an amount of 3,093,698.59, do you
18  see that.
19   A.  Yes.
20   Q.  If you go to where it says disputed, a
21  claim is disputed, do you see that?
22   A.  In which part? Yes. Yes.
23   Q.  What is it that you are disputing?
24   A.  Well, not only that the SR Acquisitions is
25  company that was created by my former partners.

Page 83

1  They created it to start acquisition to foreclose on
2  a company where they were also made partners. And
3  on top of taking all of the property, all the losses
4  that the company, San Remo Homes, that I was a part
5  of, they also managed to take the losses for
6  themselves. So, not only did they gain the entire
7  property, but also through SR Acquisitions, the
8  losses that were generated in this San Remo,
9  basically. That's the tax dispute.
10   Q.  It says here under other deficiency
11  judgment against debtor as guarantor, do you see
12  that?
13   A.  Yes, I do.
14   Q.  So there was a judgment in this case?
15   A.  Yes. Because they -- you see my brother
16  and I, we were guarantors and there were other
17  guarantors, but they sued us for the deficiencies.
18   Q.  There was a judgment here, and you're
19  saying that you're disputing this debt. Can you
20  please let me know what is it that you're disputing?
21  Are you appealing the judgment?
22   A.  When I say I'm disputing, I'm saying that
23  the taxes that they took, pretty much cover all the
24  debt of both entities, SR Acquisitions in Florida
25  City and Homestead.

Page 84

1    Q.  Are you disputing the judgment?
2    A.  No, not the judgment. Well, I mean, we
3  dispute the judgment, we lost the appeal, but this
4  has to do with taxes.
5    Q.  So you are disputing the tax treatment of
6  whatever income --
7    A.  The losses of the company that was
8  foreclosed by SR Acquisitions.
9    Q.  Okay. But siting here today, you're not
10  disputing the judgment, right?
11     MS. McKEOWN: Object to the form.
12   A.  I mean, the judgment is there.
13  BY MS. ARON:
14   Q.  It says here who incurred the debt, and
15  it's marked at least one of the debtors and another,
16  who is the another?
17   A.  Well, the Dinuro Investments, LLC, was
18  owned by my brother and I.
19   Q.  This debt was incurred March 20, 2018?
20   A.  Yeah. That was the day of the judgment.
21   Q.  Have you paid any portion of this
22  judgment?
23   A.  No.
24   Q.  Okay. Why not?
25   A.  Because it's too much money and I haven't



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
85–88

Page 85

1  paid it. It's not that I can take from the drawer a
2  million dollars. Who can do that?
3      Q.   If you go to into 4.8, SR Acquisitions
4  Homestead, Inc., do you see that?
5      A.   Yes.
6      Q.   It says amount $1,060,373.07, do you see
7  that?
8      A.   Yes.
9      Q.   And then under other, deficiency judgment
10  against debtor as guarantor, do you see that?
11     A.   Yes.
12     Q.   And then it says disputed here.
13     A.   Yes.  This is the same thing like I
14  explain with regard to Florida City.
15     Q.   Were they two separate lawsuits?
16     A.   Yes.
17     Q.   So you were a guarantor, is that what
18  happened?
19     A.   Yes.
20     Q.   Were these two lawsuits related to the
21  same San Remo --
22     A.   Yes, both of them.  Because it was San
23  Remo Florida City and San Remo Homes Homestead.  So
24  what my former partners did was they went behind my
25  back, bought the note from the bank, and proceeded

Page 86

1  to foreclose the San Remos through SR Acquisition.
2  And we couldn't defend ourselves.  They ordered
3  us -- they kept both all of the parcels, and then
4  they sued us for the deficiency as personal
5  guarantors.
6      Q.   So is SR Acquisitions Florida City, Inc.
7  and SR Acquisitions Homestead, Inc., is that the
8  company of your former partners?
9      A.   Yes.  They formed those companies to
10  basically defraud us.
11     Q.   Did you sue your former partners?
12     A.   Yes, we did.
13     Q.   The case that they filed against you or in
14  a separate case?
15     A.   There was a number of cases, I don't even
16  remember now.  I remember that my brother and I,
17  Dinuro, we sued them, but apparently the courts --
18  there was much to be done because attorneys
19  apparently Carlos Concepcion and Jorge Otero filed
20  the wrong suit.  They should have filed a realty
21  suit, but they filed a direct suit.  This is what I
22  remember.  We were like eight years in litigation.
23  At the end we lost, and then after we lost, they
24  proceeded to sue us for the personal guarantees.
25     Q.   Can you turn to -- before I go there,

Page 87

1  quick question, your wife, she's not responsible for
2  this judgment from SR Acquisitions Florida City or
3  SR Acquisitions Homestead or Jorge Otero or --
4      A.   No, she's not.
5      Q.   So page 32.
6      A.   Yes, I'm in page 32.
7      Q.   Okay.  So 3.10, do you see that?
8      A.   Yes.
9      Q.   This shows your wife is a codebtor to the
10  IRS together with you, right?
11     A.   Yes.  We have the installment agreement.
12     Q.   And if you go down one line, 3.11, it says
13  your wife's name and Legacy Estates HOA, what is
14  that for?
15     A.   That's the homeowners association where
16  the property is located at in Orlando.
17     Q.   So this is like the homeowners association
18  fees that you pay every month?
19     A.   Yes.  Yes.
20     Q.   Ten if you go page 33.
21     A.   Yes.
22     Q.   3.12, that says your wife is codebtor for
23  the Brickell West Master Association?
24     A.   Yes.
25     Q.   And this is like a condominium fee?

Page 88

1      A.   Yes, that's the condominium fee.
2          MS. McKEOWN:  Are you looking at the
3  schedule of codebtors or are you looking executory
4  contracts now?
5          MS. ARON:  No.  I'm looking at page 33,
6  codebtors.
7  BY MS. ARON:
8      Q.   So 3.13, that's a condominium fees as
9  well?
10     A.   Yes, condo association.  Yes, it's a fee.
11     Q.   I'm going to number this Exhibit 18A.
12        (Thereupon, the document was marked as
13        Exhibit 18A.)
14  BY MS. ARON:
15     Q.   Mr. Romagnoli, this is the American
16  Express --
17     A.   Yes.
18     Q.   -- credit card bill for account ending
19  8-32009, do you have it in front of you?
20     A.   Yes.
21     Q.   Do you know what this document is?
22     A.   Yes, it's a statement.
23     Q.   Okay.  And if you look on the top, it says
24  Business Platinum Card Concept International Realty
25  and your name, right?



Page 89

1    A.  Yes.
2    Q.  If you can please go to the third page.
3    A.  I'm on page 3, yes.
4    Q.  Towards the middle it says new charges
5  summary, do you see that?
6    A.  Yes.
7    Q.  Actually, on the top -- go to the top,
8  please.  Payments and credits summary.  Credits says
9  your name and your wife's name, do you see that?
10   A.  Yes.
11   Q.  So your wife is also associated with this
12  credit card?
13   A.  Yes.  She had an extension.
14       MS. McKEOWN:  Objection to the form.
15  BY MS. ARON:
16   Q.  So is she responsibility for paying this
17  card?
18   A.  I always paid it.  Well, the company paid
19  that card.
20   Q.  Is your wife responsible for paying this
21  American Express credit card?
22   A.  No, I am.  It was under my name.
23   Q.  So did you give your wife an authorized
24  user type of credit card?
25   A.  Yes, like an extension from my personal

Page 90

1  also.
2    Q.  She used this credit card, too, right?
3    A.  From time to time, yes.
4    Q.  18B.
5        (Thereupon, the document was marked as
6        Exhibit 18B.)
7    BY MS. ARON:
8    Q.  18B is an American Express bill for
9  account ending 2-03009.
10   A.  I have it.
11   Q.  Okay.  What is this document?
12   A.  That's a credit card statement.
13   Q.  Okay.  And it has your name at the top,
14  right?
15   A.  Yes.
16   Q.  And if you go to page 3, please.
17   A.  Okay.
18   Q.  It also lists your wife there, do you see
19  that?
20   A.  Yes.  I gave her an extension of this
21  card.
22   Q.  And who is responsible for paying this
23  credit card?
24   A.  Me.  I got it originally, so I'm always
25  been the owner of that card since 2004.

Page 91

1    Q.  Did your wife have any responsibility for
2  paying for this credit card?
3    A.  No.
4        MS. ARON:  We can take a break now.  How
5        long would you -- I think I have about probably an
6        hour, hour and a half of questioning.
7        MS. McKEOWN:  Give me like 15 minutes.
8        MS. ARON:  You want to do 12:35?
9        MS. McKEOWN:  Yeah, that's fine.  That
10       will be great.
11       (Thereupon, a break was taken from
12       12:17 p.m. to 12:41 p.m., after which the
13       following proceedings were held:)
14  BY MS. ARON:
15   Q.  Mr. Romagnoli, I'm going to introduce
16  Exhibit 18C.
17       (Thereupon, the document was marked as
18       Exhibit 18C.)
19  BY MS. ARON:
20   Q.  Mr. Romagnoli, please me know when you
21  have 18C in front of you.
22   A.  I have it.
23   Q.  Do you know what this document is?
24   A.  This is complaint SR Acquisition
25  Homestead, LLC, filed against my brother and I.

Page 92

1    Q.  This complaint was filed on
2  August 20,2014, right?
3    A.  I don't recall exactly.
4    Q.  If you look at the top of the complaint
5  that's the date that shows there.  This is the same
6  complaint we were talking about before the break
7  that led to the judgment against you?
8    A.  Yes.
9    Q.  I'll now introduce Exhibit 18D.
10       (Thereupon, the document was marked as
11       Exhibit 18D.)
12  BY MS. ARON:
13   Q.  Mr. Romagnoli, do you have it in front of
14  you?
15   A.  Yes.
16   Q.  And what is this document?
17   A.  SR Acquisitions Florida City, LLC, a
18  complaint against Marco Romagnoli, my brother, and
19  myself.
20   Q.  And this complaint was filed on August 20,
21  2014?
22   A.  Yes.
23   Q.  This is the other judgment we talked about
24  before the break, right?
25   A.  Yes.



Page 93

1    Q.  I want to go back to Exhibit 4.  Let me
2    know when you have Exhibit 4 up.  Thank you.
3        A.  I'm going to need some help from the lady
4    with the computer.
5        Q.  Do you want to go off the record for a
6    couple minutes so you can find her?
7            (Off the record.)
8    BY MS. ARON:
9        Q.  Exhibit 4.
10           Do you have it in front of you?
11       A.  Yes.
12       Q.  And we went through this document, and
13   this is the deed by which you put the 1103 Azure
14   condominium and 9401 Collins into the Varoma Trust,
15   do you recall that?
16       A.  Yes.
17       Q.  So this happened after the lawsuit by SR
18   Acquisitions was filed against you.
19       A.  Okay.
20       Q.  Remember the previous exhibit we saw the
21   lawsuits by SR Acquisitions were filed in August of
22   2014 and this deed is from October 2015.  So my
23   question is, the deed to the trust of the 9401
24   Collins property was done after SR Acquisitions had
25   sued you, right?

Page 94

1        A.  Yes -- can you repeat the question you
2    just asked me?
3        Q.  Sure.  The deed of transfer of the 9401
4    Collins property from you to the Varoma Trust was
5    done after SR Acquisitions had sued you in 2014?
6        A.  Apparently, that's the date, yes.
7        Q.  At the time of the transfer of the 9401
8    Collins Avenue property to the Varoma Trust, were
9    you insolvent?
10           MS. McKEOWN:  Objection to the form.
11       A.  Could you repeat the question?
12   BY MS. ARON:
13       Q.  Sure.  If you refer back to Exhibit 4, you
14   see the deed was done on October 14, 2015, right?
15       A.  And the question is?
16       Q.  The question is, were you insolvent at
17   that time?
18           MS. McKEOWN:  Object to the form.
19       A.  Well, I didn't have much money if that's
20   what you mean.
21   BY MS. ARON:
22       Q.  Did you have more liabilities than assets?
23           MS. McKEOWN:  Objection to the form.
24       A.  I couldn't say.
25

Page 95

1    BY MS. ARON:
2        Q.  And after you transferred the 9401 Collins
3    property to the Varoma Trust, you maintained control
4    over the property, right?
5        A.  We live there, my wife and I.
6        Q.  Was one of the reasons why you transferred
7    the property to the Varoma Trust to protect the
8    asset from any potential creditors?
9            MS. McKEOWN:  Objection to the form.
10       A.  No.  Basically, we wanted to provide
11   security and estate for our daughter just in case
12   something happened, and the home, the Azure
13   property, is homestead anyways.
14   BY MS. ARON:
15       Q.  When you say you wanted to provide
16   security for your daughter in case something
17   happens, can you give me some examples what that
18   something could be?
19       A.  What something could be, okay, give you
20   example.  My father died from heart failure, my
21   brother and I inherited the same problem.  A few
22   years ago my brother had a heart attack, and he
23   barely survived.  And we have high blood pressure
24   and doctor tells me I have a strong possibility of
25   dying from heart attack like my father did.  It's a

Page 96

1    family thing.  That's why if something happen to me,
2    I don't want my wife to be worrying, especially with
3    a daughter and everything to protect our daughter.
4    That's -- basically, health issues regarding to me.
5        Q.  Now, I will have this introduced as
6    Exhibit 19.
7            (Thereupon, the document was marked as
8        Exhibit 19.)
9    BY MS. ARON:
10       Q.  This is Exhibit 19.  It's a quitclaim
11   deed --
12       A.  I don't see it yet.
13       Q.  I put it in the chat.  Just let me know
14   when it's up.
15       A.  Yes, I have it now.
16       Q.  So this is October 14, 2015, quitclaim
17   deed related to a property at Lot 64 Royal Legacy
18   Estate, do you see that?
19       A.  Yes.
20       Q.  Is this your signature?
21       A.  Yes, that's my signature.
22       Q.  And it's signed by Luisa Rengifo, right?
23       A.  Yes.
24       Q.  She's your attorney, right?
25       A.  She's no longer my attorney.  If she was



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
97–100

Page 97

1   attorney who did the trust.
2      Q.   It's also signed by Jacqueline Rodriguez
3   and --
4      A.   Yes.  That's the witness.
5      Q.   Was Ms. Rodriguez your CPA?
6      A.   Yes.  She still is.
7      Q.   Do you recognize this document?
8      A.   Yes.  Quitclaim deed.
9      Q.   Was this for the Orlando property?
10     A.   Yeah.  Royal Legacy Estates, yes.
11     Q.   At Prince George Way?
12     A.   Yes.
13     Q.   Here it says:  Grantor Roberto Romagnoli
14  and Maria Antonieta Laviosa, husband and wife, and
15  grantee Roberto Romagnoli and Maria Antonieta
16  Laviosa as trustees, or their successors in
17  interest, of the Varoma Joint Living Revocable
18  Trust, do you see that?
19     A.   Yes.
20     Q.   Why did you transfer the property to the
21  Varoma Trust?
22     A.   For the same --
23     MS. McKEOWN:  Form.
24     A.   -- same reason we transfer Azure, to
25  provide security for our daughter in case something

Page 98

1   happen to me or my wife.
2   BY MS. ARON:
3      Q.   This transfer of the Orlando property was
4   done on October 14, 2015, right?
5      A.   Yes.
6      Q.   That's after the SR litigation was filed
7   against you, right?
8      A.   Yes.
9      Q.   And the SR litigation was ongoing from
10  2014 to 2015?
11     A.   That litigation ended in 2018.
12     Q.   After you transferred the property to
13  Varoma Trust, you maintained the property, right?
14     A.   My wife and I.
15     Q.   Did you get anything in return for
16  transferring this property to the Varoma Trust?
17     A.   No.
18     Q.   I will introduce Exhibit 20.
19         (Thereupon, the document was marked as
20  Exhibit 20.)
21     A.   I have it.
22  BY MS. ARON:
23     Q.   This is a quitclaim deed dated April 22nd,
24  2016, that relates to Lot 64 also Royal Legacy
25  Estates?

Page 99

1      A.   Yes.
2      Q.   Do you know what this document is?
3      A.   It's a quitclaim deed.
4      Q.   And this relates to the same Orlando
5   property at Prince George Way?
6      A.   Yes.
7      Q.   If you can please turn to the second page.
8      A.   Okay.
9      Q.   It says here:  Roberto Romagnoli and Maria
10  Antonieta Laviosa as trustees, or the successors of
11  interest, in the Varoma Revocable Living Trust.  And
12  that's your signature, right?
13     A.   Yes.
14     Q.   Now, this transfer -- strike that.
15         So this is a quitclaim deed from Roberto
16  Romagnoli and Maria Antonieta Laviosa, or their
17  successors in interest, of the Varoma Revocable
18  Living Trust under agreement dated October 14, 2015.
19  And Roberto Romagnoli and Maria Antonieta Laviosa,
20  husband and wife, as grantees, do you see that?
21     A.   Yes.
22     Q.   And I believe we already discussed this
23  today, but the reason for transferring this Orlando
24  property from the Varoma Trust to you and your wife
25  is because you needed to get a line of credit, and

Page 100

1   the bank asked you to have the property in your
2   name, right?
3      A.   Yes.  The bank otherwise wouldn't have
4   approved the credit.
5      Q.   Do you remember which bank this was?
6      A.   I know the service company is called
7   Citadel.  Basically, we make all the payments to
8   Citadel.  I don't know what bank they use.
9      Q.   This Orlando property today is owned by
10  you and your wife, right?
11     A.   Yes.
12     Q.   After this property was transferred from
13  the trust to you and your wife, you and your wife
14  have control over this property, right?
15     A.   Yes.
16     Q.   What did the Varoma Trust get in return
17  for transferring this property to you and your wife?
18     A.   Nothing.
19     Q.   Were you insolvent at the time of this
20  transfer, which is April 22nd, 2016?
21     MS. McKEOWN:  I didn't hear part of the
22  question.
23     MS. ARON:  Were you insolvent at the time
24  of the transfer of this property on April 22nd,
25  2016?



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
101–104

Page 101

1    MS. McKEOWN:  Objection to form.
2    BY MS. ARON:
3    Q.  You may answer.
4    A.  Yes.  I didn't have money.  If insolvent
5    means that, we didn't have money.
6    Q.  So, for this Orlando property on Prince
7    George Way, is it rented now or is there anyone
8    living there?
9    A.  Right now it's rented.
10    Q.  And who gets the rent money?
11    A.  The rent money is sent to Concept
12    International Realty.  We do property manager.  We
13    manage -- the company manages rent at apartments
14    from private owners.  So the money goes to the
15    office, and then the office makes whatever payments
16    for the owner, and anything left it is deposited
17    into the owner.  So this one is managed at the same
18    time.  Concept International Realty gets the rent,
19    makes whatever payments in this case there are no
20    payments to the owner because the rent my wife get
21    overnight doesn't even cover the rest of the
22    expenses.
23    Q.  Okay.  So, the property is owned by you
24    and your wife, but the rent payments go to Concept
25    International Realty, right?

Page 102

1    A.  Yes, like any other customer.
2    Q.  Do you and your wife get any piece of that
3    rent payment that goes to Concept International
4    Realty?
5    A.  If we get any?
6    Q.  Yes.  Any portion of the payment.
7    A.  No because the rent is not enough after we
8    pay the bank and expenses like association fees, et
9    cetera, there isn't much left.  And now even less
10    because the tenant, due to the coronavirus, is
11    paying $700 less a month than what he used to pay.
12    So we are red.
13    Q.  Who manages this Orlando property?
14    A.  Concept International Realty.
15    Q.  So, for example, you have to decide to
16    lower the rent for the tenant like you just did, is
17    that a decision you made or a decision your wife
18    made?
19    A.  Basically, my wife make that decision.
20    Q.  You cut off.  Can you please repeat your
21    answer.
22    A.  My wife and I together decided that.
23    Q.  Since the time that the Varoma Trust
24    transferred the Orlando property to you, have you or
25    your wife ever conveyed or transferred any interest

Page 103

1    in this property to anyone else?
2    A.  No.
3    Q.  Is this a house or an apartment?
4    A.  It's a house.
5    Q.  Okay.  And today you own that house with
6    your wife, right?
7    A.  Yes, husband and wife.
8    Q.  We'll now go to Exhibit 20A.
9        (Thereupon, the document was marked as
10        Exhibit 20A.)
11    BY MS. ARON:
12    Q.  This is a uniform residential loan
13    application for the property at 11843 Prince George
14    Way, Orlando, Florida, okay.
15    A.  Yes.
16    Q.  Can you tell me what this document is?
17    A.  Can you repeat?
18    Q.  Yes.  Do you know what this document is?
19    A.  Yes.  This is the loan that we got for the
20    Orlando house, like the credit or whatever you want
21    to name it.
22    Q.  Is this your signature on the first page?
23    A.  Yes.
24    Q.  When you say Orlando property, this is a
25    property that we just discussed was transferred from

Page 104

1    you and your wife to the Varoma Trust, and then from
2    the Varoma Trust to you and your wife, right?
3    A.  We had to transfer out from trust to get
4    the loan.
5    Q.  Is this document accurate?
6        MS. McKEOWN:  Objection to the form.
7    A.  To my knowledge.
8    BY MS. ARON:
9    Q.  Did you ever amend or revise this
10    document?
11    A.  No, never amended it.
12    Q.  If you can look on page 1.  If you go
13    down, there's a section called III.Borrower
14    Information.
15    A.  Yes.
16    Q.  If you go up two boxes, there's a box that
17    says:  Title will be held in one name, do you see
18    that?
19    A.  Title will be held in one name, yes.
20    Q.  And that lists you and your wife, right?
21    A.  Maria Laviosa and Roberto Romagnoli, yes.
22    Q.  If you go to the right, there's another
23    box.  It says:  Manner in which title will be held,
24    do you see that?
25    A.  Yes.



Page 105

1     Q.   What does it say there?
2     A.   Joint tenants.
3     Q.   I will now introduce Exhibit 21.
4          (Thereupon, the document was marked as
5     Exhibit 21.)
6   BY MS. ARON:
7     Q.   Mr. Romagnoli, let me know when you have
8   it up.
9     A.   Yes, I have it.
10    Q.   So this document is titled Special
11  Warranty Deed.  Do you know what this document is?
12    A.   This is for the Brickell Heights unit.
13    Q.   It says for Unit 1607, Brickell Heights
14  West Condominium, right?
15    A.   Yes.
16    Q.   Is that a condominium unit or an office?
17    A.   No.  That's a small apartment, small
18  condominium.
19    Q.   And so is it rented out to someone right
20  now?
21    A.   Yes, it's rented.
22    Q.   And who gets the rent payments?
23    A.   The same way that the Orlando house does,
24  the rent goes to Concept International Realty and
25  then Concept International Realty makes all the

Page 106

1   payments -- send the payment for the mortgage, pay
2   association fees, et cetera, et cetera.
3     Q.   You and your wife own this unit, right?
4     A.   Yes.
5     Q.   Do you get any portion of that rent
6   payment?
7     A.   No.  This rent payment doesn't get any
8   portion for nobody.  It's short after all payments
9   are made, nothing left.
10    Q.   So --
11    A.   Basically, the rent breaks even.  You pay
12  mortgage and everything, it breaks even.  I have to
13  double check, it may even be in red there.
14    Q.   If you go to Exhibit 21, this is the
15  warranty deed from 9SMA West, LLC, to you and your
16  wife for this Brickell Heights West condominium,
17  right?
18    A.   Yes, I'm looking at special warranty deed
19  you just mentioned.
20    Q.   Did you and your wife acquire this unit at
21  Brickell Heights condominium on July 7, 2017?
22    A.   Yes.
23    Q.   Did you ever live there?
24    A.   No.
25    Q.   Today do you and your wife still own this

Page 107

1   property?
2     A.   Yes.
3     Q.   Did you or your wife convey any part or
4   interest of this property to any third party?
5     A.   No.
6     Q.   Did you and your wife ever convey your
7   interest in the property to each other?
8     A.   I don't know what you mean.
9     Q.   Did you or your wife ever give each other
10  interest in this property?
11       MS. McKEOWN:  Objection to the form.
12    A.   It's under both names, my wife and myself.
13  I don't understand the question.
14  BY MS. ARON:
15    Q.   Has it always been --
16    A.   Husband and wife.
17    Q.   Let me repeat it so the court reporter can
18  gets a good record.
19       Since you purchased the property in 2017,
20  have you and your wife been the only owners of this
21  property?
22    A.   Yes.
23    Q.   Who controls this property today?
24    A.   My wife, basically.  She asks me, but at
25  the end of the day she decides, she has the final

Page 108

1   word.
2     Q.   I'll introduce Exhibit 21A.
3          (Thereupon, the document was marked as
4     Exhibit 21A.)
5   BY MS. ARON:
6     Q.   It says uniform residential loan
7   application, do you see that?
8     A.   Yes.
9     Q.   If you can go to the last page of the
10  document, please.
11    A.   Last page?
12    Q.   Yes.
13       Is this your wife's signature?
14    A.   Yes.
15    Q.   And she shows up as the borrower, right?
16    A.   Yes.
17    Q.   If you can please go back to the first
18  page.
19    A.   Okay.
20    Q.   Have you seen this document before?
21    A.   I may have not.
22    Q.   This is for the property at 55 Southwest
23  9th Street, Unit 1607, do you see that?
24    A.   Yes.
25    Q.   That's the Brickell Heights property that



ROBERTO ROMAGNOLI VOLUME 1                              June 09, 2020
IN RE: ROBERTO ROMAGNOLI                                      109–112

1  we were just discussing, right?
2      A.  Yes.
3      Q.  Do you see towards the middle of the page
4  there's a box saying:  Title will be held in one
5  name?
6      A.  Middle of where?
7      Q.  See where it says Roman numeral three,
8  Borrower Information?
9      A.  Yeah.
10     Q.  Go up two boxes from that.  So above where
11 it says Borrower Information, go above two boxes.
12 Title will be held in one name, do you see that?
13     A.  Yes.
14     Q.  And manner which title will be held says:
15 Joint tenants, do you see that?
16     A.  Yes.
17     Q.  I'd like to please go back to Exhibit 1,
18 which is your petition and schedules, and then to
19 page 17.  Let me know when you're there.
20     A.  What page?
21     Q.  Page 17 of 56.
22     A.  Okay, I'm there.
23     Q.  Do you see section 33, there it says:
24 Claims against third parties.  Claims against Javier
25 Macedo and Felisberto Camacho for, inter alia,

1  contribution, unjust enrichment, misappropriation of
2  NOL carry-forward and misappropriation of proceeds
3  from sale of real estate parcel on February 1, 2018,
4  by Sam Remo Homes at Florida City.  Value is
5  estimated.  And it says 3 million next to it, right?
6      A.  Yes.
7      Q.  Are these the former partners we talked
8  about earlier?
9      A.  Yes.
10     Q.  This is a lawsuit that you lost, right?
11     A.  Yes, these are the ones who created the SR
12 Acquisition and then foreclose and then S.R
13 Acquisitions who does for personal warranties.
14 Those were former partners.  And this lot that
15 they -- because Florida City was not totally for
16 foreclosed, the land of Florida City was not totally
17 foreclosed because there was a piece of land that
18 had no mortgage.  What they did after all the
19 litigation was over, even the litigation for the
20 warranties and everything, they sold the property
21 and without my knowledge.  So, basically they must
22 have gotten some money from the sale of that
23 property of which my -- from which my brother and I
24 would have been entitled to one-third through the
25 Dinuro Investments, LLC.  They basically stole that

1  money from us.
2      Q.  Did you sue Mr. Macedo and Mr. Camacho?
3      A.  For this, no, we haven't yet.
4      Q.  Without telling me any conversations that
5  you have had with any of your attorney, setting that
6  aside if you can answer why haven't you sued them?
7      A.  Because it's going to be another battle,
8  to be honest with you.  I'm tired.  That is the
9  reason.  Going back to litigation is just going to
10 give me a heart attack, and I don't want that.
11     Q.  I assume that you are not in good terms
12 with Macedo and Camacho?
13     A.  Not at all.
14     Q.  How did you arrive at the valuation of $3
15 million for this claim?
16     A.  I don't know.  We just estimated that.  It
17 was an estimation.  The land -- the total land value
18 was approximately $12.5 million, so figure the cost
19 would be $3 million or so.
20     Q.  Where is that land located?
21     A.  This one in particular the company says
22 Florida City, but it's actually Homestead right
23 where the turnpike ends -- where the turnpike meets
24 US-1 on the left hand side.
25     Q.  And who owns that land today?

1      A.  They had sold that land.  I don't recall
2  the name, to be honest with you.  I don't know if my
3  attorney has it because I copied her the names of
4  the ones that bought the land, but I don't recall
5  them now.
6      Q.  If you can go to page 15 of Exhibit 1.
7      A.  Yes, I'm here.
8      Q.  So, do you see where it says Dinuro at the
9  bottom of the page?
10     A.  Dinuro Investments, LLC, yes.
11     Q.  It says it's co-owned 50-50 with your
12 brother, Marco Romagnoli, do you see that?
13     A.  Yes.
14     Q.  It says unknown for the value.  Why is the
15 value unknown?
16     A.  Dinuro was one partner of the San Remo
17 entity.  The other two people we just mentioned
18 before through their LLC, they had the other
19 two-thirds.  After they foreclosed San Remo, there
20 was nothing else for Dinuro, so the value was
21 basically nothing.
22     Q.  Does it have assets?
23     A.  No.
24     Q.  Any money in any bank accounts?
25     A.  Nothing.



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
113—116

1    Q.   Was Dinuro set up just to be a vehicle for
2   the San Remo investment?
3    A.   Yes.  Dinuro was set up around 2005 or
4   2004 to invest with -- together with the other two
5   partners in the San Remo projects.
6    Q.   Is Dinuro operating today?
7    A.   No.
8    Q.   Do you know who the officers or directors
9   of Dinuro are?
10    A.   Dinuro, my brother and I.
11    Q.   While the company was alive, who
12   controlled the company, you, your brother, or both
13   of you?
14    A.   Both of you -- I mean both of us.  My
15   brother maybe he has bigger opinion than mine, but
16   basically these decisions were between him and
17   myself.
18    Q.   And now, if you can look at page 15, which
19   you have in front of you, there's a company named
20   Concept Rental and Property Management, LLC.
21    A.   Yes.
22    Q.   Owned 100 percent with spouse as tenants
23   by the entirety?
24    A.   Yes.
25    Q.   The value is zero.  So why is the value

1   zero?
2    A.   That company was created to invest in some
3   particular projects with couple of partners, but
4   then when the time came, the partners didn't have
5   the capital to provide, so we never went into
6   business.  The company hasn't done anything ever.
7    Q.   Just enough to do the investment?
8    A.   We created the company with the purpose to
9   make the investment, but it never happened.
10    Q.   So the company is not operating today?
11    A.   No.  Never operated.
12    Q.   Who are the officers and directors of this
13   company?
14    A.   My wife and myself, if I'm not mistaken.
15    Q.   While the company was alive, who
16   controlled it, you or your wife or you and wife
17   together?
18    A.   Either one.
19    Q.   This company never owned any assets?
20    A.   It was alive, but it never did anything,
21   never operated, no assets, no nothing.
22    Q.   And today the company doesn't have any
23   assets or any money?
24    A.   Nothing, not even a bank account.
25    Q.   Do you recall how much money was in it

1   that bank account?
2    A.   Yes.  I think we opened that account with
3   $150, which is minimum to open the account.  We
4   never made deposits to the account, and monthly fees
5   bank charges basically ate up all the $150
6   deposited, and the bank ended up closing the
7   account.
8    Q.   Okay.  Next property on this list is
9   Concept Property Maintenance and Improvement, LLC.
10   It's the third company listed, do you see it?
11    A.   Yes.
12    Q.   Owned 100 percent with spouse as tenants
13   by the entirety?
14    A.   Yes.
15    Q.   Value is zero.  So why is the value zero?
16    A.   It's the same story as Concept Rentals and
17   Property Management, LLC.
18    Q.   Okay.  So it was set up to make an
19   investment?
20    A.   With some other partners, but never
21   happened.
22    Q.   And it's not operating today?
23    A.   No, not operating and has not.
24    Q.   When the company was alive, who were the
25   directors, do you know?

1    A.   My wife and I.
2    Q.   And the company never owned any assets?
3    A.   No.
4    Q.   The next company is Romava Group, LLC, do
5   you see that?
6    A.   Yes.
7    Q.   It says owned 100 percent with spouse as
8   tenants by the entirety, and the value is zero.  Why
9   is the value zero?
10    A.   That's again same story as the previous
11   two, Concept Rental Property Management and Concept
12   Property Maintenance and Improvement.  I was created
13   also for the purpose of making another investment
14   with another partner, and it never happened either.
15    Q.   And the company is not operating today,
16   right?
17    A.   No.
18    Q.   While the company was alive, do you know
19   who the officers and directors were.
20    A.   My wife and I.
21    Q.   And who controlled the company while it
22   was alive?
23    A.   Both.  It was alive, but it has no
24   movement in it, never did any business.
25    Q.   And has this company ever owned any



Page 117

1  assets?
2      A.  No.
3      Q.  Today does it own any assets?
4      A.  No.
5      Q.  The next company is -- if you can please
6  go to page 46 of the exhibit I have in front of you?
7      A.  Page 46?
8      Q.  Yes.  Four-six.
9          If you look seven companies down, there's
10  a company called Concept International Realty
11  Orlando, LLC?
12     A.  Yes.
13     Q.  So what does this company do?
14     A.  That company was created to start doing
15  real estate and property management for real estate
16  in Orlando.  That was basically the reason we bought
17  the house in Orlando because we created that company
18  in order to move the business to Orlando, but at the
19  end, it didn't happen, so we just stay in Miami.
20     Q.  Is this company operating today?
21     A.  No.  Right now not operating.
22     Q.  Who are the owners of this company?
23     A.  My wife and I.
24     Q.  When the company was alive, who were the
25  officers and directors?

Page 118

1      A.  I would say my wife was director.  I don't
2  remember if I was a director maybe.
3      Q.  When the company was alive, who controlled
4  the company?
5      A.  Basically my wife.
6      Q.  Does this company have any assets?
7      A.  No.  It used to operate in a small office
8  in Orlando paying rent, but never had anything.
9      Q.  Did it have a bank account?
10     A.  I have to double check with my wife.
11     Q.  Okay.
12     A.  I think we were using -- this is a
13  guess -- we were using the same account that we had
14  in Miami.  I don't think, but I have to double check
15  that we never open account for that company.
16     Q.  And then if you go to the next company,
17  Damaro USA, Inc., do you see that?
18     A.  Yes.
19     Q.  It says real estate investment?
20     A.  Yes.
21     Q.  And from August 16, 2006, to present, do
22  you see that?
23     A.  Yes.
24     Q.  What does Damaro USA, Inc., do?
25     A.  That was a company that used to own a

Page 119

1  condominium with my brother and I, but then we
2  separated.  So he kept the Damaro when we sold the
3  property, and so he kept the Damaro USA Inc. for
4  himself.
5      Q.  Did you get -- when did you give your
6  interest in Damaro to your brother?
7      A.  I don't remember.  A few years ago.  2014
8  maybe, I don't know.
9      Q.  Did you get anything in exchange for
10  giving your interest in Damaro to your brother?
11     A.  Yes.  We sold the apartment condominium.
12     Q.  Do you know where the condominium was
13  located?
14     A.  In Miami Beach.
15     Q.  A little more specific?
16     A.  It's 50 Collins Avenue, Apartment 1501,
17  Miami Beach, I believe.
18     Q.  It's about Collins and 50th Street?
19     A.  Yes.
20     Q.  The company sold the property, and then
21  you and your brother split up the money that came
22  from the property?
23     A.  Yes.
24     Q.  Okay.  And so today who owns Damaro?
25     A.  My brother.

Page 120

1      Q.  You have no interest in Damaro today?
2      A.  No.
3      Q.  Okay.  And today who are the officers and
4  directors of Damaro, if you know?
5      A.  Today who are, that's your question?
6      Q.  Yes.  If you know.
7      A.  I don't know.
8      Q.  You told me Damaro owned that condominium
9  on Collins and 50th.  Besides that condominium when
10  you were involved with Damaro, did Damaro own any
11  other assets?
12     A.  No.
13     Q.  Last of this list is Diaroma, Inc.  It
14  says real estate investment, do you see that?
15     A.  Yes.
16     Q.  What does Diaroma do?
17     A.  Diaroma was a company that owned the
18  property and Damaro was the holding -- like the
19  company that hold.
20     Q.  Is Diaroma operating today?
21     A.  I don't think so.  I don't know.
22     Q.  Who owned Diaroma?
23     A.  My brother and I.
24     Q.  And today do you still own a piece of the
25  Diaroma?



Page 121

1    A.   No.
2    Q.   When did you stop owning your piece of
3    Diaroma?
4    A.   About five years ago, I guess.
5    Q.   Did you sell it to your brother or did you
6    give it to your brother?
7    A.   Basically, when the condominium was sold,
8    you know, Diaroma didn't make sense anymore.
9    Q.   When Diaroma was alive, who were the
10   officers or directors?
11   A.   My brother and myself.
12   Q.   Does the company Diaroma own any assets
13   today?
14   A.   No.
15   Q.   Besides that apartment on Collins and
16   50th, does Diaroma own anything else?
17   A.   No.
18   Q.   I will now introduce Exhibit 22.
19       (Thereupon, the document was marked as
20   Exhibit 22.)
21   BY MS. ARON:
22   Q.   Please let me know when you have it in
23   front of you.
24   A.   Okay.
25   Q.   If you can please go to page 7.

Page 122

1    A.   Yes.
2    Q.   Do you know what this document is?
3        MS. McKEOWN:  The one that starts on page
4    7?
5        MS. ARON:  Yes.  It says Findings of Fact,
6    Conclusions of Law, and Final Judgment.
7    A.   Judgment, right.
8    BY MS. ARON:
9    Q.   If you look at the page 7, it's SR
10   Acquisitions Florida City, LLC, versus you and Marco
11   Romagnoli?
12   A.   Yes.
13   Q.   If you go to 14...
14   A.   Yes.
15   Q.   This is the judgment that SR Acquisitions
16   Florida City, LLC, got against you, correct?
17   A.   Yes.
18   Q.   The date of the judgment was March 19,
19   2018?
20   A.   Yes.
21   Q.   Then the total here is $3,093,698.59?
22   A.   Yes.
23   Q.   And I will introduce the next exhibit now.
24       (Thereupon, the document was marked as
25   Exhibit 23.)

Page 123

1    BY MS. ARON:
2    Q.   Please let me know when you have it.
3    A.   Yes, I have it.  Yes.
4    Q.   If you can please go to page 8.
5    A.   Okay.  Yes, I'm on page 8.
6    Q.   Is this a judgment that SR Acquisitions
7    got against you and Marco Romagnoli?
8    A.   Yes.
9    Q.   If you can please go to page 15 of this
10   document.
11   A.   Okay.
12   Q.   So the total amount of this judgment is
13   $1,060,373.07?
14   A.   Yes.
15   Q.   And the judgment was entered on March 19,
16   2018?
17   A.   Yes.
18   Q.   Now, this case filed by SR Acquisitions
19   stem from this loan that you guaranteed, right?
20       MS. McKEOWN:  I'm sorry, say that again.
21   BY MS. ARON:
22   Q.   The case filed by SR Acquisitions against
23   you stem from a loan that you guaranteed, right?
24   A.   Yes.
25       MS. McKEOWN:  Objection to the form.

Page 124

1    BY MS. ARON:
2    Q.   Do you know where the proceeds of that
3    loan went?  Did it go to your partners or where did
4    the money go?
5    A.   Well, the money, it was owed to the bank,
6    Ocean Bank, and then we been making the payments of
7    interest for like five years.  But 2010, February of
8    2010, when the loan was due, our former partners,
9    Mr. Macedo and Mr. Camacho, they said that they did
10   not want to renew the loans anymore and they were
11   not going to make any payments on the loan anymore
12   to the bank.
13       So basically, we were left, my brother and
14   I, without knowing what to do.  What happened is
15   that the bank send another default payment.  But
16   then what happened was that one of these ex-partners
17   happens to be a shareholder and a director of such
18   banks.
19       So what they did, they went on our bank
20   and created this enterprise called SR Acquisitions
21   and bought the loan from the bank everything, and
22   proceeded to foreclose on the San Remo homes.  After
23   the foreclosure was done, they proceeded to sue us
24   for the personal guarantees since they owned the
25   loan then.  So we tried to defend ourselves, but we



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
125–128

Page 125

1  couldn't, we lost.
2      Q.  That was SR Acquisition judgment we saw?
3      A.  Yes.  SR Acquisition at Homestead and SR
4  Acquisition at Florida City.
5      Q.  I will introduce Exhibit 24.
6          (Thereupon, the document was marked as
7      Exhibit 24.)
8      A.  I have it.
9  BY MS. ARON:
10      Q.  This is the final judgment against you
11  that was entered in favor of Carlos Concepcion,
12  right?
13      A.  Yes.
14      Q.  And if you go to the third page -- let me
15  know when you're there.
16      A.  I'm here.
17      Q.  Amount of the judgment $109,970.21, right?
18      A.  Yes.
19      Q.  And this judgment was entered on June 15,
20  2018, right?
21      A.  Yes.
22      Q.  Did you pay any piece of this judgment to
23  Mr. Concepcion?
24          MS. McKEOWN:  Objection to the form.
25      A.  No.

Page 126

1  BY MS. ARON:
2      Q.  And why is that?
3      A.  Well, Mr. Concepcion --
4          MS. McKEOWN:  Object to the form.
5      A.  -- was attorney of ours, but we didn't
6  have any money to pay him to begin with.
7  BY MS. ARON:
8      Q.  I will introduce now 25.
9          (Thereupon, the document was marked as
10      Exhibit 25.)
11      A.  Yes, I have the page.
12  BY MS. ARON:
13      Q.  Okay.  This is the final judgment against
14  you in favor of Jorge Otero and Jorge Otero, P.A.,
15  right?
16      A.  Yes.
17      Q.  And if you go to the second page, the
18  amount of the judgment is $170,440.40, right?
19      A.  Yes.
20      Q.  And this judgment was entered on June 19,
21  2018?
22      A.  Yes.
23      Q.  You have not paid any portion of this
24  judgment, right?
25          MS. McKEOWN:  Objection to the form.

Page 127

1      A.  No.
2      BY MS. ARON:
3      Q.  Is the answer the same as you gave me for
4  Mr. Concepcion --
5      A.  Yes, the same answer.
6          MS. McKEOWN:  Let her finish the question,
7      please, before you answer.
8          THE WITNESS:  Okay.
9          MS. McKEOWN:  Could I have the question
10      back.  He was talking over you.
11      BY MS. ARON:
12      Q.  Yes.  We're talking about the Otero
13  judgment.  Is the reason why you have not paid the
14  judgment the same reason why you have not paid the
15  Concepcion judgment, which is now you don't have
16  money, right?
17          MS. McKEOWN:  Object to the form.
18      A.  Right.
19      BY MS. ARON:
20      Q.  Could you have sold any of the properties
21  that you have in order to pay these two judgments?
22          MS. McKEOWN:  Objection to the form.
23      A.  I don't think I could because then it
24  would hurt my wife.  I don't think I have to take
25  anything away from her for something that was only

Page 128

1  my problem.
2      BY MS. ARON:
3      Q.  Did you ever look into potentially selling
4  any of the properties to pay this judgment?
5          MS. McKEOWN:  Object to the form.
6      A.  No.  That would mean I have to take
7  something from my wife in order to pay for something
8  that it was my problem.
9      BY MS. ARON:
10      Q.  I'm going to introduce an exhibit.  It's
11  26.
12          (Thereupon, the document was marked as
13      Exhibit 26.)
14      A.  Something looks like bank papers.
15      BY MS. ARON:
16      Q.  Yes.  And I want to turn your attention to
17  the second page, please.
18      A.  Yes.
19      Q.  The first box shows a wire in the amount
20  of 264,000, and it looks like it -- says originator
21  beneficiary, it's not clear which is which, but it
22  lists Concept International Realty, Inc. and Law
23  Offices of Carillo and Carillo, P.A., do you know
24  when this wire was for?
25      A.  I don't know right now.  I have no



Page 129

1  recollection.
2      Q.  Do you know who Mr. or Mrs. Carillo is?
3      A.  Mr. Carillo, he's an attorney who
4  manages -- when my wife sells a property, he
5  basically does all the paperwork and the closings of
6  the sales.
7      Q.  Then there's a wire here on the first
8  page, the fourth box there's a wire for 92,400 and
9  it also has the Law Offices of Carillo and Carillo,
10 do you know what this is about?
11     A.  I have no recollection right now.
12     Q.  Okay.  I would like to take a two-minute
13 break, go through my notes and see if I have any
14 other questions.  And after that I will be done, if
15 that's okay, Tamara.
16     MS. McKEOWN:  That's fine.  I'm going to
17 have a couple questions.  I may want to put a
18 document in the system.
19         (Thereupon, a break was taken from
20     1:52 p.m. to 2:08 p.m., after which the
21     following proceedings were held:)
22 BY MS. ARON:
23     Q.  So Mr. Romagnoli, if you can please open
24 Exhibit 1, page 44.  Are you there?
25     A.  Almost.

Page 130

1      Q.  Okay.  Let me know when you're there.
2      A.  Page 44.
3      Q.  Now, if you go to section 20, it lists a
4  Sun Trust bank account, do you see that?
5      A.  Yes, I do.
6      Q.  It says closed by bank in approximately
7  August of 2019, do you see that?
8      A.  Yes.
9      Q.  Why did the bank close that account?
10     A.  Because the balance went to zero.  I
11 didn't make any more deposits into the account, so
12 the balance -- I believe they send me a letter
13 closing the account.
14     Q.  And were you the sole account owner or was
15 it you and your wife?
16     A.  In that one in particular it was only
17 myself.
18     Q.  And where did the money in that account
19 go?
20     A.  You mean the Sun Trust account?
21     Q.  Yes.
22     A.  Yeah, there was money, you know, making
23 payments and expenses wherever, not that there was
24 too much money, but whatever was there, was to
25 basically make payments expenses and stuff.

Page 131

1      Q.  Where did the money in that account come
2  from, do you recall?
3      A.  From money that I had.  I mean the Sun
4  Trust account I had for quite a few years and money
5  that I had, basically.
6      Q.  When you were getting paid for your job,
7  did that money go into that account?
8      A.  No.
9      Q.  What account did the money from your
10 account go to?
11     A.  Citibank account.
12     Q.  Do you have a middle name?
13     A.  No.
14     Q.  Are you related to or do you know someone
15 named Roberto Juan Romagnoli?
16     A.  I have no middle name.  I know there are
17 quite a few in Miami, but I don't know Roberto Juan.
18     Q.  I'll enter the last exhibit, which is
19 going to be Number 27.
20         (Thereupon, the document was marked as
21     Exhibit 27.)
22 BY MS. ARON:
23     Q.  Do you know what this document is?
24     A.  Yes.  It's an order, a court order.
25     Q.  Is this the order that dismissed your case

Page 132

1  against Mr. Concepcion and Mr. Otero?
2      A.  Yes.
3      Q.  And this order was entered on October 18
4  of 2016?
5      A.  I don't recall.  I don't remember.
6      Q.  If you go to page 2 of that document.
7      A.  Okay.
8      Q.  You see it was entered October 18 of 2016?
9      A.  Yes.
10     MS. ARON:  I have no further questions at
11 this time, but I reserve the right to ask
12 questions after your counsel questions you.  Thank
13 you, Mr. Romagnoli.
14     THE WITNESS:  Thank you.
15         (Thereupon, the document was marked as
16     Exhibit 28.)
17             CROSS-EXAMINATION
18 BY MS. McKEOWN:
19     Q.  Mr. Romagnoli, if I can have you refer to
20 the document we just marked Exhibit 28.  Could you
21 take a look, please, at that document and see if you
22 recognize it?
23     A.  It's operating agreement for management.
24     Q.  Turn to the last page, 13, does that look
25 like signatures?



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
133–136

Page 133

1    A.  Yes, that's my signature.
2    Q.  Do you recognize that as your wife's
3  signature as well?
4    A.  Yeah, that's my wife's signature.
5    Q.  Let me go up to -- if I could have you go
6  to page 7 of 13.
7    A.  Okay.
8    Q.  I'm sorry, it's section 7 -- section 5 of
9  page 2 and section 7 on page 3.  Start at page 2,
10  section 5.
11    A.  Okay.  Section Number 5, page 2.
12    Q.  It's a section for managing members with
13  an S in parentheses.
14    A.  Yes.
15    Q.  And managing members are designated or
16  appointed as -- if you go to the top of the next
17  page, it has you and your wife, correct?
18    A.  Yes.
19    Q.  And look, if you would, at section 7, the
20  members.
21    A.  Section 7, yes.
22    Q.  Just a couple of paragraphs down, does
23  that list the members of the LLC as you and your
24  wife in the entirety?
25    A.  Yes.

Page 134

1    Q.  Is it your understanding this was the
2  final signed operating agreement for Marova?
3    A.  Yes.
4    Q.  And you and your wife were tenants of the
5  entirety?
6    A.  Yes.
7    Q.  When you were speaking about your wife
8  earlier, you said she makes decisions about Marova,
9  does she confer with you before she makes any
10  decisions?
11    A.  Yes, she asks me.
12    Q.  Does Marova do much of anything or just
13  hold property?
14    A.  Right now only just holds the property.
15    Q.  If I can refer briefly to Exhibit 18A.
16  There are two exhibits that Ms. Aron marked earlier
17  and asked you questions earlier about the American
18  Express bills and the cards held in the name of
19  Concept International Realty and your name, do you
20  recall generally she showed you a couple statements?
21    A.  Could you repeat?
22    Q.  Yes.  Do you have it in front of you now?
23    A.  Yes, I have the statement.
24    Q.  I just want to refer briefly to those.
25  Those are for the business account you had for

Page 135

1  Concept International Realty, correct?
2    A.  Yes.
3    Q.  I want to make sure there's no confusion
4  on.  This is this an account you obtained with
5  American Express?
6    A.  Could you repeat?
7    Q.  Is this an account you maintained with
8  American Express?
9    A.  Yes.  I already have one American Express,
10  then I got this for the business.
11    Q.  You had a personal American Express and
12  then you obtained this one for Concept International
13  Realty, right?
14    A.  Yes.
15    Q.  Is there a codebtor on this account?
16    A.  No.
17    Q.  It's a business account for Concept
18  International Realty, so let me -- is Concept
19  International Realty a codebtor on this account?
20    A.  The payments were made on the account of
21  Concept International Realty.
22    Q.  It's a business card in that company's
23  name, correct?
24    A.  Yes.
25    Q.  All right.  Maria is not a codebtor on

Page 136

1  that account, correct?
2    A.  No.
3    Q.  She never applied for that account with
4  you?
5    A.  No.  I was the one who applied.
6    Q.  Okay.  Let's go to Exhibit 21A.  You see
7  the uniform loan application for 55 Southwest 9th
8  Street, that's the Brickell Heights, right?
9    A.  Yes.
10    Q.  Who filled out this loan application?
11    A.  Could you repeat?
12    Q.  Who filled in the application?  Who
13  completed the application, all the sections that are
14  typed?
15    A.  The mortgage broker.
16    Q.  You said you don't recall specifically on
17  this one if you saw it, correct?
18    A.  To be honest with you, I think first time
19  seeing it.
20    Q.  Let me ask you this, when you bought
21  Brickell Heights condo with Maria, did you intend to
22  hold it as tenants by the entirety, husband and
23  wife?
24    A.  Yes.  Since the beginning.
25    Q.  Go to Exhibit 20A.



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
137–140

Page 137

1    A.  Okay.
2    Q.  Other uniform residential loan
3  application.  Who filled in the information?
4    A.  The mortgage broker.
5    Q.  But you signed it with Maria, correct?
6    A.  Yes.
7    Q.  When you reviewed the application, did you
8  notice it said joint tenants instead of tenants by
9  the entirety?
10    A.  No.  To be honest with you, I never saw
11  that.
12    Q.  You purchased the Orlando house with Maria
13  as husband wife, tenants by the entirety, correct?
14    A.  Yes.
15    Q.  That was the original purchase, then
16  transfer it husband and wife to the trust, correct?
17    A.  Yes.
18    Q.  And then when you needed to refinance and
19  take some money out, you had to put it back in your
20  individual names, so then you transferred it from
21  the trust back to yourself; is that correct?
22    A.  Yes.
23    Q.  Do you remember when you bought the house
24  in Orlando?
25    A.  I believe around 2015, between May or so

Page 138

1  2015.
2    Q.  Can you open this one?
3        (Thereupon, the document was marked as
4      Exhibit 29.)
5    BY MS. McKEOWN:
6    Q.  It's being marked Exhibit 29.  Do you
7  recognize that document?
8    A.  I don't see it.  Okay, I see it now.
9    Q.  Do you recognize that document?
10    A.  Yes.
11    Q.  What is that?
12    A.  It's a warranty deed.
13    Q.  Is this a deed from when you and Maria
14  purchased the Orlando house as husband and wife in
15  2015?
16    A.  Yes.
17    Q.  When you purchased that house, you
18  intended to purchase it as husband and wife, tenants
19  by the entirety, correct?
20    A.  Yes.
21    Q.  One more thing, I'm not hundred percent
22  certain that you answered this when counsel asked
23  you.  Before she had asked you about the loans that
24  were obtained in connection with the SR
25  Acquisitions, the two cases that resulted in there

Page 139

1  being deficiency judgments against you and your
2  brother.  The original loans that were obtained from
3  Ocean Bank, what was the purpose of the money?  Was
4  that to buy the property?
5    A.  Yes, to buy the land, basically.
6    Q.  The land that was purchased by San Remo --
7    A.  By San Remo, yes.
8    Q.  San Remo homestead and San Remo Florida
9  City, right?
10    A.  Yes.
11    Q.  That was the project that you went into
12  business with -- you and your brother with
13  Mr. Camacho and Mr. Macedo, correct?
14    A.  Yes.  We created San Remo and we each, my
15  brother and I, we went into business.
16    Q.  Okay.  But the purpose of the loan
17  originally was to buy the real estate, correct?
18    A.  To buy the land.
19        MS. McKEOWN:  Okay.  That's all I have.
20    Thank you.
21        REDIRECT EXAMINATION
22  BY MS. ARON:
23    Q.  Please go back to Exhibit 28.  Please let
24  me know when you have it up in front of you.  That's
25  the operating agreement for management of Marova,

Page 140

1  LLC, right?
2    A.  Yes.
3    Q.  When was this agreement made, entered
4  into?
5    A.  When?
6        MS. McKEOWN:  Object to the form.
7    A.  In March, I believe, of 2011.
8  BY MS. ARON:
9    Q.  Did you sign this document back in March
10  of 2011?
11    A.  Yes.
12    Q.  Is there a reason why the tax returns that
13  we looked at earlier today show that your brother,
14  Marco Romagnoli, has a 20 percent profit or loss
15  from Marova, but this document doesn't say that?
16        MS. McKEOWN:  Object to the form.
17    A.  Because that's when I explain to you, he
18  was going to contribute for the operations of the
19  company, but he never did.
20  BY MS. ARON:
21    Q.  The tax returns we saw were from after
22  2011 and they still listed your brother, Marco.  Any
23  explanation why the tax returns show your brother
24  Marco as having 20 percent of profit or loss on
25  Marova?



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
141–144

Page 141

1    A.  On what date?
2    Q.  Go to Exhibit 18, page 15.
3    A.  Okay.
4    Q.  So this is from Marova 2018 tax return.
5  Do you see 2018 at the top?
6    A.  Yes.
7    Q.  This document shows your brother as having
8  20 percent of the profit and loss, do you see that?
9    A.  Yes.
10    Q.  So that's not reflected in the operating
11  agreement that's Exhibit 28, right?
12    A.  No.  Because, I mean, he's got zero
13  capital.
14    Q.  Right.  But the 20 percent profit or loss
15  share, that's not reflected in the operating
16  agreement, right?
17    A.  I don't think so.
18    Q.  Did you ever amend your 2018 tax return?
19    A.  I don't think so.
20    MS. McKEOWN:  Can I just --
21    MS. ARON:  Do you have an objection?
22    MS. McKEOWN:  Well, I mean, to be clear,
23  you already discussed with him the previous page
24  where it says he and his wife own 100 percent.  I
25  can do this on redirect, but it should be

Page 142

1  comprehensive.
2    MS. ARON:  Well, if you want to do
3  redirect, that's fine.
4  BY MS. ARON:
5    Q.  Please go back to Exhibit 28.  I believe
6  that's the one you have on paper.  Who prepared that
7  document?
8    A.  I don't remember.  I don't know all the
9  lawyers, been so many.  I have no recollection right
10  now.
11    Q.  If you please go to page 3 -- actually,
12  page 2, section 5, that's for managing members,
13  correct?
14    A.  Yes.
15    Q.  You and your wife were managing members of
16  Marova in 2011, correct?
17    A.  Yes.
18    Q.  Was this document ever amended or revised
19  or supplemented?
20    A.  I don't recall.  I don't think so.
21    Q.  When your counsel asked you about the
22  Brickell Heights apartment, you stated it was your
23  intention to hold it with your wife as tenants by
24  the entirety, right?
25    A.  Yes.

Page 143

1    Q.  What does that mean in terms of your
2  intention to hold it as tenants by the entirety?
3    MS. McKEOWN:  Objection.
4    A.  Because we have a daughter, and eventually
5  she's growing up a few years from now, we would like
6  to give it to her.  Right now it's us, but in the
7  future we would give it to our daughter, not that
8  we're going to live there.  We want it as a husband
9  and wife.
10  BY MS. ARON:
11    Q.  How do you manage that intention?
12    MS. McKEOWN:  Which property are you
13  referring to?
14    MS. ARON:  Brickell Heights.
15    MS. McKEOWN:  Thank you.
16  BY MS. ARON:
17    Q.  It was always your intention to hold it as
18  tenants by the entirety and husband and wife?
19    A.  Unless get divorced.  Every intension to
20  hold as husband and wife, always our intention.
21    Q.  Are you aware that there's other ways to
22  hold property as husband and wife that is not
23  tenants by the entirety?
24    A.  I do not know.  I don't know.
25    Q.  Do you know you can hold a property as

Page 144

1  joint tenants?
2    MS. McKEOWN:  Object to the form.
3    A.  I don't know.  That term I don't
4  understand it; husband and wife I do.
5  BY MS. ARON:
6    Q.  I would like to go to Exhibit 20A.
7    A.  Okay.
8    Q.  This is a document your counsel just
9  showed you.  If I could direct your attention to
10  page 5.
11    A.  Yes.
12    Q.  Is that your signature on the bottom of
13  page 5?
14    A.  Yes, that is my signature.
15    Q.  Do you see:  I understand it's a federal
16  crime punishable by fine or imprisonment, or both,
17  to knowingly make false statements about any of the
18  above facts applicable, et cetera, you saw that,
19  right?
20    A.  Yes.
21    MS. McKEOWN:  Objection to the form.
22  BY MS. ARON:
23    Q.  Page 6, is that your signature on the
24  bottom as well?
25    A.  Yes.  That's my signature, yes.



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
145–148

Page 145

1  Q.  And in page 4, there's a signature in the
2  middle of the page, is that yours as well?
3  A.  That's my signature, yes.
4  Q.  Go to page 1, just want to make sure
5  that's your signature on the top of page 1 where it
6  says borrower?
7  A.  Yes.
8  Q.  Bottom of page 1 there's initials, looks
9  like initials next to borrower.
10  A.  Yes.  Double R.  Those are any initials.
11  MS. ARON:  I don't have any further
12  questions at this time.
13  THE WITNESS:  Okay.
14  RECROSS EXAMINATION
15  BY MS. McKEOWN:
16  Q.  You testified that Marco was going to --
17  if he put any capital contribution to Marova, he was
18  going to share only in 20 percent of profits and
19  loss, but that never happened, correct?
20  A.  Yes.
21  Q.  You have always owned Marova with your
22  wife 100 percent, correct; and in fact the tax
23  return you're listed as 100 percent owners, correct?
24  A.  Yes.
25  Q.  On the document that counsel just referred

Page 146

1  to, the loan application, I believe you stated
2  earlier you didn't notice it said joint tenants
3  instead of by the entirety?
4  A.  No, I didn't notice.
5  Q.  Okay.  And in the bottom where she asked
6  about signature and she read the language about you
7  understand that it's a federal crime punishable by
8  fine or imprisonment to knowingly make any false
9  statements concerning the above.  Did you knowingly
10  make any false statements on this application?
11  A.  No.
12  Q.  You just didn't notice they had put joint
13  tenants instead.  You didn't fill out the form,
14  correct?
15  A.  Could you repeat?
16  Q.  You yourself didn't fill out the form that
17  has joint tenants in that box on the first page?
18  A.  No.  It was presented in front of us just
19  to sign.
20  Q.  Okay.  I assume you reviewed it, but you
21  didn't notice it said joint tenants -- let me finish
22  my question.  You didn't knowingly make any false
23  statements on this application, correct?
24  A.  Correct.
25  Q.  And if you missed the fact that it said

Page 147

1  joint tenants in that box that wasn't a knowing or
2  intentional misstatement, correct?
3  A.  Correct.
4  MS. McKEOWN:  I have nothing else.
5  MS. ARON:  I think we're done.  Thank you
6  for your time, Mr. Romagnoli.
7  MS. McKEOWN:  We'll read.
8  (The proceedings concluded for the day at
9  2:50 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

CERTIFICATION

I, ALEXA GOLDMAN, a Shorthand Stenographer and
Notary Public, within and for the State of Florida,
do hereby certify:

That ROBERTO ROMAGNOLI, the witness whose
examination is hereinbefore set forth, was first
duly sworn by me and that this transcript of said
testimony is a true record of the testimony given by
said witness.

I further certify that I am not related to any
of the parties to this action by blood or marriage,
and that I am in no way interested in the outcome of
this matter.

IN WITNESS WHEREOF, I have hereunto set my hand
this 13th day of June 2020.

ALEXA GOLDMAN, FPR

Notary Public, State of Florida

My Commission No.  GG187805

Expires:  2/19/22



ROBERTO ROMAGNOLI VOLUME 1
IN RE: ROBERTO ROMAGNOLI

June 09, 2020
149—151

Page 149

ERRATA SHEET

ESQUIRE JOB ID: J5663845

CASE CAPTION: IN RE: ROBERTO ROMAGNOLI

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have
read the entire transcript of my deposition taken in
the above-captioned matter or the same has been read
to me and the same is true and accurate, save and
except for changes and/or corrections, if any, as
indicated by me on the ESQUIRE DEPOSITION ERRATA
SHEET hereof, with the understanding that I offer
these changes as if still under oath.

Signed on the _____ day of _____,
_____.

_____

ROBERTO ROMAGNOLI

Page 150

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
SIGNATURE: _____ DATE: _____
ROBERTO ROMAGNOLI

Page 151

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for change: _____
SIGNATURE: _____ DATE: _____
ROBERTO ROMAGNOLI



EXHIBIT "D"

Page 1

1    UNITED STATES BANKRUPTCY COURT
        SOUTHERN DISTRICT OF FLORIDA
2                MIAMI DIVISION
3    In re:         Case No. 19-26521-LMI
4    ROBERTO ROMAGNOLI,         Chapter 7
5        Debtor.
     _____/
6
7
8
9
10
11
12    VIDEO CONFERENCE DEPOSITION
13                OF
      MARIA ANTONIETA LAVIOSA
14
15
16        Taken on behalf of the Chapter 7 Trustee before
17    Maggie Rubio, Registered Professional Reporter, Notary
18    Public in and for the State of Florida at Large, on
19    Wednesday, September 9, 2020, at 10:01 a.m., via Zoom
20    Video Conference, in Miami, Florida, pursuant to a
21    Notice of Rule 2004 Examination filed in the above
22    cause.
23            - - - - -
24
25

Page 2

1
2        APPEARANCES:
3    AARONSON SCHANTZ BEILEY, P.A., by
         TAMARA D. MCKEOWN, ESQUIRE
4    2 South Biscayne Boulevard, Suite 3450
         Miami, Florida 33131
5        Attorneys for Debtor and
         Maria Antonieta Laviosa
6    MARK MIGDAL & HAYDEN, by
         ISAAC M. MARCUSHAMER, ESQUIRE
7        MAIA ARON, ESQUIRE
     80 S.W. 8th Street, Suite 1999
8        Miami, Florida 33130
         Attorneys for Chapter 7 Trustee
9
10
11
12            INDEX
13
     Witness    Direct    Cross    Redirect
14   -------    ------    -----    --------
15   MARIA ANTONIETA LAVIOSA
       (by Ms. Aron)    5
16
17
18
19
20
21
22
23
24
25

Page 3

1
2            EXHIBITS
     TRUSTEE'S        DESCRIPTION        PAGE
3
     No 1    Subpoena For Rule 2004 Examination    16
4
     No 2        Affidavit of Maria Laviosa    26
5
     No 3    Marova, LLC 2012 Annual Report    107
6
     No 4    Marova, LLC 2013 Annual Report    110
7
     No 5            (Skipped)
8
     No 6    Marova, LLC 2016 Annual Report    115
9
     No 7    Marova, LLC 2017 Annual Report    115
10
     No 8    Marova, LLC 2018 Annual Report    117
11
     No 9    Marova, LLC 2019 Annual Report    118
12
     No 10    Marova, LLC 2020 Annual Report    119
13
14        EXHIBITS MARKED IN DEBTOR'S DEPOSITION
15
     TRUSTEE'S        DESCRIPTION        PAGE
16
     No 1A    Maria Laviosa's Response        17
17
     No 21A    Uniform Residential Loan Application    43
18
     No 20A    Uniform Residential Loan Application    60
              (Orlando Property)
19
20   No 19    Quitclaim Deed (Orlando property)    67
21   No 20        Quitclaim Deed 4/22/16    69
22   No 4    Quitclaim Deed (Azure property)    86
23   No 7        Quitclaim Deed 10/14/15    87
24   No 16    Marova, LLC 2014 Tax Return    94
25   No 17    Marova, LLC 2015 Tax Return    99

Page 4

1
2
3    EXHIBITS MARKED IN DEBTOR'S DEPOSITION (continued)
4
     TRUSTEE'S        DESCRIPTION        PAGE
5
     No. 10        Articles of Organization    104
6
     No. 11        IRS 3/15/2011 letter    106
7
     No. 14    Marova, LLC 2014 Annual Report    112
8
     No. 15    Marova, LLC 2015 Annual Report    113
9
     No. 9    Sunbiz Marova, LLC printout    120
10
     No. 8        Quit-Claim Deed 5/4/12    122
11
     No. 26        Wires Outgoing    129
12
13
14
15        (All exhibits were electronically uploaded.)
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Page 5

1     THE COURT REPORTER: Pursuant to the COVID-19
2  Emergency Procedures for the Administering of Oaths Via
3  Remote Audio-Video Communication Equipment dated March 18,
4  2020, this deposition of MARIA ANTONIETA LAVIOSA is being
5  taken via Zoom Video Conference.
6     Today's date is September 9, 2020. The time is
7  approximately 10:01 a.m. The witness is located in
8  Surfside, Florida. The witness has provided a State of
9  Florida I.D.
10    My name is Maggie Rubio. I am administering the
11  oath and reporting the deposition remotely by stenographic
12  means from my residence within the state of Florida.
13    Will counsel, please, state their appearances for
14  the record and express their stipulation that this
15  deposition may take place with a remote administration of
16  the oath and remote reporting of the deposition.
17    MS. ARON: Maia Aron and with me is my partner,
18  Isaac Marcushamer, Mark Migdal & Hayden, on behalf of the
19  Trustee Maria Yip.
20    MS. MCKEOWN: Tamara McKeown at Aaronson Schantz
21  Beiley on behalf of the debtor and the witness, Maria
22  Antonieta Laviosa, his wife.
23    THEREUPON:
24         MARIA ANTONIETA LAVIOSA
25    after having been first duly sworn, was examined and

Page 6

1  testified as follows:
2         DIRECT EXAMINATION
3  BY MS. ARON:
4     Q. Good morning, Ms. Laviosa. How are you?
5     A. Very good. Thank you.
6     Q. Can you, please, state your name for the record?
7     A. Maria Antonieta Laviosa.
8     Q. Thank you. Have you been deposed before? Do you
9  hear?
10    A. I didn't hear you. Sorry. It was breaking up.
11    Q. Okay. If I break up, just let me know, and I will
12  repeat the question.
13    Has your deposition ever been taken before?
14    A. Yes.
15    Q. Okay. How many times?
16    A. I guess three.
17    Q. Okay. We'll go into that a little bit later. I
18  want to go through some rules for today's deposition.
19    You understand that you have to tell the truth,
20  right?
21    A. Yes.
22    Q. You understand that you are under oath, correct?
23    A. Yes.
24    Q. Okay. Please wait for me to finish my question
25  before you begin your answer so that we have a good record

Page 7

1  of the proceedings today. Do you understand that?
2     A. Yes.
3     Q. If you don't understand a question, please let me
4  know. If you answer the question, I will assume that you
5  understood the question. Do you understand that?
6     A. Yes.
7     Q. Are you under the influence of any medication that
8  could affect your testimony today?
9     A. No.
10    Q. Okay. Great. Before we got started you stated
11  that you were deposed before three times. Can you, please,
12  let me know what those three times were?
13    A. In my business related.
14    Q. Which business?
15    A. Real estate.
16    Q. What's the name of the business?
17    A. Concept International Realty.
18    Q. So, all three times that you were deposed it had to
19  do with Concept International Realty?
20    A. Yes.
21    Q. Were all three times in the same lawsuit or in a
22  different lawsuit?
23    A. A different.
24    Q. Can you briefly tell me what all three lawsuits
25  were about?

Page 8

1     A. One was from one of my agents and the other one was
2  my clients that got another suit in a different transaction.
3     Q. Okay. Tell me about your education after high
4  school.
5     A. I'm engineer, civil engineer.
6     Q. When did you graduate?
7     A. 2004.
8     Q. What school did you graduate from?
9     A. Universidad Central de Venezuela.
10    Q. Do you have any other degree besides the civil
11  engineering degree?
12    A. No.
13    Q. Do you have any licenses?
14    A. My real estate license.
15    Q. When did you get your real estate license?
16    A. I get my real estate license in 2000, October 2000.
17    Q. Is the license still effective today?
18    A. Not that number. I'm a broker now.
19    Q. Was your real estate license revoked or was it
20  discontinued or lapsed?
21    A. No. Simple, I have my license with two different
22  companies. So, I got two numbers. And my first number was
23  with the other company that just closed and I keep the other
24  one.
25    Q. So, the real estate license is not effective today?

2 (Pages 5 to 8)

Page 9

1        MS. MCKEOWN:  Objection to form.
2  BY MS. ARON:
3        Q.  You can answer.
4        A.  Yes, it's active.  I have an active license.
5        Q.  Okay.  So, you have an active real estate license
6  and you also have an active broker license?
7        A.  No.  I have a broker active license now.
8        Q.  Okay.  So, you have a broker license now, real
9  estate broker?
10       A.  Yes.
11       Q.  Okay.  And you had a real estate agent license and
12  that's not active anymore?
13       A.  No.  It doesn't work like that.  It's just -- you
14  keep the same number, just -- it's like you do a trade when
15  you change your license.
16       Q.  So, your license went from agent to broker and
17  currently you have a broker license, correct?
18       A.  That is correct.
19       Q.  When did you acquire the broker license?
20       A.  In 2007.
21       Q.  Okay.  And that broker license is active today,
22  right?
23       A.  It is.
24       Q.  Has that broker license ever been -- has it ever
25  lapsed or been revoked in any way?

Page 10

1        A.  No.
2        Q.  Do you have any other licenses that we haven't
3  discussed yet?
4        MS. MCKEOWN:  Aside from a driver's license, I
5  assume.
6        MS. ARON:  Correct.  Aside from a driver's license.
7        THE WITNESS:  That's correct.  Only my driver's
8  license and my real estate broker's license.
9  BY MS. ARON:
10       Q.  You don't have any other professional licenses,
11  right?
12       MS. MCKEOWN:  Objection to form.
13       THE WITNESS:  No.
14  BY MS. ARON:
15       Q.  Okay.  So, you graduated college in 2004.  What was
16  the first job you got after graduating from college?
17       A.  I was working for -- in Venezuela for -- for the
18  government, the local government.
19       Q.  What did you do for the local government?
20       A.  Construction inspections.
21       Q.  How long did you do that for?
22       A.  I guess for a couple of years or so.
23       Q.  What was the next job after that?
24       A.  I was working for another firm that they make
25  constructions.

Page 11

1        Q.  Do you recall what years, approximately?
2        A.  I don't know.  It was more than 20 years ago.
3        Q.  Okay.  And then after that job what was your next
4  job?
5        A.  I worked like for two more companies as engineer
6  before I moved here.
7        Q.  When did you move to the United States?
8        A.  1999.
9        Q.  And after you moved here what was your first job
10  here in the United States?
11       A.  I worked in a store in Boston.
12       Q.  And when was your next job after the store in
13  Boston?
14       A.  I got my license here in Miami, 2000.
15       Q.  Did you move to Miami from Boston in 2000?
16       A.  Yes.
17       Q.  Okay.  And then in 2000, when you got your real
18  estate license in Miami, did you work as a realtor?
19       A.  Yes, I did.
20       Q.  Okay.  And starting in 2000, did you work as a
21  realtor continuously up until the present?
22       A.  Yes.
23       Q.  Okay.  And which company did you work for when you
24  were working as a realtor, starting in the year 2000?
25       A.  Elite International Realty.

Page 12

1        Q.  How long did you work at Elite International Realty
2  for?
3        A.  I guess two years.
4        Q.  And where did you go after Elite?
5        A.  I don't remember the name.  It was for a few months
6  and after I went to International Realty.
7        Q.  Okay.  So, do you remember approximately what year
8  you went to International Realty?
9        A.  I guess it's 2004, if I'm not mistaken.
10       Q.  Okay.  And the complete name of that company is
11  International Realty?
12       A.  International Realty.  Yes.
13       Q.  Okay.  Were you an owner of International Realty?
14       A.  No.
15       Q.  Okay.  And how long were you at International
16  Realty for?
17       A.  Three years.
18       Q.  So, until around 2007 or so?
19       A.  Yes, until I opened the company.
20       Q.  Okay.  And in 2007 you opened your own company?
21       A.  Uh-huh.
22       Q.  And what's the name of that company?
23       A.  Concept International Realty.
24       Q.  And between 2007 and today, the only job you have
25  had is at Concept International Realty, right?

3 (Pages 9 to 12)

Page 13

1    A.  Right.
2    Q.  Okay.  What's your title at Concept International
3  Realty?
4    A.  I'm the broker.
5    Q.  Are you the owner of Concept International Realty?
6    A.  With my husband.
7    Q.  What percentage of Concept International Realty do
8  you own?
9    A.  A hundred percent with my husband.
10    Q.  Do you have share certificates showing that?
11    A.  I don't have it here.  I guess we do.
12    Q.  Did you form Concept International Realty with your
13  husband?
14    A.  Yes.
15    Q.  Did you and your husband own Concept International
16  Realty together from the beginning of the company?
17    A.  You're breaking up.  I didn't hear it.
18    Q.  Sure.  Can you hear me now?
19    A.  Yes.
20    Q.  Okay.  Did you and your husband own Concept
21  International Realty from the beginning of the company?
22    A.  Yes.
23    Q.  Who are the directors of Concept International
24  Realty?
25    A.  Both of us.

Page 14

1    Q.  And who are the officers of Concept International
2  Realty?
3    A.  What do you mean officers?
4    Q.  Is there a president, vice president, secretary, or
5  treasurer?
6    A.  No.
7    Q.  Okay.  Do you have any employees at Concept
8  International Realty?
9    A.  Yes.
10    Q.  How many?
11    A.  Two.
12    Q.  What are the names?
13    A.  Sonia Correa and Fabiola Suarez.
14    Q.  Have you ever been sued?
15    A.  Once.
16    Q.  What was the case about?
17    A.  One of my agents, they sued me because a check.
18    Q.  Do you recall what happened with the case?
19    A.  Yeah.  We settled.
20    Q.  What's the name of the agent that sued you?
21    A.  Wanda Shortt.
22    Q.  Okay.  Have you ever been arrested?
23    A.  No.
24    Q.  When did you marry Mr. Romagnoli?
25    A.  December 28, 2006.

Page 15

1    Q.  And you are currently married to Mr. Romagnoli,
2  right?
3    A.  Yes.
4    Q.  Okay.  I would like to introduce an exhibit now.
5  It's the subpoena to your deposition.  I'm going to drop it
6  in the Zoom chat function, Ms. Laviosa.  So, once I drop it,
7  you'll see it there and, please, try to open it, and if you
8  cannot open it, please let me know.
9    A.  Okay.
10    Q.  Okay?  Let me see if this works.  It's not working.
11  One second.
12    MS. ARON:  Can we go off the record until we figure
13  this out?
14    THE COURT REPORTER:  Yes.
15    MS. ARON:  Thank you.  Let's go off the record.
16    (Thereupon, a brief discussion was held off the
17  record, after which the following proceedings were had:)
18  BY MS. ARON:
19    Q.  Okay.  So, Ms. Laviosa, I'm going to be screen
20  sharing my exhibits.  So, that means that I will have
21  control over scrolling through the pages.  So, if there is a
22  page that you would like to look at before you answer the
23  question, let me know, and I will go to that page.  Okay?
24    Can you hear me, Ms. Laviosa?
25    MS. MCKEOWN:  Let me just clarify.  You said you're

Page 16

1  going to also e-mail me the exhibits.  I can forward them to
2  Ms. Laviosa.  Do you want us to do that process with all
3  your exhibits going forward?
4    MS. ARON:  Well, I -- no, I think we can screen
5  share and then after the deposition, if that's okay with
6  you, I'll send you and the court reporter the exhibits.
7    MS. MCKEOWN:  Okay.  With the caveat, though, that
8  if there's something else that I guess either the witness or
9  I want to direct you to, you'll have to do the scrolling, I
10  suppose.
11    MS. ARON:  Yes.  Yes, the witness -- and,
12  Ms. Laviosa, just let me know if there is a page that you
13  want to look at.
14  BY MS. ARON:
15    Q.  Okay.  So, let me scroll through this now so you
16  can look at it, Ms. Laviosa.  Okay.  I'm going to go to the
17  beginning of the exhibit.
18    Have you seen this exhibit before, Ms. Laviosa?
19    A.  No.
20    MS. MCKEOWN:  Are you marking this as Exhibit 1?
21    MS. ARON:  Yes.  Sorry.  This is Exhibit 1 to
22  Ms. Laviosa's deposition.  It's a Subpoena Duces Tecum that
23  we issued to Ms. Laviosa and it's dated September 2nd, 2020.
24    (Thereupon, Trustee's Exhibit Number 1 was marked
25  for identification.)

4 (Pages 13 to 16)

Page 17

1 BY MS. ARON:
2    Q. Ms. Laviosa, have you seen this document before?
3    A. Yes.
4    Q. Okay. Do you understand that the subpoena required
5 you to produce documents, right?
6    A. Right.
7    Q. Okay. So, I will scroll now through the section of
8 the "Document Requests."
9    Okay. So, Ms. Laviosa, what did you do to look for
10 and produce documents responsive to this request?
11    A. I went through my e-mails.
12    Q. How did you search your e-mails?
13    A. For the -- for the property that you were asking
14 for and the persons that you asked for in that document.
15    Q. Okay. Are you withholding any communications or
16 e-mails or documents that are responsive to this request?
17    A. Again.
18    Q. Yes. Are you holding back, not producing, any
19 documents or communications that are responsive to these
20 requests?
21    A. No.
22    MS. ARON: Okay. Now I will go ahead and introduce
23 Exhibit 1A, which is your response. Okay? Give me one
24 second. I'm going to put it up here.
25    (Thereupon, Debtor's Deposition Exhibit Number 1A

Page 18

1 previously marked was referenced.)
2 BY MS. ARON:
3    Q. Okay. Ms. Laviosa, can you see the document?
4    A. Yes.
5    MS. ARON: Okay. This is Exhibit 1A. It's
6 Ms. Laviosa's Response and Objections to Trustee's Document
7 Request which was served yesterday. I will scroll through
8 the document now.
9 BY MS. ARON:
10    Q. Ms. Laviosa, have you seen this document before?
11    A. Yes.
12    Q. And if you look at the second paragraph on the
13 first page -- do you see that I'm highlighting that?
14    A. Yes.
15    Q. You do not have any written communications with
16 your husband that are responsive to the Trustee's document
17 requests, right?
18    A. Right.
19    Q. Okay. So, production of documents is complete in
20 response to the requests, right?
21    A. Right.
22    Q. Okay. I will take this down.
23    MS. MCKEOWN: Well, notwithstanding -- with the
24 exception of objections. There was some extremely broad and
25 duplicative objections that were asserted, but ---

Page 19

1    MS. ARON: And I object to your characterization of
2 the request as overly broad.
3 BY MS. ARON:
4    Q. But let's go through those requests. So, I will
5 put up again Exhibit 1A, which is Ms. Laviosa's response,
6 and let's look at request -- your response to Request 5.
7 And, Ms. Laviosa, you objected to this request stating that
8 it's overly broad, unduly burdensome and duplicative.
9    So, I would like to look at the Request No. 5. So,
10 I will pull up the subpoena. "All communications regarding
11 the Brickell Heights Property." Do you see that,
12 Ms. Laviosa?
13    A. Yes.
14    Q. Did you search for any e-mails about the Brickell
15 Heights property, whether it's about renting it to someone
16 or making repairs on the Brickell Heights property?
17    A. Renting the property? I do not understand.
18    Q. Let me rephrase it. Is the Brickell Heights
19 property rented?
20    A. Yes.
21    Q. Okay. Did you have an e-mail exchange regarding
22 the renting of the Brickell Heights property?
23    MS. MCKEOWN: Objection.
24    THE WITNESS: I guess.
25 BY MS. ARON:

Page 20

1    Q. Did you look for those e-mails?
2    A. No.
3    Q. Okay. Do you have any e-mails about doing repairs
4 at the Brickell Heights property?
5    A. I don't think so.
6    Q. Okay. And now I'd like to go to Request No. 10.
7 So, I will go back to the subpoena. Okay. One second,
8 please. Okay. 10, "All communications regarding the
9 Orlando Property."
10    Is the Orlando property rented today?
11    A. Yes.
12    Q. Okay. Do you have any e-mail exchange with the
13 renters of the Orlando property?
14    A. I'm not sure.
15    Q. Did you have any e-mail exchange about any repairs
16 done to the Orlando property?
17    A. No.
18    Q. Okay. How did you go about renting the Orlando
19 property without sending e-mails about it?
20    MS. MCKEOWN: Objection to form. You can answer.
21    THE WITNESS: I have a realtor there when I rent
22 the property. Somebody else handled it.
23 BY MS. ARON:
24    Q. And did you communicate with that realtor regarding
25 the rental of the Orlando property?

Page 21

1    A. Of course.
2    Q. And did you produce those communications?
3       MS. MCKEOWN: Objection on the same grounds that we
4  raised in the response.
5  BY MS. ARON:
6    Q. And you can answer, Ms. Laviosa.
7    A. No. I say no.
8    Q. Okay. So, you have those documents but you have
9  not produced them; is that correct?
10   A. I'm not sure what I have, so ---
11   Q. Okay. I will ask your counsel to, please, produce
12 those documents.
13      MS. MCKEOWN: And I ask the relevance.
14      MS. ARON: It has to do with Ms. Laviosa saying in
15 her affidavit that she doesn't control the properties and
16 that she makes decisions together with her husband. So, I'm
17 entitled to get those documents that go to control.
18      MS. MCKEOWN: So, if she happened to have an e-mail
19 with the realtor about a prospective tenant, that's going to
20 show she has control and that it's not -- I don't understand
21 the relevance. I think it's going ---
22      MS. ARON: We can argue it later, but we're
23 entitled to those documents.
24 BY MS. ARON:
25   Q. Did you search for any text messages that are

Page 22

1  responsive to the request, Ms. Laviosa?
2    A. For what response?
3    Q. Did you look for any text messages that have to do
4  with any of the requests in the subpoena?
5    A. I don't have texts for that long. They are all
6  gone.
7    Q. For the text messages that you currently have, did
8  you search to see if there was anything responsive to the
9  request in the subpoena?
10   A. I don't have any communication on my text phone --
11 by text or anything of this.
12   Q. Did you exchange text messages with your husband?
13   A. No.
14      MS. MCKEOWN: Objection to form.
15 BY MS. ARON:
16   Q. Okay. Have you seen your husband's response to the
17 Trustee's objections that was filed in this case?
18      MS. MCKEOWN: Objection. Can I ---
19      MS. ARON: No, thank you.
20 BY MS. ARON:
21   Q. Did you say no, Ms. Laviosa?
22   A. Yes.
23   Q. Okay. Is Ms. McKeown representing you?
24      MS. MCKEOWN: Yes. I already stated that at the
25 beginning of the deposition.

Page 23

1       MS. ARON: Well, I understand, but, please, let the
2  witness answer my question.
3  BY MS. ARON:
4    Q. Ms. McKeown is representing you today?
5    A. Yes.
6    Q. When did you engage Ms. McKeown?
7    A. When I received the subpoena.
8    Q. Are you paying Ms. McKeown?
9       MS. MCKEOWN: Objection. I don't think that's a
10 question she needs to answer.
11      MS. ARON: Well, you can instruct her not to
12 answer, if you would like, and then we'll deal with it
13 later. Are you instructing her not to answer?
14      MS. MCKEOWN: Yes.
15      MS. ARON: Okay.
16 BY MS. ARON:
17   Q. Did you prepare for your deposition today?
18   A. Yes.
19   Q. How did you prepare? I'm not asking you about
20 communications that you had with your counsel. Aside from
21 communications with your counsel, can you tell me whether
22 you met with your counsel or what you did to prepare?
23   A. I spoke to my counsel and I read the documents.
24   Q. Okay. How many times did you speak with your
25 counsel?

Page 24

1    A. A couple of times.
2    Q. Do you recall how long this couple of times were?
3    A. I'm not sure.
4    Q. Were any of the phone calls more than 30 minutes?
5    A. I'm not sure.
6    Q. Did anyone else participate in these phone calls
7  with your counsel?
8    A. No.
9    Q. Did your husband participate in these phone calls
10 with your counsel?
11   A. No.
12   Q. Okay. You stated that you also reviewed documents.
13 Can you tell me what documents you reviewed?
14   A. My affidavit. My -- the documents that I provide.
15 That's it.
16   Q. Did you review any of the filings in your husband's
17 bankruptcy case?
18   A. No.
19   Q. Did you discuss your deposition with your husband?
20      MS. MCKEOWN: Objection to form.
21 BY MS. ARON:
22   Q. You can answer.
23   A. We talked about it.
24   Q. What did you discuss?
25      MS. MCKEOWN: Objection. That calls for

6 (Pages 21 to 24)

Page 25

1    information subject to the husband-wife privilege.
2         MS. ARON:  And we object.  If you would like, you
3    can instruct her not to answer and we'll take it up later.
4         Are you instructing her not to answer?
5         MS. MCKEOWN:  How far are you going with this?  I
6    mean, I want her to be able to give you information and to
7    answer your questions, but I also don't want to waive any
8    privileges that she's entitled to assert.
9         MS. ARON:  I don't believe she's entitled to assert
10   the spousal privilege in this procedure, and besides that,
11   in her affidavit she discusses conversations she's had with
12   her husband.  So, I don't think any privilege exists; and if
13   it exists, it's been waived.  But, you know, we'll deal with
14   it later if you would like to instruct her not to answer.
15        I would like to know what Ms. Laviosa discussed
16   with her husband about the deposition and about the subpoena
17   and her affidavit.
18        MS. MCKEOWN:  Ms. Laviosa, go ahead, and we'll see
19   how far this goes.  And if it gets to a point where I think
20   it's becoming too invasive, we'll stop.
21   BY MS. ARON:
22        Q.  Ms. Laviosa, you stated you discussed your
23   deposition today with your husband.  Can you, please, tell
24   me what you discussed?
25        A.  We didn't discuss.  We spoke about it.

Page 26

1         Q.  Okay.
2         A.  And he knows that I have the subpoena.  He knows
3    what the subpoena is about and I'm here and he knows that
4    I'm here doing this deposition.  That's what we were talking
5    about.
6         Q.  Did you discuss your testimony with your husband?
7         A.  No, there's nothing to discuss about that.
8         Q.  Did you speak with your husband about the testimony
9    that you are going to give today?
10        MS. MCKEOWN:  Objection to form.  Asked and
11   answered.
12   BY MS. ARON:
13        Q.  You can answer.
14        A.  No, I didn't discuss anything.
15        Q.  Did you review your husband's deposition transcript
16   in this case?
17        A.  No.
18        Q.  Did you speak with your husband about what your
19   husband testified to in this case?
20        A.  No.
21        MS. ARON:  Okay.  I will now introduce Exhibit 2,
22   which is Ms. Laviosa's affidavit in this matter.  One
23   second.  I'm going to open it up.
24        (Thereupon, Trustee's Exhibit Number 2 was marked
25   for identification.)

Page 27

1    BY MS. ARON:
2         Q.  Okay.  So, this is Exhibit 2.  It's the Affidavit
3    of Maria Laviosa filed on August 14, 2020.
4         Ms. Laviosa, do you know what this document is?
5         A.  Yes.  It's my affidavit.
6         Q.  Who drafted this affidavit?
7         A.  My lawyer.
8         Q.  Is that Ms. McKeown?
9         A.  Yes.
10        Q.  Did you come up with the language in the affidavit?
11        MS. MCKEOWN:  Objection to form.
12        THE WITNESS:  I don't understand the question.
13   BY MS. ARON:
14        Q.  Sure.  The affidavit has a couple of paragraphs.
15   You understand that, right?
16        A.  Yes.
17        Q.  Who created this language?  Who drafted this
18   language?
19        MS. MCKEOWN:  Objection to form.  Asked and
20   answered.
21   BY MS. ARON:
22        Q.  You can answer.
23        A.  Accordingly, that we spoke about it.  So ---
24        Q.  Well, my question is different.  Who came up with
25   the language in the affidavit?  Did you come up with this

Page 28

1    language?
2         MS. MCKEOWN:  Asked and answered.
3         THE WITNESS:  I do not understand the question.
4    What is -- I do not understand.
5    BY MS. ARON:
6         Q.  So, it's your testimony that your lawyer drafted
7    the language in this affidavit, right?
8         A.  That she wrote it.  Yes.
9         Q.  Okay.  Did your husband ask you to prepare this
10   affidavit?
11        A.  No.
12        Q.  How is it that you ended up filing and signing and
13   executing this affidavit?
14        MS. MCKEOWN:  Objection to form.  I'm sorry, can I
15   have that again?
16        MS. ARON:  Sure.
17   BY MS. ARON:
18        Q.  How is it that you executed and decided to come
19   forward with this affidavit?
20        MS. MCKEOWN:  Objection to form, and I think you're
21   starting to invade attorney-client privilege.
22        MS. ARON:  I'm not asking you about conversations
23   with Ms. McKeown or any other counsel at her firm.
24        MS. MCKEOWN:  Well, you are indirectly.
25        MS. ARON:  Well, let me -- I am not.  But let me

7 (Pages 25 to 28)

Page 29

1 clarify that for Ms. Laviosa.
2 BY MS. ARON:
3    Q. Ms. Laviosa, I'm not asking for communications with
4 your counsel. Outside of communications with your counsel,
5 how did you decide to come up with this affidavit?
6       MS. MCKEOWN: Objection to form, and objection to
7 the extent that it calls for anything that she's learned
8 from counsel.
9       MS. ARON: And I'm not asking about what she
10 learned from counsel.
11       MS. MCKEOWN: Well, you are indirectly. I think
12 you are.
13       MS. ARON: I'm not. I'm setting that aside.
14 BY MS. ARON:
15    Q. And if you can't answer the question, Ms. Laviosa,
16 then let me know and I will rephrase it. Can you answer it
17 or -- I will rephrase it.
18    Was it your idea to prepare this affidavit?
19    A. No.
20    Q. Was it your husband's idea to prepare this
21 affidavit?
22    A. I don't know.
23    Q. Did you ever prepare another affidavit
24 that's been filed in another court proceeding?
25    A. No.

Page 30

1    Q. So, this was the only time that you ever prepared
2 an affidavit that was filed in a proceeding, correct?
3       MS. MCKEOWN: Objection to form.
4       THE WITNESS: I'm not a lawyer, so I don't prepare
5 affidavits.
6 BY MS. ARON:
7    Q. Okay. This was the only time that you ever
8 executed an affidavit that was used in a court proceeding,
9 right?
10       MS. MCKEOWN: Objection.
11       THE WITNESS: I'm not sure.
12 BY MS. ARON:
13    Q. Do you recall ever executing another affidavit that
14 was used in a court proceeding?
15    A. I don't remember.
16    Q. Did you decide which exhibits you would attach to
17 your affidavit?
18    A. I don't understand the question.
19    Q. Sure. You understand that your affidavit has
20 exhibits attached to it, right?
21    A. Which exhibits?
22    Q. We can go through it. I'll show you. Do you see
23 the affidavit on the screen?
24    A. Yes.
25    Q. Okay. So, this is Exhibit 1. It's a Special

Page 31

1 Warranty Deed. Do you see that?
2    A. Yes.
3    Q. Okay. Exhibit 2 is a Settlement Statement (HUD-1).
4 Do you see that?
5    A. Yeah.
6    Q. Exhibit 3, it's a Special Warranty Deed. Do you
7 see that?
8    A. Yeah.
9    Q. Okay. I will keep going. This is Exhibit 4. It's
10 Settlement Statement (HUD-1). Do you see that?
11    A. Yes.
12    Q. Exhibit 5, The Varoma Joint Revocable Living Trust
13 Agreement. Do you see that?
14    A. Yes.
15    Q. Okay. Exhibit 6, it's the Operating Agreement for
16 Management of Marova, LLC. Do you see that?
17    A. Yeah.
18    Q. Okay. So, we just saw there are exhibits attached
19 to your affidavit, correct?
20    A. Okay.
21    Q. Did you decide to attach these exhibits to your
22 affidavit?
23       MS. MCKEOWN: I'm going to object here. I think
24 you're getting into attorney-client privilege information.
25 The preparation of her affidavit and the documents that were

Page 32

1 attached would have been the subject of discussions and
2 decisions made with her counsel. I think you're getting
3 into attorney-client privilege. I'm going to instruct her
4 not to answer.
5       MS. ARON: Okay. And I am not asking about
6 communications with your counsel. I want to -- I just want
7 to know if you decided which exhibits to go into this
8 affidavit.
9       MS. MCKEOWN: You're going into the whole analysis
10 and thought process that went into the affidavit and I think
11 it's the same thing.
12       MS. ARON: I disagree, but if you would like to
13 instruct her not to answer, please do so.
14       MS. MCKEOWN: Okay. Let me just say, you're not
15 asking specifically about a specific conversation, but you
16 are, I think, invading the attorney-client privilege in what
17 decisions were made and what eventually ended up in the
18 affidavit. So, I'm going to instruct her not to answer.
19       MS. ARON: And I disagree, but you instructed her
20 not to answer. So, we will move on to the next question.
21 BY MS. ARON:
22    Q. Now I'll go to the end of the affidavit. Is this
23 your signature, Ms. Laviosa?
24    A. Yes.
25    Q. And it's notarized by someone named Sonia Correa.

8 (Pages 29 to 32)

Page 33

1  Do you see that?
2      A. Yes.
3      Q. Who is Ms. Correa?
4      A. My employee.
5      Q. Okay. Now I want to move on to Paragraph 6 of your
6  affidavit. Okay. Do you see Paragraph 6 of your affidavit
7  on the screen?
8      A. Yes.
9      Q. Okay. So, this paragraph states, "Since we have
10  been married, my husband and I have purchased certain real
11  property, all of which we acquired as husband and wife with
12  the intention to own it as tenants by the entireties. At no
13  time have we acquired property with the intent to hold it as
14  anything other than as husband and wife, as tenants by the
15  entireties." Do you see that?
16      A. Yes.
17      Q. What does tenants by the entireties mean?
18      A. That we are -- that we hold the property
19  altogether. We share the entire thing equally.
20      Q. Do you know what else it means?
21      A. Well, as far as I know, that when -- in the case --
22  when we marry, in the case that one of the other -- one of
23  the part die, we don't have to do -- we don't have to go to
24  the probate.
25      Q. Are you aware that husband and wife can hold

Page 34

1  property in other ways aside from tenants by the entireties?
2      A. I guess.
3      Q. Are you familiar with the term "joint tenants"?
4      A. Not really.
5      Q. Now, you say here that you acquired property as
6  husband and wife with the intention to own it as tenants by
7  the entireties.
8          Did you have discussions with your husband about
9  the fact that -- about how and what shape or form you were
10  going to hold property together?
11      MS. MCKEOWN: Objection to form.
12  BY MS. ARON:
13      Q. Let me rephrase it. Did you have discussions with
14  your husband about what you stated was your intention to own
15  property as tenants by the entireties?
16      MS. MCKEOWN: Objection to form.
17      THE WITNESS: We didn't have discussion. We
18  decided to take title on the properties that way. There's
19  nothing to discuss.
20  BY MS. ARON:
21      Q. Okay. Let's move on to Paragraph 7. Do you see it
22  on your screen?
23      A. Yes.
24      Q. "My husband and I purchased a unit at the Brickell
25  Heights condominium development in Miami, located at 55

Page 35

1  Southwest 9th Street, Unit 1607, Miami, Florida 33130 (the
2  'Brickell Heights Property') which closed on July 7, 2017.
3  We purchased the condominium as husband and wife and the
4  deed reflects that we own it as husband and wife. A copy of
5  the Special Warranty Deed is attached to my affidavit as
6  Exhibit 1." Do you see that?
7      A. Yes.
8      Q. Okay. Now I will move on to Exhibit 1 of your
9  affidavit. Okay. Do you know what this document is?
10      A. Yes.
11      Q. What is the document?
12      A. The Special Warranty Deed.
13      Q. And is this for the Brickell Heights property?
14      A. Yes, it is.
15      Q. Okay. And here this entity, 9SMA West, LLC, is
16  deeding the property to you and your husband as wife and
17  husband. Do you see that?
18      A. Can you repeat, because you're breaking up?
19      Q. Oh, sure. Can you hear me now?
20      A. Yes.
21      Q. Okay. The deed shows that this entity named 9SMA
22  West, LLC deeded this property to Maria Antonieta Laviosa
23  and Roberto Romagnoli, wife and husband, right?
24      A. Yes.
25      Q. Okay. And the deed does not say as husband and

Page 36

1  wife, tenants by the entireties, correct?
2      MS. MCKEOWN: Objection to form.
3  BY MS. ARON:
4      Q. You can answer.
5      A. Well, wife and husband, husband and wife is the
6  same thing.
7      Q. Well, my question is a little different. The deed
8  doesn't say as tenants by the entireties, right?
9      A. As far as I know it doesn't need to as long as it
10  says husband and wife.
11      Q. Why doesn't it need to say tenants by the
12  entireties?
13      A. Because husband and wife is considered -- is
14  considered the -- by the -- it's considered that way.
15  That's why, I guess, it doesn't need to say.
16      Q. Where did you learn that from?
17      A. I'm a realtor.
18      Q. So, it's your testimony that a deed doesn't need to
19  say tenants by the entireties; it just needs to say husband
20  and wife, right?
21      A. Well, husband and wife is considered tenants by
22  entireties.
23      Q. Is it your testimony that when a deed says husband
24  and wife it's always considered tenants by the entireties?
25      A. That is correct.

9 (Pages 33 to 36)

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 37

1  Q. I will move on to Paragraph 8 now. Okay. Do you
2  see Paragraph 8 in front of you?
3  A. Uh-huh.
4  Q. Okay. It states, "My husband and I are currently
5  using the Brickell Heights Property as a rental property,
6  and because Concept and I provide property management
7  services for rental properties as part of our normal
8  business activities, I often handle ordinary day-to-day
9  rental and tenant issues that arise in connection with the
10  Brickell Heights Property. However, I discuss all
11  significant issues with my husband, my husband and I make
12  all major decisions regarding the Brickell Heights Property
13  together, and we share control of the Brickell Heights
14  Property equally regarding all substantive matters."
15  Do you see that?
16  A. Yes.
17  Q. Is the Brickell Heights property rented today?
18  A. Yes, it is.
19  Q. Who gets the rent payments?
20  A. My company.
21  Q. Concept ---
22  A. Yes.
23  Q. Concept International gets the rent payments?
24  A. Yes.
25  Q. Okay. Does Concept International pass the rent

Page 38

1  payments to you and your husband as owners?
2  A. All expenses of the apartment.
3  Q. I'm sorry. Can you, please, repeat the answer? I
4  didn't hear you.
5  A. Concept pays the mortgage and the property -- the
6  condo fees and whatever has -- you know, the expenses of the
7  property. And whatever is left -- there usually is not --
8  they give it to us.
9  Q. Do you know how much there is left per month out of
10  the rent payments for the Brickell Heights property?
11  MS. MCKEOWN: Objection to form.
12  THE WITNESS: Not really. Usually it's nothing.
13  Sometimes I have to put money to complete the expenses.
14  BY MS. ARON:
15  Q. So, you and Concept -- you provide property
16  management services for the Brickell Heights property. Is
17  that part of your normal business activities?
18  A. Yes.
19  Q. Do you and Concept get paid for providing the
20  services to this property?
21  A. Pardon me?
22  Q. Yes. Do you and Concept get paid for providing the
23  services for this property?
24  MS. MCKEOWN: Objection to form.
25  THE WITNESS: I'm not sure. I have to see the

Page 39

1  file.
2  BY MS. ARON:
3  Q. Okay. Your affidavit says that you often handle
4  the day-to-day rental and tenant issues, right?
5  A. That I do? No, the company does.
6  Q. Well, your affidavit says, "I often handle ordinary
7  day-to-day rental and tenant issues." Do you see that?
8  A. Yes. Well, I'm in the office. I do that for all
9  the properties that I have in the property management.
10  Q. You also state in your affidavit that you discuss
11  all significant issues that arise in connection with the
12  Brickell Heights Property with your husband. Do you see
13  that?
14  A. You broke up.
15  Q. Let me repeat that. Can you hear me now?
16  A. Yes.
17  Q. Your affidavit says that, "I discuss all
18  significant issues with my husband, my husband and I make
19  all major decisions regarding the Brickell Heights Property
20  together." Do you see that?
21  A. Yes.
22  Q. What are those significant issues that you have
23  discussed with your husband about this property?
24  A. Well, the -- how much it was rented. We approve --
25  we see the tenant who is in the property and make decisions

Page 40

1  together if we approve it or not, stuff like that.
2  Q. Okay. If you were to list for me the significant
3  issues that you have discussed with your husband about this
4  property, it's the amount of rent that was charged to the
5  tenants and what else?
6  MS. MCKEOWN: Objection to the form.
7  BY MS. ARON:
8  Q. You can answer.
9  A. What are you referring to because ---
10  Q. Well, your affidavit states that you discuss all
11  significant issues that arise in connection with the
12  Brickell Heights property with your husband. And so, I
13  would like to know what those issues have been in the past.
14  A. Well, we decided to buy the property together. We
15  decided together to get a financing, the way we took title,
16  and we decided to rent it out. And that's it. There is no
17  other major issue arising. The other thing is day-to-day --
18  you know, to collect the rent and make the payments and make
19  sure that the property is in accurate standing.
20  Q. When you say, "We discussed the way we do title" --
21  A. Yes.
22  Q. -- what is it that you talked about with your
23  husband about title for the Brickell Heights property?
24  A. That we decide to take title -- like with all the
25  rest of the property that I answered to you before; that we

10 (Pages 37 to 40)

Page 41

1 took it like a husband and wife.
2      Q. Did you and your husband specifically discuss the
3 words "tenants by the entireties" when you were discussing
4 or speaking about taking title to this property?
5           MS. MCKEOWN: Objection to form.
6           THE WITNESS: I don't remember every word that I
7 talk to my husband and this was several years ago, so ---
8 BY MS. ARON:
9      Q. I understand. I'm asking what you remember today.
10     Do you remember discussing with your husband --
11 mentioning specifically the words "tenants by the
12 entireties" when discussing title to the Brickell Heights
13 property?
14          MS. MCKEOWN: Objection to form.
15          THE WITNESS: I don't remember exactly the words.
16 I know what we decided to do and that's how we did it.
17 BY MS. ARON:
18     Q. And what you decided to do was to hold title as
19 husband and wife, right?
20     A. We decided to take the title as husband and wife.
21 Yes. That is correct.
22     Q. And sitting here today, you don't remember whether
23 you used tenants by the entireties or any other way to hold
24 title specifically, right?
25          MS. MCKEOWN: Objection to form.

Page 42

1           THE WITNESS: Well, I don't talk to my husband
2 in -- with all the technicalities, so ---
3 BY MS. ARON:
4      Q. Well, I'm asking to the best of your recollection,
5 sitting here today, besides discussing that you're going to
6 hold the property as husband and wife, what else did you
7 discuss about that? I just want to make sure that I
8 understand what you discussed with your husband about
9 holding title to this property.
10     A. We didn't talk too much about it.
11          MS. MCKEOWN: Was that a question?
12          MS. ARON: Yes.
13          MS. MCKEOWN: Okay. I'll ask you to rephrase it,
14 please, because that didn't really sound like a question.
15          MS. ARON: Okay. Let me rephrase it.
16 BY MS. ARON:
17     Q. Sitting here today, all you recall is that you
18 discussed with your husband taking title to this Brickell
19 Heights property as husband and wife, right?
20          MS. MCKEOWN: Objection to form.
21          MS. ARON: I'm sorry, I didn't hear an answer,
22 Ms. Laviosa.
23          THE WITNESS: Yes.
24 BY MS. ARON:
25     Q. Okay. Sitting here today, you don't recall

Page 43

1 discussing that you were going to hold title as tenants by
2 the entireties, correct?
3           MS. MCKEOWN: Objection to form.
4           THE WITNESS: I didn't say that.
5 BY MS. ARON:
6      Q. Okay. Now, this paragraph, Paragraph No. 8, also
7 states, "my husband and I make all major decisions regarding
8 the Brickell Heights Property equally regarding all
9 substantive matters." And so, I would like to know what
10 those major decisions are that you made together about the
11 substantive matters.
12          MS. MCKEOWN: Objection to form. Asked and
13 answered.
14 BY MS. ARON:
15     Q. Is it the same answer that you gave me before?
16     A. That's the same question.
17     Q. Who owns the Brickell Heights property today?
18     A. My husband and I.
19          MS. ARON: Okay. Now I will introduce Exhibit 21A
20 to the debtor's deposition and I will put that up.
21          (Thereupon, Debtor's Deposition Exhibit 21A
22 previously marked was referenced.)
23 BY MS. ARON:
24     Q. Okay. Ms. Laviosa, this is a Uniform Residential
25 Loan Application for the property at 55 Southwest 9 Street,

Page 44

1 Unit 1607, Miami, Florida 33130.
2           Do you see Exhibit 21A on your screen?
3      A. Yes.
4      Q. Okay. I'm going to scroll through it before I ask
5 questions about it. Okay?
6      A. Okay.
7      Q. Okay. Have you seen this document before,
8 Ms. Laviosa?
9      A. Well, I guess. It has my signature.
10     Q. Okay. And that was my next question. Is this your
11 signature at the bottom of Page 1?
12     A. Yes.
13     Q. Okay. And is this your signature at the bottom of
14 Page 2?
15     A. Yes.
16     Q. Is this your signature on Page 3?
17     A. Yes.
18          MS. MCKEOWN: I think those are initials.
19 BY MS. ARON:
20     Q. Or initials. Are these your initials on Page 4?
21     A. Yes.
22     Q. And is this your signature on Page 5?
23     A. Yes.
24     Q. And are these your initials on Page 6?
25     A. Yes.

Page 45

1    Q.  And this is your signature on Page 7, correct?
2    A.  Correct.
3    Q.  Okay.  In your work as a realtor do you deal with
4  this type of loan applications?
5    A.  No.  The mortgage broker does.
6    Q.  Is the information provided by this form accurate?
7      MS. MCKEOWN:  Objection to form.  I'm sorry, can
8  you repeat that?
9      MS. ARON:  Yes.
10     MS. MCKEOWN:  Let her finish because it didn't make
11  sense.  Can I have the question repeated?
12 BY MS. ARON:
13   Q.  In this form that you signed is the information
14  accurate?
15     MS. MCKEOWN:  Objection to form.
16     THE WITNESS:  What do you want to ask?
17 BY MS. ARON:
18   Q.  I want -- you signed this form, correct?
19   A.  I initialed.  Yes.
20   Q.  Okay.  I want to point you to where it says -- do
21  you see where the mouse is?  It says, "Manner in which Title
22  will be held, joint tenants."  Do you see that?
23   A.  Yes.
24   Q.  Is this information accurate or not?
25   A.  No.

Page 46

1    Q.  When did you realize that this was not accurate, as
2  you state?
3    A.  Well, the first time that I saw this like that come
4  up now with the -- with this litigation.
5    Q.  So, before this litigation you didn't realize that
6  this form was wrong, right?
7    A.  That's correct.
8    Q.  Did you ever reach out to anyone to let them know
9  that the information was wrong?
10     MS. MCKEOWN:  Objection to form.
11     THE WITNESS:  I didn't even know it was wrong, and
12  that was three years ago.
13 BY MS. ARON:
14   Q.  Why is it your allegation that it's wrong where it
15  says "joint tenants" on the first page?
16   A.  I don't know.
17   Q.  Okay.  I will go back to your affidavit.  I'm going
18  to look at Paragraph 9.  Do you see it in front of you?
19   A.  Yes.
20   Q.  Okay.  And you state, "Recently I have seen a copy
21  of a Uniform Residential Loan Application for the Brickell
22  Heights Property that was an exhibit to my husband's
23  deposition taken by the Trustee.  I recall that I gave the
24  information for that loan application to the mortgage broker
25  by telephone, and the mortgage broker filled out the

Page 47

1  application form before sending it to me.  When I received
2  the application, I did not notice before signing it that the
3  application said that my husband and I would hold the
4  property as 'joint tenants' rather than as tenants by the
5  entireties.  In fact, the loan application is only a
6  preliminary document and is not an assurance of getting the
7  mortgage loan, nor is it a final document determining how
8  title to the property is to be held.  The final documents
9  for closing were reviewed by an attorney to ensure their
10  accuracy, and the final closing documents here, the
11  Settlement Statement and the Deed, do not include any
12  reference to 'joint tenant' ownership of the property, but
13  rather reflect ownership as husband and wife."  Do you see
14  that?
15   A.  Yes.
16   Q.  Do you recall the name of that mortgage broker?
17   A.  Yes.
18   Q.  What's the name?
19   A.  Alex Berg.
20   Q.  You filled out this application -- and I'm moving
21  to 21A again -- in order to get a loan for the Brickell
22  Heights property, right?
23   A.  I didn't fill it out.  I did not.
24   Q.  Okay.  Let me rephrase that.  You signed this
25  application in order to get a loan for the Brickell Heights

Page 48

1  property, right?
2    A.  Correct.
3    Q.  I'm sorry, I didn't hear you.
4    A.  Right.
5    Q.  Okay.  And which attorney reviewed the final
6  documents for closing?  Do you recall his or her name?
7    A.  The documents were -- the closing was made by
8  Greenberg Traurig.
9    Q.  Okay.  Did you have any discussion with the
10  mortgage broker when you spoke with him on the phone about
11  how you and your husband wanted to hold title to the
12  property?
13   A.  I told him that we were going to have title as
14  husband and wife.
15   Q.  Did you tell him anything more specific on that?
16   A.  I don't remember about that.
17   Q.  Okay.  And I will move to Exhibit 2 of your
18  affidavit, which you reference in this paragraph, in
19  Paragraph 10, which states, "At no time did I tell the
20  mortgage broker that my husband and I wanted to hold title
21  to the property as joint tenants rather than as tenants by
22  the entireties, nor did I tell the mortgage broker that my
23  husband and I wanted to acquire the property as anything
24  other than husband and wife.  I do not know why 'joint
25  tenants' appears on the application form and I do not know

Page 49

1  whether this is the final version of the application, since
2  my husband did not sign it. However, the 'joint tenant'
3  language does not appear in the final documents later when
4  the transaction was closed, either in the Special Warranty
5  Deed (Exhibit 1) or in the final Settlement Statement
6  (HUD-1) that was executed at the closing, a copy of which is
7  attached as Exhibit 2." Do you see that?
8      A. Yes.
9      Q. Okay. I will move on to Exhibit 2, which is the
10  final Settlement Statement (HUD-1) for this property.
11      Okay. Do you see that?
12      A. Yes.
13      Q. Okay. Does this form say anything about how you
14  and your husband were to hold this property?
15      A. Well, it doesn't say anything about title, but it's
16  saying the name of the borrower.
17      Q. I'm sorry. The name of the what?
18      A. Name of the borrower, that was my husband and I.
19      Q. Right. But does this form say anything about how
20  you and your husband were to hold title to the Brickell
21  Heights property?
22      A. It doesn't say anything. The only name that --
23  it's in our names.
24      Q. But it doesn't say anything about how title is
25  going to be held, right?

Page 50

1      MS. MCKEOWN: Objection form.
2  BY MS. ARON:
3      Q. You can answer.
4      A. I don't see anything about title there.
5      Q. Okay. And I'll move to the next page of the form.
6  The same with this page, right? It doesn't say anything
7  about how title will be held between you and your husband to
8  this Brickell Heights property, right?
9      A. This is the HUD.
10      Q. And the HUD doesn't tell you how title is to be
11  held, right?
12      MS. MCKEOWN: Objection form.
13      THE WITNESS: This is the numbers, how much to pay,
14  how much the charges, everything.
15  BY MS. ARON:
16      Q. But it doesn't tell you how title will be held,
17  right?
18      A. I guess no.
19      MS. MCKEOWN: Don't guess.
20  BY MS. ARON:
21      Q. Do you see how -- this form is two pages. Do you
22  see anywhere in the form that it provides how title will be
23  held to this property; yes or no?
24      MS. MCKEOWN: Objection to form. And I think if
25  you're going to ask her to scrutinize the whole document,

Page 51

1  you need to blow it up a little, please.
2      MS. ARON: That's fine. I'll make it bigger.
3      Okay.
4      MS. MCKEOWN: Thank you.
5  BY MS. ARON:
6      Q. And I can scroll down, Ms. Laviosa. Let me know.
7      Does this document tell you anywhere how title will
8  be held?
9      A. No.
10      Q. Okay. Thank you.
11      Okay. I will now go back to the affidavit. Okay.
12  Paragraph 11, right here. Do you see it?
13      A. Yes.
14      Q. Okay. It states, "My husband and I also purchased
15  a single family home in Orlando, Florida on May 22, 2015,
16  located at 11843 Prince George Way, Orlando, Florida 32836
17  (the 'Orlando Property'). We also acquired this property as
18  husband and wife, with the intent to own it as tenants by
19  the entireties. A copy of the Special Warranty Deed for the
20  Orlando property is attached as Exhibit 3." Do you see
21  that?
22      A. Yes.
23      Q. Okay. Now, you state here that you acquired the
24  Orlando property as husband and wife with the intent to own
25  it as tenants by the entireties.

Page 52

1      How did you and your husband manifest this intent
2  to own this property as tenants by the entireties?
3      MS. MCKEOWN: Objection to form.
4      THE WITNESS: The same answer. You are doing the
5  same question. Husband and wife. The same thing.
6  BY MS. ARON:
7      Q. Well, it's a different property now. We're talking
8  about the Orlando property. And so, I just want to make
9  sure that your testimony is clear.
10      A. And it's the same answer.
11      Q. And the answer is that -- if you can, please,
12  repeat it. I want to make sure that your previous answer
13  applies to the Orlando property as well.
14      MS. MCKEOWN: Objection to form.
15      THE WITNESS: No, we decided to take it husband and
16  wife. That is -- it's tenants by the entireties. We know
17  that.
18  BY MS. ARON:
19      Q. What do you recall that you spoke about with your
20  husband that there was an intention to take this property as
21  tenants by the entireties?
22      MS. MCKEOWN: Objection to form.
23  BY MS. ARON:
24      Q. You can answer.
25      A. Well, the same thing. We take titles under our

13 (Pages 49 to 52)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 53

1   names as husband and wife because we own tenants by
2   entireties, equally, and if something happen to any of us,
3   we don't have to go to a probate.
4       Q. Sitting here today, do you recall any discussions
5   with your husband about specifically holding the property as
6   tenants by the entireties?
7       MS. MCKEOWN: Objection to form.
8       THE WITNESS: As I said before, I don't have any
9   discussion with my husband. Make an agreement simple. It's
10  like this and that's it. Nothing to discuss.
11  BY MS. ARON:
12      Q. Did you ever speak with your husband about holding
13  this property as tenants by the entireties?
14      MS. MCKEOWN: Objection to form.
15      THE WITNESS: The same answer. We decided to take
16  it together under this agreement. There's nothing to
17  discuss. There was no discussion. There's nothing like
18  that we needed to talk about this several times. Just sign
19  it. That's how we did it.
20  BY MS. ARON:
21      Q. So, this is not something you discussed before or
22  talked about before and then said, "We'll take it as tenants
23  by the entireties?" That conversation never happened?
24      MS. MCKEOWN: Objection to form.
25      THE WITNESS: As I said, we decided to take title

Page 54

1   on the properties as a husband and wife that we know is
2   tenants by the entireties and there's not too much to
3   discuss.
4   BY MS. ARON:
5       Q. Okay. So, I would like to move to -- do you see --
6   it refers to Exhibit 3 here in Paragraph 11, the Warranty
7   Deed for the Orlando property.
8       A. Yes.
9       Q. Okay. I will go there now.
10      Okay. Do you know what this document is?
11      A. Can you put it a little bigger because ---
12      Q. Yes, I will. And let me know if you want me to
13  scroll down.
14      MS. MCKEOWN: You need to scroll down, please, to
15  get to the property description. Thank you.
16      THE WITNESS: Okay. Yes. This is the warranty
17  deed for the Orlando property.
18  BY MS. ARON:
19      Q. Okay. And this is dated May 22nd, 2015?
20      A. Uh-huh.
21      Q. Okay. It says that the property is deeded to
22  Roberto Romagnoli and Maria Antonieta Laviosa, husband and
23  wife. Do you see that?
24      A. Yes.
25      Q. Okay. And the deed says only husband and wife. It

Page 55

1   does not say tenants by the entireties, right?
2       A. Right.
3       MS. MCKEOWN: Form.
4   BY MS. ARON:
5       Q. Okay. I'll move back to your affidavit, Paragraph
6   12. It says, "We purchased the Orlando Property when we
7   were considering relocating to Orlando and opening a Concept
8   office in Orlando. We did form a corporation for the
9   Orlando office but ultimately decided not to relocate to
10  Orlando or continue with an Orlando office of Concept." Do
11  you see that?
12      A. Yes.
13      Q. Why did you decide not to relocate to Orlando?
14      A. Because the business here was bigger than there.
15      Q. How long did you live in the Orlando house?
16      MS. MCKEOWN: Objection to form.
17  BY MS. ARON:
18      Q. Let me rephrase that. Did you ever live in
19  Orlando?
20      A. Not permanently, but I used to go a lot.
21      Q. Okay. Now, let's move on to 13 of your affidavit.
22  It states, "Like the Brickell Heights Property, my husband
23  and I make all major decisions regarding the Orlando
24  Property together. When we originally purchased the house,
25  we used it for our own purposes when we traveled to Orlando.

Page 56

1   However, after we decided not to relocate to Orlando on a
2   permanent basis, we rented the property to a tenant to
3   generate income to offset the mortgage payments and other
4   expenses on the house. As with the Brickell Heights
5   Property, although as I sometimes handle ordinary day-to-day
6   rental and tenant issues that arise in connection with the
7   Orlando Property now that it is rented, I discuss all
8   significant issues with my husband, my husband and I make
9   all major decisions regarding the Orlando Property together,
10  and we share control of the Orlando Property equally
11  regarding all substantive matters." Do you see that?
12      A. Yes.
13      Q. Okay. Now, here you reference that your husband
14  and you make all major decisions regarding the Orlando
15  property together. Can you tell me what major decisions you
16  and your husband have made regarding the Orlando property
17  together?
18      MS. MCKEOWN: Objection to form.
19      THE WITNESS: We decided not to move there. We
20  decided to rent it. We decided to get a loan on the
21  property. The same thing with the other property. All the
22  major decisions that have to be done with the property we do
23  it together.
24  BY MS. ARON:
25      Q. And the property is rented today?

14 (Pages 53 to 56)

Page 57

1   A. Yes.
2   Q. And who gets the rent payments?
3   A. Concept International Realty as well.
4   Q. And does Concept pay the expenses on the house?
5   A. Yes.
6   Q. And is there any leftover of the rent payment after
7   you pay the expenses?
8   A. No.
9   Q. Has there ever been any leftover?
10  A. No.
11  Q. Does Concept get paid for providing services to
12  this house?
13  A. I need to check that. I'm not sure.
14  Q. Sitting here today, you cannot tell me either way
15  whether Concept gets paid or not paid to provide services to
16  this house?
17      MS. MCKEOWN: Objection to form.
18      THE WITNESS: I'm not sure. I have to check.
19  BY MS. ARON:
20  Q. Okay. Your affidavit also says that you handle
21  ordinary day-to-day rental and tenant issues that arise in
22  connection with the Orlando property. Do you see that?
23  A. Yes.
24  Q. And what are those issues generally?
25  A. When the tenant pays late or they need to send the

Page 58

1   maintenance. Little stuff. You know, day-to-day.
2   Q. Okay. And you also stated in your affidavit you
3   discuss all significant issues with your husband. Are those
4   the same issues that you stated before, the decision not to
5   move there, to rent the house, and to get a loan on the
6   house?
7   A. Yes.
8   Q. Are there any other significant issues that you
9   have discussed with your husband?
10      MS. MCKEOWN: Objection to form.
11      THE WITNESS: No, there is no -- any other issue
12  arising with the property so far.
13  BY MS. ARON:
14  Q. And then you state, "My husband and I make all
15  major decisions regarding the Orlando Property together,"
16  and those decisions were the ones that you already testified
17  to, the decision not to move there, the decision to rent the
18  house and to get a loan on the house; is that right?
19      MS. MCKEOWN: Objection to form.
20      THE WITNESS: Some of them. Yes.
21  BY MS. ARON:
22  Q. What other major decisions have you and your
23  husband made together regarding the Orlando property?
24  A. Everything that has to do with the property we
25  decide it together.

Page 59

1   Q. Who owns the Orlando property today?
2   A. My husband and I.
3   Q. Does Concept manage other properties besides the
4   Orlando house and the Brickell Heights condominium?
5      MS. MCKEOWN: Objection to form.
6   BY MS. ARON:
7   Q. You can answer.
8   A. I think The Metropolitan condo too.
9   Q. Okay. So, aside from The Metropolitan condo, the
10  Brickell Heights condo, and the Orlando property, does
11  Concept International manage any other properties?
12      MS. MCKEOWN: Objection to form.
13      THE WITNESS: Concept manage a lot of properties
14  that are not mine.
15  BY MS. ARON:
16  Q. Right. So, that's my question.
17  So, besides the three properties, The Metropolitan,
18  the Brickell Heights, and the Orlando properties, does
19  Concept provide that same type of services to other
20  properties that have nothing to do with you?
21  A. That's right.
22  Q. And does Concept get paid for providing those
23  services?
24  A. Yes.
25  Q. How does Concept get paid for providing those

Page 60

1   services, generally?
2   A. There is a fee, a monthly fee for the services.
3   Q. Okay. I will show you now Exhibit 20A to the
4   debtor's deposition. Okay. And I will scroll through.
5   Okay?
6      MS. MCKEOWN: What did you say this was, 22A?
7      MS. ARON: 20A. You'll see the sticker when I
8   scroll down.
9      (Thereupon, Debtor's Deposition Exhibit Number 20A
10  previously marked was referenced.)
11  BY MS. ARON:
12  Q. Okay. Ms. Laviosa, do you know what this document
13  is?
14  A. Put it a little bigger because I can't read it in
15  that size.
16      MS. MCKEOWN: Enlarge it.
17      MS. ARON: Yeah. Okay. Hold on. There you go.
18      MS. MCKEOWN: Thank you.
19      THE WITNESS: Yeah. That's a Uniform Residential
20  Loan Application.
21  BY MS. ARON:
22  Q. Is this a loan application for the Orlando
23  property?
24  A. Yes.
25  Q. Okay. And I will ask you if these are your

15 (Pages 57 to 60)

Page 61

1    initials on the first page?
2        MS. MCKEOWN:  At the bottom?
3        MS. ARON:  Yes.
4        THE WITNESS:  Yes.
5    BY MS. ARON:
6        Q.  Are your initials next to borrower or co-borrower?
7        A.  It's too small.  I can't -- I can't read.
8        Q.  I'll make it bigger.  Hold on.  There we go.  Do
9    you see that?
10       A.  Yeah.  Co-borrower.  Yes.
11       Q.  Okay.  And then same question for this page.  Is
12   this your initials next to co-borrower?
13       A.  Yes.
14       MS. MCKEOWN:  For the record, Page 2 of 6.
15       MS. ARON:  Yes.
16   BY MS. ARON:
17       Q.  Page 3 of 6.  Are these your initials at the bottom
18   of Page 3?
19       A.  Yes.
20       Q.  And is this your signature on Page 4?
21       A.  Yes.
22       Q.  And is this your signature on Page 5?
23       A.  Yes.
24       Q.  And is this your signature on Page 6?
25       A.  Yes.

Page 62

1        Q.  Okay.  I'll move back to your affidavit.  I want to
2    look at Paragraph 14.  Do you see it in front of you?
3        A.  Yes.
4        Q.  Okay.  It states, "Recently I also have since seen
5    the Uniform Mortgage Loan Application for the Orlando
6    Property, which reflects that my husband and I were going to
7    hold title to the property as 'joint tenants.'  Again, the
8    mortgage application was taken by the mortgage broker over
9    the telephone and it was the mortgage broker who completed
10   the form which he later sent to my husband and me to sign.
11   I did not notice at that time that the application said
12   title to the property would be held as 'joint tenants', and
13   neither I nor my husband told the mortgage broker that we
14   wanted to hold title to the property as joint tenants."
15       Do you see that?
16       A.  Yes.
17       Q.  Okay.  Do you remember the name of this mortgage
18   broker?
19       A.  Alex Berg.
20       Q.  Okay.  And he's the same mortgage broker that we
21   discussed before in connection with the loan for the
22   Brickell Heights property, right?
23       A.  Yes.
24       Q.  Okay.  Moving on to 15, "At no time did my husband
25   or I tell the mortgage broker, or anyone else, that we

Page 63

1    wanted to purchase the Orlando property as anything other
2    than husband and wife, as tenants by the entireties."
3        Do you see that?
4        A.  Yes.
5        Q.  Okay.  What do you recall about what you told
6    Mr. Berg about how you and your husband were going to hold
7    title?
8        A.  Under our names as husband and wife.
9        Q.  Did you tell Mr. Berg that you wanted to hold the
10   property as tenants by the entireties?
11       A.  I guess so.
12       Q.  Well, I'm trying to understand what you recall and
13   I don't want you to guess or speculate.
14       Sitting here today, do you recall what you told
15   Mr. Berg about how you and your husband were going to hold
16   this Orlando property?
17       MS. MCKEOWN:  Objection to form.
18       THE WITNESS:  As husband and wife.
19   BY MS. ARON:
20       Q.  Did you tell Mr. Berg specifically that you wanted
21   to hold this property as tenants by the entireties with your
22   husband?
23       A.  I don't remember exactly the words, but I know I
24   told him that we were going to have under our names as
25   husband and wife.  That's how we take title on all the

Page 64

1    properties.
2        Q.  So, sitting here today, you recall that what you
3    told Mr. Berg is that you and your husband were going to
4    hold this property as husband and wife, correct?
5        A.  Correct.
6        MS. MCKEOWN:  Form.
7    BY MS. ARON:
8        Q.  Is there anything else you recall about this
9    conversation with Mr. Berg?
10       A.  We didn't talk too much about this.  Really, we
11   were talking about the interest rate, how much is going to
12   be the cost, how long it's going to take to do the financing
13   and stuff like that.  That's pretty much the conversation.
14       You know, this is something that we didn't have
15   like an hour or minutes discussing the option.  There was no
16   option.  We decided to take the title under our name as a
17   husband and wife that is, obviously, the tenants by the
18   entireties and we were talking about interest rates and the
19   rest.  That is really what we were discussing of it.
20       Q.  But you didn't specifically tell him that you
21   wanted to hold title as tenants by the entireties, right?
22       MS. MCKEOWN:  Objection to form.
23   BY MS. ARON:
24       Q.  You can answer.
25       A.  I don't remember exactly words.

16 (Pages 61 to 64)

Page 65

1    Q. Okay. Moving on, on 15 you state, "I do not know
2  why 'joint tenants' appears on the application form but
3  again, this is a preliminary application and that language
4  does not appear in the final documents when the transaction
5  was closed, either in the Special Warranty Deed (Exhibit 3)
6  or in the final Settlement Statement (HUD-1) that was
7  executed at the closing, a copy of which is attached as
8  Exhibit 4." Do you see that?
9    A. Yes.
10   Q. When did you realize that the form had "joint
11 tenants" in it?
12   A. Recently when they showed me this document.
13   Q. And what do you mean when you say that this is a
14 preliminary application?
15   A. Well, because this is not the approval. By the
16 time when that document was done I don't even know if it's
17 going to get approved by the bank.
18   Q. Okay. And I'm going to move to 20A again. But as
19 we went through, this is a document that you signed and you
20 understand that when you're putting information here you're
21 making representations in order for a bank or a mortgage
22 company to give you a loan, right?
23   A. Again, I didn't fill out that application.
24   Q. Okay. Let me rephrase the question.
25    When you sign this application, you understand that

Page 66

1  this is information that you are attesting to, that you're
2  giving to a bank or a mortgage company in order to obtain a
3  loan, right?
4    A. Yes, but I didn't fill it out, so I -- I didn't
5  notice there was something wrong.
6    Q. But you signed the form, right?
7    A. I did sign it, but I didn't fill it out.
8    Q. But you signed the form after it was filled out,
9  correct?
10   A. When they sent it to me and I was -- honestly, I
11 didn't see that.
12   Q. So, my question is a little different. You signed
13 the form after it was filled out, right?
14   A. Yes.
15   Q. Okay. So, now, you refer here, on Paragraph 15,
16 the HUD-1, the final Settlement Statement for the Orlando
17 property. So, I will go to Exhibit 4 now.
18    Okay. Let's make sure that this is Exhibit 4.
19 Okay. Exhibit 4 -- and I'm going to make this bigger.
20 Okay. Do you know what this document is?
21   A. Yes.
22   Q. Okay. Does this document tell you anything about
23 how you and your husband were going to hold title to this
24 Orlando property?
25    MS. MCKEOWN: Objection to form.

Page 67

1  BY MS. ARON:
2    Q. And I'm happy to scroll for you, if you want me to.
3    A. It's the name of the buyer. The name of my husband
4  and I.
5    Q. Right here? Is this what you're referring to,
6  Section D, "Name and Address of Buyer"?
7    A. Yeah. "Name and Address of Buyer." Yes.
8    Q. But the document doesn't tell you anything about
9  how title is going to be held, right?
10    MS. MCKEOWN: Objection to form.
11    THE WITNESS: Usually HUD-1, the buyer, the
12 borrower is the person holding title. They don't put
13 anything different on there.
14    MS. MCKEOWN: Form.
15 BY MS. ARON:
16   Q. Okay. But it doesn't say husband and wife, right?
17   A. It doesn't say anything else either.
18   Q. It doesn't say tenants by the entireties, right?
19   A. It doesn't say anything either. Just my name and
20 my husband name.
21   Q. Okay. Now I will move to Exhibit 19 of the
22 debtor's deposition.
23    (Thereupon, Debtor's Deposition Exhibit Number 19
24 previously marked was referenced.)
25 BY MS. ARON:

Page 68

1    Q. Okay. And this is one page. Let me know when you
2  have reviewed this document. I have some questions about
3  it.
4    A. Okay.
5    Q. Okay. Let me know when you're ready, Ms. Laviosa.
6    A. I'm ready.
7    Q. Oh, you're ready. Okay. Do you know what this
8  document is?
9    A. Yeah. This is a Quitclaim Deed.
10   Q. And is this a Quitclaim Deed for the property at
11 9401 Collins Avenue, Apartment 1103?
12    MS. MCKEOWN: Objection to form.
13    THE WITNESS: No.
14 BY MS. ARON:
15   Q. Oh, I apologize. Is this a Quitclaim Deed for the
16 Orlando property?
17   A. You're breaking up.
18   Q. Hold on. Can you hear me now?
19   A. Yes.
20   Q. Okay. Is this a Quitclaim Deed for the Orlando
21 property? Can you hear me?
22   A. Yes.
23   Q. Okay. So, is this a Quitclaim Deed for the Orlando
24 property?
25   A. Yes.

Page 69

1    Q.  Okay.  Is this your signature at the bottom of this
2  document?
3    A.  Yes.
4    Q.  Why was this Orlando property quitclaimed to the
5  Varoma Joint Revocable Living Trust?
6    A.  Because we do -- we transferred to -- this property
7  to a trust that was controlled by me and my husband.
8    Q.  Why did you transfer the property to a trust?
9    A.  Because we were doing estate planning.  We have a
10  daughter.
11    Q.  Now, this deed here that you have in front of you
12  does not say that it's being granted to you and to your
13  husband as tenants by the entireties, right?
14    A.  It was transferred to a trust.
15    MS. ARON:  Okay.  And I will introduce Exhibit 20
16  from the debtor's deposition.  One second.
17    (Thereupon, Debtor's Deposition Exhibit Number 20
18  previously marked was referenced.)
19  BY MS. ARON:
20    Q.  Okay.  This is a two-page document.  I will scroll
21  through and I have a couple of questions for you.
22    Okay.  Is this your signature on Page 2?
23    A.  Yes.
24    Q.  Okay.  Now, do you know what this document is?
25    A.  Yes.

Page 70

1    Q.  What is the document?
2    A.  A Quitclaim Deed.
3    Q.  For the Orlando property?
4    A.  Yes.
5    Q.  Okay.  And you are deeding the property from you
6  and your husband as Trustees of The Varoma Joint Revocable
7  Living Trust to you and your husband as husband and wife.
8  Do you see that?
9    A.  Yes.
10    Q.  Why did you quitclaim this property from the Trust
11  to you and your husband?
12    A.  Because we were doing a financing on the property.
13    Q.  And did the bank require you to put it under your
14  own names?
15    A.  Yes.  They didn't -- we couldn't get the loan under
16  the Trust.  We had to reverse it and put it under our names
17  again.
18    Q.  Do you know why the bank did not want to give you
19  the loan under the Trust?
20    A.  Not really.  That was the requirement and that's
21  why we did it.
22    Q.  Did the bank ever tell you why they wanted you to
23  put the property under your own and your husband's names?
24    A.  My husband and I.  I don't remember.  I know it was
25  the requirement and we did it.  That's it.

Page 71

1    Q.  Is there anything else that you recall, sitting
2  here today, about why the bank did not want to give you a
3  loan while this property was owned by the Trust or why the
4  bank asked you to transfer the property to you and your
5  husband in order to give you a loan?
6    MS. MCKEOWN:  Objection to form.
7    THE WITNESS:  I don't know.  That's the rules and
8  you follow.  That's it.  Simple.  That's the requirement,
9  so ---
10  BY MS. ARON:
11    Q.  What's the name of the bank?
12    A.  I think Sabadell.
13    Q.  Sabadell?  Okay.  And do you remember the name of
14  the person that you dealt with at Sabadell?
15    A.  No.  I did this with Alex Berg.
16    Q.  Okay.  So, Mr. Berg.  Do you know what company
17  Mr. Berg works for?
18    A.  Global Lending.
19    Q.  Are you friends with Mr. Berg?
20    A.  Yes.
21    Q.  Okay.  Were you represented by a lawyer when you
22  deeded the Orlando property from the Trust back to you and
23  your husband?
24    MS. MCKEOWN:  Objection to form.
25  BY MS. ARON:

Page 72

1    Q.  You can answer.
2    A.  I'm thinking.  I don't -- we did the closing
3  with -- with the Pulte (phonetic) Homes when we bought the
4  house.  I think we had a lawyer review those documents
5  before I signed.
6    Q.  I'm sorry, I didn't hear you.  You did or you did
7  not have a lawyer review these documents?
8    A.  We bought the house without financing.  I think we
9  did everything with the closing agent from the developer.
10  I'm not quite sure.
11    Q.  And after you bought the house you deeded it from
12  the Trust to you and your husband, right?
13    MS. MCKEOWN:  Objection to form.
14  BY MS. ARON:
15    Q.  And that's the exhibit that we're looking at on the
16  screen, right?
17    A.  We did two Quitclaim Deeds.  One to put it on the
18  Trust and one to take it out of the Trust.  So, the second
19  one.
20    Q.  Okay.  So, this is Exhibit 20 that I'm showing you
21  now.  This is when you took the Orlando house out of the
22  Trust, right?
23    A.  Yes.
24    Q.  Okay.  And did you have a lawyer help you with this
25  paperwork or review this deed before you signed it?

18 (Pages 69 to 72)

Page 73

1    A. Yeah.
2    Q. What's the name of the lawyer?
3    A. It was Giorgio. Giorgio Ramirez, if I'm not
4  mistaken.
5    Q. And earlier you told me that you had a conversation
6  with the bank and the bank required that the property be
7  under you and your husband's name in order to get financing,
8  right?
9        MS. MCKEOWN: Objection to form.
10       THE WITNESS: I didn't say that.
11  BY MS. ARON:
12    Q. Okay. What did you say?
13    A. I said that the bank requires to be under our name.
14  I didn't say I spoke to the bank. I told you that we did
15  this with Alex Berg.
16    Q. Okay. So, it was ---
17    A. It was Alex Berg.
18    Q. It was through Mr. Berg that you learned that the
19  bank required you to take the property out of the Trust,
20  right?
21    A. Right.
22    Q. Did you ever speak with the bank?
23    A. No.
24    Q. Okay. Did you or your husband speak with Mr. Berg
25  about the requirement to take the property out of the Trust

Page 74

1  in order to get financing from Sabadell?
2        MS. MCKEOWN: Objection to form.
3        THE WITNESS: Again.
4  BY MS. ARON:
5    Q. Yes. You stated that it was through Mr. Berg that
6  you learned that the bank had this requirement that you had
7  to take the property out of trust; remember that?
8    A. Yes.
9    Q. Okay. Who was the person that was dealing with
10  Mr. Berg; was it you or your husband?
11    A. Both.
12    Q. Okay.
13       MS. MCKEOWN: Ms. Aron, we've been going for an
14  hour and 45 minutes. If we can have -- whenever you come up
15  to a good breaking point, if we could just take a quick
16  restroom break.
17       MS. ARON: Sure. Sure. I think now is a good
18  breaking point, actually. So, it's 11:46. Do you want to
19  come back at 11:55?
20       MS. MCKEOWN: It's fine with me. I just need a
21  quick break.
22       MS. ARON: That's fine. So, let's go off the
23  record. We'll be back at 11:55. Okay.
24       (Thereupon, a brief recess was taken at 11:46 a m.,
25  after which the deposition resumed at 11:57 a.m.)

Page 75

1        MS. ARON: So, let's go back on the record, please.
2  BY MS. ARON:
3    Q. Ms. Laviosa, before the break you testified that
4  Ms. McKeown is representing you. Did you ever sign a
5  retainer agreement with Ms. McKeown?
6    A. Sorry, can you repeat it again? I didn't hear you.
7    Q. Yes. Can you hear me okay?
8    A. Yeah, now I can.
9    Q. Okay. Before the break, earlier today, you
10  testified that Ms. McKeown is representing you, right?
11    A. Right.
12    Q. Okay. Did you ever sign a retainer agreement with
13  Ms. McKeown?
14    A. No.
15    Q. Okay. Thank you.
16       Okay. I'd like to go back to your affidavit and I
17  will go back to Exhibit 5 of your affidavit. So, do you see
18  the affidavit on the screen?
19    A. Yes.
20    Q. I will move to Exhibit 5.
21       Okay. Do you see it says "The Varoma Joint
22  Revocable Living Trust Agreement"?
23    A. Yes.
24    Q. Can you tell me what this document is?
25    A. This is the trust that my husband and I made.

Page 76

1    Q. Okay. Who prepared this document?
2    A. Oh, my gosh, I just -- Luisa Rengifo.
3    Q. She's an attorney, right?
4    A. Yes.
5    Q. So, now I will move back to your affidavit. And
6  I'm going to go to Paragraph 4.
7        Okay. So, Paragraph 4 states, "I operate as a real
8  estate broker through Concept International Realty, Inc.
9  ('Concept'), a Florida corporation which is 100% owned by
10  the Varoma Joint Revocable Living Trust ('Varoma Trust'),
11  which is an estate planning trust that was created by my
12  husband and I in October 2015 to provide estate planning for
13  the protection and care of our daughter, an only child." Do
14  you see that?
15    A. Yes.
16    Q. Okay. What happened in October of 2015 that you
17  decided to plan for the protection and care of your daughter
18  by creating this Trust?
19       MS. MCKEOWN: Objection to form.
20       THE WITNESS: Well, I think that was about time
21  doing so. I'm not getting younger. I was traveling a lot
22  to Orlando, even I was -- I was driving back and forth the
23  same day. My husband have a heart condition. So, I think
24  that was the right thing to do.
25  BY MS. ARON:

ils be

**Page 77**

1  Q. And your affidavit states that you entered into the
2  Trust for the protection and care of your daughter. Do you
3  see that?
4  A. Yes.
5  Q. So, what is it that you're protecting your daughter
6  from with the Trust?
7  MS. MCKEOWN: Objection to form.
8  THE WITNESS: Well, I was -- she was a minor. She
9  was about eight years old by then and -- well, she still is
10  a minor, but by then she was eight years old. And, you
11  know, my husband has some properties or something that we
12  wanted to make sure that while she was a minor, until she
13  can take care of by herself, people that we trust can take
14  care on our names. That's the reason we had a trust,
15  correct?
16  BY MS. ARON:
17  Q. Why is it that you decided to have a trust instead
18  of, let's say, having a will or appointing someone as power
19  of attorney for your daughter in case something happened to
20  you?
21  MS. MCKEOWN: Objection to form.
22  THE WITNESS: You're breaking.
23  BY MS. ARON:
24  Q. Yes. Can you hear me now?
25  A. Can you repeat the -- you're breaking half of

**Page 78**

1  the --
2  Q. Okay. Hold on.
3  A. -- the statement.
4  Q. Let me adjust. Can you hear me okay now?
5  A. Yes.
6  Q. Okay. Why is it that you decided to go with a
7  trust as opposed to another instrument? So, for example, a
8  will and a power of attorney for your daughter, providing
9  for her to be taken care of if something were to happen to
10  you.
11  A. Well, because in this document we can -- we have --
12  everything is stated the way that we want it.
13  Q. Do you have any understanding about whether the
14  Trust would give you and the assets in the Trust protection
15  from creditors?
16  MS. MCKEOWN: Objection to form.
17  THE WITNESS: Not really.
18  BY MS. ARON:
19  Q. Why?
20  A. Because ---
21  MS. MCKEOWN: Objection to form.
22  THE WITNESS: I don't understand the question. Can
23  you repeat the question and rephrase?
24  BY MS. ARON:
25  Q. Sure. Sure. Do you have any understanding as to

**Page 79**

1  the Trust probably providing protection from creditors?
2  MS. MCKEOWN: Objection. Asked and answered.
3  BY MS. ARON:
4  Q. You can answer.
5  A. No.
6  Q. Did you explore other instruments aside from the
7  Trust in order to protect your daughter?
8  MS. MCKEOWN: Okay. Just right here I'm going to
9  interject. I don't want her to answer anything that gets
10  into the communications she had with her trusts and estates
11  attorney, so -- because I don't want to take any chance of
12  waiving that privilege, so ---
13  BY MS. ARON:
14  Q. Okay. So, let me rephrase the question.
15  Okay. Aside from any conversations you may have
16  had with your trusts and estates attorney, did you
17  independently think or look at other options instead of a
18  trust, like a will or a power of attorney, anything of the
19  sort?
20  MS. MCKEOWN: Independently, without the guidance
21  of her counsel?
22  MS. ARON: Yeah.
23  THE WITNESS: No. I did everything with my
24  counsel.
25  BY MS. ARON:

**Page 80**

1  Q. Okay. So, let's move on to your affidavit. I'd
2  like to go to Paragraph 16. Okay. Do you see that?
3  A. Yes.
4  Q. Okay. It says, "In or around 2015, my husband and
5  I began estate planning for our daughter, who was eight
6  years old at the time. We wanted to put our affairs in
7  order so that our daughter would be protected if anything
8  were to happen to both of us, and to ensure that she would
9  be cared for by people we trusted. On or about October 14,
10  2015, my husband and I executed the Varoma Joint Revocable
11  Living Trust Agreement, which was prepared for us by Luisa
12  Rengifo, a trusts and estates attorney. The Trust
13  Agreement, a copy of which is attached as Exhibit 5,
14  provides that my husband and I retain joint control over all
15  trust property and states our express intent that all
16  property held under the Trust Agreement be held as tenants
17  by the entireties. See Trust Agreement at Page 7 of 9." Do
18  you see that?
19  So, I will go back to the Trust, which is Exhibit 5
20  to your affidavit, and let's look at Page 7 through 9, which
21  it refers.
22  Okay. Is this your signature on Page 7?
23  A. Yes.
24  Q. Okay. And I'm going to zoom in.
25  A. Thank you.

Page 81

1    Q.  Do you see where it says, "It is the express intent
2  of the Grantors that property held under the Trust Agreement
3  be held as Tenants by the Entirety?"  Do you see that?
4    A.  Yes.
5    Q.  Okay.  What does this mean?
6      MS. MCKEOWN:  Objection to form.
7      THE WITNESS:  That my husband and I, we own
8  everything together.
9  BY MS. ARON:
10    Q.  And let's move on to Page 8.  Okay.  The first
11  property is the one at 9401 Collins Avenue, correct?
12    A.  Correct.
13    Q.  The second one is the one at The Metropolitan,
14  correct?
15    A.  Correct.
16    Q.  And the third one is the Orlando property, correct?
17    A.  Correct.
18    Q.  These three properties are owned by the Varoma
19  Trust?
20      MS. MCKEOWN:  Objection to form.
21      THE WITNESS:  Now?  Only two.
22  BY MS. ARON:
23    Q.  Okay.  Which two?
24      Can you hear me, Ms. Laviosa?
25    A.  Now, yes.  I didn't hear.

Page 82

1    Q.  Okay.  Which two properties are currently owned by
2  the Varoma Trust?
3    A.  The condominium in Azure and The Metropolitan.
4    Q.  Okay.  Let's go back to Paragraph 17 of your
5  affidavit.  Do you see that?  Do you see Paragraph 17 in
6  front of you?
7    A.  Yes.
8    Q.  Okay.  It states, "Our creation of the Varoma Trust
9  had nothing to do with my husband's dispute with his former
10  partners or with any creditors that my husband may have had
11  at the time.  In fact, at the time the Varoma Trust was
12  created, the only property owned solely by my husband was
13  our homestead property at 9401 Collins Avenue, Unit 1103,
14  Surfside, Florida 33154 (the 'Homestead Property'), which my
15  husband purchased in December 2005, the year before we were
16  married.  My husband and I have lived continuously at our
17  Homestead Property since before our marriage in 2006, and
18  our daughter has lived there with us since her birth in
19  April 2007."  Do you see that?
20    A.  Yes.
21    Q.  Okay.  Are you aware that the Varoma Trust was
22  created after your husband's disputes with his former
23  partners began?
24    A.  Can you repeat?
25    Q.  Sure.  Are you aware that the Varoma Trust was

Page 83

1  created after your husband began having disputes with his
2  former partners?
3    A.  I suppose.
4    Q.  Let me ask it differently.  Do you recall your
5  husband having disputes with his former partners?
6    A.  Yes, but I don't remember exactly when they start.
7    Q.  Do you remember your husband was sued related to
8  the disputes with his former partners?
9      MS. MCKEOWN:  Objection to form.
10      THE WITNESS:  If I remember that he was sued?  Can
11  you repeat the question?
12  BY MS. ARON:
13    Q.  Sure.  Do you remember that your husband was sued
14  related to his former business partners disputes?
15    A.  Yeah, he was sued.
16    Q.  Do you recall whether he was sued before you formed
17  the Varoma Trust or after you formed the Varoma Trust?
18    A.  Honestly, I don't remember.
19    Q.  Do you know that there were judgments entered
20  against your husband?
21    A.  Yes, I know.
22    Q.  Do you recall the timing of those judgments?
23    A.  I don't know.  I guess like -- I don't think it's
24  more than two years.  I'm not quite sure of the date there
25  was judgments.

Page 84

1    Q.  Okay.  Today, do you live at 9401 Collins?
2    A.  Yes, I do.
3    Q.  Now, when you say here that the creation of the
4  Varoma Trust had nothing to do with your husband's dispute
5  with his former partners or with any creditors that your
6  husband may have had at the time, what is the basis for
7  that?
8    A.  Well, that the only intention that we did that
9  trust was to protect our daughter.  We don't create a trust
10  for anything else.
11    Q.  So, it's your testimony here today the creation of
12  the Trust had nothing to do with your husband being sued for
13  millions of dollars?
14      MS. MCKEOWN:  Objection to form.
15      THE WITNESS:  Pardon me?
16  BY MS. ARON:
17    Q.  You can answer.  Do you want me to repeat the
18  question?
19    A.  Please.
20    Q.  It's your testimony today that you and your
21  husband's creation of the Varoma Trust has nothing to do
22  with the fact that your husband was sued for millions of
23  dollars?
24      MS. MCKEOWN:  Objection to form.
25      THE WITNESS:  Yes, it's nothing -- has nothing to

21 (Pages 81 to 84)

Page 85

1  do with that.
2  BY MS. ARON:
3     Q.  Are you aware that your husband had creditors at
4  the time the Varoma Trust was formed?
5     MS. MCKEOWN:  Objection to form.
6     THE WITNESS:  No.  No, he didn't have creditors at
7  that time.
8  BY MS. ARON:
9     Q.  Okay.  Let's move on to 18 on your affidavit, which
10  is in front of you.  "When we formed the Varoma Trust for
11  estate planning purposes, we transferred three pieces of
12  real property to the Trust:  (i) the Homestead Property,
13  which was transferred to the Trust by my husband; (ii) a
14  condominium at the Metropolitan, located at 2475 Brickell
15  Avenue, Unit 2504, Miami, Florida 33129 (the 'Metropolitan
16  Property') which I purchased prior to our marriage and which
17  was owned solely by me and transferred to the Trust by me;
18  and (iii) the Orlando Property, which we had purchased as
19  husband and wife, tenants by the entireties, and which we
20  transferred together as tenants by the entireties to the
21  Trust."  Do you see that?
22     A.  Yes.
23     MS. ARON:  Okay.  Now I want to show you a
24  Quitclaim Deed.  So, one second.  Let me pull it up.  This
25  is Exhibit 4 to the debtor's deposition.  And I'll scroll so

Page 86

1  you can see.
2     (Thereupon, Debtor's Deposition Exhibit Number 4
3  previously marked was referenced.)
4  BY MS. ARON:
5     Q.  This is your signature?
6     A.  Yes.
7     Q.  And do you know what this document is?
8     A.  That's the Azure, where we live.
9     Q.  And this is the 9401 Collins property?
10     A.  94 Collins Avenue.  Yes.
11     Q.  Why did you transfer 9401 Collins to the Varoma
12  Trust?
13     MS. MCKEOWN:  Objection to form.
14     THE WITNESS:  Because that's one of the properties
15  that we own, Roberto and I, that goes to my daughter.
16  That's why.
17  BY MS. ARON:
18     Q.  Before the 9401 Collins Avenue apartment was deeded
19  to the Trust it was owned by your husband individually,
20  right?
21     A.  That's correct.
22     Q.  Okay.  And here it does not say that the property
23  is granted as tenants by the entireties, correct?
24     A.  It's to the Varoma Trust.
25     MS. MCKEOWN:  Objection to form.

Page 87

1     THE WITNESS:  Not to the personal names.
2     MS. ARON:  Okay.  I will now introduce Exhibit 7 to
3  the debtor's deposition.  I'm going to put it up.  I'll
4  scroll through.
5     (Thereupon, Debtor's Deposition Exhibit Number 7
6  previously marked was referenced.)
7  BY MS. ARON:
8     Q.  Okay.  Is this your signature?
9     A.  Yes.
10     Q.  Okay.  And do you know what this document is?
11     A.  Yes.  That's the Quitclaim Deed of my apartment.
12     Q.  This is the apartment at The Metropolitan?
13     A.  Yes.
14     Q.  And this was deeded to the Varoma Trust, correct?
15     A.  Yes.  Correct.
16     Q.  And we discussed earlier today this apartment is
17  owned by the Varoma Trust, right?
18     A.  It's owned by the Varoma Trust.  That is correct.
19     Q.  Is this apartment rented today?
20     A.  It's empty right now.
21     Q.  When did you last have a tenant in this apartment?
22     A.  Like three months ago that my tenant passed away.
23     Q.  Are you looking to rent this apartment out to
24  another tenant?
25     A.  Yes.  I need to pay the bills.

Page 88

1     Q.  While this apartment was rented to your former
2  tenant who got the rent payments?
3     A.  Me.
4     Q.  You personally?
5     A.  Yes.
6     Q.  Do you recall how much it was per month?
7     A.  I guess it was 2400.
8     Q.  Okay.  And this is a two-bedroom or one-bedroom
9  apartment?
10     A.  Two-bedroom.
11     Q.  Is it two bathrooms as well?
12     A.  Yes.
13     Q.  Okay.  And do you manage this apartment?
14     A.  Yes.
15     Q.  Okay.  Let's go back to your affidavit.  I'm going
16  to close this.  Okay.  Let's go to Paragraph 4, which we
17  just went through.  I have another question here.
18     Okay.  Do you see Paragraph 4 in front of you?
19     A.  Yes.
20     Q.  Okay.  So, this states that Varoma Trust owns
21  Concept International Realty.  Do you see that?
22     A.  Yes.
23     Q.  Okay.  Varoma Trust was created in 2015.  So, who
24  owned Concept before 2015?
25     A.  My husband and I.

22 (Pages 85 to 88)

Page 89

1    Q. And so, did you transfer Concept International to
2    the Varoma Trust later?
3    A. Yes.
4    Q. How did you go ahead and transfer Concept to the
5    Varoma Trust?
6    A. That's what we did. Yes.
7    Q. Do you recall when you transferred Concept to the
8    Trust?
9    A. When the Trust was created, when everything was
10   done.
11   Q. Is there a deed transferring Concept to the Trust?
12       MS. MCKEOWN: Objection to form.
13       THE WITNESS: I don't think there's a deed. It's
14   just like a -- it's different. This is not like real
15   property. It just like a -- it's just the shares or
16   something like that that was transferred.
17   BY MS. ARON:
18   Q. Are you aware of any documents showing that Concept
19   was transferred to Varoma?
20   A. Yes. I guess they have the shares. I don't have
21   it with me, but I suppose they were. That was five years
22   ago. I don't have the documents. I don't remember all the
23   documents. But I know that the attorney was doing all that.
24   Q. Have you ever seen any document transferring the
25   shares from you and your husband to the Varoma Trust?

Page 90

1    A. I think so.
2    Q. What do you recall about that document?
3        MS. MCKEOWN: Objection to form.
4        THE WITNESS: I don't -- I don't remember. I don't
5    know exactly how the document is. The same day that I
6    signed the Quitclaim Deeds I signed a bunch of documents. I
7    don't remember all of them.
8    BY MS. ARON:
9    Q. Okay. So, sitting here today, you don't recall any
10   specific document transferring the Concept company to the
11   Trust, right?
12   A. No. I don't remember -- I can't recall every piece
13   of paper that she put in front of me.
14   Q. Did you and your husband get anything in return for
15   transferring Concept to the Trust?
16   A. No.
17   Q. Okay. And going back to Concept International, can
18   you approximate how many closings Concept International did
19   last year?
20   A. Not that much. Actually, it wasn't a good year.
21   Q. Was it 10 closings?
22   A. I can say that was 10 -- less than 10 closings.
23   Q. How many properties does Concept provide property
24   management services to?
25   A. I think around a hundred. A little less. 95, a

Page 91

1    hundred, something like that.
2    Q. Okay. I'd like to go to Paragraph 20 of your
3    affidavit. Okay. Do you see Paragraph 20 in front of you?
4    A. Yes.
5    Q. Okay. It states, "My husband and I also own 100%
6    of the equity interests in a company called Marova, LLC,
7    which we have owned as husband and wife, tenants by the
8    entireties, since the company was formed in March 2011. A
9    copy of the executed Marova, LLC Operating Agreement is
10   attached as Exhibit 6 (see page 3 of 13). My husband and I
11   have owned 100% of the equity interests of this company in
12   the same manner since it was formed in March 2011."
13       Do you see that?
14   A. Yes.
15   Q. Okay. Why was Marova created?
16   A. Marova was created to put the real estate of this
17   under that name. It was just to own real estate. A condo
18   office.
19   Q. So, Marova's goal is to own real property?
20   A. Yes.
21       MS. MCKEOWN: Objection to form.
22       THE WITNESS: Just to own a real estate property.
23   Yes.
24   BY MS. ARON:
25   Q. Okay. And which property does Marova own today?

Page 92

1    A. An office located in Brickell.
2    Q. And whose idea was it to create Marova, LLC?
3    A. My attorney back then who mailed my closings and
4    all those stuff. He recommended ---
5    Q. Well, I'm not asking you about -- don't tell me
6    conversations with your attorney.
7        Okay. So, I'd like to go to Exhibit 6 of your
8    affidavit. So, I'll go there. Okay. Exhibit 6. Okay. Do
9    you know what this document is?
10   A. Can you put it a little bit bigger? I cannot read
11   that small.
12   Q. Sure. There you go.
13   A. Yeah. It's Operating Agreement for Marova.
14   Q. Okay. And who prepared this document?
15   A. I'm not sure who was the accountant or the lawyer.
16   I'm not quite sure.
17   Q. What's the name of the accountant?
18   A. Jacqueline Rodriguez.
19   Q. And what's the name of the lawyer you think might
20   have created this document?
21   A. Jorge Otero.
22   Q. Okay. Do you know when this document was prepared?
23   A. It was prepared when the company was created.
24   Q. So, this document was prepared back in 2011?
25   A. Yeah, I think so.

23 (Pages 89 to 92)

Page 93

1    Q.  Okay.  And I want to show you the signature.  Okay.
2  Is this your signature on Page 13 of 13?
3    A.  Yes, it is.
4    Q.  Okay.  And you signed this back in 2011?
5    A.  Yes.  I suppose.
6    Q.  Okay.  So, who owns Marova today?
7    A.  My husband and I.  No, I think it's the Trust.
8    Q.  The Trust owns Marova?
9    A.  I'm not sure.
10    Q.  Okay.  Do you have share certificates for Marova?
11        MS. MCKEOWN:  Objection to form.
12        THE WITNESS:  I think so.
13  BY MS. ARON:
14    Q.  I'm sorry, I didn't hear you.
15    A.  I guess I do.
16    Q.  Okay.  Did you and your husband own Marova together
17  from the beginning of the company?
18    A.  Yes.
19    Q.  Do you have any document showing that you and your
20  husband own Marova as tenants by the entireties?
21        MS. MCKEOWN:  Objection to form.  You mean other
22  than this document?
23        MS. ARON:  No, I'm just talking generally.
24        MS. MCKEOWN:  Objection to form.
25        THE WITNESS:  I think so.

Page 94

1  BY MS. ARON:
2    Q.  What basis do you have for that?  What evidence do
3  you have for believing that you and your husband have owned
4  Marova from the beginning as tenants by the entireties?
5        MS. MCKEOWN:  Objection to form.
6        THE WITNESS:  Because we have everything in that
7  form.
8  BY MS. ARON:
9    Q.  Did you ever discuss or speak with your husband
10  about owning Marova's shares as tenants by the entireties?
11        MS. MCKEOWN:  Objection to form.
12        THE WITNESS:  Like I said before, there's nothing
13  to discuss.  That's the way we do our business and we manage
14  our things.
15        (Thereupon, Debtor's Deposition Exhibit Number 16
16  previously marked was referenced.)
17  BY MS. ARON:
18    Q.  Okay.  I'm showing you Exhibit 16 to the debtor's
19  deposition and I will -- from the cover page, do you know
20  what this is?
21    A.  Yes.  That's a tax return.  Can you, please, put it
22  bigger?
23    Q.  Yes.
24    A.  Yes.  Okay.
25    Q.  There?

Page 95

1    A.  Okay.
2    Q.  So, it's a 2014 tax return for Marova, right?
3    A.  Right.
4    Q.  Okay.  And I'd like to go to Page 10.  Okay.  So,
5  I'm going to zoom in here.
6        Do you see here, Part II, "Individuals or Estates
7  Owning 50% or More of the Partnership?"  Do you see that?
8    A.  Yes.
9    Q.  Okay.  And it shows you as owning 50% and your
10  husband as owning 50%, correct?
11        MS. MCKEOWN:  That document needs to not be filed
12  publicly.  You have not redacted Social Security numbers and
13  they should have been redacted.
14        MS. ARON:  I have not filed it.  Or if I did file
15  it, I'm pretty sure I redacted.
16        THE WITNESS:  I didn't do this.
17  BY MS. ARON:
18    Q.  What do you mean, Ms. Laviosa?
19    A.  Well, I think if it -- or states owing 50% or more
20  of partnership, so -- I don't know.  I don't know why she
21  put it 50/50 because -- I'm not quite sure why she did that.
22  Maybe because in the past I filed separate.  We didn't file
23  together.  We start filing together after, so ---
24    Q.  When did you -- sorry, go ahead.
25    A.  I don't remember.  But I know for some time after

Page 96

1  we were married we were filing our taxes separate.  So --
2  and after we decided to do it together.
3    Q.  When did you and your husband start filing your tax
4  returns together?
5    A.  I don't remember exactly what year it was.
6    Q.  Okay.  And when you say "I don't know why she put
7  it this way," are you referring to your accountant?
8    A.  Yes.
9    Q.  Okay.  Is it your testimony today that the tax
10  return is wrong?
11        MS. MCKEOWN:  Objection to form.
12        THE WITNESS:  No, I didn't say that --
13  BY MS. ARON:
14    Q.  Okay.  What's ---
15    A.  -- that it was wrong and I haven't said that it's
16  right either.  So ---
17    Q.  Okay.
18    A.  I don't know.
19    Q.  So, it's not right or wrong; you just don't know,
20  right?
21    A.  I don't know.
22        MS. MCKEOWN:  Objection to form.
23        THE WITNESS:  I don't know.
24  BY MS. ARON:
25    Q.  Okay.  Now, this is the Partner's Share of Income,

24 (Pages 93 to 96)

Page 97

1    Deductions and Credits, etc.  Do you see that?
2        A.  Uh-huh.
3        Q.  Okay.  And it's for Marova, LLC.  And this is for,
4    partner's name, your husband.  Do you see that?
5        A.  Yes.
6        Q.  And it says here that he owns 40% of profit, 40% of
7    loss, and 50% of capital.  Do you see that?
8        A.  Yes.
9        Q.  Okay.  And now I'm going to move on to the next
10   page.  Okay.  And this is a Partner's Share of Income,
11   Deductions, Credits, etc. for you, for Marova LLC.  Do you
12   see that?
13       A.  Uh-huh.
14       Q.  Okay.  And it says you own 40% of profit, 40% of
15   loss, and 50% of capital, right?
16       A.  That's what that says.
17       MS. MCKEOWN:  Objection to form.
18   BY MS. ARON:
19       Q.  Okay.  And then this is the Partner's Share of
20   Income Deductions, Credits for partner Marco Romagnoli.  Do
21   you see that?
22       A.  Yes.
23       Q.  And is Marco Romagnoli your brother-in-law?
24       A.  Yes, he is.
25       Q.  Okay.  And it says that he owns 20% of profit and

Page 98

1    20% of loss.  Do you see that?
2        A.  Yes.
3        Q.  Do you recall Marco Romagnoli owning 20% of profit
4    or loss of Marova, LLC?
5        MS. MCKEOWN:  Can I have that back, please?
6        THE WITNESS:  I'm sorry, what did you say?
7        MS. ARON:  Can you hear me?
8        MS. MCKEOWN:  I just was asking her to repeat the
9    question, or the reporter, one or the other.
10   BY MS. ARON:
11       Q.  Sure.  Were you aware that Mr. Romagnoli owned 20%
12   of profit or loss of Marova, LLC?
13       MS. MCKEOWN:  Objection to form.
14   BY MS. ARON:
15       Q.  You can answer.
16       A.  I remember there was some kind of agreement, but at
17   the end of the day we didn't ended up, you know -- I don't
18   think we moved forward, even though we were trying something
19   with him.  But I suppose -- I don't remember exactly because
20   that was a long time ago, but -- I know we talked about
21   something like that and -- but we didn't ended up doing the
22   business with my brother-in-law, so ---
23       Q.  But your brother-in-law is listed on the tax return
24   for Marova as a 20% owner of profit or loss, right?
25       A.  No, it's not listed like that now.  I don't know it

Page 99

1    was in this year.  I don't know if there was an amendment.
2    Because I know we have to do something, but I don't really
3    remember it exactly.
4        Q.  Okay.  Is it your testimony that you and your
5    husband were the sole owners of Marova, LLC?
6        A.  Yes, we are.
7        Q.  And what about in 2014, which is the date of this
8    tax return?
9        A.  No, we still were the entire owners.
10       Q.  And so, it's not accurate here what the tax return
11   says that ---
12       A.  You're talking -- there it says about profit and
13   loss, not about capital.
14       Q.  So, let me rephrase my question.
15           Is it your testimony that your husband and you
16   owned 100% of profit and loss of Marova in 2014?
17       MS. MCKEOWN:  Objection to form.
18       THE WITNESS:  Like I said, I'm not sure.  You know,
19   that has been a long time.  I don't remember how -- I know
20   we didn't ended up doing business with my brother-in-law.  I
21   don't remember this part.  I'm sorry.
22       MS. ARON:  Okay.  I will move on to Exhibit 17 to
23   the debtor's deposition.
24       (Thereupon, Debtor's Deposition Exhibit Number 17
25   previously marked was referenced.)

Page 100

1    BY MS. ARON:
2        Q.  Okay.  Do you know what this document is?
3        A.  Yes.
4        Q.  Okay.  And is this the 2015 tax return for Marova,
5    LLC?
6        A.  That's what it says.
7        Q.  Okay.  So, I'd like to move on to Page 17.  Okay.
8    So, here it still lists Mr. Marco Romagnoli as owning 20% of
9    profit and loss of Marova.  Do you see that?
10       A.  Yes.
11       Q.  Okay.  And I want to show you something else.
12           Okay.  So, here, this is 2015, Part II, it says
13   "Individuals or Estates Owning 50% or More of the
14   Partnership," and it has your name and your husband's name
15   and it says 100%.  Do you see that?
16       A.  Yes.
17       Q.  Do you know why the change from the previous year's
18   tax return where it was 50% and 50% to 100% for both you and
19   your husband?
20       MS. MCKEOWN:  Objection to form.
21       THE WITNESS:  Well, this is correct.  The other one
22   I don't know.  Like I told you, I don't know why she put it
23   that way.  I have to ask --
24   BY MS. ARON:
25       Q.  Okay.

Page 101

1    A. -- my accountant. So, Marova is a company that
2  doesn't have any movement. It just owns the real estate.
3  It's nothing like I'm doing business with that company. It
4  just owns the real estate. That's it.
5    Q. And if you look at the partner's share of income
6  for your husband, it says he owns 40% of profit and loss and
7  50% of capital in Marova. Do you see that?
8    A. Yes.
9    Q. Sorry, what did you say?
10    A. That's what it says.
11    Q. Okay. It this incorrect?
12    A. I don't know. Like I said -- look, this is a bunch
13  of forms that the accountants fill it out and I don't know
14  why she fill it out that way. You know, she's the
15  accountant. We own the property as we told you and there's
16  an operating agreement and everything, but I can't tell you
17  why we fill it out this way. Maybe you should ask her.
18    Q. And you understand that this tax return was sent to
19  the government, right?
20    MS. MCKEOWN: Objection to form.
21    THE WITNESS: Yes. So?
22  BY MS. ARON:
23    Q. And then, if you look at the page you have in front
24  of you, it refers to you as having 40% of the profit and
25  loss and 50% of the capital of Marova. Do you see that?

Page 102

1    A. Yes.
2    Q. Okay. And is this incorrect?
3    MS. MCKEOWN: Objection to form.
4    THE WITNESS: I don't know that it's incorrect or
5  not.
6  BY MS. ARON:
7    Q. Okay. And now let's move on to this page, which is
8  Page 20 of the PDF, and I'm going to zoom in here. Okay.
9  And now it says information about the partner and it has you
10  and your husband as tenants by the entireties. Do you see
11  that?
12    A. Yes.
13    Q. Okay. 80% of profit and loss and 100% of capital.
14  Do you see that?
15    A. Yes.
16    Q. Okay. Why the change from the previous year? So,
17  now it says tenants by the entireties. Do you know why this
18  change was made?
19    MS. MCKEOWN: Objection to form.
20    THE WITNESS: I don't know.
21  BY MS. ARON:
22    Q. And do you know if there was any sort of instrument
23  or document where you and your husband transferred your
24  interest in Marova to both of you as tenants by the
25  entireties?

Page 103

1    MS. MCKEOWN: Objection to form.
2    THE WITNESS: I didn't make any transfer of the
3  company. We created the company the way it is.
4  BY MS. ARON:
5    Q. So, now we'll go back to your affidavit. I'm going
6  to close this and I'm going to look at 21, Paragraph 21 in
7  your affidavit. Okay. Do you see it, Ms. Laviosa?
8    A. Yes.
9    Q. Okay. It's states, "We are both Managing Members
10  of Marova, LLC as well, and have both been Managing Members
11  since the company's formation in March, 2011. At no time
12  have either my husband or I been the sole Managing Member of
13  Marova, LLC, even if only one of us was listed as the
14  Managing Member on the company's filings with the Florida
15  Division of Corporations, all of which have been filed by an
16  attorney or an accountant on behalf of the company." Do you
17  see that?
18    A. Yes.
19    Q. Okay. So, it's your testimony today that you and
20  your husband were both always the managing members of
21  Marova?
22    A. Yes.
23    MS. ARON: Okay. Let me introduce Exhibit 10 to
24  the debtor's deposition. Now, hold on. This is the wrong
25  one. There we go.

Page 104

1    (Thereupon, Debtor's Deposition Exhibit Number 10
2  previously marked was referenced.)
3  BY MS. ARON:
4    Q. Okay. I will scroll through this. Okay?
5    A. Okay.
6    MS. MCKEOWN: Which exhibit is this?
7    MS. ARON: 10 to the debtor's deposition.
8  BY MS. ARON:
9    Q. And I'll zoom in for you. Okay? Have you seen
10  this document before?
11    A. Yes.
12    Q. When did you see this document?
13    A. I don't know. A long time ago, I guess. Many
14  years.
15    Q. Do you know what this document is?
16    A. Yeah. It's the Articles of Organization for
17  Marova.
18    Q. And if you look here, "Article IV, Managing Member
19  And Management Of Business," do you see where it says, "The
20  name and address of the managing member of this Limited
21  Liability Company are: Name," and it has your husband's
22  name, and then it says, "The business of this Limited
23  Liability Company shall be managed by the managing member in
24  a meeting, or by written consent without a meeting." Do you
25  see that?

26 (Pages 101 to 104)

Page 105

1    A. Yes.
2    Q. So, your husband was the managing member of Marova
3  when it was created in March 2011?
4        MS. MCKEOWN: Can I have that back, please? Was a
5  managing member or the managing member?
6        MS. ARON: Was the managing member when Marova was
7  created in 2011.
8        MS. MCKEOWN: Objection to form.
9        THE WITNESS: Was a managing member.
10  BY MS. ARON:
11    Q. Is it your testimony that you were another managing
12  member?
13    A. Yeah, we were both.
14    Q. And why were you not listed here?
15    A. I don't know.
16    Q. And if you look at Page 2, this was signed by your
17  husband, right?
18    A. Yes. I know.
19    Q. So, is this document wrong because it doesn't list
20  you?
21    A. Not necessarily.
22    Q. Do you see where it says, "The business of this
23  Limited Liability Company shall be managed by the managing
24  member in a meeting, or by written consent without a
25  meeting?" Do you see that?

Page 106

1        MS. MCKEOWN: Objection to form.
2        THE WITNESS: Yes.
3  BY MS. ARON:
4    Q. So, is it your testimony today that the document is
5  wrong because it should have included you or is it your
6  testimony that the document is correct?
7        MS. MCKEOWN: Objection to form.
8        THE WITNESS: It's not wrong and -- it doesn't
9  matter what it says. We do everything together. It's not
10  like he's doing anything and that -- like I said, Marova
11  only owns the property.
12  BY MS. ARON:
13    Q. Okay. So, now -- sorry.
14    A. To me it doesn't matter it's my name or his name.
15  We do everything together.
16        MS. ARON: I will now introduce Exhibit 11 to the
17  debtor's deposition. Okay. And I will scroll through so
18  you can take a look.
19        (Thereupon, Debtor's Deposition Exhibit Number 11
20  previously marked was referenced.)
21        THE WITNESS: Uh-huh.
22  BY MS. ARON:
23    Q. Okay. Have you seen this document before?
24    A. I don't know.
25    Q. Do you see where it says here, "Marova LLC, Roberto

Page 107

1  Romagnoli Sole Member?" Do you see that?
2    A. Yeah, I see that in the paper.
3    Q. This is wrong?
4    A. Yeah, it's wrong.
5    Q. Why is it wrong?
6    A. Because he's not the only member. We are, both of
7  us.
8    Q. Did you or your husband reach out to the IRS to say
9  that this was wrong?
10    A. I don't know. I -- I -- I don't remember. I don't
11  know. Honestly, I don't know. And this has a tax ID
12  number. On all the taxes we have been declaring this with
13  my Social Security and with his, so ---
14    Q. But sitting here today, you don't know why this
15  says your husband is the sole member, right?
16    A. No. It's the first time that I see that.
17        MS. ARON: Okay. I will now introduce Exhibit 3 to
18  your deposition.
19        (Thereupon, Trustee's Exhibit Number 3 was marked
20  for identification.)
21  BY MS. ARON:
22    Q. And I will scroll through and then let me know when
23  you're ready. Thank you.
24    A. Okay.
25    Q. Okay. Do you know what this document is?

Page 108

1    A. Yeah. That's the annual -- the annual report of
2  the corporation.
3    Q. And this is the annual report for Marova, LLC,
4  which was filed on April 18, 2012, right?
5    A. Right.
6    Q. Okay. And was Jorge Otero your lawyer?
7    A. Yes.
8    Q. Okay. And if you look here where it says "Managing
9  Members/Managers," it says, "Title: MGRM." Do you know
10  what MGRM stands for?
11    A. It's managing member.
12    Q. And it states your husband's name. Do you see
13  that?
14    A. Yes.
15    Q. And this doesn't include you, right?
16        MS. MCKEOWN: Objection to form.
17        THE WITNESS: I don't see my name there.
18  BY MS. ARON:
19    Q. Let me rephrase that. You're not listed here as a
20  manager/member or a managing member, right?
21    A. No.
22    Q. Okay. Do you know why you're not listed?
23    A. No.
24        MS. MCKEOWN: Objection to form.
25  BY MS. ARON:

Page 109

1    Q.  Is it your testimony today that this form is wrong?
2        MS. MCKEOWN:  Objection to form.
3        THE WITNESS:  I'm not saying that.
4    BY MS. ARON:
5    Q.  Okay.  So, is this form correct?
6        MS. MCKEOWN:  Objection to form.
7        THE WITNESS:  Well, I don't know it's mandatory
8    that all members has to be listed.
9    BY MS. ARON:
10    Q.  What do you know -- I'm sorry, go ahead.
11    A.  I don't know if all members have to be listed for
12    this.
13    Q.  Do you have any knowledge one way or the other
14    whether all manager or managing members have to be listed?
15        MS. MCKEOWN:  Objection to form.
16        THE WITNESS:  I'm not sure, but I don't know.  You
17    know, I have a lawyer.  He knows we are the owners and he
18    was the one who did it this way.  So, I trust in my lawyers.
19    So, I guess he did the right thing.  But it doesn't mean I'm
20    not a managing member.  I am.  It's just listed the
21    renovation of the corporation.
22    BY MS. ARON:
23    Q.  And you see this is signed by your husband, right?
24    It's an electronic signature, right?
25    A.  That's what it says there.

Page 110

1    Q.  Okay.  And earlier, when you said you didn't know
2    if it's mandatory that all members be listed, do you have
3    any knowledge about whether all members should be listed or
4    not, either way?  I'm just trying to understand what it is
5    that you know.
6        MS. MCKEOWN:  Objection to form.
7        THE WITNESS:  Like I say, I'm not sure.  It's
8    like -- at least the lawyer didn't tell me that everybody
9    has to be listed here.
10    BY MS. ARON:
11    Q.  Okay.  So, today, you don't know whether this is
12    right or wrong, this form?
13        MS. MCKEOWN:  Objection to form.
14        THE WITNESS:  Yeah.  No, I don't.
15        MS. ARON:  Okay.  I will now introduce Exhibit 4 to
16    your deposition and I will scroll through.
17        (Thereupon, Trustee's Exhibit Number 4 was marked
18    for identification.)
19        THE WITNESS:  It's the same document.
20    BY MS. ARON:
21    Q.  Well, the date is April 12, 2013, right?
22    A.  Right.
23    Q.  Okay.  And this is for Marova, LLC, correct?
24    A.  Correct.
25    Q.  And only your husband is listed for manager or

Page 111

1    managing member, right?
2    A.  Well, they didn't do anything.  They just go into
3    Sunbiz and pay the fee and that's it.  We didn't do
4    anything.  They didn't make any change, so ---
5        MS. MCKEOWN:  Objection to form.
6    BY MS. ARON:
7    Q.  And who is "they"?
8    A.  That was done by the attorney's office.  You go to
9    Sunbiz, you put the name of the corporation, you pay the
10    fee, and that's it.  You don't necessarily have to do any
11    change.  Obviously, they didn't do it, so ---
12    Q.  Is what you're saying that your attorney filed this
13    document without your authorization?
14        MS. MCKEOWN:  Objection to form.
15        THE WITNESS:  I didn't say that.  I'm just saying
16    they didn't make any change.
17    BY MS. ARON:
18    Q.  Okay.  And this is signed by your husband.  Do you
19    see that?
20    A.  Yes.
21    Q.  Okay.  As MGRM, right?
22    A.  Yes.
23        MS. ARON:  Okay.  So, now I will introduce Exhibit
24    14 to the debtor's deposition, and I will scroll through.
25    Okay.  Let me go to the top.

Page 112

1        (Thereupon, Debtor's Deposition Exhibit Number 14
2    previously marked was referenced.)
3    BY MS. ARON:
4    Q.  Ms. Laviosa, do you know what this document is?
5    A.  Yes.
6    Q.  And this is the annual report for Marova filed on
7    April 10, 2014 for the year 2014, right?
8    A.  Right.
9    Q.  Okay.  And Jacqueline Rodriguez is your accountant?
10    A.  Yes.
11    Q.  Okay.  And then for MGRM, manager or member, we
12    have your husband.  Do you see that?
13    A.  Yes, I do.
14    Q.  Okay.  And again you're not listed here, correct?
15    A.  Yes.
16    Q.  And this is signed by your husband, right?
17    A.  Right.
18    Q.  Okay.  Have you seen this document before or is it
19    the first time that you see this?
20    A.  No, I haven't seen it.  To me it's like -- just
21    things that you need to complete.  You pay on the thing and
22    you don't -- it's a thing that you have to pay to the State
23    every year.  That's it.  And, honestly, like I said, we do
24    everything together.  It's nothing like, "Oh, it has to be
25    you or it has to be me," or for any reason.  No.

28 (Pages 109 to 112)

Page 113

1    Q.  Okay.  So, this is the 2015 Annual Report for
2  Marova.  Do you see that?
3    A.  Yes.
4      MS. ARON:  And this is Exhibit 15 to the debtor's
5  deposition for the record.
6      (Thereupon, Debtor's Deposition Exhibit Number 15
7  previously marked was referenced.)
8  BY MS. ARON:
9    Q.  Okay.  So, here we see your name as the MGRM.  Do
10  you see that?
11    A.  Yes.
12    Q.  Do you know why the change from 2014, where only
13  your husband was listed, to now you're only listed?
14    A.  No.
15    Q.  Okay.  And then if you go to the bottom, it's your
16  electronic signature as MGRM.  Do you see that?
17    A.  Yes.
18    Q.  And sitting here today, you do not know why you
19  became the managing member of Marova in February of 2015
20  right?
21      MS. MCKEOWN:  Objection to form.
22      THE WITNESS:  Well, what you're saying is wrong.  I
23  didn't became, because I always have been manager of the
24  company.  That I now appear in the registered thing is
25  another thing.  But I have always been a managing member.

Page 114

1  BY MS. ARON:
2    Q.  Okay.  And you understand that when you sign this
3  document you certify the information was true and accurate?
4    A.  It's accurate.  I'm aware.
5    Q.  And that you're a managing member or a manager of
6  the limited liability company.  Do you see that?
7    A.  I'm a managing member.  So, that's accurate.
8  That's not a lie.
9    Q.  Okay.  But your husband is not listed here, right?
10    A.  But he is still a managing member.  It doesn't mean
11  he's not.
12    Q.  And where did you get that understanding from?
13      MS. MCKEOWN:  Understanding of what?
14      MS. ARON:  That a company does not have -- that
15  someone can be a managing member while not being listed in
16  the annual reports of the company.
17      MS. MCKEOWN:  Objection to form.
18      THE WITNESS:  I don't know.  Like I said before, I
19  didn't know everybody has to be listed.
20  BY MS. ARON:
21    Q.  And sitting here today, you don't know either way
22  whether everyone has to be listed or everyone doesn't have
23  to be listed, right?
24    A.  I don't know.
25      MS. ARON:  Okay.  I will now introduce Exhibit 6 to

Page 115

1  your deposition.
2      (Thereupon, Trustee's Exhibit Number 6 was marked
3  for identification.)
4  BY MS. ARON:
5    Q.  Okay.  And this is the 2016 Annual Report for
6  Marova, LLC.  Do you see that?
7    A.  Yes.
8    Q.  Okay.  And it lists you as the authorized person
9  and managing member.  Do you see that?
10    A.  Yes.
11    Q.  Okay.  And your husband is not listed, right?
12    A.  Yes.
13    Q.  Okay.  And this is electronically signed by you,
14  correct?
15    A.  Yes.
16      MS. ARON:  Okay.  I'm moving on to Exhibit 7 to
17  your deposition.
18      (Thereupon, Trustee's Exhibit Number 7 was marked
19  for identification.)
20      MS. MCKEOWN:  I'm sorry.  We need to stop here a
21  minute because this has already gotten very confusing for
22  the record.  I don't know where you're getting these
23  exhibits to her affidavit.  I just looked back at her
24  affidavit.  Exhibit 6 to her affidavit is not the Sunbiz
25  report.  It's the Operating Agreement.

Page 116

1      MS. ARON:  I'm not saying they're exhibits to her
2  affidavit.  These are exhibits that I'm introducing to her
3  deposition.
4      MS. MCKEOWN:  Then perhaps I misheard you.  I
5  thought you were saying these were ---
6      MS. ARON:  No.  I said, "It's Exhibit 6 to your
7  deposition," not to your affidavit.
8      MS. MCKEOWN:  To whose deposition?  You mean to
9  Mr. Romagnoli's deposition?
10      MS. ARON:  No.  To today's deposition.  To
11  Ms. Laviosa's deposition.  That's what I mean when I say
12  "your deposition."
13      MS. MCKEOWN:  Okay.  I misheard you.  I thought you
14  said exhibits to the ---
15      MS. ARON:  No.  No.  You will see the transcript.
16  No.  We have gone over the exhibits of the affidavit.  This
17  is exhibits to the deposition.  I did not separately number
18  the exhibits that were attached to the affidavit.  The
19  affidavit is Exhibit 2 to the depo.
20      MS. MCKEOWN:  Correct.
21      MS. ARON:  Right?  Okay.
22      MS. MCKEOWN:  And these documents, these are
23  separately --
24      MS. ARON:  Yes.  Marked.
25      MS. MCKEOWN:  -- numbered from Mr. Romagnoli's?

29 (Pages 113 to 116)

Page 117

1    MS. ARON:  Yes.  And I will send them to you after
2  the deposition and to the court reporter.
3    MS. MCKEOWN:  Okay.
4  BY MS. ARON:
5    Q.  Okay.  So, this is Exhibit 7 to your deposition,
6  Ms. Laviosa.  It's a 2017 Annual Report for Marova, LLC.  Do
7  you see that?
8    A.  Yes.
9    Q.  Okay.  And here you are again listed at the
10 manager/member.  Do you see that?
11   A.  Yes.
12   Q.  And you signed this document electronically,
13 correct?
14   A.  Correct.
15   Q.  And your husband is not listed here, correct?
16   A.  No.
17   MS. ARON:  Okay.  I will introduce Exhibit 8 to
18 your deposition.
19   (Thereupon, Trustee's Exhibit Number 8 was marked
20 for identification.)
21   THE WITNESS:  Okay.
22 BY MS. ARON:
23   Q.  Okay.  Let me scroll through it for you.  This is
24 the 2018 Annual Report for Marova.  Do you see that?
25   A.  Yes.

Page 118

1    Q.  And you're listed here as the sole manager/member,
2  correct?
3    MS. MCKEOWN:  Objection to form.
4  BY MS. ARON:
5    Q.  You can respond.
6    A.  This is correct.  It doesn't say that I'm the sole
7  manager.
8    Q.  Let me rephrase that.  You're the only manager and
9  member listed here, right?
10   A.  Only listed, yes.  But I'm not the only ---
11   Q.  Okay.  Your husband is not listed here, right?
12   A.  He's not listed on this paper.
13   Q.  And do you know why he's not listed?
14   A.  I have no idea.
15   Q.  And you signed this form, correct?
16   A.  Uh-huh.
17   Q.  And you understand this is a form that's filed with
18 the State of Florida, correct?
19   A.  I do.
20   MS. ARON:  Okay.  And I will go on to Exhibit 9 to
21 your deposition.
22   (Thereupon, Trustee's Exhibit Number 9 was marked
23 for identification.)
24   THE WITNESS:  Exhibit 9, 2019.
25 BY MS. ARON:

Page 119

1    Q.  That's correct.  So, this is the 2019 Annual Report
2  for Marova, LLC.
3    A.  Uh-huh.
4    Q.  I'll scroll through it for you.  Okay.  And again,
5  you're listed as the manager/member here, correct?
6    A.  Yes.
7    Q.  You're the only person that's listed as a manager,
8  right?
9    A.  Yes.
10   Q.  And your husband is not listed here, right?
11   A.  Right.
12   Q.  And then consistent with the previous exhibit, you
13 don't know why he's not listed, right?
14   A.  No.  Like I said before, I don't know.
15   Q.  And this is your electronic signature at the
16 bottom, right?
17   MS. MCKEOWN:  Objection to form.
18   THE WITNESS:  Right.
19   MS. ARON:  Okay.  And I will now introduce Exhibit
20 10 to your deposition.
21   (Thereupon, Trustee's Exhibit Number 10 was marked
22 for identification.)
23 BY MS. ARON:
24   Q.  Okay.  And I'll scroll for you.  Okay.  This is the
25 2020 Annual Report for Marova, LLC, correct?

Page 120

1    A.  Correct.
2    Q.  And you are the only manager/member that's listed
3  here, right?
4    A.  Yes.
5    Q.  And your husband is not listed, right?
6    A.  Right.
7    Q.  And you don't know why your husband is not listed,
8  right?
9    A.  I do not.  No.
10   Q.  And you electronically signed this form, right?
11   MS. MCKEOWN:  Objection to form.
12 BY MS. ARON:
13   Q.  I'm sorry, I didn't get your answer.
14   A.  I said right.
15   MS. ARON:  Okay.  So, now let me go to Exhibit 9 to
16 the debtor's deposition.
17   (Thereupon, Debtor's Deposition Exhibit Number 9
18 previously marked was referenced.)
19 BY MS. ARON:
20   Q.  Okay.  And again this lists you as a
21 manager/member, correct?
22   A.  Correct.
23   Q.  And you're the only manager/member that's listed
24 here, right?
25   MS. MCKEOWN:  Objection to form.  The document

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 121

1 speaks for itself.
2 BY MS. ARON:
3     Q. You can answer.
4     A. Yes, I am the only one listed.
5     Q. Okay. So, your testimony today is despite all the
6 documents we saw from the Florida Department of Corporations
7 and the IRS document that I showed to you, it's your
8 testimony today that you and your husband are both
9 manager/members of Marova, right?
10     MS. MCKEOWN: Objection to form.
11     THE WITNESS: Yes, it is.
12 BY MS. ARON:
13     Q. Okay. Now we'll go on to your affidavit, Paragraph
14 22. Do you see it in front of you?
15     A. Yes.
16     Q. Okay. It states, "Marova, LLC owns an office
17 condominium located at 55 S.E. 6th Street, Unit 206, Miami,
18 Florida 33131 (the 'Office Property'), which is the location
19 of Concept's office. The Office Property originally was
20 purchased by Concept, but later was transferred to Marova,
21 LLC to hold title to the property in a separate entity from
22 the operating realty company." Do you see that?
23     A. Yes, I do.
24     Q. Okay. So, today Concept's office is in that 55
25 S.E. 6th Street office owned by Marova, right?

Page 122

1     A. Correct.
2     Q. Okay. Do you sublet that office to anyone?
3     A. No.
4     Q. Okay. So, it's just your company in that office,
5 right?
6     A. Right.
7     Q. How big is the office?
8     A. I think it's 1900 square footage.
9     MS. ARON: Okay. So, now I will show you Exhibit 8
10 to your deposition. Actually -- sorry, Exhibit 8 to the
11 debtor's deposition. Okay. And I will scroll through.
12     (Thereupon, Debtor's Deposition Exhibit Number 8
13 previously marked was referenced.)
14 BY MS. ARON:
15     Q. Okay. Do you know what this document is?
16     A. Yes. A Quitclaim Deed for Concept International
17 Realty.
18     Q. Is it the Quitclaim Deed of the office?
19     A. Yes.
20     Q. Okay. So, the office was deeded from Concept
21 International Realty to Marova, LLC, correct?
22     A. Correct.
23     Q. Okay. Why did Concept quitclaim the office
24 property to Marova?
25     MS. MCKEOWN: Objection. Asked and answered.

Page 123

1 BY MS. ARON:
2     Q. You can answer.
3     A. Well, you asked that before. Because we want to
4 have the real estate in the name -- on the name of another
5 company just to separate -- like for liability reasons for
6 the operating business.
7     Q. Okay. And if you look at this language here at the
8 bottom of the first page, it says, "This transfer from
9 Grantor is to her wholly owned limited liability company and
10 is exempt from documentary stamp tax." Okay. And if we
11 look at "Grantor," that's Concept International.
12     So, do you know what this language means and why
13 it's here?
14     MS. MCKEOWN: Objection to form.
15     THE WITNESS: I'm not quite sure. That's what the
16 lawyer -- like I said, you know, this is very -- language
17 from the lawyers.
18 BY MS. ARON:
19     Q. Okay. I'm going back to your affidavit. Let's
20 look at Paragraph 23. "Marova, LLC is not engaged in any
21 business and only holds title to the real estate, therefore
22 no 'control' of Marova is necessary." Do you see that?
23     A. Yes.
24     Q. "Any issues regarding Marova, LLC would necessarily
25 involve the ownership of the Office Property and my husband

Page 124

1 and I would make all decisions regarding the Office Property
2 together. I do not control or make decisions regarding
3 Marova, LLC independently, and there is nothing to control
4 on a day to day basis." Do you see that?
5     A. Yes.
6     Q. Okay. So, I'd like to know what type of decisions
7 you and your husband make regarding the office property
8 together.
9     A. What do you mean? I don't understand the question.
10     Q. Sure. Let me rephrase it.
11     So, your affidavit says, in Paragraph 23, "my
12 husband and I would make all decisions regarding the Office
13 Property together." Do you see that?
14     A. Yes.
15     Q. Okay. Tell me all the decisions that you have made
16 regarding the office property together with your husband.
17     A. Well, the major decision was to put the real estate
18 on Marova's name. We operate Concept in that space. Not
19 too much to do every day, I guess. If we decide to move or
20 to sell the property or do whatever we want in the future,
21 of course we are going to do it together.
22     Q. Do you have any documents to support your statement
23 that you and your husband make all decisions regarding the
24 office property together?
25     MS. MCKEOWN: Objection to form.

31 (Pages 121 to 124)

Page 125

1     THE WITNESS: What kind of document are you
2  referring to?
3  BY MS. ARON:
4     Q. I'm asking you if you have any.  Any e-mails, any
5  letters, any other document.
6     A. No, I -- my husband and I, we live together, we are
7  together and we talk a lot.  I don't communicate with my
8  husband through text, through e-mails, or anything like
9  that.  I sleep with the guy every day.
10    Q. Who pays the bills regarding the office property?
11       MS. MCKEOWN: Objection to form.
12       THE WITNESS: Who pays the bills?  What do you
13  mean?  What bills?
14  BY MS. ARON:
15    Q. Who writes -- the electricity, the Internet bill.
16  Who manages all that?
17       MS. MCKEOWN: Objection to form.
18  BY MS. ARON:
19    Q. I'm sorry, I couldn't hear your answer.  You broke
20  up.
21    A. Concept pays the expenses of the real estate.
22    Q. From the time that you acquired the office property
23  have you subleased any space within the office to someone
24  else?
25    A. No.

Page 126

1     Q. Okay.  And then let's look at 24 in your affidavit.
2  "However, Concept's office is located at the Office Property
3  owned by Marova, LLC and because I am the licensed real
4  estate broker of Concept, I do make most decisions regarding
5  Concept's operations."  Do you see that?
6     A. Yes.
7     Q. Okay.  And Concept pays you a salary, correct?
8     A. Correct.
9     Q. Does Concept pay your husband a salary?
10    A. No, it does not.
11    Q. Okay.  So, what you're saying in Paragraph 24 is
12  that Concept manages Marova and you make decisions for
13  Concept in turn?
14       MS. MCKEOWN: I'm sorry, say that again.
15       MS. ARON: Sure.
16  BY MS. ARON:
17    Q. Is it your testimony that -- I'll break it up.  Are
18  you saying that it's Concept that manages Marova?
19       MS. MCKEOWN: Objection to form.
20       THE WITNESS: No, I didn't say that.
21  BY MS. ARON:
22    Q. Okay.  And Paragraph 25, "I have never been
23  involved with the Dinuro Investments, LLC, the company my
24  husband owned with his brother, not have I ever been
25  involved with any of my husband's business dealings with SR

Page 127

1  Acquisitions or its principals."  Do you see that?
2     A. Yes.
3     Q. Okay.  What do you know about the lawsuits between
4  SR Acquisitions and your husband?
5     A. Again.
6     Q. Sure.  What do you know about the lawsuits
7  between -- let me rephrase that.  What do you know about the
8  lawsuits by SR Acquisitions against your husband?
9     A. Well, this is kind of a complicated thing.  This is
10  the business that my -- I don't know any details.  I know
11  they were partners.  I know my husband lost everything in
12  that business, and it has been really hard for us.  That's
13  the only thing that I really know.
14    Q. When you say that your husband lost everything, how
15  much did he lose?
16       MS. MCKEOWN: Objection to form.
17       THE WITNESS: I can't give you exactly amount, but
18  it was a lot.
19  BY MS. ARON:
20    Q. You know that there were judgments entered against
21  your husband?
22    A. Yes, I know.
23    Q. Do you know that there were judgments entered by
24  your husband's former attorney, Mr. Otero and
25  Mr. Concepcion, against your husband?

Page 128

1     A. I know.
2     Q. Okay.  So, you know that those judgments are
3  outstanding, right?
4     A. I don't know exactly what ---
5       MS. MCKEOWN: Objection to form.
6  BY MS. ARON:
7     Q. Does your husband intend to pay those judgments?
8       MS. MCKEOWN: Objection to form.
9       THE WITNESS: We have no money to pay those
10  judgments.
11  BY MS. ARON:
12    Q. But there are properties that can be used to pay
13  those judgments, right?
14       MS. MCKEOWN: Objection to form.
15       THE WITNESS: No, there's not.
16  BY MS. ARON:
17    Q. Why not?
18       MS. MCKEOWN: Are you asking -- objection to form.
19  BY MS. ARON:
20    Q. Do you want me to rephrase the question?
21    A. Yes, please.
22    Q. Sure.  Why can't one or two or three properties be
23  used to pay those judgments off?
24       MS. MCKEOWN: Objection to form.  Why should they?
25       MS. ARON: Well, please, let the witness testify.

Page 129

1  I'm asking her.  I'd like to hear what her testimony is.
2          MS. MCKEOWN:  It's an absurd question, but go
3  ahead.
4          MS. ARON:  Well, please, refrain from making
5  comments.
6          THE WITNESS:  Well, they're also mine and I don't
7  have anything to do with that.
8  BY MS. ARON:
9      Q.  You don't have anything to do with the lawsuits?
10     A.  No, I have nothing to do with that.
11         MS. ARON:  Okay.  This is the last exhibit I will
12  introduce today.  It's Exhibit 26 from the debtor's
13  deposition, and I will direct your attention to -- let me
14  find it.
15         (Thereupon, Debtor's Deposition Exhibit Number 26
16  previously marked was referenced.)
17  BY MS. ARON:
18     Q.  Okay.  On Page 2, do you see there's a wire for
19  $264,000?  Do you see that, Ms. Laviosa?
20     A.  What is that?
21     Q.  This is a document that was produced, I believe, by
22  one of the banks in response to a subpoena.  But do you know
23  anything about this wire?  It's Originator Concept
24  International to the Law Offices of Carillo.  Do you know
25  who Carillo is?

Page 130

1      A.  Yes, I know who he is.
2      Q.  Okay.  And do you know what this wire was for?
3      A.  I don't know what is that.  Carillo -- I suppose it
4  was -- it should be a closing.
5      Q.  Okay.  And there's also -- let me find it.  Okay.
6  Right here on the first page -- sorry, what did you say?
7      A.  You're breaking up.
8      Q.  Okay.  If you look on the first page, second entry
9  from the bottom.  Okay?  There's a wire for $92,400 from
10  Concept International Realty, Inc. to the Law Offices of
11  Carillo & Carillo.  Sitting here today, do you know what
12  this is?  Do you recall?
13     A.  That's -- that's a wire transfer from -- that money
14  belongs to a client.  He was buying a property.  We had the
15  money in escrow and I had to send it to the lawyer for
16  closing.  That money is not -- is not -- doesn't belong to
17  me.
18         MS. ARON:  Okay.  I'd like to take a two-minute
19  break.  I think I'm done, but I want to go through my notes
20  and see if there's anything, and then after that I'll ask
21  any follow-up questions and then we'll be done.  Does that
22  work, Ms. McKeown?
23         MS. MCKEOWN:  Fine.
24         MS. ARON:  Okay.  We'll be back in two minutes.
25  Thank you.

Page 131

1          (Thereupon, a brief recess was taken at 1:14 p.m.,
2  after which the deposition resumed at 1:16 p.m.)
3          MS. ARON:  Okay.  So, I have no further questions
4  for you, Ms. Laviosa.  Thank you for your time.
5          MS. MCKEOWN:  We'll read.
6          MS. ARON:  I will send you the exhibits.
7
   AND FURTHER DEPONENT SAITH NOT.
8
          (Thereupon, formalities having not been
9
   waived, the deposition was concluded at 1:16 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 132

1
                CERTIFICATE OF OATH
2
3  STATE OF FLORIDA      )
                         ) SS
4  COUNTY  OF  MIAMI-DADE)
5      I, Maggie Rubio, RPR, Notary Public in and
6  for the State of Florida at Large, certify that
7  the witness, MARIA ANTONIETA LAVIOSA, personally
8  appeared before me via Zoom Video Conference and was
9  duly sworn pursuant to the COVID-19 Emergency Procedures
10  for the Administering of Oaths Via Remote Audio-Video
11  Communication Equipment dated March 18, 2020.
12      WITNESS my hand and official seal this 17th day
13  of September, 2020.
14
15
16
17              MAGGIE RUBIO
           Notary Public - State of Florida
           Commission No. GG 179907
18         My Commission Expires: April 14, 2022
19
20
21
22
23
24
25

Page 133

1
            REPORTER'S CERTIFICATE
2
3         I, Maggie Rubio, RPR, certify that I was
4    authorized to and did stenographically via Zoom Video
5    Conference report the deposition of MARIA ANTONIETA LAVIOSA
6    the witness herein; that the said witness was duly sworn by
7    me; and that the foregoing pages numbered from 1 to 133
8    inclusive is a true and complete record of my stenographic
9    notes of the deposition by said witness.
10        I further certify that I am not a relative,
11   employee, attorney or counsel of any of the parties, nor am
12   I a relative or employee of any of the parties' attorney or
13   counsel connected with the action.
14        Dated at Miami-Dade County, Florida, this 17th
15   day of September, 2020.
16
17
            MAGGIE RUBIO, RPR
18
19
20
21
22
23
24
25

34 (Page 133)

EXHIBIT "E"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                          Case No.: 19-26521-LMI

ROBERTO ROMAGNOLI                               Chapter 7

      Debtor

_____/

## AFFIDAVIT OF ROBERTO ROMAGNOLI

STATE OF FLORIDA :

COUNTY OF MIAMI-DADE:

    BEFORE ME, the undersigned authority, personally appeared ROBERTO ROMAGNOLI who, being first duly sworn, deposes and states the following:

1.    My name is Roberto Romagnoli and I am over the age of 18 and *sui juris*.  This Affidavit is given in support of *Debtor's Motion for Summary Judgment as to Trustee's Objections to Debtor's Claimed Exemptions* and is based on my own personal knowledge.

2.    The attached Exhibit "1" is a true and correct copy of the "2020 Automatic Residential Renewal Receipt" that I received in the mail from the Miami-Dade County Property Appraiser for my homestead property located at 9401 Collins Avenue, Unit 1103, Surfside, Florida 33154 (the "Homestead Property").  Even though title to the Homestead Property has been held in the name of the Varoma Joint Revocable Living Trust since my wife and I created this estate planning trust in October 2015, the Miami-

Dade County Property Appraiser still applies the homestead exemption to the property and each year sends me a notice of the automatic renewal of my exemptions.

3.     The attached Exhibit "2" is a true and correct copy of a Summary Report from the website of the Miami-Dade County Property Appraiser, which correctly reflects the exemptions applied to my Homestead Property (Save Our Homes Cap, Homestead Exemption and Second Homestead Exemption).  The website of the Miami-Dade County Property Appraiser is located at https://www.miamidade.gov/Apps/PA/propertysearch/#/.

4.     The attached Exhibit "3" is a true and correct copy of the Operating Agreement of Marova, LLC, a limited liability company that my wife and I formed in March 2011. As reflected in the Operating Agreement, my wife and I are the only members of Marova, LLC and we own 100% of Marova, LLC as tenants by the entireties.  My wife and I also are the only managing members of Marova, LLC.  This Operating Agreement is still in effect and to the best of my recollection has never been amended.

FURTHER AFFIANT SAYETH NAUGHT.

_____
ROBERTO ROMAGNOLI

Notary Public State of Florida
Sonia Correa
My Commission GG 055308
Expires 12/15/2020

12-15-20

SWORN AND SUBSCRIBED before me, the undersigned authority, on this 2 day of November, 2020 by Roberto Romagnoli, who is _____ personally known to me, or who has produced _____ as identification.



Notary Public State of Florida
Sonia Correa
My Commission GG 055308
Expires 12/15/2020

_____
Notary Public, State of Florida

My Commission Expires: 12 – 15 – 20

# EXHIBIT
# "1"



**2020 AUTOMATIC RESIDENTIAL RENEWAL RECEIPT**

MIAMI-DADE COUNTY
PROPERTY APPRAISER

**PEDRO J. GARCIA**
**PROPERTY APPRAISER**

---

ROBERTO ROMAGNOLI TRS
VAROMA JOINT REV LIVING TRUST
9401 COLLINS AVE APT 1103
SURFSIDE, FL 33154

**Folio:** 14-2235-046-0310
**Property:** 9401 COLLINS AVE PH1103
**Legal:** AZURE CONDO
UNIT PH1103
UNDIV 1.29947000%

**Mail Date:** December 27, 2019

---

### AUTOMATIC RENEWAL OF EXEMPTION(S)*

Please review the following 2019 exemption(s) for the above property. If you are still eligible for these exemption(s) in 2020, you DO NOT NEED to take any further action. RETAIN THIS DOCUMENT FOR YOUR RECORDS AS YOUR 2020 RENEWAL RECEIPT. If the Automatic Renewal Receipt contains any errors, please contact the Property Appraiser's Office immediately at 305-375-4712. Please note that if any errors are reflected in this receipt, entitlement to exemption(s) will be determined in accordance with State Law. This automatic exemption renewal is only valid for the following person(s):

**Homestead Exemption:** Roberto Romagnoli

**\*NOTICE:**     If you are the new owner of this property, this renewal receipt is <u>VOID and you must file an original application for this property by **March 2, 2020**, in order to receive the exemption.</u>

**\*IMPORTANT:**  If this property or any portion thereof, is rented you may be committing homestead fraud and you must notify this office. Failure to do so may subject you to 50% penalty and 15% interest per year up to 10 years!

---

**TO CANCEL EXEMPTIONS, COMPLETE THIS SECTION** (Check applicable exemption(s), sign where indicated, keep a copy for your records, and return this entire page with a copy of your valid Driver's License or State ID)

As of January 1, 2020, I no longer qualify for (check applicable):

☐ **HOMESTEAD EXEMPTION** because the above property was not my permanent residence

☐ $500 Widow/Widower                   ☐ $500 Civilian Disability              ☐ $500 Blind Disability

☐ Total & Permanent Quadriplegic    ☐ $5,000 Veteran Disability         ☐ Veteran Abatement

☐ Veteran Total & Permanent Disability        ☐ Surviving Spouse of Total & Permanent Disabled Veteran

☐ Totally & Permanently Disabled First Responder    ☐ Surviving Spouses of First Responder Who Died In the Line of Duty

☐ Assessment Reduction for living Quarters of Parents or Grandparents

**Please remove the above exemption(s) from my property:**

_____          _____          _____
**Signature**   (Include a copy of your driver's license or state ID)          **Date**          **Phone Number**

Mail To: **Miami-Dade Property Appraiser's Office**
**P.O. Box 013140**
**Miami, FL 33101-3140**

---

**SEE REVERSE SIDE FOR ADDITIONAL INFORMATION**

MDPA-500ARE
REV. 10/2018

# EXHIBIT
## "2"

 **OFFICE OF THE PROPERTY APPRAISER**

## Summary Report

Generated On : 8/11/2020

| Property Information | |
|---|---|
| **Folio:** | 14-2235-046-0310 |
| **Property Address:** | 9401 COLLINS AVE   UNIT: PH1103<br>Surfside, FL 33154-2610 |
| **Owner** | ROBERTO ROMAGNOLI TRS<br>VAROMA JOINT REV LIVING<br>TRUST<br>MARIA ANTOINETA LAVIOSA TRS |
| **Mailing Address** | 9401 COLLINS AVE APT 1103<br>SURFSIDE, FL 33154 USA |
| **PA Primary Zone** | 5000 HOTELS & MOTELS -<br>GENERAL |
| **Primary Land Use** | 0407 RESIDENTIAL - TOTAL VALUE<br>: CONDOMINIUM - RESIDENTIAL |
| **Beds / Baths / Half** | 3/3/0 |
| **Floors** | 0 |
| **Living Units** | 1 |
| **Actual Area** | Sq.Ft |
| **Living Area** | 1,910 Sq.Ft |
| **Adjusted Area** | 1,910 Sq.Ft |
| **Lot Size** | 0 Sq.Ft |
| **Year Built** | 2005 |

| Assessment Information | | | |
|---|---|---|---|
| Year | 2020 | 2019 | 2018 |
| **Land Value** | $0 | $0 | $0 |
| **Building Value** | $0 | $0 | $0 |
| **XF Value** | $0 | $0 | $0 |
| **Market Value** | $982,008 | $1,067,400 | $1,062,091 |
| **Assessed Value** | $700,492 | $684,743 | $671,976 |

| Benefits Information | | | | |
|---|---|---|---|---|
| Benefit | Type | 2020 | 2019 | 2018 |
| **Save Our Homes Cap** | Assessment Reduction | $281,516 | $382,657 | $390,115 |
| **Homestead** | Exemption | $25,000 | $25,000 | $25,000 |
| **Second Homestead** | Exemption | $25,000 | $25,000 | $25,000 |

Note: Not all benefits are applicable to all Taxable Values (i.e. County, School Board, City, Regional).

| Short Legal Description |
|---|
| AZURE CONDO |
| UNIT PH1103 |
| UNDIV 1.29947000% |
| INT IN COMMON ELEMENTS |
| OFF REC 23738-0743 |



| Taxable Value Information | | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| **County** | | | |
| Exemption Value | $50,000 | $50,000 | $50,000 |
| Taxable Value | $650,492 | $634,743 | $621,976 |
| **School Board** | | | |
| Exemption Value | $25,000 | $25,000 | $25,000 |
| Taxable Value | $675,492 | $659,743 | $646,976 |
| **City** | | | |
| Exemption Value | $50,000 | $50,000 | $50,000 |
| Taxable Value | $650,492 | $634,743 | $621,976 |
| **Regional** | | | |
| Exemption Value | $50,000 | $50,000 | $50,000 |
| Taxable Value | $650,492 | $634,743 | $621,976 |

| Sales Information | | | |
|---|---|---|---|
| Previous Sale | Price | OR Book-Page | Qualification Description |
| 10/14/2015 | $100 | 29817-0270 | Corrective, tax or QCD; min consideration |
| 12/01/2005 | $605,000 | 24032-2166 | Sales which are qualified |

The Office of the Property Appraiser is continually edi ing and updating the tax roll. This website may not reflect the most current information on record. The Property Appraiser and Miami-Dade County assumes no liability, see full disclaimer and User Agreement at http://www.miamidade.gov/info/disclaimer.asp

Version:

# EXHIBIT "3"

# OPERATING AGREEMENT FOR MANAGEMENT

## MAROVA, LLC

THIS AGREEMENT, is made this __11th__ day of ___March___, 20_11__ between Marova, LLC and the members (as hereinafter defined) of said Limited Liability Company, for the purpose set forth herein:

RECITALS:

WHEREAS, the Articles of Organization of Marova, LLC permit the election/appointment/designation of manager(s)/managing member(s) in accordance with Florida Statute 608.404(8); and

WHEREAS, Marova, LLC and manager(s)/managing member(s) desire to set forth the terms and provisions of the management of Marova, LLC in accordance with Florida Statutes 608.422.

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, it is agreed as follows:

1. Marova, LLC retains the hereinafter named person(s) as manager(s)/managing member(s) for this Limited Liability Company.

2. The compensation terms for the services of the within manager(s)/managing member(s) are as follows:

_____

_____

_____

3. The manager(s)/managing member(s) are retained/appointed/designated to perform the following:

(a) Manage the day to day affairs of Marova, LLC, subject to the restrictions limitations and instructions as may be agreed upon by the members of Marova, LLC.

(b) Adopt, amended and/or repeal regulations of Marova, LLC in accordance with Florida Statute.

(c) Enter into contracts and agreements, incur debt or exercise the powers of Marova, LLC necessary for the management of Marova, LLC business, except as may be otherwise restricted or

provided by agreement of the members of Marova, LLC.

(d) _____

_____

_____

**4.** The term of this agreement shall expire at the annual meeting of members unless the manager(s)/managing member(s) resign, or removed or otherwise cease serving as manager(s)/managing member(s) and successors thereto are appointed/elected by the members.

**5.** The operation of Marova, LLC will be conducted in accordance with the provisions of this agreement.

## FURTHER PROVISIONS REGARDING THE LIMITED LIABILITY COMPANY

### I. DEFINITIONS

For purposes of this operating agreement, the following terms are defined as follows:

**Section 1. Articles of Organization.** As used throughout this operating agreement, this term is defined as the document creating Marova, LLC pursuant to Florida Statute 608.407.

**Section 2. Capital Account.** As used throughout this operating agreement, this term is defined as the agreed value of the initial contributions, increased by amounts subsequently contributed to capital and reduced by distributions as set forth in Florida Statute 608.402(6).

**Section 3. Limited Liability Company.** As used throughout this operating agreement, this term is defined as the entity herein created in accordance with Florida Statutes Chapter 608 et. seq.

**Section 4. Manager(s).** As used throughout this operating agreement, this term is defined as the persons who are elected or appointed pursuant to the Articles of Organization or by this operating agreement of Marova, LLC to manage the affairs of this entity pursuant to Florida Statutes 608.422 and 608.4225. The manager(s) are designated/appointed as follows:

_____

_____

_____

_____

_____

_____

**Section 5. Managing Member(s).** As used throughout this operating agreement, this term is defined as the member(s) appointed or elected by the members of Marova, LLC to manage this entity as set forth in Florida Statue 608.402(20). The managing member(s) are designated/appointed as follows:

FLMINI C

Roberto Romagnoli & Maria Antonieta Laviosa

_____

_____

_____

_____

_____

**Section 6.  Majority Relative Capital Account Vote.**  As used throughout this operating agreement, this term is defined as the vote of members of Marova, LLC, entitled to vote, who together hold relative capital accounts (as that term is defined under Florida Statue 608.402(17)) in excess of fifty per cent (50%) of the total the capital accounts of all members.

**Section 7. Member(s).**  As used throughout this operating agreement, this term is defined as any person who has an equity interest in Marova, LLC represented by a capital account as set forth in Florida Statute 608.402(21).  The member(s) are defined as follows:

Roberto Romagnoli & Maria Antonieta Laviosa-Tenant by Entirety  100%

_____

_____

_____

_____

_____

**Section 8. Member's Promise to Contribute.**  As used throughout this operating agreement, this term is defined as a promise by a member to contribute to  Marova, LLC which is set forth in writing and signed by the said member, pursuant to Florida Statute 608.4211(2).

**Section 9.  Operating Agreement.**  As used throughout this operating agreement, this term is defined as the written provisions set forth herein which are adopted for the management and operating agreement of the affairs of Marova, LLC and which set forth the relationships of the members as set forth in Florida Statute 608.402(24).

**Section 10.  Relative Capital Account.**  As used throughout this operating agreement, this term is defined with respect to a member, the ratio, the numerator of which is the capital account of that member and the denominator of which is total of the capital account of all members as set forth in Florida Statue 608.402(6).

## II. MEETINGS OF MEMBERS

**Section 1. Annual Meeting.**  The annual membership meeting of  Marova, LLC will be held on

FLMINLC

the _____ day of _____ _____, of each year or at such other time and place as designated by the managing members(s) (or manager(s) as applicable) of Marova, LLC provided that if said day falls on a Sunday or legal holiday, then the meeting will be held on the first business day thereafter.  Business transacted at said meeting may include the election/appointment/designation of manager(s)/managing member(s) of Marova, LLC.

  **Section 2.  Special Meetings.**  Special meetings of the member(s) will be held when directed by a member(s), manager(s) or managing member(s) provided that said person(s) sign, date and deliver to Marova, LLC's managing member(s) (or manager(s) if applicable) one or more written demands for the meeting describing the purposes(s) for which it is to be held.  A meeting so requested will be called for a date not less than 10 nor more than 60 days after the request is made, unless the member (or manager(s) or managing member(s)) requesting the meeting designates a later date.  The call for the meeting will be made by the member(s), manager(s) or managing member(s) initiating the request.

  **Section 3. Place.**  Meetings will be held at the principal place of business of Marova, LLC or at such other place as is designated by the members.

  **Section 4.  Record Date and List of Members.**  The members of Marova, LLC shall fix the record date; however, in no event may a record date fixed by the members be a date prior to the date on which the resolution fixing the record date is adopted.

  After fixing a record date for a meeting, the member(s) (manager(s) or managing member(s), if applicable) shall prepare an alphabetical list of the names of all the Marova, LLC's members who are entitled to notice of a meeting, arranged by name with the address and relative capital account of each member.  Said list shall be available for inspection in accordance with Florida law.

  **Section 5.  Notice.**  Written notice stating the place, day and hour of the meeting, and the purpose(s) for which said special meeting is called, will be delivered not less than 10 nor more than 60 days before the meeting, either personally or by first class mail, by or at the direction of managing member(s) (or manager(s) if applicable) calling the meeting to each member of record entitled to vote at such meeting.  If mailed, such notice will be deemed to be effective when deposited in the United States mail and addressed to the member at the member's address as it appears on the membership Ledger of Marova, LLC, with postage thereon prepaid.

  Marova, LLC shall notify each member, entitled to a vote at the meeting, of the date, time and place of each annual and special meeting no fewer than 10 or more than 60 days before the meeting date.  Notice of a special meeting shall describe the purpose(s) for which the meeting is called.  A member may waive any notice required hereunder either before or after the date and time stated in the notice;

however, the waiver must be in writing, signed by the member entitled to the notice and be delivered to Marova, LLC for inclusion in the minutes of Marova, LLC.

**Section 6.  Notice of Adjourned Meeting.**  When a meeting is adjourned to another time or place, it will not be necessary to give any notice of the adjourned meeting provided that the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken. At such an adjourned meeting, any business may be transacted that might have been transacted on the original date of the meeting. If, however, a new record date for the adjourned meeting is made or is required, then, a notice of the adjourned meeting will be given on the new record date as provided in this Article to each member of record entitled to notice of such meeting.

**Section 7. Member Quorum and Voting.**  Members representing more that 50% of the relative capital accounts of Marova, LLC, represented in person or by proxy, will constitute a quorum at a meeting of members.

If a quorum, is present as herein defined, a Majority Relative Capital Account Vote represented at the meeting will be the act of the members unless otherwise provided by law.

**Section 8.  Voting by Members.**  All members of Marova, LLC are entitled to vote on matters relating to Marova, LLC except to the extent otherwise provided in the Articles of Organization or in this Operating Agreement. Each member's vote shall be weighted in proportion to the member's relative capital account; however, if the capital account of each member is negative or zero, each member shall have one vote. Any manager who is not a member shall not be entitled to vote on matters relating to Marova, LLC, except to the extent otherwise provided in the Articles of Organization or in this operating agreement.

**Section 9.  Proxies.**  A member may vote either in person or by proxy provided that any and all proxies are executed in writing by the member or his duly authorized attorney-in-fact. No proxy will be valid after the duration of 11 months from the date thereof unless otherwise provided in the proxy.

**Section 10.  Action by Members Without a Meeting.**  Any action required or permitted by law, this operating agreement, or the Articles of Organization of Marova, LLC to be taken at any annual or special meeting of members may be taken without a meeting, without prior notice and without a vote, provided that the action is taken by the members constituting a Majority Relative Capital Account Vote. The foregoing actions(s) shall be evidenced by written consents describing the action taken, dated and signed by members constituting a Majority Relative Capital Account Vote and delivered to Marova, LLC in accordance with Florida law. Within 10 days after obtaining such authorization by written consent, notice shall be given to those members who have not consented in writing or who are not

5 of 13

entitled to vote. Said notice shall fairly summarize the material features of the authorized action.

### III.  MANAGEMENT

**Section 1:  Management of Limited Liability Company.**  Unless otherwise provided in the Articles of Organization or in this operating agreement, the management of Marova, LLC shall be vested in the members in proportion to the members' contributions to the capital of Marova, LLC, as adjusted from time to time to properly reflect any additional contributions or withdrawals by the members.

If the Articles of Organization or this operating agreement provide for the management of Marova, LLC by a manager(s) or managing member(s), said manager(s) or managing member(s) shall be elected annually by the members in the manner prescribed by this operating agreement.  Such manager(s) or managing member(s) shall hold the offices and have responsibilities accorded to them by the members and set out in the Articles of Organization or this operating agreement of Marova, LLC. The manager(s) or managing member(s) of  Marova, LLC shall discharge said person(s)' duties , including duties as a committee member in accordance with Florida Statute 608.4225.

### Section 2:  Liability of Managers, Managing Members and Members.

Neither the members of  Marova, LLC nor the managers or managing members are liable under a judgment, decree or order of a court or in any other manner, for a debt, obligation or liability of Marova, LLC, except as provided in Florida Statutes 608 et. seq.  Notwithstanding the foregoing, the manager(s) and/or managing member(s) of Marova, LLC may be found liable to the extent set forth in Florida Statute 608.4362.

### IV.  MANAGING MEMBER(S) OR MEMBER(S)

**Section 1.  Function.**  All limited liability company powers, business, and affairs will be exercised, managed and directed by  Marova, LLC's _____

_____.

**Section 2. Qualification.**  Managing member(s) (or manager(s) if applicable) must be natural persons of 18 years of age or older but need not be residents of this state and need not be members of Marova, LLC.  Managing member(s) must be member(s) of  Marova, LLC; however, if manager(s) are utilized, manager(s) need not be member(s) of  Marova, LLC.

**Section 3. Compensation.**  The member(s) will have authority to fix the compensation (if any) for the manager(s) and/or managing member(s) of  Marova, LLC.

**Section 4.  Number.**  If managing member(s) are used by  Marova, LLC, the number of managing member(s) will be as set forth hereafter.  If manager(s) are used by  Marova, LLC, the number

FLMINLC

of manager(s) will be as set forth hereafter.  Said number is   **2**   .

**Section 5.  Election and Term.**  Each person named in the Articles of Organization as a managing member(s) or manager(s) will hold office until the first annual meeting of member, or until the earlier resignation, removal or death of said managing member(s) or manager(s).

At the first annual meeting of members and at each annual meeting thereafter, the members will elect managing member(s) (or manager(s), if applicable) to serve until the next annual member meeting, prior resignation, removal or death.

**Section 6.  Vacancies.**  Any vacancy occurring in the managing member(s) (or manager(s) if applicable) will be filled by a Majority Relative Capital Account Vote.  A managing member or manager so elected to fill a vacancy will hold office only until the next annual meeting of members.

**Section 7.  Removal and Resignation of Managers.**  At a meeting of managers called expressly for that purpose, any managing member(s) (or manager(s) if applicable) may be removed by a Majority Relative Capital Account Vote.  Managing member(s) (or manager(s) if applicable) may resign at any time by delivering written notice to the members of Marova, LLC.  Such a resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

## V.  MEMBERSHIP CERTIFICATES

**Section 1.  Issuance.**  Every member in  Marova, LLC will be entitled to have a certificate representing said member's interest in the limited liability company.  No certificate representing such membership will be issued until the respective member has fully paid the initial capital contribution applicable for said member.

**Section 2.  Form.**  Certificates representing membership in  Marova, LLC will be signed by the managing member(s) (or manager(s) if applicable) and will be sealed with the seal of  Marova, LLC.

**Section 3. Admission and Transferability of Membership.**  Unless otherwise provided in the Articles of Organization or in this operating agreement, a member's interest in  Marova, LLC is not assignable in whole or in part, unless a majority of the non assigning members consent to this assignment.  Thus, an assignee of an interest in a limited liability company may not become a member unless all other members consent.  As assignee who has become a member has, to the extent assigned, the rights and powers, and is subject to the restrictions and liabilities, of a member under the Articles of Organization, this operating agreement and Florida law.   An assignee who becomes a member also is liable for the obligations of his assignor to make and return contributions as provided under Florida Statutes 608.421 and 608.428; however, the assignee is not obligated for liabilities which are unknown to the assignee at the time he became a member and which could not be ascertained  this operating

agreement hereof. If an assignee of an interest in Marova, LLC becomes a member, the assignor is nor released from liability to the limited liability company under Florida Statutes 608.4211, 608.426 and 608.4362. As assignment of a member's interest in Marova, LLC does not dissolve the limited liability company or entitle the assignee to become or to exercise any rights or powers of a member. An assignment entitles the assignees to share in the profits and losses of Marova, LLC, to receive such distribution(s) and to receive such allocation of income, gain, loss deduction or credit or similar item to which the assignor was entitled, to the extent assigned. A member ceases to be a member and ceases to have the power(s) to exercise of a member upon assignment of his entire interest in Marova, LLC.

If an individual member dies or is adjudged incompetent to manage his person or his property by a court of competent jurisdiction, the member's legal representative may exercise all the member's rights for the purpose of settling such member's estate or administering such member's property, including any power the member had to give an assignee the right to become a member. If a non-individual member is dissolved or terminated, the powers of that member may be exercised by its legal representative or successor.

No person may be admitted as a member unless each member consents in writing to the admission of the additional member, unless otherwise provided in the Articles of Organization or in this operating agreement.

**Section 4. Lost, Stolen, or Destroyed Certificates.** If a member claims that a membership certificate issued and recorded by Marova, LLC has been lost or destroyed, a new certificate will be issued to said member, provided that said member presents an affidavit claiming the said certificate to be lost, stolen or destroyed. At the discretion of the managing member(s) (or manager(s), if applicable), said member may be required to deposit a bond or other indemnity in such amount and with such sureties, if any, as the members may require.

## VI. BOOKS AND RECORDS

**Section 1. Books and Records.** Marova, LLC shall keep as permanent records the following:

(a) Current list of the full names and last known business addresses of all members;

(b) Copy of the articles of organization and all certificates of amendments thereto, together with executed copies of any powers of attorney pursuant to which any certificate was executed;

(c) Copies of Marova, LLC's federal, state and local income tax returns and reports, if any, for the three (3) most recent years;

(d) Copies of any effective operating agreement and financial statements of Marova, LLC for the three (3) most recent years;

FLMINLC

(e) Unless contained in the articles of organization or the operating agreement, a writing setting forth:

(i) The amount of cash and a description and statement of the agreed value of the other property or services contributed by each member and which each member has agreed to contribute;

(ii) The times at which or events on the happening of which any additional contributions agreed to be made by each member are to be made;

(iii) Any events upon the happening of which the limited liability company is to be dissolved and its affairs wound up."

**Section 2. Member's Inspection Rights.** A member of Marova, LLC (including a beneficial owner whose interest are held in a trust or a nominee on behalf of a beneficial owner) may inspect and copy, during regular business hours at Marova, LLC's principal office, any of Marova, LLC records required to be kept pursuant to Section 1, of this Article of these operating agreement, if said member gives Marova, LLC written notice of such demand at least 5 business days before the date on which the member wishes to inspect and copy. The foregoing right of inspection is subject however to such other restrictions as are applicable under Florida law, including, but not limited to, the inspection of certain records being permitted only if the demand for inspection is made in good faith and for a proper purpose (as well as the member describing with reasonable particularity the purpose and records desired to be inspected and such records are directly connected with the purpose).

**Section 3. Other Reports to Members.** Marova, LLC shall report any indemnification or advanced expenses to any managing member, manager, employee, or agent (for indemnification relating to litigation or threatened litigation) in writing to the members with or before the notice of the next members' meeting, or prior to such meeting if the indemnification or advance occurs after the giving of such notice but prior to the time such meeting is held, which report shall include a statement specifying the persons paid, the amounts paid, and the nature and status, at the time of such payment, of the litigation or threatened litigation.

## VII. CONTRIBUTIONS

**Section 1. Contributions by Members.** The contribution of a member may be in cash, property or services rendered or a promissory note or other obligation to contribute cash or property or to perform services as set forth in Florida Statute 608.4211. A member is obligated to Marova, LLC to perform any enforceable promise to contribute cash or property or services, even if he is unable to perform because of his death, disability or any other reason. If a member does not make the required contribution of property or services, he is obligated at the option of Marova, LLC to contribute cash

FLMINLC

equal to that portion of the value, as stated in the records of Marova, LLC of the stated contribution that have not been made. The obligation of a member to make a contribution or return money or other property paid or distributed in violation of these operating agreements or of Chapter 608, Florida Statutes, may be compromised only by consent of all the members.

**Section 2. Failure to Make Contributions.** Any member who fails to make any contribution which said member is obligated to make shall be subject to the following penalties or consequences as may be determined by the non-defaulting members:

(i) The defaulting member's proportionate interest in Marova, LLC may be reduced;

(ii) The defaulting member's interest may be subordinated to the interest(s) of the non-defaulting members;

(iii) The defaulting member's interest may be subjected to forced sale;

(iv) The defaulting member's interest may be forfeited;

(v) The loan by the non-defaulting members to the defaulting member of the amount necessary to meet the defaulting member's commitment on such terms as may be reasonable and proper;

(vi) The fixing of the value of the defaulting member's interest in Marova, LLC by appraisal or by formula and redemption or sale of such interest at such value; and/or

(vii) Such other penalties and/or consequences as may be determined to be fair and reasonable, under the circumstances.

## VIII. DISTRIBUTIONS

Marova, LLC may from time to time distribute its property to its members in accordance with this operating agreement, except that no distribution may be made if after the distribution Marova, LLC would not be able to pay its debts as they become due in the usual course of business, or Marova, LLC's total assets would be less than the sum of its total liabilities (except liabilities to members on account of their contributions, unless otherwise provided in the Articles of Organization). The distributions, when made, must be allocated on the basis of each member's relative capital account. The managing member(s) (or manager(s) if applicable) may base a determination that a distribution is proper either on financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances. In the case of any distribution based upon such valuation, each such distribution shall be identified as a distribution based upon a current valuation of assets, and the amount distributed shall be disclosed to the receiving members concurrent with their receipt of the distribution.

## IX. SHARING OF PROFITS AND LOSSES

10 of 13

FLMINLC

The profits and losses of Marova, LLC shall be allocated among the members on the basis of each member's relative capital accounts.

## X.  WITHDRAW/REDUCTION OF CAPITAL CONTRIBUTIONS

A member may withdraw from Marova, LLC upon not less than six (6) months' prior written notice on each non withdrawing member at the records for each such non withdrawing member appearing on Marova, LLC's records.  Upon withdrawal, a withdrawing member is entitled to receive any distribution to which he is entitled under the Articles of Organization and the within operating agreement hereunder.  At the minimum, the withdrawing member is entitled to receive the balance of such member's capital account within a reasonable time after withdrawal; however, such a withdrawing member may not receive a distribution from Marova, LLC to the extent that after giving effect to the distribution, all liabilities of  Marova, LLC (other than liabilities to members on account of their ownership interests) exceed the value of Marova, LLC's assets.  Irrespective of the nature of a member's contribution, a member has only the right to demand and receive cash in return for such member's contribution to capital.  If a member receives the return of any part of such member's contribution, such member is subject to potential liability for and in the amount set forth in Florida Statute 608.428.

## XI.  LIMITED LIABILITY COMPANY SEAL

The manager(s)/managing member(s) will provide a limited liability company seal which will be in circular form embossing in nature and stating "Limited Liability Company Seal", "Florida", year of organization and name of  Marova, LLC.

## XII.  ADOPTION, ALTERATION, AND REPEAL OF OPERATING AGREEMENT

The power to adopt, alter, or repeal provisions of this operating agreement of  Marova, LLC shall be vested in the members of the company (unless vested in the manager(s) or in the managing member(s) by the Articles of Organization) provisions of this operating agreement adopted by the members (or manager(s)/managing member(s) if applicable) may be repealed or altered; new provisions of this operating agreement may be adopted; and the members may prescribe in any regulations that such operating agreement may not be altered, amended or repealed by the manager(s)/managing member(s). The operating agreement may contain any provisions for the provisions of this operating agreement and management of the affairs of  Marova, LLC which are consistent with law and the Articles of Organization.

If the management of  Marova, LLC is vested in a manager(s) or managing member(s), the manager(s) (or managing member(s) if applicable) may adopt provisions of this operating agreements to be effective only in an emergency.  An emergency exists if Marova, LLC's manager(s) (or managing

FLMINLC

member(s) if applicable) cannot readily be assembled because of some catastrophic event. The emergency provisions of this operating agreement, which are subject to amendment or repeal by the members, may make all provisions necessary for managing Marova, LLC during an emergency, including procedures for calling a meeting of the manager(s) (or managing member(s) if applicable) and designation of additional or substitute manager(s) (or managing member(s) if applicable). All provisions of the regular operating agreement consistent with the emergency provisions of this operating agreement remain effective during the emergency. The emergency provisions of this operating agreement are not effective after the emergency ends. Actions taken by Marova, LLC in good faith in accordance with the emergency operating agreement have the effect of binding the company and may not be used to impose liability on a manager(s), managing member(s) (if applicable), employee, or agent(s) of the company.

FI.MINLC

Year 2011

**IN WITNESS WHEREOF,** the parties have exacted this agreement on the year and date above written.

Manager(s)/Managing Member(s)/Member(s):

Marova, LLC

_____
MANAGER/MANAGING MEMBER

_____
MANAGER/MANAGING MEMBER

_____
MANAGER/MANAGING MEMBER

_____
MANAGER/MANAGING MEMBER

_____
MANAGER/MANAGING MEMBER

_____
MEMBER

_____
MEMBER

_____
MEMBER

_____
MEMBER

_____
MEMBER

13 of 13

FLMINLC

EXHIBIT "F"

CFN: 20170393475 BOOK 30607 PAGE 4050
DATE:07/11/2017  02:13:29 PM
DEED DOC 1,853.40
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

This instrument prepared by, or under the supervision of (and after recording, return to):

Gary A. Saul, Esq.
Greenberg Traurig, P.A.
333 Avenue of the Americas (333 SE 2ⁿ Avenue)
Miami, FL 33131

Parcel ID No.: 01-4138-163-2020

(Reserved for Clerk of Court)

SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED is made and entered into as of the 7 day of July, 20 17 by 9SMA West, L.L.C., a Delaware limited liability company, Grantor, whose office address is at 315 S. Biscayne Boulevard, 3rd Floor, Miami, Florida 33131, to **Maria Antonieta Laviosa and Roberto Romagnoli**, wife and husband, Grantee, whose mailing address is 55 SW 9 Street, Unit **1607**, Miami, Florida 33130. Wherever used herein, the terms "Grantor" and "Grantee" shall include all of the parties to this instrument and their heirs, legal representatives and assigns.

W I T N E S S E T H:

GRANTOR, for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained and sold, and by these presents does hereby grant, bargain and sell to Grantee, the following described land situate and being in Miami-Dade County, Florida (the "Property"):

Condominium Parcel No. **1607** of **BRICKELL HEIGHTS WEST CONDOMINIUM**, according to the Declaration of Condominium thereof, recorded November 17, 2014 in Official Records Book 29392, at Page 4849, as amended in Official Records Book 29470, Page 4525, as amended in Official Records Book 30423, Page 1004, as further amended in Official Records Book 30562, Page 2634, of the Public Records of Miami-Dade County, Florida, as amended and/or supplemented from time to time, together with an undivided interest in the common elements appurtenant thereto.

TOGETHER WITH all the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining.

THIS CONVEYANCE is subject to: taxes and assessments for 2017 and all subsequent years; zoning ordinances, restrictions, prohibitions and other requirements imposed by governmental authority; conditions, restrictions, reservations, limitations and easements of record, if any, but this reference shall not operate to reimpose same; and restrictions, conditions, covenants, liens, terms and limitations set forth in (i) the Declaration of Condominium referenced above and all exhibits thereto, all as amended or modified from time to time (the "Declaration of Condominium"), and (ii) the Declaration of Covenants, Restrictions and Easements for Brickell Heights recorded February 3, 2014 in Official Records Book 29015, Page 1788, as amended in Official Records Book 29161, Page 0632, as amended in Official Records Book 29381, Page 1023, as further amended in Official Records Book 30562, Page 2475, and as affected by Collateral Assignment of

*MIA 185949460v1*

CFN: 20170393475 BOOK 30607 PAGE 4051

(Reserved for Clerk of Court)

Declarants Rights recorded in Official Records Book 29565, Page 3400, of the Public Records of Miami-Dade County, Florida, all as amended and/or supplemented from time to time (the "Master Covenants").

GRANTOR hereby warrants the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor.

IN WITNESS WHEREOF, Grantor has hereunto set its hand and seal as of the day and year first above written.

Witnessed by:

Name: Sheila Lorenzo

Name: Priscilla Rivas

9SMA West, L.L.C., a Delaware limited liability company

By:

Jon Paul Perez, Project Manager

STATE OF FLORIDA    )
                     ) SS
COUNTY OF MIAMI-DADE )

The foregoing instrument was acknowledged before me this 20 day of June, 2017 by Jon Paul Perez, as Project Manager of 9SMA West, L.L.C., a Delaware limited liability company, on behalf of said entity. He is personally known to me or produced _____ as identification.



VICTORIA DELGADO
MY COMMISSION #FF094501
EXPIRES February 20, 2018
My commission ex... FloridaNotaryService.com
(407) 398-0153

Name: Victoria Delgado
Notary Public, State of Florida
Commission No. FF094501

MIA 185828888v1

EXHIBIT "G"

04/29/2016 07:44 AM  Page 1 of 2
Rec Fee: $18.50
Deed Doc Tax: $0.70
Mortgage Doc Tax: $0.00
Intangible Tax: $0.00
Martha O. Haynie, Comptroller
Orange County, FL
Ret To: CSC INC

This Document Prepared By and Return to:
Jonathan Pelley
Pinnacle Title Services
10691 N KENDALL DRIVE, SUITE 106
MIAMI, FL 33176

Parcel ID Number:  01-24-27-7140-00640

# Quitclaim Deed

This Quitclaim Deed, Made this 22nd day of April, 2016 A.D., Between
Roberto Romagnoli and Maria Antonieta Laviosa as Trustees, or their
successors in interest, of The Varoma Joint Revocable Living Trust,
under agreement dated Oct. 14, 2015
of the County of Miami, State of Florida, grantor, and
ROBERTO ROMAGNOLI and MARIA ANTONIETA LAVIOSA, HUSBAND AND WIFE
whose address is: 9401 COLLINS AVE, APT 1103, SURFSIDE, FL 33154
of the County of MIAMI-DADE, State of Florida, grantees.

Witnesseth  that the GRANTOR, for and in consideration of the sum of
---------------------------TEN DOLLARS ($10)------------------------- DOLLARS,
and other good and valuable consideration to GRANTOR in hand paid by GRANTEES, the receipt whereof is hereby acknowledged, has
granted, bargained and quitclaimed to the said GRANTEES and GRANTEES' heirs, successors and assigns forever, the following described
land, situate, lying and being in the County of Orange State of Florida to wit:
Lot 64, Royal Legacy Estates, according to the map or plat thereof, as
recorded in Plat Book 81, Page(s) 125 through 129, inclusive, of the
Public Records of Orange County, Florida.

To Have and to Hold the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and
all the estate, right, title, interest, lien, equity and claim whatsoever of grantor, either in law or equity, for the use, benefit and profit of the said
grantees forever.

160390A

# Quitclaim Deed - Page 2

Parcel ID Number:  01-24-27-7140-00640

**In Witness Whereof,** the grantor has hereunto set its hand and seal the day and year first above written.

Signed, sealed and delivered in our presence:

Roberto Romagnoli and Maria Antonieta
Laviosa as Trustees, or their
successors in interest, of The Varoma
Joint Revocable Living Trust, und

By: _____ (Seal)

Printed Name: JONATHAN PELLEY
Witness

ROBERTO ROMAGNOLI
INDIVIDUALLY AND AS TRUSTEE,
P.O. Address:

By: _____ (Seal)

Printed Name: C BLANCO
Witness

MARIA ANTONIETA LAVIOSA
INDIVIDUALLY AND AS TRUSTEE
P.O. Address:

STATE OF    Florida
COUNTY OF  MIAMI-DADE

The foregoing instrument was acknowledged before me this  **22nd**  day of  **April**  , 2016  by
**ROBERTO ROMAGNOLI, INDIVIDUALLY AND AS TRUSTEE** and **MARIA ANTONIETA**
**LAVIOSA, INDIVIDUALLY AND AS TRUSTEE** on behalf of said Florida trust
who are personally known to me or who have produced their **Florida driver's license** as identification.

JONATHAN PELLEY
Commission # FF 232111
Expires July 6, 2019
Bonded Thru Troy Fain Insurance 800-385-7019

Printed Name:
Notary Public
My Commission Expires:

Laser Generated by © Display Systems, Inc., 2016  (863) 763-5555 Form FLQCD-2

EXHIBIT "H"

DOC # 20150263674  B: 10924 P: 3966
05/27/2015 10:56 AM  Page 1 of 2
Rec Fee: $18.50
Deed Doc Tax: $2,902.90
Mortgage Doc Tax: $0.00
Intangible Tax: $0.00
Martha O. Haynie, Comptroller
Orange County, FL
Ret To: SIMPLIFILE LC

**Prepared By:**
PGP Title of Florida, Inc. dba PGP Title
Attn: Tracy Minerley
4901 Vineland Road, Suite 500
Orlando, FL 32811

**Return To:**
PGP Branch Support Center

2728 N. Harwood, 3rd Floor
Dallas, TX 75201

File No.: FL-070509

Property Appraiser's Parcel I.D. (folio) No.:
01-24-27-7140-00640

## SPECIAL WARRANTY DEED



THIS SPECIAL WARRANTY DEED made this May 22, 2015 by Pulte Home Corporation, a Michigan corporation existing under the laws of Michigan, and having its principal place of business at 4901 Vineland Road, Suite 500, Orlando, FL 32811 (the "Grantor"), and Roberto Romagnoli and Maria Antonieta Laviosa, husband and wife having a mailing address of 9401 Collins Ave Apt 1103, Surfside, FL 33154, (the "Grantee"):

(Which terms "Grantor" and "Grantee" shall include singular and plural, corporation or individual, and either sex, and shall include heirs, legal representatives, successors and assigns of the same)

WITNESSETH:  That the Grantor, for and in consideration of the sum of TEN and No Dollars ($10.00) and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold, remised, released, conveyed and confirmed unto the Grantee, its successors and assigns forever, following described land situated in County of Orange, State of Florida, to-wit:

Lot 64, ROYAL LEGACY ESTATES, according to the plat thereof, as recorded in Plat Book 81, Page(s) 125 through 129, Public Records of Orange County, Florida.

SUBJECT, however, to all reservations, covenants, conditions, restrictions and easements of record and to all applicable zoning ordinances and/or restrictions or requirements imposed by governmental authorities, if any.

TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in any wise appertaining.

TO HAVE AND TO HOLD the same in Fee Simple forever.

AND the Grantor hereby covenants with said Grantee that the Grantor is lawfully seized of said land in fee simple; that the Grantor has good right and lawful authority to sell and convey said land; and that said land is free of all encumbrances except taxes accruing subsequent to 12/31/2014, and any other matters referenced herein; and hereby warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through or under the said grantor, but against none other.

IN WITNESS WHEREOF, the said grantor has caused these presents to be executed in its name, and its corporate seal to be hereunto affixed, by its proper officers duly authorized, the day and year first above written.

(CORPORATE SEAL)

Signed, and sealed and delivered in presence of:

Pulte Home Corporation, a Michigan corporation

BY: _____

    Jose Rosario
    Closing Coordinator

_____
Witness Signature

Tracy Minerley
Printed Name of First Witness

_____
Witness Signature

_____
Printed Name of Second Witness

**Grantee Address:**
9401 Collins Ave Apt 1103
Surfside, FL 33154

STATE OF Florida  )
COUNTY OF Orange )

The foregoing instrument was acknowledged before me this May 22, 2015 by Jose  Rosario, Closing Coordinator of Pulte Home Corporation, a Michigan corporation, on behalf of the corporation.  He/she is personally known to me or produced _____ as identification.

_____
Notary Public

_____
Printed Name
My Commission Expires:
(SEAL)

TRACY A. MINERLEY
Commission # FF 4797
My Commission Expires
May 25, 2017

EXHIBIT "I"

DOC # 20150549700 B: 10988 P: 9304
10/16/2015 07:58 AM  Page 1 of 1
Rec Fee: $10.00
Deed Doc Tax: $0.70
Mortgage Doc Tax: $0.00
Intangible Tax: $0.00
Martha O. Haynie, Comptroller
Orange County, FL
Ret To: SIMPLIFILE LC

| | |
|---|---|
| Prepared by/return to: | Luisa F. Rengifo, Esq.<br>2800 Weston Rd., #103<br>Weston, FL 33331 |
| Parcel ID Number: | 01-24-27-7140-00-640 |

## QUITCLAIM DEED

THIS QUITCLAIM DEED executed this 14th of October, 2015 by GRANTOR, **ROBERTO ROMAGNOLI and MARIA ANTONIETA LAVIOSA, husband and wife,** , with a mailing address is 9401 Collins Ave., Apt. 1103, Surfside, FL 33154, and GRANTEE **ROBERTO ROMAGNOLI and MARIA ANTONIETA LAVIOSA as Trustees, or their successors in interest, of THE VAROMA JOINT REVOCABLE LIVING TRUST**, under agreement dated October 14, 2015, and any amendments thereto, with a mailing address of 9401 Collins Ave., Apt. 1103, Surfside, FL 33154.

("Grantor " and "Grantee" are used for singular or plural, as context requires)

**WITNESSETH**, that Grantor, for and inconsideration of the sum of $10.00 (TEN DOLLARS), and other good an valuable consideration paid in hand by Grantee, the receipt whereof is hereby acknowledged, does hereby remise, release and quit-claim unto Grantee, and unto Grantee's heirs, successors and assigns forever, all the right, title, interest, claim, and demand which said Grantor has in, and to, the following described lot, piece, or parcel of land in Orange County, Florida:

**WITH A LEGAL DESCRIPTION OF:**

**Lot 64, ROYAL LEGACY ESTATES, according to the plat thereof, as recorded in Plat Book 81, Page(s)125 through 129, Public Records of Orange County, Florida**

**PARCEL ID NUMBER:** 01-24-27-7140-00-640

**SUBJECT TO** easements, reservations, restrictions of record, if any, and to real estate taxes for the year 2012 and all subsequent years.

**NOTE**: THIS DEED IS BEING PREPARED WITHOUT THE BENEFIT OF TITLE SEARCH, TITLE EXAMINATION OR SEARCH IN THE PUBLIC RECORDS.

**TO HAVE AND TO HOLD** the same together with all and singular appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity, and claim whatsoever of Grantor, either in law or equity, to the only proper use, benefit, and behalf of Grantee forever.

ROBERTO ROMAGNOLI

MARIA ANTONIETA LAVIOSA

**IN WITNESS WHEREOF**, Grantor has hereunto set their hand(s) and seal(s) the day and year first above written. Signed, sealed and delivered in the presence of:

Witness (1) Signature

Jacqueline Rodriguez
Printed Name (1)

Witness (2) Signature

**Luisa F. Rengifo**
Printed Name (2)

STATE OF FLORIDA          )
COUNTY OF BROWARD          )

The foregoing instrument was acknowledged before me this 14th of October, 2015, by **ROBERTO ROMAGNOLI** and **MARIA ANTONIETA LAVIOSA** and who appeared before me, and they to produced Fl Drivers Licenses as valid identification.

Witness my hand and official seal.

Notary Signature

# EXHIBIT "J"

## ERRATA SHEET

ESQUIRE JOB ID: J5663845

CASE CAPTION:    IN RE: ROBERTO ROMAGNOLI
Case No.: 19-26521-LMI
U.S. Bankruptcy Court, Southern District of Florida, Miami Division

### DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the Errata Sheet attached hereto, with the understanding that I offer these changes as if still under oath.

Signed on the _30_ day of _July_, 2020.

_____
ROBERTO ROMAGNOLI

## DEPOSITION ERRATA SHEET

- Page 50, Lines 10-11:
  Change from "We wanted Concept International Realty owning the property."
  Change to "We did not want Concept International Realty owning the property."

- Page 54, Lines 1-3:
  When Marova was created I was a managing member, but I was not the only managing member.  My wife and I both have been the managing members of the company since it was formed in March 2011.

- Page 61, Lines 22-25:
  As of April 2014, I was a managing member of Marova, but I was not the only managing member.  My wife and I both have been the managing members of the company since it was formed in March 2011.

- Page 62, Line 8 to Page 63, Line 13:
  My wife and I both have been the managing members of the company since it was formed in March 2011.  When I was asked these questions, I had not seen the Marova operating agreement in quite some time, which I was shown later in the deposition.  I don't recall any time when only one of us was a manager member of Marova.

- Page 64, Lines 5-11:
  I meant that my wife controls Concept International Realty, the business operating at the property owned by Marova, as she is the real estate broker of that company.   There is nothing to "control" regarding Marova because it only owns the property where Concept International Realty's office is located.  Any decisions to be made regarding Marova would relate to the ownership of the property, and my wife and I would make those decisions together.

- Page 72, Lines 6-9:
  After seeing the March 2011 operating agreement later in my deposition, it helped me to recall that my wife and I owned Marova 100% as tenants by the entireties from the beginning.

- Page 76, Line 22 to Page 77, Line 4:
  The co-debtor on this American Express business card is Concept International Realty, not my wife.  I had applied for this business card on behalf of Concept International Realty and the business was the co-debtor.

- Page 82, Lines 1-11:
  I did not say that even if I had the money, I wouldn't pay them.  I said that even if I had the money, I didn't know if I could pay them because it was too much money and I didn't have it.

- Page 86, Lines 2-3:
  Change from "They ordered us – …."
  Change to "They outvoted us - …."

- Page 124, Line 19:
  Change from "So what they did, they went on our bank…."
  Change to "So what they did, they went around our back…."